

United States District Court
Southern District of Texas
FILED

SEP 2 6 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO       §
                             §
VS.                          §       CIVIL ACTION NO.    B-02-176
                             §            (JURY REQUESTED)
TITAN TIRE CORPORATION OF     §
TEXAS, and RUSSELL ASH        §

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, TITAN TIRE CORPORATIONS OF TEXAS and RUSSELL ASH, named

Defendants in the above-styled and numbered cause and files this their Motion for Summary

Judgment and in support thereof, would respectfully show unto the court as follows:

**I.**

## EXHIBITS

Exhibit A –    Plaintiff's First Amended Complaint

Exhibit B --   Plaintiff's deposition testimony

Exhibit C –    Plaintiff's employment records indicating her rate of pay

Exhibit D –    Excerpts from Johnny Garcia's deposition testimony

Exhibit E --   Titan Tire Employee Handbook

Exhibit F --   Titan Tire sexual harassment training sign-in sheet

Exhibit G --   Excerpts from Steve Harrison's deposition testimony

## IV.

## ARGUMENTS AND AUTHORITIES

The Plaintiff has brought claims pursuant to Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act. (See Plaintiff's First Amended Complaint attached hereto as Exhibit "A "). The Texas Commission on Human Rights Act is intended to carry out the policies of Title VII of the Civil Rights Act of 1964. Tex. Labor Code Ann. Sec. 21.001(1). Texas courts may consider analogous federal case law, focusing on Title VII, in the interpretation and application of the Texas Commission on Human Rights Act, since the state statute tracks its federal counterpart. *Graves v. Komet*, 982 S.W.2d 551, 554 (Tex.App.–San Antonio 1998, no writ); *Trico Technologies Corp. v. Rodriguez*, 907 S.W.2d 650, 652-53 (Tex.App.–Corpus Chrisit 1995, no writ); *Benavides v. Moore,* 848 S.W.2d 190, 193  (Tex.App.–Corpus Christi 1995, writ denied); *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex.1996).  Therefore, any arguments and authorities set forth within Defendant's Motion for Summary Judgment relate to Plaintiff's claims pursuant to both Title VII and the Texas Commission on Human Rights.

## V.

## STANDARD FOR DETERMINING EMPLOYER LIABILITY

Plaintiff claims that she was subjected to sexual harassment by her supervisor at Titan Tires. In *Casiano v. AT&T Corp.*, the Fifth Circuit adopted what is known as the *Ellerth/Faragher* road map, promulgated by the United States Supreme Court, when deciding whether or not an employer could be held liable for its employee's sexual harassment where the offending employee is the plaintiff's supervisor. *Casiano v. AT&T Corp.*, 213 F.3d 278 (5th Cir.2000).  Applying this road map, the Fifth Circuit set forth the following steps:

4

First, courts are required to determine whether the plaintiff has suffered a tangible employment action. *Id.* at 283. If the plaintiff has suffered a tangible employment action, the lawsuit is classified as a quid pro quo case. *Id.* If the plaintiff has not suffered a tangible employment action, the lawsuit is classified as a hostile environment case. *Id.*

Once the case has been classified as a hostile environment case, the next inquiry is whether the supervisor's actions were severe and pervasive. If the supervisors actions were not severe and pervasive, then there is no Title VII liability. *Id.* If the supervisors actions were severe and pervasive, the employer will have to establish the *Ellerth/Faragher* affirmative defense in order not to be held liable for its supervisor's actions.

The *Ellerth/Faragher* affirmative defense involves two steps. First, the employer must establish that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. Second, the employer must establish that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or otherwise failed to avoid harm. *Id.*

## VI.

## NO TANGIBLE EMPLOYMENT ACTION

Tangible employment actions "require an official act of the enterprise, a company act," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998). A tangible employment action "'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Id.* at 761. A demotion without change in pay, benefits, duties, or prestige

5

does not amount to a tangible employment action. *Id.* Additionally, a reassignment to a more inconvenient job is insufficient *Id.*

In the present case, the Plaintiff did not suffer a tangible employment action. She was employed by Titan Tires as a tire builder. Eventually, she was promoted to tire builder supervisor. She remained as a tire builder supervisor until she resigned. Although she testified that at one point after being promoted to supervisor she was moved back to tire builder, she also testified that this move was only for a few of weeks, and she became a supervisor again. (See page 77, lines 2-12 of Plaintiff's deposition testimony attached hereto as Exhibit "B"). She also testified that during that time, her rate of pay never changed. (See page 78, lines 11-13 of Exhibit "B"). Her personnel records also indicate that once she was promoted to supervisor, she remained as supervisor until she resigned. (See Exhibit "C"). Therefore, the Plaintiff did not suffer a tangible employment action, and her lawsuit must be classified as a hostile environment claim, and the Plaintiff must prove that supervisor's actions were severe and pervasive.

**VII.**

**PLAINTIFF HAS FAILED TO ESTABLISH A HOSTILE WORK ENVIRONMENT**

In Plaintiff's First Amended Petition, Plaintiff alleges that she was subjected to a hostile work environment. Specifically, she alleges that Russell Ash's "conduct was sufficiently pervasive to alter the terms and conditions of Plaintiff's employment and created a working environment that was intimidating, insulting, and abusive to female employees." (See paragraph III of Exhibit "A").

The United States Supreme Court has set out the applicable standard for what constitutes a hostile work environment: "Title VII is violated when the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to create a discriminatory hostile or abusive working environment." *Meritor Savings Bank, FSB. v. Vinson,* 477

6

U.S. 57, 64, 67, 106 S.Ct. 2399, 2405-406, 91 L.Ed.2d 49 (1986). "To find merit in a hostile environment claim, we must conclude the conduct complained of expresses extreme insensitivity against women and is so egregious in nature as to alter the conditions of employment and destroy women's equal opportunity in the workplace. A less onerous standard, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance would not serve the goal of equality and, further, would insulate women, mandating not equality but preference." *DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 593 (5th Cir. 1995).

In determining whether an environment is hostile or abusive the following factors must be considered: "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

Furthermore, a plaintiff alleging that she was constructively discharged based on a hostile work environment needs to meet an additional burden to prevail on a claim based on constructive discharge. The Plaintiff must prove that the "employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65 (5th Cir. 1980).

## Acts complained of do not rise to the level of sexual harassment

Plaintiff testified  that Russell Ash asked her to have a beer with him on three separate occasions, September, October and November of 2000.  He engaged in no other unwelcome behavior. (See pages 99, 100, and page 101 lines 1-6 of Exhibit "B").  The three instances that the

Plaintiff alleges Russell Ash asked her out do not rise to the level of sexual harassment. They are not severe and do not express extreme insensitivity against women. These acts were not physically threatening or humiliating. They do not expresses extreme insensitivity against women, since not only female employees but also male employees were treated the same by Russell Ash. Arguably, asking a co-worker out for a beer is not a sexual advance. However, even incidental or occasional sexual comments do not give rise to a hostile work environment claim. *Prigmore v. Houston Pizza Ventures, Inc.*, 189 F.Supp.2d 639, (S.D.Tex. 2002); *Faragher v. City of Boca Rotan*, 524 U.S. 744, 188 S.Ct. 2275 (1998). The three incidents, Plaintiff complained of occurred over a four month period. (See page 100 of Exhibit "B"). Since this is the only behavior complained of, it does not constitute a severe or pervasive environment. *Guidry v. Zale Corp.*, 969 F.Supp. 988 (M.D.La. 1997) (holding that three isolated incidents that occurred over a period of six or more months did not constitute a hostile work environment). In fact, the Fifth Circuit has held that even more severe conduct than what the Plaintiff has complained of in the present case did not constitute a hostile work environment. In *Shepard v. Comptroller of Public Accounts*, the Court held that there was no sexual harassment where the employee made crude remarks about the plaintiff's anatomy, rubbed her shoulder, touched her arm on several occasions, and motioned to her for her to sit on his lap. *Shepard v. Comptroller of Public Accounts*, 168 F.3d 871 (5th Cir.1999). Plaintiff complains only that Russell Ash asked her to go for a beer three times, and nothing more. He did not make sexual comments to her, did not ask her on a date, nor did he make any other sexual advances such as touching her in any way. Clearly, the conduct Plaintiff complains of does not rise to the level of sexual harassment.

**Russell Ash's conduct toward the Plaintiff was not based on her sex**

The Plaintiff also testified that after the first time Russell Ash asked her to go for a beer, he became aggressive toward her. (See page 108, lines 11-18 of Exhibit "B"). She testified that Russell Ash yelled at her and told her that she was not doing her job. (See page 89, lines 16-23 of Exhibit "B"). However, the fact is that she was not doing her job. She admitted to having problems meeting production goals. (See page 40, lines 10-25 of Exhibit "B"). She testified that aside from having problems with the materials and the machinery, there were times her employees simply did not want to work, and told her so. (See page 51, lines 17-25, page 52, lines 1-12 of Exhibit "B"). She testified that when she timed the tire builders to see how long it took them to build a tire, she encountered even greater resistance. (See page 52, lines 1-12 of Exhibit "B'). She testified the employees worked slower, because they did not like to be timed. (See page 52, lines 1-12 of Exhibit "B"). Therefore, Plaintiff's testimony that Ash reprimanded for not doing her job and not meeting her production goals was apparently true.

Supervisors are responsible for ensuring that their daily production goals are met, and it is only logical to expect that the plant manager would reprimand his supervisors if the job was not getting done. In fact, Russell Ash is not the only one to reprimand her for her lack of production. She testified that she was reprimanded by other supervisors at the plant as well. (See page 41, lines 2-6 of Exhibit "B").

Moreover, there is no evidence to suggest that Russell Ash's aggressive behavior toward her was in any way related to her sex. Instead, the evidence establishes that Russell Ash was aggressive toward all employees, and the Plaintiff cannot prevail on her sexual harassment claim since the evidence in this case shows that Russell Ash treated both male and female employees the same. Evidence that other similarly situated male and female employees were treated the same by the

9

alleged harasser will defeat Plaintiff's claim that she was discriminated against because of her sex. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995).

In *Ray*, the plaintiff brought suit against her employer pursuant to Title VII. She alleged that she was discriminated against because of her sex. Her employer produced evidence which showed that the plaintiff's supervisor treated both male and female employees the same. The plaintiff also admitted that her supervisor was an "even-handed harasser" who treated all of his employees poorly. *Id.* The court held that Title VII "does not exist to punish poor management skills; rather, it exists to eliminate certain types of bias in the workplace." *Id.* The court affirmed summary judgment in favor of the plaintiff's employer, holding that the plaintiff could not establish a sexual harassment claim, because other similarly situated male and female employees were treated the same. *Id.*

In the present case, evidence from the Plaintiff's own witness shows that Russell Ash treated all his employees in the same aggressive manner. Johnny Garcia was a supervisor with Titan Tires, and witnessed Russell Ash's aggressive management style. Johnny Garcia testified that Russell Ash used his aggressive management style with all Titan employees to get the job done. He also testified that other employees complained that Russell was mean and aggressive toward them. (See Johnny Garcia's deposition testimony attached hereto as Exhibit "D").

> Q:    Didn't anybody ever tell you, complain to you about Russell?
> A:    There was a lot of people, I would say, complained.
> Q:    Well, what was it that they complained about?
> A:    I guess the way he – his character, I guess.
> Q:    What about his character?
> A:    Him being just, I guess, what they called, I guess, mean, mad.

Page 44, lines 23-25; page 45, lines 5-8.

> Q:    Would you agree with me that he's an aggressive manager?
> Q:    And would you agree that Russell, he wanted things – was harsh?
> A:    I guess, yeah.
> Q:    Okay. Would you – would you agree that when Russell wanted something done he
>       was going to – you know, you had to get it done; would you agree with that?

10

A:    Well, yeah.
Q:    Okay. You didn't like his management style, did you?
A:    No.
Q:    Okay. Well, would you agree with me that he – Russell's management style, he used it with everybody, it wasn't just to you; would you agree with me?
A:    I guess.
Q:    Would you agree that a lot of people didn't like the way Russell – his management style?
A:    Uh-huh, yes.
Q:    And when you say a lot of people complained about his character as being mean and mad, that's what they were complaining about, Russell being an aggressive manager?
A.    Yeah, yes.

Pages 53, lines 1, 2, 9-14, 17-21, 24-25; page 54, lines 1-5, 7-10, 12-16, 19.

Even the Plaintiff testified that Russell treated other supervisors and employees the same way as he treated her. She testified that Russell used foul language when he spoke to other supervisors, and was aggressive and mean to other supervisors as well. (See page 81, lines 22-25; page 82, lines 1-9, page 83, lines 1-18 of Exhibit "B"). Therefore, the Plaintiff was not being singled out by Russell Ash because she was a woman. The evidence shows that Russell Ash treated all employees at Titan Tire the same. Russell Ash used his aggressive management style with all employees. In fact, other employees, aside from the Plaintiff, characterized him as mean and mad, and they did not like his management style. Since the evidence shows that both male and female employees were treated the same by Russell Ash, Defendants are entitled to summary judgment. *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995).

The fact is that the Plaintiff worked in a setting in which the ultimate goal was production. Everyone employed at the tire plant had to work to meet production goals. Management styles vary depending on the individual. A manager has to do whatever it takes to meet the plant's production goals, sometimes this means being aggressive. As the Fifth Circuit has emphasized, "Title VII is not a general civility code for the American workplace." *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258 263 (5th Cir. 1999). Being a supervisor, the Plaintiff needed to meet her production goals, and could expect to be reprimanded for not doing so.

11

The evidence does not support an inference that Ash's conduct was directed towards Plaintiff because of her gender, but rather that he treated all employees, males and females with the same aggressive, loud management style. Therefore, Defendants are entitled to dismissal of these claims.

## VIII.

## CONSTRUCTIVE DISCHARGE

The Plaintiff resigned from her employment at Titan Tire. She claims that she was constructively discharged based on a hostile work environment. However, since the Plaintiff's sexual harassment claims based on a hostile work environment fail, the Plaintiff's constructive discharge claim must also fail. The Fifth Circuit has held that in order to prove constructive discharge, the plaintiff must demonstrate a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992). The evidence in this case does not support a claim for hostile work environment, therefore, Plaintiff cannot maintain a cause of action based on constructive discharge.

## VIII.

## DEFENDANT'S AFFIRMATIVE DEFENSE

Even if the court finds that the conduct the Plaintiff complains of was severe or pervasive, Titan Tires can establish the *Ellerth/Faragher* affirmative defense, and is therefore, not liable for Plaintiff's Title VII sexual harassment claims.

First, Titan Tires exercised reasonable care to prevent any sexually harassing behavior. Titan Tires implements a policy strictly prohibiting sexual harassment by any employee. This policy is included in the Titan Tire Employee Handbook. (See Exhibit "E"). The policy reads in pertinent part: Neither the Company, nor anyone working at the Company will tolerate discrimination on the basis of race, color, sex, creed, religious belief, handicap, national origin, or age. The policy goes on to define what constitutes sexual harassment, and states that sexual harassment will not be

12

tolerated. The policy also provides the procedures for reporting sexual harassment as follows: Report the harassment to your supervisor and/or Human Resources Manager as soon as possible. If your supervisor is the one harassing you, you may report it to the Human Resources Manager, Corporate Human Resources Department or Operations Manager whichever you feel most comfortable. The policy states that a confidential investigation into all incidents of harassment be conducted. (See pages 33-34 of Exhibit "E")

Additionally, Titan Tires holds sexual harassment training that each employee is required to attend. The Plaintiff received this training. (See Exhibit "F", the sign-in sheet wherein Plaintiff, Guillermina Montelongo, signed-in). This first step requires that an employer to correct any sexually harassing behavior; however, the Plaintiff testified that she never reported the sexual harassment to Titan Tires, so it never had an opportunity to correct the sexually harassing behavior. (See page 113, lines 8-17 of Exhibit "B"). She testified that she did not report the alleged sexual harassment, because she needed her job, and she was afraid she would be terminated. (See page 113, lines 14-17 of Exhibit "B"). However, several jurisdictions have held that an employee's fear of retaliation is not a valid reason for not reporting the alleged conduct to her employer. *Young v. R.R. Morrison and Son, Inc.,* 159 F.Supp.2d 921 (N.D.Miss. 2000); *Madray v. Publix Super Mkts., Inc.,* 30 F.Supp.2d 1371 (S.D.Fla.1998); *Taylor v. Nickels and Dimes, Inc.,* 2002 WL 1827657 (N.D.Tex).

Second, the Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Titan Tires. The Plaintiff received a copy of the employee handbook and received sexual harassment training; therefore, she was well aware of the policies and procedures for reporting sexual harassment. Despite this, she failed to take advantage of these procedures. The Plaintiff testified that she reported the alleged sexual harassment to her supervisor, Steve Harrison. However, she also testified that Steve Harrison did nothing about it. (See page 106, lines 8-23, page 113, lines 8-12 of Exhibit "B"). The Plaintiff never told anyone else about her complaints, until after

13

her she resigned. There were a number of other supervisors, and a human resources director that she could have gone to, but she did not. An employer cannot be held liable if it had no knowledge of the sexual harassment complaints. The *Ellerth/Faragher* affirmative defense requires an employee to reasonably take advantage of the employer's preventative measures in order for an employer to be held liable. Since, as the Plaintiff testified, that she did not report the alleged sexual harassment, because she feared retaliation, Titan Tires cannot be held liable. *Young v. R.R. Morrison and Son, Inc.,* 159 F.Supp.2d 921 (N.D.Miss. 2000). To hold an employer liable for failing to correct actions it had no knowledge of would be a complete injustice.

She testified that she told Steve Harrison about Russell Ash's conduct, but he did nothing about it, and she does not remember him telling her to report it to anyone. (See page 106, lines 8-23, page 113, lines 8-12 of Exhibit "B"). Steven Harrison testified that the Plaintiff told him about Russell Ash's conduct to her the following spring, months after the occurrence. (See page 80, lines 5-21 of Steve Harrison's deposition testimony attached hereto as Exhibit "G ") Steve Harrison claims that he reported this to the human resources director, but he does not know if the human resources director did anything about it. (See page 82, lines 11-23, page 90, lines 4-9 of Exhibit "G"). However, Steve Harrison's testimony is completely unreliable and biased, since he too is suing Titan Tires and Russell Ash for age discrimination. (See page 150, lines 3-17 of Exhibit "G"). Nonetheless, this Court should not have to reach the affirmative defense since the conduct was not severe and pervasive enough to constitute a hostile environment.

Titan Tires established both elements of its affirmative defense: it had a sexual harassment policy in place, and provided sexual harassment training to all employees in order to prevent sexual harassment, and the Plaintiff did not reasonably take advantage of these policies. Therefore, it is not liable for Plaintiff's Title VII sexual harassment claims.

14

## VII.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Plaintiff has alleged a cause of action for intentional infliction of emotional distress as against Russell Ash. To recover damages for intentional infliction of emotional distress the Plaintiff must prove the following: "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *GTE Southwest, Inc., v. Bruce*, 998 S.W.2d 605 (Tex.1998).

The Plaintiff does not have legally sufficient evidence to establish the necessary elements for a case of intentional infliction of emotional distress. The Texas Supreme Court has held that in order to establish that the conduct complained of was extreme and outrageous, the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. The Court also held that insensitive, rude behavior, mere insults, indignities, threats, annoyances, or petty oppressions do not constitute extreme and outrageous conduct. *Id*.

Applying this standard, the Plaintiff in the present case cannot support the elements of a cause of action for intentional infliction of emotional distress. Plaintiff testified that Russell Ash asked her to have a beer with him on three separate occasions, and that is the extent of his unwelcome conduct. She also testified Ash began to treat her unfavorably after the first invitation but before the second and third. She testified that Russell Ash yelled at her on several occasions and told her that she was not doing her job. This conduct is not so outrageous in character or so extreme in degree, as to go beyond all possible bounds of decency. Furthermore, the acts complained of are not atrocious or utterly intolerable. In fact, as set forth above, other Titan Tire employees were subjected to the same treatment by Russell Ash. These employees complained about Russell, but continued working at Titan Tire.

15

Moreover, termination itself is insufficient to state a claim for intentional infliction of emotional distress. *Taylor v. Houston Lighting & Power*, 756 F.Supp. 297, 298 (S.D.Tex. 1991). In order to prevail on a claim for intentional infliction of emotional distress based on termination of employment, the plaintiff must prove that the termination was affected in an extreme and outrageous manner. *Farrington v. Sysco Food Services, Inc.,* 865 S.W.2d 247 (Tex.App. – Houston, 1993)*; citing Diamond Shamrock Refining and Marketing Co., v. Mendez*, 844 S.W.2d 198, 202 (Tex.1992). In fact, in the present case, the Plaintiff cannot prove that her termination was done in an extreme and outrageous manner, because she quit. Therefore, she cannot prevail on her claim for intentional infliction of emotional distress claim, and this claim should be dismissed as a matter of law.

## VIII.

## RUSSELL ASH IS NOT A PROPER DEFENDANT

Plaintiff has brought suit against Russell Ash pursuant to the Civil Rights Act of 1964, Title VII and the Texas Commission on Human Rights Act. Russell Ash was a supervisor at Titan Tires of Texas. Both Title VII and the Texas Commission on Human Rights Act require that suits be brought against employers, not individual supervisors. Therefore, individual employees, supervisors, or managers cannot be held liable. *Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir. 1994), *cert denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994)*;DeMoranville v. Specialty Retailers, Inc.*, 909 S.W.2d 90 (Tex.App.–Houston [14[th] Dist.] 1995), rev'd on other grounds, 933 S.w.2d 490 (Tex. 1996); *Tex. Labor Code Ann. Sec.* 21.051. Since Russell Ash was not an employer, he cannot be held liable under Title VII or the Texas Commission on Human Rights Acts. Therefore, any claims brought against Russell Ash pursuant to Title VII or the Texas Commission on Human Rights Act should be dismissed.

## VIII.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants, TITAN TIRE CORPORATION

OF TEXAS and RUSSELL ASH, respectfully request the Court grant this its Motion for Summary

Judgment, dismiss all of Plaintiff's claims against it with prejudice, enter a take-nothing judgment

in Defendant's favor as to all of Plaintiff's claims against it, grant the Defendants its attorney's fees,

expenses and court costs, and grant Defendants such other and further relief to which it may be justly

entitled.

Signed on this 26 day of September, 2003.

Respectfully submitted,
**WILLETTE & GUERRA, L.L.P.**
3505 Boca Chica Blvd., Suite 460
Brownsville, Texas 78520
Telephone (956) 541-1846
Facsimile (956) 541-1893

By: _Eileen Leeds wp mm_
Eileen M. Leeds
State Bar No. 00791093
Federal No. 16799

Attorney for Defendants Titan Tire Corporation of
Texas and Russell Ash

17

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document, has been sent to the following via Certified Mail, return receipt requested on September 26, 2003.

Mr. Michael R. Cowen,
Michael R. Cowen, P.C.
765 E. 7th Street, Ste. A
Brownsville, Texas 78520

Mr. Carlos Cisneros
Mr. Chuck Mattingly
Cisneros & Mattingly, P.C.
845 E. Harrison
Brownsville, Texas 78520

Eileen M. Leeds

## CERTIFICATE OF CONFERENCE

The local rules do not require a certificate of conference for this motion.

Eileen M. Leeds

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GUILLERMINA MONTELONGO | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.    B-02-176 |
| | § | (JURY REQUESTED) |
| TITAN TIRE CORPORATION OF | § | |
| TEXAS, and RUSSELL ASH | § | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this the _____ day of _____, 2003, came on for consideration Defendant's Motion For Summary Judgment. Having examined same and considered the arguments of counsel, this Court is of the opinion that said Motion should be GRANTED.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is GRANTED. It is further ORDERED that all of Plaintiff's claims against Defendant are hereby DISMISSED with prejudice.

All relief requested and not granted is hereby denied.

SIGNED on this _____ day of _____, 2003.

_____
JUDGE PRESIDING

xc:

Eileen M. Leeds, WILLETTE & GUERRA, L.L.P., 3505 Boca Chica, Ste. 460 , Brownsville, Texas 78521
Mr. Michael R. Cowen, Michael R. Cowen, P.C., 765 E. 7th Street, Ste. A, Brownsville, Texas 78520
Mr. Carlos Cisneros, Mr. Chuck Mattingly, Cisneros & Mattingly, P.C., 845 E. Harrison, Brownsville, Texas 78520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GUILLERMINA MONTELONGO | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.   B-02-176 |
| | § | (JURY REQUESTED) |
| TITAN TIRE CORPORATION OF | § | |
| TEXAS, and RUSSELL ASH | § | |

## ORDER SETTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this _____ day of _____, 2003, came on to be considered

Defendant's Motion for Summary Judgment in the above styled and numbered cause.

IT IS THEREFORE ORDERED that said Motion for Summary Judgment be and is hereby

set for hearing on the _____ day of _____, 2003, at _____.m. in this Honorable

Court.

SIGNED FOR ENTRY this _____ day of _____, 2003.

_____
JUDGE PRESIDING

cc:

Eileen M. Leeds, WILLETTE & GUERRA, L.L.P., 3505 Boca Chica, Ste. 460 , Brownsville, Texas 78521
Mr. Michael R. Cowen, Michael R. Cowen, P.C., 765 E. 7th Street, Ste. A, Brownsville, Texas 78520
Mr. Carlos Cisneros, Mr. Chuck Mattingly, Cisneros & Mattingly, P.C., 845 E. Harrison, Brownsville, Texas 78520

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GUILLERMINA MONTELONGO | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-02-176 |
| | § | JURY DEMANDED |
| TITAN TIRE CORPORATION OF TEXAS | § | |
| and RUSSELL ASH | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Guillermina Montelongo files this Amended Complaint against Defendants Titan

Tire Corporation of Texas and Russell Ash, seeking compensatory and exemplary damages as a

result of the sexual harrassment and other workplace torts that Defendants committed.

## I.
## PARTIES

1.1     Plaintiff is an individual residing in Cameron County, Texas.

1.2     Defendant Titan Tire Corporation of Texas is a Texas corporation with its principal place of

business in Brownsville, Texas.  It may be served by personal service upon its registered

agent, Titan Wheel International, Inc., 6700 Parades Line Road, Brownsville, Texas 78520.

1.3     Defendant Russell Ash is a United States Citizen residing in Uruguay.  He may be served

with process at his current place of employment, FUNSA, Camino Corrales 3076, P.O. Box

15-175, District No. 5, 12000, Montevideo, Uruguay.

## II.
## VENUE & JURISDICTION

2.1     The unlawful employment practices alleged in this Complaint were committed in Cameron

County in the Southern District of Texas.

EXHIBIT
A
ALL-STATE LEGAL®

2.2    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. sections 1337 and 1343(4) and 42 U.S.C. section 2000e-5(f). Plaintiff also invokes the Court's pendent jurisdiction. This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, the Texas Labor Code, and the common law.

## III.
## BACKGROUND

3.1    Guillermina Montelongo ("Plaintiff") began working for Defendant Titan Tire Corporation of Texas ("Titan") on or about November 30, 1998.

3.2    Defendant Russell Ash was Plaintiff's supervisor.

3.3    Ash made repeated romantic advances toward Plaintiff.

3.4    Plaintiff declined each of Ash's advances.

3.5    The very first time Ash asked Plaintiff out, Plaintiff declined and said she did not drink and that she was married.

3.6    Because of Ash's unwelcome advances, Plaintiff sought medical attention at Valley Doctor's Clinic in or around October 2000. A doctor wrote a note to Titan saying that Plaintiff needed time off due to stress and symptoms of severe depression.

3.7    When Ash discovered his attempts at wooing the Plaintiff had failed, Ash retaliated by demoting Plaintiff.

3.8    After demoting her, Ash continued to retaliate against the Plaintiff by harassing her. Once, in front of other employees, Ash said he "needed to fire [Plaintiff] or find a way to fire [Plaintiff] because [she] was a fucking bitch." In addition, Ash constantly yelled at Plaintiff.

3.9    Defendant Ash's conduct was sufficiently pervasive to alter the terms and conditions of Plaintiff's employment and created a working environment that was intimidating, insulting

and abusive to female employees.

3.10    As a result of Ash's sexual harassment, Plaintiff was obliged to resign her employment on or around August 10, 2001 and was thereby constructively discharged.

## IV.
## FIRST CAUSE OF ACTION: TITLE VII VIOLATION

4.1    Defendants discriminated against Plaintiff because of her sex in violation of section 703(a) of Title VII by constructively terminating and otherwise discriminating against her, by engaging in, tolerating or failing to prevent the sexual harassment alleged above and by failing to take affirmative action to correct and redress these unlawful employment practices. Defendants also discriminated against Plaintiff in violation of section 704 of Title VII by constructively terminating her because of her opposition to the unsolicited and unwelcome sexual advances forced upon her and the other sexual harassment in her workplace.

4.2    Plaintiff believes that the effect of the defendants' unlawful employment practices had been to limit, classify and discriminate against females in ways which jeopardize and tend to deprive them of employment opportunities and otherwise adversely affect their status as employees because of their sex in violation of Title VII; and Plaintiff, a victim of such practices, is now and will continue to be unlawfully deprived of income in the form of wages and prospective benefits, and other monetary and non-monetary benefits due to her solely because of her sex in sums to be proved at trial.

4.3    Defendant has acted maliciously or with reckless indifference to Plaintiff's rights under federal law.

4.4    Plaintiff is entitled to recover from the Defendants reasonable attorneys' fees as provided in section 706(k) of Title VII.

## V.
## SECOND CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

5.1     During Plaintiff's employment, Defendant Ash's conduct exceeded the bounds of decency

tolerated in the State of Texas. The harassment which ultimately caused the termination of

Plaintiff's employment was either intended to cause her severe emotional distress or was

perpetrated with reckless indifference to the likelihood that it would cause severe emotional

distress. Defendants are, therefore, liable to the Plaintiff for all damages proximately

resulting from the distress she has suffered relating to Defendant Ash's conduct.

## VI.
## THIRD CAUSE OF ACTION: TEXAS LABOR CODE VIOLATION

6.1     Defendants' discrimination against Plaintiff because of her sex violated the Texas Human

Rights Commission Act.

## VII.
## VICARIOUS LIABILITY

7.1     Defendant Titan is vicariously liable for the misfeasant and malfeasant conduct of its

employees, because those employees are agents of Titan.

## VIII.
## JURY DEMAND

8.1     Plaintiff demands trial by jury.

## IX.
## PRAYER FOR RELIEF

9.1     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that citation be

issued and defendants be served and that Plaintiffs recover judgment against Defendants,

jointly and severally, for actual damages, exemplary damages, prejudgment interest, post-

judgment interest, and court costs.

Respectfully submitted,
MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____

Michael R. Cowen
Texas Bar No. 00795306

Carlos Cisneros
Texas Bar No. 00793508
Chuck Mattingly
Texas Bar No. 00791202
CISNEROS & MATTINGLY, P.C.
845 E. Harrison
Brownsville, Texas 78520
Telephone (956) 504-2260
Facsimile (956) 504-5988

## CERTIFICATE OF SERVICE

I, Michael R. Cowen, P.C., hereby certify that I sent a copy of the foregoing document to all opposing counsel of record in the manner indicated below on this the 2 day of October, 2002.

Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
3505 Chica Blvd, Suite 460
Brownsville, TX 78521

**Via Facsimile (956) 541-1846**
**& Regular U.S. Mail**

_____
Michael R. Cowen, P.C.

## In The Matter Of:

### *GUILLERMINA MONTELONGO*

### *vs.*

### *TITAN TIRE CORPORATION OF TEXAS, ET AL*

---

*Deposition of GUILLERMINA MONTELONGO*

*Taken SEPTEMBER 10, 2003*

---

### *Carolyn Newman, C.S.R.*

### *Pockrus Court Reporting Service*

### *P.O. Box 531786, Harlingen, Tx. 78553*

### *1-800-423-7713*

*E-Mail: PockrusRep@aol.com*



EXHIBIT

B

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
 2               BROWNSVILLE DIVISION
 3  GUILLERMINA MONTELONGO        )
                                  )
 4  VS.                           )  CIVIL ACTION NO. B-02-176
                                  )      (JURY REQUESTED)
 5  TITAN TIRE CORPORATION OF     )
    TEXAS AND RUSSELL ASH         )
    *********************************************
         ORAL AND VIDEOTAPED DEPOSITION OF
            GUILLERMINA MONTELONGO
              SEPTEMBER 10, 2003
    *********************************************
16       ORAL AND VIDEOTAPED DEPOSITION of GUILLERMINA
17  MONTELONGO, produced as a witness at the instance of the
18  Defendants, and duly sworn, was taken in the above-styled
19  and numbered cause on the 10th day of September, 2003,
20  from 3:47 p.m. to 6:09 p.m. before Carolyn Newman, CSR in
21  and for the State of Texas, reported by oral stenography,
22  at the offices of Michael R. Cowen, P.C., 520 East Levee
23  Street, Brownsville, Texas, pursuant to the Federal Rules
24  of Civil Procedure and the provisions stated on the
25  record or attached hereto
```

**Page 2**

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF
       Mr. Carlos Cisneros
 3     Mr. Charles E. Mattingly, Jr
       CISNEROS & MATTINGLY. P C
 4     845 East Harrison. Suite A
       Brownsville. Texas  78520
    FOR THE DEFENDANT
 6     Ms Eileen M Leeds
       Ms Melanie A. Moore
 7     WILLETTE & GUERRA. L L.P.
       International Plaza. Suite 460
 8     3505 Boca Chica Boulevard
       Brownsville. Texas  78521
    ALSO PRESENT.
10     Mr Russell Ash, Defendant
       Mrs Claudia Garza, Videographer
11     Mr. Julio Galvan, Interpreter
       Ms Carolyn Newman, CSR
```

**Page 3**

```
 1          T A B L E  O F  C O N T E N T S
 2                                            PAGE
 3  AGREEMENTS OF COUNSEL . . . . . . . . . . . . .  4
 5  EXAMINATION OF GUILLERMINA MONTELONGO
 6     By Ms. Leeds  . . . . . . . . . . . . . . .  6
 7     By Mr. Mattingly  . . . . . . . . . . . . . 121
 9  FILING CERTIFICATION . . . . . . . . . . . . . 123
10  CHANGES AND SIGNATURE  . . . . . . . . . . . . 125
11  WITNESS' SIGNATURE CERTIFICATE . . . . . . . . 126
13  OBJECTIONS
14     Mr. Cisneros  . . . . . . . . . . . . 30, 60, 91
15     Mr. Mattingly . . . . . . . . . . 106, 109, 117
16     Ms. Leeds  . . . . . . . . . . . . . . 25, 54
18  EXHIBITS
19  NO.    DESCRIPTION                 MK'D  ID'D
20  (None were marked)
```

**Page 4**

```
 1               A G R E E M E N T S
 2          It was agreed by and between counsel for the
 3  Plaintiff and Defendant that no objections need be made
 4  by any party at the time of taking said deposition,
 5  except objections as to the form of the question or the
 6  responsiveness of the answer, which if not made during
 7  the deposition are waived; but if and when said
 8  deposition, or any portion thereof, is offered in
 9  evidence at the trial of this cause by any party thereto,
10  it shall be subject to any and all legal objections, such
11  objections to be made at the time of tender, the same as
12  though the witness were on the stand personally
13  testifying;
14          It is further agreed that Mr Julio Galvan may
15  act as the interpreter for the taking of said deposition,
16  and the oath of the interpreter was sworn to;
17          It is further agreed that the original
18  deposition transcript was delivered on the 25th day of
19  September, 2003, for examination and signature and is to
20  be returned to Pockrus Reporting Service. If and when
21  the original deposition transcript is returned with the
22  correction sheet containing the changes made by the
23  witness, if any, a copy of the changes will be forwarded
24  to all counsel of record;
25          It was further agreed that in the event the
```

**Page 5**

1 original deposition is not signed by the witness within
2 thirty (30) days and filed at the time of trial or
3 hearing. that the original or a certified copy of said
4 deposition may be used as though the witness had signed
5 original deposition.
6                        -oOo-

**Page 6**

1  P R O C E E D I N G S
2     THE VIDEOGRAPHER:    The time is 3:46, and
3  you're on the record.
4     (Interpreter sworn)
5  GUILLERMINA MONTELONGO,
6  having been first duly sworn, testified through the duly
7  sworn interpreter as follows:
8  E X A M I N A T I O N
9  BY MS. LEEDS:
10    Q.    Ms. Montelongo, would you please state your name
11 for the record.
12    A.    Guillermina Montelongo.
13    Q.    What's your date of birth?
14    A.    August the 3rd of 1952.
15    Q.    Where were you born?
16    A.    In La Villa, Texas.
17    Q.    Where did you go to school?
18    A.    In La Villa, Texas, and here in Brownsville,
19 Texas.
20    Q.    So did you graduate from high school?
21    A.    I took out my GED.
22    Q.    How many years of schooling did you have?
23    A.    Six.
24    Q.    That was all in English, correct?
25    A.    (Witness answers) Correct.

**Page 7**

1  (Interpreter answers) Correct.
2     Q.    You know how to read, write, and speak English,
3  do you not?
4     A.    (Witness answers) Correct.
5  (Interpreter answers) Correct.
6     Q.    Nonetheless, we are here with an interpreter
7  here today, correct?
8     A.    (Witness answers) Correct.
9  (Interpreter answers) Correct.
10    Q.    But you understand everything I'm saying when I
11 say it in English, don't you?
12    A.    (Witness answers) Correct.
13 (Interpreter answers) Correct.
14    Q.    When – did you have any other training after
15 your GED of an educational sort?
16    A.    No.
17    Q.    When did you get your GED?
18    A.    In 1986.
19    Q.    What was your first job?
20    A.    My first job was working in the field.
21    Q.    Where?
22    A.    In the North.
23    Q.    Do you know what state?
24    A.    Indiana and – and Michigan and Ohio.
25    Q.    Ms. Montelongo, so that this can go a little

**Page 8**

1  more easily, because sometimes since you do understand
2  me, can we try to do this in English, and if you don't
3  understand something, then we use the interpreter?
4     A.    I would prefer the interpreter because there are
5  some big words that I do not understand.
6     Q.    And that's what I mean. When there are those
7  big words, we can use the interpreter with no problem. I
8  have no problem doing that, but when the questions are
9  easy questions such as "Where did you work," and you do
10 understand me, I'm just asking you because it will go a
11 lot quicker if we do this in English.
12    MR. CISNEROS:    (To the witness in Spanish)
13    THE WITNESS:    (In Spanish)
14    MR. CISNEROS:    Okay.
15    A.    Okay.
16    Q.    (BY MS. LEEDS) Okay. How long did you work in
17 he fields, how many years?
18    A.    (Witness in Spanish) I don't remember. It's
19 been a long time.
20    Q.    Okay. What was your next job after the fields?
21    A.    I started working on a hotel as a maid – a room
22 maid cleaning rooms.
23    Q.    Where?
24    A.    Here in Brownsville –
25    Q.    Do you remember –

Page 9

1   A.   – at Motel 6.
2   Q.   Motel 6?
3   A.   Uh-huh.
4   Q.   Which one?
5   A.   The one that used to be on Central Boulevard.
6   Q.   Okay.
7   A.   It's not there anymore.
8   Q.   The one that burned?
9   A.   Yes.
10   Q.   How long did you work there?
11   A.   Only about three months.
12   Q.   Okay. Then where did you work?
13   A.   Then I started working on the Omni (ph) phone.
14   It was...
15   Q.   I'm sorry. I didn't get that. The what?
16   A.   It was a Omni phone company where they used to
17   make parts – electric parts.
18   Q.   Okay. Here in Brownsville?
19   A.   Yes.
20   Q.   How long did you work there?
21   A.   I don't remember, about I think six months more
22   or less.
23   Q.   Okay. Next where did you work?
24   A.   Haggard Slacks.
25   Q.   Do you remember what years you worked there?

Page 10

1   A.   Yes. I started working there in 1973 until
2   1997.
3   Q.   Is that when the plant closed?
4   A.   Yes.
5   Q.   Was that in the Brownsville plant?
6   A.   Yes.
7   Q.   Did they give you a – a compensation package or
8   a separation package or something like that when the
9   plant closed?
10   A.   Yes.
11   Q.   What did they give you?
12   A.   I don't remember the amount, but they do –
13   Q.   Oh, it – it was cash?
14   A.   Not cash. I don't understand the question.
15   Q.   Well, was it money?
16   A.   Yes.
17   Q.   Okay. Where did you next work after Haggard?
18   A.   Then I – let me see. Then I work in the – in
19   the same area in the same plant when they close, but it
20   was from the name of Horace Small plant.
21   THE REPORTER:   Name of what?
22   THE WITNESS:   Horace Small. Horace –
23   MR. CISNEROS:   Horace –
24   THE WITNESS:   – Small.
25   MS. LEEDS:   Oh, Horace.

Page 11

1   MR. CISNEROS:   – Horace, Horace, Horace
2   Small.
3   Q.   (BY MS. LEEDS) Okay.
4   A.   That's the name of the plant.
5   Q.   What did they manufacture?
6   A.   Uniforms.
7   Q.   Okay. What – what did you do at Haggard?
8   A.   When I started to work there?
9   Q.   Sure.
10   A.   I used to – a machine operator sewing –
11   Q.   Okay.
12   A.   – and then operating other machines, a hook
13   machine –
14   Q.   Okay.
15   A.   – pressers.
16   Q.   What were you doing at the end?
17   A.   At the end I was inspecting and operating
18   machines.
19   Q.   Okay. Were you ever a supervisor at Haggar?
20   A.   No, not – not a supervisor.
21   Q.   Okay. What about Horace Small what were you
22   doing?
23   A.   I was operating machines.
24   Q.   How long did you work there?
25   A.   About a year and something more or less.

Page 12

1   Q.   A little over a year?
2   A.   Yes.
3   Q.   Okay. What happened to that job?
4   A.   I quit working there because I got hired in
5   Titan Tire.
6   Q.   Okay. So you started working with Titan around
7   '98 or '99?
8   A.   '98.
9   Q.   '98?
10   A.   (Moving head up and down)
11   Q.   Okay. How – were you ever a supervisor at
12   Horace Small?
13   A.   No.
14   Q.   Okay. At Titan who hired you?
15   A.   I don't remember his name. I think it was
16   Mr. Burnias – Ramiro Burnias.
17   Q.   Ramiro Burnias?
18   A.   Burnias.
19   Q.   What position were you hired for?
20   A.   Well, at first we started cleaning machines –
21   old machines, and then I was put to build tires.
22   Q.   Do you remember when you were changed and put to
23   build tires?
24   A.   No, ma'am, I don't remember.
25   Q.   Okay. How long did you remain in the building

Page 13

1 tires before your next change in the employment there at
2 Titan?
3    A.    I don't remember.
4    Q.    Okay. Do you remember who the operations
5 manager was at the time you started working?
6    A.    Steve Harrison.
7    Q.    Do you remember when it was that – or let me
8 rephrase that. How long were you working when he was no
9 longer operations manager?
10    A.    I don't remember that.
11    Q.    Was it a long time over years, or was it pretty
12 quick after you started working?
13    A.    I don't really understand the question.
14    Q.    Let me – let me reask it. How long were you
15 working there when Steve Harrison stopped being
16 operations manager?
17    (Question translated)
18    A.    (Interpreter answers) I do not remember.
19    Q.    (BY MS. LEEDS) Do you know if it was over a
20 year?
21    A.    No (in Spanish).
22    Q.    Okay.
23    MS. LEEDS:    We need that in English, her
24 answer.
25    THE INTERPRETER:    Oh. "I do not remember."

Page 14

1 Excuse me.
2    MS. LEEDS:    That's okay, that's okay.
3    THE INTERPRETER:    She – she was answering
4 in English and...
5    MS. LEEDS:    That's okay.
6    Q.    (BY MS. LEEDS) Before we go any further, are
7 you married?
8    A.    Yes.
9    Q.    Who – what's your husband's name?
10    A.    Benigno Rico, common – only common law. We're
11 not married –
12    Q.    Okay.
13    A.    – legally.
14    Q.    How – how long have you been married with him?
15    A.    Since 1998.
16    Q.    He worked at Titan Tires, also, right?
17    A.    Yes.
18    Q.    Was he working at Titan Tires before you got
19 married or started living with him?
20    A.    I don't – I don't understand.
21    Q.    Did you meet him at Titan?
22    A.    No.
23    Q.    Okay. Do you know –
24    A.    No. We started our relationship in 1986.
25    Q.    Oh, okay.

Page 15

1    A.    We got together in 1998.
2    Q.    Okay. Did you start working at Titan before he
3 did?
4    A.    Yes.
5    Q.    Okay.
6    A.    I don't understand that one.
7    THE WITNESS:    (To the interpreter) I
8 didn't understand that one. It was before –
9    (Question translated)
10    A.    (Interpreter answers) I started after.
11    Q.    (BY MS. LEEDS) Okay. So – so Benigno was
12 working at Titan and then you went to Titan?
13    A.    Uh-huh.
14    Q.    Okay. Do you – you have children, right?
15    A.    Yes.
16    Q.    How many?
17    A.    I have six.
18    Q.    Are they all Benigno's children?
19    A.    No, only two.
20    Q.    Okay. What names and ages, please?
21    A.    Starting from the oldest?
22    Q.    Whichever way you want.
23    A.    Okay. Hilberto Herrera, he's 32.
24    Q.    Okay.
25    A.    Jaime Herrera, 30; Roman Herrera, Jr., 28; Rosa

Page 16

1 Isabel Herrera, 20; Casandra Marie Rico, 15; Monique
2 Gabrielle Rico, 13.
3    Q.    Where does Hilberto live?
4    A.    He lives in Edcouch, Texas.
5    Q.    What about – I can't read my writing here –
6 number 2?
7    MR. CISNEROS:    Jaime.
8    A.    Jaime.
9    Q.    (BY MS. LEEDS) Jaime.
10    A.    He lives here in Brownsville.
11    Q.    Do you know where he works?
12    A.    No, not work.
13    Q.    Is he married?
14    A.    Yes.
15    Q.    Do you know what his wife's name?
16    A.    Irene –
17    Q.    Irene?
18    A.    – Herrera.
19    Q.    Okay. What Roman, where does he live?
20    A.    He lives in San Diego, California.
21    Q.    Okay. Rosa Isabel?
22    A.    Indiana.
23    Q.    Okay. And the other two are 15 and 13, right?
24    A.    They live with me.
25    Q.    Okay. Is Montelongo your maiden name?

**Page 17**

1  A.   It's my father's last name.
2  Q.   Okay. Have you gone by any other name?
3  A.   Guillermina Montelongo Herrera.
4  Q.   Okay.
5  A.   That was my first husband last name.
6  Q.   And other than Herrera have you ever been
7  referred to as Mrs. Rico?
8  A.   Yes.
9  Q.   Okay. Are there any other names that you have
10 been – that you have ever used?
11 A.   No.
12 Q.   What is your Social Security number?
13 A.   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.
14 Q.   Do you have a driver's license?
15 A.   Yes.
16 Q.   And what is its number if you know it?
17 A.   I don't know the number. I have to –
18 Q.   Okay.
19 A.   – check on it.
20 THE WITNESS:   Can I move it?
21 MR. CISNEROS:   Uh-huh.
22 MS. LEEDS:   I've been handed a Texas
23 driver's license number 08288382.
24 Q.   (BY MS. LEEDS) Thank you. When you first
25 started at Titan, you said you started by cleaning old

**Page 18**

1  machinery?
2  A.   Yes, ma'am.
3  Q.   Do you know if that used to be a different kind
4  of plant before?
5  A.   I don't understand the question.
6  Q.   Let me – let me rephrase it. Titan had just
7  started a new plant, right, when you – when you went to
8  work for them?
9  A.   Right.
10 Q.   Do you have any idea where – where the old
11 machinery came from instead of new machinery?
12 A.   No, ma'am.
13 Q.   Okay. When they put you to build tires, did
14 they train you?
15 A.   Yes. They train me one day.
16 Q.   Who did that?
17 A.   Johnny Garcia.
18 Q.   Who was your supervisor – well, explain to me
19 how Titan worked? I mean, were you in a particular group
20 under a particular supervisor, or how – what was the
21 structure there?
22 A.   (Witness in Spanish) I don't understand the
23 question.
24 (Question translated)
25 A.   (Witness in Spanish) When I started to work

**Page 19**

1  there, we used to do all kinds of – of work, cleaning
2  machines –
3  (Ms. Moore leaves the room)
4  A.   – sweeping, cleaning bathrooms. We – we used
5  to do any kind of job there.
6  Q.   (BY MS. LEEDS) Okay. But when you started
7  building tires, how was it structured?
8  A.   You mean how I would build the tires?
9  Q.   No. My understanding is that – and this is
10 from taking other depositions – is that you – you
11 worked like in a unit with a particular machine so that
12 you had your little group of people building a tire.
13 A.   Yes.
14 Q.   Okay. That's what I'm trying to get at. How
15 was that divided up, per machine?
16 A.   Per machine. Every operator used to run a
17 machine.
18 Q.   Okay. So how many people would run a machine
19 with you?
20 A.   Only one –
21 Q.   Just you?
22 A.   – only – only the operator that was running
23 the machine.
24 Q.   Okay. How many machines were there?
25 A.   I don't remember.

**Page 20**

1  Q.   Okay. Do you know how many different kinds of
2  machines there were?
3  A.   We had a lot of kinds of machines. I don't
4  remember how much – how many.
5  Q.   Were you trained on only one machine?
6  A.   I was first trained on the small tires, yes.
7  Q.   Okay. Is that how it was divided up, making
8  small tires and –
9  A.   We started with the small tires and then we went
10 big – big then – you know, bigger.
11 Q.   Okay. Were there – do you know if there were a
12 certain number of machines that made small tires and a
13 certain number that bigger tires?
14 A.   Yeah. We did have some, but I don't remember
15 how many and of – of each kind. I don't remember.
16 Q.   Okay.
17 A.   It's been a long time.
18 Q.   Who was your supervisor when you first started
19 building tires?
20 A.   Steve Harrison.
21 Q.   So at that point he was no longer operations
22 manager?
23 A.   Oh, he was an operation manager. Yes, he was
24 still the manager –
25 Q.   Okay. Did –

Page 21

1    A.    – when I started building tires.
2    Q.    He was still the ops manager?
3    A.    Yes.
4    Q.    Okay. Did you have another supervisor between
5    you and he?
6    (Ms. Moore enters the room)
7    A.    I had Johnny Garcia for – I don't – I don't
8    remember how long – how long, but I had Johnny Garcia,
9    too, as a supervisor –
10    Q.    (BY MS. LEEDS) Okay.
11    A.    – as my –
12    Q.    As your direct –
13    A.    Yes.
14    Q.    – supervisor? Okay. Did – how long did you
15    have Johnny Garcia as your direct supervisor?
16    A.    I don't remember, but it was not very – very
17    long.
18    Q.    What happened to him?
19    A.    They move him to the prepping machine.
20    Q.    Okay. Who came in after him?
21    A.    They – Steve Harrison stay there.
22    Q.    As your direct –
23    A.    Yes.
24    Q.    – supervisor?
25    A.    Uh-huh.

Page 22

1    Q.    Was he still operations manager at that time?
2    A.    Yes.
3    Q.    But there did come a point in time when another
4    operations manager came in, right?
5    A.    When you're talking about an operation manager,
6    do you mean the manager from the tire building
7    department? Is that what you're asking?
8    Q.    Well, the plant manager. Operations –
9    A.    Oh, the –
10    Q.    – manager –
11    A.    No, no, then I'm not – I'm not understanding
12    your – your question, no.
13    Q.    Okay.
14    A.    I was – I – I thought it was the tire building
15    manager that you were talking about.
16    Q.    Well, then, maybe I don't understand me. I had
17    the impression that operations manager was the same thing
18    as the plant manager; is that not –
19    A.    No –
20    Q.    – correct?
21    A.    – ma'am. No –
22    Q.    Okay.
23    A.    – it's different.
24    Q.    Can you explain how – what it really is?
25    A.    Well, because the plant manager was the manager

Page 23

1    of the whole plant –
2    Q.    Okay.
3    A.    – and Steve Harrison was manager of a certain
4    department.
5    Q.    Oh, okay. Who was the plant manager when you
6    first started working?
7    A.    Chuck Smith.
8    Q.    Do you know if Steve Harrison was ever plant
9    manager?
10    A.    Yes, he was –
11    Q.    Okay. That's –
12    A.    – plant manager.
13    Q.    – where I'm confused. But that was before you
14    got there?
15    A.    Yes, ma'am.
16    Q.    Okay. So that when you got there, Chuck Smith
17    was the plant manager. Steve Harrison was operations
18    manager, and under Steve Harrison was Johnny Garcia, your
19    direct supervisor?
20    A.    I never knew – I never knew the – the – I –
21    I never knew the truth who was first or was after because
22    they were both working on the unit – on the
23    department – tire building department.
24    Q.    Okay. When you say "both," are you talking
25    about Johnny –

Page 24

1    A.    Johnny and –
2    Q.    – Steve?
3    A.    – Steve.
4    Q.    Okay. And then Johnny was moved and you were
5    left with Steve as a supervisor?
6    A.    Uh-huh.
7    Q.    Did a time come when somebody else came
8    in-between you and Steve as a direct supervisor?
9    A.    I don't remember.
10    Q.    Do – do you think that maybe Steve remained as
11    your direct supervisor until he was removed from being
12    your direct supervisor?
13    A.    Yes. He was removed because there was a time
14    that he was still a manager there that – up to my
15    knowledge, but I could not report to him because Russell
16    Ash would not let me report to him, so I had to report to
17    Russell.
18    Q.    Okay. But what I'm – what I'm saying is there
19    came a point in time when he was removed as being your
20    direct supervisor, right? He was still there, but he
21    wasn't supervising you –
22    A.    Yes.
23    Q.    – anymore.
24    A.    There was a time where they move him to the
25    pressing machines.

Page 25

1    Q.   Okay. When that came – when that time
2 occurred, did you ever have a different supervisor other
3 than Russell Ash or Steve Harrison?
4    A.   I don't remember.
5    Q.   Okay. Do you know whatever happened to Johnny
6 Garcia?
7    A.   No. We – I only remember that all the sudden
8 he was gone. I mean, Russell Ash had – had let him go.
9    MS. LEEDS:   Okay. I – I need to object,
10 nonresponsive.
11    Q.   (BY MS. LEEDS) When you say that Russell Ash
12 had let him go, do you know – did Johnny tell you that
13 Mr. Ash had terminated him?
14    A.   No. I've – they told me – I mean, the whole
15 plant knew that he was – that Russell had terminate him.
16    Q.   Okay. And when you say "the whole plant knew,"
17 was that because –
18    A.   Nobody told me direct to me –
19    Q.   Okay.
20    A.   – if – if that's what you're asking, no.
21    Q.   How many people would work during – well, let
22 me ask you this: What was your main shift?
23    A.   On what time?
24    Q.   Well, let's –
25    A.   When I started working, it was first shift.

Page 26

1    Q.   First shift, which means what time to what time?
2    A.   From 7:00 to 3:30.
3    Q.   Okay. Do you remember how long you were on that
4 shift?
5    A.   No, I don't remember.
6    Q.   Do you remember about what year it was that
7 changed to the afternoon shift?
8    A.   No, I don't remember.
9    Q.   Were you in the afternoon shift more of the
10 time – during – during your whole employment with
11 Titan, were you in the afternoon more than you were in
12 the morning?
13    A.   I don't remember.
14    Q.   Or do you think it was half and half, or do you
15 have any memory at all?
16    A.   No, I don't remember. I don't want to say
17 that – you know, because I don't – I – I'm not sure.
18    Q.   Okay. But eventually you were changed to the
19 afternoon 3:00 to 11:00, right?
20    A.   Yes.
21    MS. LEEDS:   Excuse me.
22    Q.   (BY MS. LEEDS) During the period of time when
23 you were working in the late-afternoon shift, was Steve
24 Harrison your supervisor then?
25    A.   Yes.

Page 27

1    Q.   Okay. So it was during that period of time
2 because you stayed at that – on that shift until you
3 left the plant, right?
4    A.   Yes.
5    Q.   Okay. So it was in that late-afternoon shift
6 that whatever changes occurred with Mr. Harrison
7 occurred?
8    A.   Yes.
9    Q.   Okay. If you could tell me how your employment
10 changed at Titan. You started building small tires, and
11 then how did you progress?
12    A.   I started cleaning machines like I told you.
13 Then I was move to build tires, and then we stop building
14 tires for – for several months. And then they put me
15 to – to – Jerry Shanholtzer put me to – as a leadman on the
16 extruder department.
17    Q.   On the what?
18    A.   Extruder department –
19    Q.   Extruder?
20    A.   – extruder machine.
21    Q.   Okay. And what does that machine do?
22    A.   That's the machine that makes – I want to
23 say – can I say it in Spanish?
24    Q.   Oh, yes –
25    MR. CISNEROS:   Yes.

Page 28

1    Q.   (BY MS. LEEDS) – absolutely. That's why we
2 have an interpreter.
3    A.   (Witness in Spanish)
4 (Interpreter answers) It's where you press
5 the – the different layers of the – of – of the
6 tire –
7 (Witness answers) It's the material –
8 (Interpreter answers) – where you press them.
9 (Witness answers) – the – the –
10    MR. CISNEROS:   The canvas?
11    A.   – extruder makes the material to –
12    MR. CISNEROS:   (In Spanish)
13    A.   – build the tires –
14    MR. CISNEROS:   Canvas.
15    A.   – the plys.
16    THE REPORTER:   Excuse me, please. Three at
17 a time doesn't work.
18    Q.   (BY MS. LEEDS) Okay. Is that where the tire
19 tread is made?
20    A.   No.
21    Q.   Okay. It's where the material that eventually
22 makes the tire is made?
23    A.   It's the – the plys. I don't know how to –
24    Q.   Oh, the plys –
25    A.   The plys.

Page 29

1   Q.   – the different –
2   A.   Uh-huh.
3   Q.   – the different –
4   A.   – layers –
5   Q.   – layers?
6   A.   – yes.
7   Q.   Okay. Okay. Then after the extruder machine –
8   A.   Then we move back –
9   Q.   – where did you go?
10  A.   – I – I – they put – put me back to build
11  tires.
12  Q.   Okay. At that point was it still the small
13  tires, or was it bigger tires?
14  A.   I don't remember. We used to build small and
15  bigger and bigger or small.
16  Q.   Okay.
17  A.   It depend on what order we at.
18  Q.   But those would be on different machines, right?
19  A.   Yes.
20  Q.   Okay. Do you remember how many people were on
21  your shift building tires in your department?
22  A.   No. I don't remember, because sometimes we used
23  to have one certain amount, and then sometime we have
24  smaller amount, so I really don't remember.
25  Q.   Okay. There came a – well, is it safe to say

Page 30

1   other than the time you were on the extruder machine –
2   and I'm excluding the cleaning part because that was at
3   the very beginning of your employment, right?
4   A.   Right.
5   MR. CISNEROS:   Objection; form.
6   Q.   (BY MS. LEEDS) Other than the time you were on
7   the extruder machine, was the rest of your employment at
8   Titan building tires?
9   A.   Yes.
10  Q.   Okay. When – and – and I believe you told me
11  that it's one person per machine?
12  A.   Yes.
13  Q.   Okay.
14  A.   There's one person per machine, but on one
15  machine you – you can build several kinds of tires
16  sometimes because we change the molds –
17  Q.   Okay.
18  A.   – and the drums.
19  Q.   Okay. Now, if – if I understand you correctly,
20  the extruder machine puts the layers together, and then
21  would you as a tire builder take that material and make
22  the tire –
23  A.   Yes, ma'am.
24  Q.   – out of it? Okay. As a tire builder, what
25  were you suppose to do? I mean, I know build a tire, but

Page 31

1   did you have certain duties? You had to go and get the
2   material and put it in the machine. Can you – if – if
3   you had to explain to me what you did when you were –
4   A.   To build a tire?
5   Q.   – operating – yes –
6   A.   Okay.
7   Q.   – a tire machine?
8   A.   When you're – when – when you're – when I was
9   operating the machine, I used to go get my material
10  myself with a hoist.
11  Q.   Okay.
12  A.   We got the big rolls and sat them on – on the
13  front. Sometimes we used to put three or sometimes we
14  used to put four, and then at last we used a press to put
15  it on the drum so that – that's going to be the whole
16  tire –
17  Q.   Uh-huh.
18  A.   – which was called the carcass.
19  Q.   Okay.
20  THE REPORTER:   It was called what?
21  THE WITNESS:   The carcass.
22  THE REPORTER:   The carcass.
23  A.   And we used to do the carcass and then they'd
24  take them and spread them and then cooked them on the
25  presser machine.

Page 32

1   Q.   (BY MS. LEEDS) Okay. Is the product that came
2   out of your machine what's called a green tire?
3   A.   Yes, ma'am.
4   Q.   Okay. Did that look like a tire – what we know
5   as a tire?
6   A.   Well, it really doesn't look like a tire, but
7   they look like little tubes –
8   Q.   Okay.
9   A.   – but then when you put them on the presser,
10  then they – they get the form.
11  Q.   The form?
12  A.   Uh-huh.
13  Q.   Did you ever operate a presser?
14  A.   Yes.
15  Q.   How long did you operate a presser?
16  A.   Not very much. I think – well, I really don't
17  remember the exact time, but it wasn't very much.
18  Q.   Okay. Is curing after presser?
19  A.   Curing, it's the presser machine.
20  Q.   Is the presser machine?
21  A.   Yes.
22  Q.   Okay. And is that the final procedure –
23  A.   No. They still –
24  Q.   – for making a tire?
25  A.   – had to be inspected.

Page 33

1   Q.   Okay. But it – I mean, is – is the tire
2   basically made –
3   A.   Yes.
4   Q.   – after that part?
5   A.   Uh-huh.
6   Q.   Okay. When you went to the – I guess the
7   extruder machine, were you trained on that machine?
8   A.   No. I was only leading the – the workers there
9   because they were putting the parts. The machine was not
10   ready to work.
11   Q.   Was this a new machine?
12   A.   No, it was an old machine.
13   Q.   Okay. When you say that it wasn't – explain
14   that to me, wasn't –
15   A.   It's not a –
16   Q.   – wasn't working.
17   A.   – I mean, if you're talking about a new
18   product, new, new –
19   Q.   Okay.
20   A.   – no, it was not a new.
21   Q.   So what were you doing? You said you were
22   leading the workers there.
23   A.   Okay. I – then I don't understand the
24   question.
25   Q.   Okay. You recall that – that – you told me

Page 35

1   Q.   So actually, you didn't have to be trained on
2   the extruder machine, right –
3   A.   No.
4   Q.   – because you weren't operating it?
5   A.   No, ma'am.
6   Q.   When you moved to a different machine – a
7   different-size tire machine, would you undergo training
8   then?
9   A.   No.
10   Q.   So once you got that first – did you tell me it
11   was a week of training?
12   A.   No. I – I remember it was one day or a day and
13   a half by Johnny Garcia –
14   Q.   Okay.
15   A.   – on the green tires, small tires.
16   Q.   Was that the only training that you had on
17   operating the machinery that actually builds the tires?
18   A.   Yes.
19   Q.   Did they ever send you to any seminars, or did
20   they have any seminars in the plant that gave you any
21   kind of instructions on building the tires?
22   A.   No, ma'am.
23   A.   In – did you – did you receive – other than
24   the – the day that Johnny trained you on the tire
25   machine, did you receive any other kind of training or

Page 34

1   that you worked for awhile on the extruder machine.
2   A.   Uh-huh.
3   Q.   What were you doing – what were you doing when
4   you were working in that area?
5   A.   When I was working with the people that was
6   setting the parts –
7   Q.   – to build the –
8   A.   – to build –
9   Q.   – machine?
10   A.   – that machine, yes.
11   Q.   Okay. Did you –
12   A.   So they came in in parts.
13   Q.   Got you. Did you ever actually operate that
14   machine?
15   A.   No, ma'am.
16   Q.   So you were merely there during a period of time
17   in which other people were putting the machine together?
18   A.   Yes.
19   Q.   And when – did you leave that section
20   when the machine was put together?
21   A.   Only part of it. I didn't finish because in
22   that time they pulled me – they move me back to build
23   tires.
24   Q.   Okay. Do you know who took your place?
25   A.   I don't remember.

Page 36

1   orientation, safety training, talking about the company,
2   anything like that?
3   A.   I don't – I don't remember any. I need to –
4   that question I need to...
5   Q.   Let's start about when you first started there,
6   were you given some kind of orientation?
7   A.   Yes. We had – I remember we had four weeks, I
8   guess, of orientation of the air pressure and all that
9   stuff –
10   Q.   Okay.
11   A.   – hydraulics.
12   Q.   Was that kind of like little classes?
13   A.   Yes.
14   Q.   Do you remember how many people were in your
15   class?
16   A.   No.
17   Q.   What about orientation as to the company
18   policies or you are to conduct yourself as an employee?
19   A.   I don't remember.
20   Q.   Okay. Did they hand you any employee manuals or
21   pamphlets or anything like –
22   A.   Yeah.
23   Q.   – that?
24   A.   We got one book, yeah, where it says a lot of –
25   Q.   Talks about the company?

Page 37

1    A.    Uh-huh.

2    Q.    Who was it that you think you actually worked

3    for, the name of the company? Was it Titan Tires of

4    Texas? Was it Titan Tires, or do you know the exact name

5    of –

6    A.    No, I never did.

7    Q.    Okay. Were you suppose to – when you were on

8    these production machines, did they have quotas for you

9    to – to attain in a particular day?

10    A.    Yes, ma'am.

11    Q.    Was that since you first started building tires?

12    A.    Yes, ma'am.

13    Q.    Were the quotas different depending on the size

14    of the tires?

15    A.    Yes, ma'am.

16    Q.    Is that because it takes different times to –

17    A.    Yes.

18    Q.    – build different tires?

19    A.    Yes, ma'am.

20    Q.    Small tires are quicker, right?

21    A.    Yes, ma'am.

22    Q.    Do you remember how long it would take you to

23    build one of the smallest tires?

24    A.    Well, when I used to build the small tires, I

25    usually took not more than a minute and a half – minute

Page 38

1    and a half to build one.

2    Q.    Okay. What about – did you ever work on those

3    hugh, hugh, you know, industrial caterpillar tires?

4    A.    No, not on those.

5    Q.    Okay. What was the largest size you ever worked

6    on?

7    A.    I don't remember, but we did big ones, big

8    tires. I don't remember –

9    Q.    Okay.

10    A.    – the – the size.

11    Q.    How long is the largest tire – what I'm asking

12    you is how long did it take you to build the largest tire

13    you ever built? It took you a minute and a half for the

14    small one. What was the longest time?

15    A.    Well, we had several – several kind of tires,

16    several sizes. Sometimes they took 5 minutes, some

17    10 minutes, some 15.

18    Q.    For one tire?

19    A.    Yes.

20    Q.    Okay.

21    A.    It depend on what model, what size.

22    Q.    How would you as an operator keep tabs on how

23    many tires you were building? Did you have to write it

24    down somewhere? How did –

25    A.    No, because we had racks and we used to put them

Page 39

1    on racks –

2    Q.    Okay.

3    A.    – and then we count. We filled out the rack

4    and then we count the rack.

5    Q.    And did you have to write that down somewhere?

6    A.    Yes, on our production sheet every day.

7    Q.    Okay. Is that something the operator had to

8    fill out?

9    A.    Yes, ma'am.

10    Q.    Do you remember what the quotas were for any of

11    the tires you build, how many in a day you were suppose

12    to build?

13    A.    I only remember the first ones when I started

14    building.

15    Q.    And what was that?

16    A.    I used to build 200 tires a day.

17    Q.    A day?

18    A.    Uh-huh, small ones. I don't remember what was

19    the quota, but more or less that's what I – what I used

20    to do.

21    Q.    Okay. Did you ever get into a situation where

22    you were not meeting production?

23    A.    Yes, ma'am.

24    Q.    And when did that happen?

25    A.    That happen when the machines got break (sic)

Page 40

1    because machines would get break (sic) very often –

2    Q.    Okay.

3    A.    – or the material was not on the specifications

4    we needed.

5    Q.    Okay. What else?

6    A.    So that – that's why – that's when we had to

7    stop and check material or take material – material off

8    and put the – put one on, and that would take a lot of

9    time, you know, for the operator to not meet their goals.

10    Q.    Okay. Were – was there ever a period of time

11    in which you were not making your quota that was not

12    directly related to a lack of materials or machine

13    breakdown?

14    A.    Yeah. There were several problems. Sometimes

15    it – it was the machine, sometimes the – the tread,

16    sometimes the plys. Some – some days it would be a

17    different – different problem.

18    Q.    What would happen when you did not make all the

19    quota for a particular day?

20    A.    The supervisor would go and talk to you or the

21    department manager go talk – went – went to talk to you

22    and ask you why –

23    Q.    Okay.

24    A.    · – or what was happening. And we had to write

25    it down on the production sheet what happened on that

Page 41

1  hour why didn't – they didn't build those tires.
2      Q.    All right. What supervisors do you recall spoke
3  to you about your lack of production?
4      A.    Steve Harrison.
5      Q.    Okay.
6      A.    Russell Ash, Chuck Smith. That's all.
7      Q.    Okay. Did Johnny Garcia ever talk to you?
8      A.    No, not – not about production.
9      Q.    Okay. Other than production-quota problems, did
10  you ever have any other kinds of – of reprimands or, you
11  know, something that would have been not – let me – let
12  me just ask you this: Were you ever reprimanded for any
13  reason while you were employed at Titan?
14      A.    Well, yes. Every – every day because the plant
15  manager or the production manager wanted the goal from
16  each person, but sometimes it was impossible because the
17  machines would breakdown or material was not on the
18  specifications, and the operators could not do their
19  goals, so they would talk to me, yes.
20      Q.    Okay. And when you say "they" would talk to
21  you, is – is that referring to the people you mentioned
22  above?
23      A.    Yes –
24      Q.    Okay.
25      A.    – the operators.

Page 42

1      Q.    So you – you are – you are referring to the
2  lack of a production goal as a reprimand?
3      A.    I don't understand the question.
4      (Question translated)
5      A.    (Interpreter answers) Yes.
6      Q.    (BY MS. LEEDS) Okay. Other than not meeting
7  production goals, were you ever reprimanded for any other
8  reason?
9      A.    Not that I – I don't remember, no.
10      Q.    Okay. Did you ever have any problems with any
11  of your coemployees?
12      A.    No.
13      Q.    Were you ever talked to concerning your
14  relationship or maybe some problems that you had with
15  Mr. Guadalupe Salinas?
16      A.    Did I talk – if – if I talk to somebody?
17      Q.    No. Did somebody talk to you about your
18  relationship with Mr. Salinas?
19      A.    Not that I remember. Only when they put him on
20  my shift.
21      Q.    Okay. What happened then?
22      A.    Well, they just put him in my shift so he could
23  help me, but we – I really didn't need – I mean,
24  because the reason that we were not getting tires was
25  because all machines were – were down. Material was not

Page 43

1  good –
2      Q.    Okay.
3      A.    – so it was not my – my supervising that was
4  not getting the tires –
5      Q.    Okay.
6      A.    – done.
7      Q.    Before we get there, my question is simply were
8  you ever talked to by anybody about a problem that you
9  had with Mr. Salinas?
10      A.    I talk to Joe Kolniak –
11      Q.    Okay.
12      A.    – about one night that Steve had ordered me to
13  make the inventory for the – I think they were the – I
14  don't remember, but it was a kind of ply we used to use
15  to build tires, okay? So they put him to help me, so I
16  asked him to help me because I was doing something else.
17  So he went – he got very mad and saying very – really
18  bad words, harassment, really bad words.
19      Q.    You – when you say "he," you mean Mr. Salinas?
20      A.    Yes.
21      Q.    Okay.
22      A.    And I went to tell Joe Kolniak, so he went –
23  he – he went to talk to both of us.
24      Q.    Mr. Kolniak did?
25      A.    Yeah. But – but at that time – by the time –

Page 44

1  by that time that – that we had that argument, I did not
2  know that he was a supervisor –
3      Q.    Okay.
4      A.    – because Mr. Ash did not tell me right away
5  that he was a supervisor. He told me that after several
6  days –
7      Q.    Okay.
8      A.    – so I thought he was under my supervision so
9  that's why I asked him to help me.
10      Q.    Well, was it wrong for you to ask him to help
11  you even if he was a supervisor?
12      A.    No, ma'am.
13      Q.    Okay. Was there anybody else that ever talked
14  to you about any problems you had with Mr. Salinas other
15  than Mr. Kolniak?
16      A.    Not that I remember.
17      Q.    Okay. There was a point in time when you were
18  actually made supervisor, correct?
19      A.    Correct.
20      Q.    Was that associated with an increase in pay?
21      A.    Well, it – it – not right away because –
22  yeah, it – they did increase my pay, but they put it on
23  probably after a few times advance.
24      Q.    Okay. Do you remember when you were given the
25  promotion?

Page 45

1   A.   No, I don't remember.
2   Q.   Okay. Let's try to place it. Who was plant
3   manager?
4   A.   Chuck Smith.
5   Q.   And who was your supervisor when you were
6   promoted?
7   A.   At that time I don't – I don't – I really
8   didn't know if it was Johnny or Steve because it was that
9   time when they were moving. I – I really didn't know
10  who was –
11  Q.   Okay.
12  A.   – but the one that put me on for supervisor
13  first was Johnny Garcia.
14  Q.   He's the one that recommended you?
15  A.   Yes.
16  Q.   What were your duties as supervisor?
17  A.   My duties were to work with the tire builders,
18  help them in anything they needed, give them their
19  material they needed.
20  Q.   You were no longer operating a machine, right?
21  A.   Yes. I – yes. I used to supervise and build
22  tires when there was – when – sometimes there were
23  nights that a lot of people was absence –
24  Q.   Okay.
25  A.   – so I was ask by Russell Ash or Chuck Smith to

Page 46

1   help them build tires, so I used to build tires, too, and
2   I used –
3   Q.   Okay.
4   A.   – to build tires, supervise. And I had to
5   leave my clean – spick-and-span clean my whole area, and
6   I use to be able to do it myself.
7   Q.   How many supervisors were there in the tire
8   building department?
9   A.   There were three.
10  Q.   How were they divided?
11  A.   What do you mean, by hours or –
12  Q.   Well, the – were they divided?
13  A.   Yeah. They –
14  Q.   – by hours?
15  A.   – were divided by hours, I mean, on shift –
16  three shifts.
17  Q.   Okay. So three shifts, one supervisor per
18  shift?
19  A.   Yes.
20  Q.   Do you recall how many people you supervised? I
21  know it fluctuated, but an average.
22  A.   No, I don't.
23  Q.   Do you recall how many machines were under your
24  supervision?
25  A.   No, I don't, because sometimes they were – or

Page 47

1   they were ask for certain orders. We didn't use some of
2   the machines and we used others, so it's – no, I don't
3   remember.
4   Q.   So you would – your duties or the extent of
5   your duties would change depending on the order that the
6   company was trying to fill at the time?
7   A.   Yes.
8   Q.   So if you were – and this is an example. I
9   have no idea if this correct or not. If you were
10  building tires for, say, Ford trucks, then you would be
11  using the machines that built those size tires and
12  abandon completely the – the ones that would build the
13  smaller ties?
14  A.   No, not – not necessarily because we used to
15  have sometimes too much into each – each tire, or we
16  could change the drums to make it bigger or smaller.
17  Q.   Okay. So you could be building different-size
18  tires at the same time?
19  A.   On the – at the same time, no, no. It had to
20  be one – one – one size, one model.
21  Q.   Okay.
22  A.   It had to go – be one by one. I mean, if we
23  did one small, it had to be a small drum –
24  Q.   I know that's – that's per machine, right?
25  A.   Yes. You had to change the whole – the whole

Page 48

1   thing.
2   Q.   Okay. My – my question is geared towards your
3   shift. During your shift could people be building
4   different-size tires –
5   A.   Yes.
6   Q.   – on different machines –
7   A.   Yes.
8   Q.   – at the same time?
9   A.   Yes.
10  Q.   That was what I was getting at.
11  A.   Yes.
12  Q.   So you could be building machines for a little
13  Datsun and building machine – tires – I'm sorry –
14  building tires for a pickup truck –
15  A.   Uh-huh.
16  Q.   – on the same shift?
17  A.   Yes.
18  Q.   Okay. But different machines?
19  A.   Yes.
20  Q.   And I – I would assume also that there were
21  different production goals depending on the order that
22  was trying to be filled?
23  A.   Yes.
24  Q.   Okay. When you were promoted to supervisor, did
25  you undergo any training at that time –

Page 49

1  A. No.
2  Q. – on how to be a supervisor?
3  A. No, ma'am.
4  Q. Did anybody give you any instruction or any
5  talks or anything in terms of what to do as a supervisor?
6  A. Steve Harrison was the – and Johnny Garcia were
7  the ones that help me a lot, and they told me how to fill
8  papers out and – and how build tires, too.
9  Q. Okay.
10  A. They told me how to build certain model tires,
11  so, yes, they did. They did help me.
12  Q. Okay. Other than filling papers and – and just
13  building tires, which are things that you can do alone,
14  did they train you at all on how to get your people to
15  build tires?
16  A. Yes.
17  Q. Okay. How did they do that?
18  A. Steve Harrison used to talk to me on how to talk
19  to them or – and Russell Ash showed me how to – and
20  told me how he wanted me to time the people by minute –
21  Q. Okay.
22  A. – or by tire –
23  Q. Okay.
24  A. – by the hour, yes.
25  Q. When you're talking about timing, when – I

Page 50

1  mean, you had a – you always had a quota, right?
2  A. Yes.
3  Q. Did you always have to time people?
4  A. Not always. Russell – at least Russell Ash
5  used to tell me that I didn't have to time them all every
6  day. I mean, not every day –
7  Q. Okay.
8  A. – the same people or not every day –
9  Q. Right.
10  A. – but I had to keep on timing – timing them so
11  we could know how many time they – they were taking to
12  build a tire and why they were not getting their goals.
13  Q. Okay. And I guess that's why question, because
14  when you time somebody, you know how long it takes them
15  to build a tire –
16  A. Yes.
17  Q. – right?
18  A. Uh-huh.
19  Q. Were you ever timed when you were operating the
20  machines building tires?
21  A. If they time me?
22  Q. Yes.
23  A. No –
24  Q. Okay.
25  A. – they never.

Page 51

1  Q. How did you know you could build a small tire in
2  a minute and a half?
3  A. By looking at my watch.
4  Q. Okay. So you timed yourself?
5  A. Yes.
6  Q. Okay. Why did you do that?
7  A. Because I was one of the persons that I liked
8  always to make my – my goal –
9  Q. Okay.
10  A. – my quota.
11  Q. At the time that timing was instituted, was
12  there a production problem at the plant?
13  A. I don't understand the question.
14  Q. At the time timing was instituted, was there a
15  production problem at the plant?
16  (Question translated)
17  A. Oh, yeah. We had the – the production problems
18  since we started. I mean, we never – they never made
19  the goals because machines would breakdown. I mean, we
20  had problems all the time.
21  Q. (BY MS. LEEDS) Okay. And that's since you
22  started working there?
23  A. Yes.
24  Q. So did timing the individual employees give any
25  of them an incentive to work harder or faster?

Page 52

1  A. Well, in my time when I was supervising there
2  and I used to time my operators, instead of working
3  faster, they would go slower because they didn't – they
4  didn't like me timing them.
5  Q. Okay.
6  A. And they would tell me to tell Russell Ash why
7  they were being timed, that they were not going to work,
8  and I used to tell Russell. I used to tell Steve, but
9  they wouldn't do nothing.
10  Q. Is it safe to say, then, that your employees
11  were resisting your timing of them?
12  A. Yes.
13  Q. What did you try to do to get them to work
14  harder?
15  A. I used to talk to them and tell them that we
16  needed the job here in Texas. We really didn't have too
17  much jobs around, and we really need to work together as
18  a team, and sometimes we – they did work hard. They
19  did. They used to build more tires.
20  Q. How effective was that? Did – did you have to
21  keep telling them that?
22  A. Yeah.
23  Q. Would they drop back to their – you know, to –
24  to not wanting to work as –
25  A. Yeah.

Page 53

1    Q.    – hard?
2    A.    There were – there were a lot of operators that
3    would not cooperate when you were talking to them. There
4    were a lot – there were several people that they would
5    work hard –
6    Q.    Okay.
7    A.    – and they would help.
8    Q.    When a certain operator would not meet
9    production and would not listen to you, what would you
10    do?
11    A.    I would tell Steve Harrison, my supervisor –
12    my – my unit supervisor, and he would talk to them.
13    Q.    Would that change anything?
14    A.    I was not – I really was not allowed to really
15    talk to them because Russell Ash would not let me in a
16    way that I used to tell him, well, like, for – for
17    example, Mr. Silva, sometimes he would come – as a
18    manner he would get on the plant, start working and would
19    come mad saying real bad words to me. And I would tell
20    them that they – Russell Ash would say that I was nobody
21    to tell him what to do, so –
22    MS. LEEDS:    Okay. I – I need to
23    object –
24    A.    – I could do any – I – I couldn't do too much
25    on that, so...

Page 54

1    MS. LEEDS:    Object, nonresponsive.
2    Q.    (BY MS. LEEDS) My question really goes to other
3    than you telling them, "Come on. We need to work
4    together," and somebody didn't do that, did you just go
5    to your supervisor and – and tell them?
6    A.    Yes, because I was – sometimes Steve Harrison
7    would tell me that I had to write a – make them a
8    write-up –
9    Q.    Okay.
10    A.    – or, you know, stating –
11    Q.    Yes.
12    A.    – that why, but then when I was – when I used
13    to write them, then he would say, "No, let's – let's not
14    do this. Let's just talk to them." So that's – that's
15    what happen.
16    Q.    Okay. This is when Steve Harrison was your
17    supervisor –
18    A.    Yes.
19    Q.    – right? Did that change when Mr. Ash became
20    your supervisor?
21    A.    On what?
22    Q.    When you had an employee that wouldn't listen to
23    you and wouldn't work hard, would you go to Mr. Ash and
24    tell him that –
25    A.    Yes.

Page 55

1    Q.    – you had an employee that wasn't working hard?
2    A.    Yes –
3    Q.    And –
4    A.    – but it would not change.
5    Q.    Nothing would change?
6    A.    No.
7    Q.    So was either of them, Mr. Ash or Mr. Harrison,
8    effective in getting the workers to work harder?
9    A.    I – I really don't understand the question. I
10    don't.
11    Q.    Okay. Let me – let me rephrase it. You told
12    me that you would continuously tell your workers to –
13    to – "You need to work together. We need the jobs down
14    here," right?
15    A.    Yes.
16    Q.    And on occasion you would have a worker that
17    just didn't listen to you.
18    A.    Uh-huh.
19    Q.    You would go to Mr. Harrison. Sometimes
20    Mr. Harrison would tell you, "Write him up," but then
21    change his mind –
22    A.    Uh-huh.
23    Q.    – and go talk to the person?
24    A.    Yes.
25    Q.    But obviously, it didn't work because it kept

Page 56

1    occurring, right?
2    A.    Yes.
3    Q.    Okay. So what Mr. Harrison was doing – would
4    you consider what Mr. Harrison did as effective to change
5    that employee's behavior?
6    A.    I don't know. I – I don't – I don't know. I
7    don't – I don't know how to answer that question. I
8    mean, it's...
9    Q.    Okay. Well, it – I guess because they didn't
10    start working harder, right?
11    A.    Yes.
12    Q.    They stayed not working?
13    A.    Yes.
14    Q.    When Mr. Ash became your direct supervisor, you
15    would go to Mr. Ash and tell him you had a particular
16    employee that was not working hard.
17    A.    Uh-huh.
18    Q.    What would Mr. Ash do?
19    A.    Well, sometimes he would tell me – tell me to
20    tell them to – they had to – they had to do it. They
21    had to work hard, and sometimes he would tell you – he
22    would tell me, "If they don't want to work, fire them."
23    So – but then I could not do that. I was told that by
24    him, but I could not do that because my – my supervisor
25    would not let me.

Page 57

1   Q.   Well, wasn't he your supervisor?
2   A.   Yes.
3   Q.   Okay. But he was the one telling you fire them?
4   A.   Yes.
5   Q.   Okay. So why are you saying that you
6   couldn't –
7   A.   He would not –
8   Q.   – do that?
9   A.   – let me. He would tell me that, but then he
10   would not let me do that.
11   Q.   Okay. Did he ever talk to the – to the
12   operators himself?
13   A.   Yes.
14   Q.   Was that effective in changing their behavior?
15   A.   No. They would keep on doing the same thing.
16   Q.   Okay. So there really was a problem with your
17   workers in getting them motivated to work hard?
18   A.   I don't know how to answer that question, you
19   know. I really didn't know what was happening. I mean,
20   there was – there were – there were a lot of – a lot
21   of problems we had.
22   Q.   Okay. Well, let's talk about those problems.
23   You've talked to me about the machines breaking down.
24   You've talked to me about not having the right materials.
25   What other problems were there?

Page 58

1   A.   Well, one of the – the problems we really had
2   hard there was the people not showing up to work –
3   Q.   Okay.
4   A.   – every day, and that would kill the production
5   down a lot.
6   Q.   Yeah. If somebody –
7   A.   Yes.
8   Q.   – doesn't show, then you can't –
9   A.   And sometimes – sometimes up to five or six
10   people were not – they – they would not show to work,
11   and then there was no production. And that's when I had
12   to build tires, too –
13   Q.   Okay.
14   A.   – so I could help.
15   Q.   But you could not take the place of five people?
16   A.   No.
17   Q.   So was it those periods of time that you would
18   not make your production goals?
19   A.   No.
20   Q.   Okay. Did – tell me –
21   A.   Can we have a break? Can we have –
22   Q.   Oh, yes –
23   A.   – a break?
24   Q.   – yes, absolutely.
25   MR. CISNEROS:   Do you need to go to the

Page 59

1   rest room?
2   THE VIDEOGRAPHER:   The time is 4:45, and
3   you're off the record.
4   (Recess 4:45 p.m. to 4:51 p.m.)
5   THE VIDEOGRAPHER:   The time is 4:51, and
6   you're on the record.
7   Q.   (BY MS. LEEDS) Ms. Montelongo, we have been
8   talking about your job at Titan Tires, and I'd like to
9   ask you about the meetings that they used to have. When
10   you were in operations, what kind of meetings did they
11   have at which you had to attend?
12   A.   Only the – after Steve Harrison was not – now,
13   when Russell Ash would not let me talk to Steve. He
14   was – Steve was still the – the unit manager – the
15   tire building manager there up to – up to my knowledge,
16   but then Russell Ash would not let me refer to him. So I
17   had – I would go with Russell to the meetings every day
18   in the afternoons.
19   Q.   Okay. This is when you were operating
20   machinery?
21   A.   No, when I was a supervisor.
22   Q.   Okay. I'm talking about when you were operating
23   machinery what kinds of meetings did you attend when you
24   were building tires?
25   A.   Oh, oh. I don't remember. I don't remember.

Page 60

1   Q.   Did you have daily meetings with your supervisor
2   to, you know, rah-rah you into building a whole lot of
3   tires that day?
4   A.   No, not that I remember. I don't remember.
5   Q.   Okay. Do you recall that the first time you had
6   to attend daily meetings was after you became a
7   supervisor?
8   A.   Only when Russell Ash would not let Steve talk
9   to me –
10   Q.   Okay.
11   A.   – I started with the meetings with Russell in
12   the afternoon.
13   Q.   Before Mr. Ash got to the plant when Steve
14   Harrison was your direct supervisor and you were a
15   supervisor, did you have meetings you had to attend –
16   any kind of meeting?
17   MR. CISNEROS:   Objection; form.
18   A.   I don't remember.
19   Q.   (BY MS. LEEDS) Okay. Were there production
20   meetings where production was discussed and production
21   goals?
22   A.   Yeah. I remember there were meetings, but
23   they – they would never ask me. They were – the – all
24   the other supervisors would go, only not me. I don't
25   know why. I never did.

Page 61

1    Q.   Do you know if those meetings were held in the
2  morning and at that time you were in the late afternoon?
3    A.   I don't remember the time, but I do remember
4  they had some, yes.
5    Q.   Okay. Let me ask you this: When you were made
6  supervisor, you were on the 3:00 to 11:00 shift already,
7  right?
8    A.   No. I started being a supervisor on the first
9  shift.
10   Q.   On the first – the – the 7:00 to 3:00?
11   A.   Yes.
12   Q.   Okay. On – how long did you remain supervisor
13 on that shift before you changed to the late afternoon?
14   A.   I – I really don't remember the – the...
15   Q.   Okay. When you were a supervisor on the early
16 shift, did you ever go to any meetings?
17   A.   No, not that I remember.
18   Q.   And I believe what you're trying to tell me is
19 that it wasn't until Russell Ash became your direct
20 supervisor that you began attending daily meetings?
21   A.   Yes.
22   Q.   Is that your testimony?
23   A.   Not – not since I started the – when he got on
24 the plant there on year 2000, no. Those meetings started
25 when about three or four weeks before Steve was fired.

Page 62

1    Q.   The meetings with Mr. Ash?
2    A.   Yes.
3    Q.   Okay. Do you know how long Mr. Russell had been
4  at the plant when Mr. Harrison was terminated?
5    A.   No, I don't remember. I – all I remember
6  Russell got in the plant on July 2000.
7    Q.   Okay. And do you know when Mr. Harrison was let
8  go?
9    A.   Well, it was about three weeks before I – I –
10 I quit my job.
11   Q.   Okay. So about three weeks before you –
12   A.   More or less. I'm not sure if it's –
13   Q.   No, I'm not –
14   A.   – you know, the – yes.
15   Q.   – going to hold you to these dates. Do you
16 remember when it was that you left?
17   A.   Yes. I quit my job on August – I believe it
18 was August the 10th of – I don't remember if it was 2001
19 or 2002?
20   Q.   Okay.
21   A.   – but I have it on my papers.
22   Q.   Okay. No. We can – we can figure that one
23 out, but it – the best of your recollection it was three
24 to four weeks before that Mr. Harrison left?
25   A.   That I started the meetings?

Page 63

1    Q.   No, that Mr. Harrison left.
2    A.   Yes.
3    Q.   So he left –
4    A.   More or less.
5    Q.   – before you did?
6    A.   More or less, yes.
7    Q.   Okay. Do you remember how long a period of time
8  before that was it that Mr. Ash was your direct
9  supervisor?
10   A.   No, I don't. I don't remember.
11   Q.   Was it a long, long time, or did it seem like a
12 short time?
13   A.   No, I don't – I don't remember.
14   Q.   Okay. But in any event meetings at which you
15 were required to attend did not begin until Mr. Harrison
16 was removed as your direct supervisor, correct?
17   A.   I – I – I don't remember or really I didn't
18 know when he was remove, but the only thing I remember is
19 that Mr. Ash would not let me report to Steve Harrison
20 anymore.
21   Q.   Okay. You had to report to Mr. Ash –
22   A.   Yes.
23   Q.   – right?
24   A.   So I really – I – I really didn't know when or
25 how –

Page 64

1    Q.   Okay. But –
2    A.   – how –
3    Q.   – obviously, at the time that you had to start
4  reporting to Mr. Ash, Mr. Harrison was no longer your
5  direct supervisor, right? Mr. Ash had become your direct
6  supervisor.
7    A.   Well, see, this is – this is why I didn't know
8  because in the – in – in the unit, he would give me
9  orders. He –
10   Q.   He –
11   A.   – he would say, "You have to do this, you have
12 to do this," but then I would – I – it – in – in the
13 productions – I – I mean, the papers for the
14 production, I would have to go with Russell Ash. I – I
15 could not talk to – to Steve, so, see, that's why I
16 didn't – I didn't know what was happening really.
17   Q.   Okay. Let me just clarify that because you said
18 in the unit he would tell you what to do. You're saying
19 Mr. Harrison –
20   A.   Yes.
21   Q.   – would tell you what to do –
22   A.   Yes.
23   Q.   – but then in production you had to respond to
24 Mr. Ash?
25   A.   Yes.

BSA   Guillermina M̃ elongo v. Titan Tire, Et Al   Guillerm̃ Montelongo–9/10/03   XMAX(17/17)

Page 65

```
1    Q.   Okay. When you say that you — Mr. Ash said
2  that you couldn't talk to Mr. Harrison, how did that come
3  about?
4    A.   I don't know. I never did. I mean, all I know
5  is that it — is I would go to Steve and tell — tell
6  him, "Look, this — this product says" – he would say,
7  "Don't talk to me. Russell will — Russell does not want
8  you to talk to me."
9    Q.   Okay. Would you talk to him about anything?
10   A.   Then I had to go with Russell Ash to — to —
11  you know, to ask him what I wanted or what I needed or
12  what I wanted to tell him.
13   Q.   Okay. But nonetheless, Mr. Harrison could give
14  you orders?
15   A.   Yes.
16   Q.   And you could not talk to Mr. Harrison about the
17  order?
18   A.   No, not about production or nothing of that.
19   Q.   Okay.
20   A.   See, this — that's why I was confused because I
21  really didn't know. I really didn't know what was
22  happening between them because Russell Ash would say one
23  thing and Steve would say another thing, so I was in
24  between —
25   Q.   Okay.
```

Page 66

```
1    A.   — or I didn't —
2    Q.   Let me — let me ask you this: What was
3  Mr. Ash's position?
4    A.   Plant manager.
5    Q.   Plant manager?
6    A.   Yes. And so — and those last days — you're
7  talking about the last days that I work there?
8    Q.   Yeah. As best you know, what did he come in as?
9  What did Mr. Ash — when Mr. Ash first started there in
10  July of 2000, what was his position?
11   A.   Plant manager.
12   Q.   And did he remain plant manager until the time
13  you left?
14   A.   Yes.
15   Q.   Okay. So he was everybody's boss?
16   A.   Yes.
17   Q.   Okay. How is it that he told you not to talk to
18  Steve anymore? What did he say to you?
19   A.   He said I was not to report to Steve on
20  production or on anything. He didn't wanted (sic) me
21  talking to Steve at all.
22   Q.   Okay. What kinds of things did you interact
23  with Steve about?
24   A.   Oh, well, because on — at the end of the day, I
25  had to clean machines. I had to clean the floor. I had
```

Page 67

```
1  to leave everything clean or material on the machines.
2  That's what we used to talk —
3    Q.   Okay. That —
4    A.   — but other than that I could not talk to him
5  about anything of production.
6    Q.   Okay. So all production problems you were
7  suppose to go to Mr. Ash?
8    A.   Yes.
9    Q.   Other stuff you could go to Mr. Harrison for?
10   A.   Uh-huh.
11   Q.   And I believe you told us that that order not to
12  talk to Mr. Harrison came about three or four weeks
13  before Mr. Harrison left?
14   A.   Yes.
15   Q.   Okay. I don't know if I just asked you this:
16  How is it that Mr. Ash told you not to talk to Steve?
17  Did I just ask you that? Okay.
18  MS. LEEDS:   Short-term memory is gone.
19   Q.   (BY MS. LEEDS) When you had the meetings with
20  Mr. Ash, who would attend?
21   A.   Sometimes I would attend myself or sometimes
22  with — when Lupe was there —
23   Q.   Okay. Were —
24   A.   — Guadalupe Salinas.
25   Q.   Were there ever any meetings with general
```

Page 68

```
1  operators, tire builders, or, you know, general workers?
2    A.   Not that I remember.
3    Q.   Okay. So you're telling me that your meetings
4  used to be one on one with Mr. Ash?
5    A.   Yes. Sometimes —
6    Q.   Was —
7    A.   — and sometimes with Guadalupe.
8    Q.   Okay. And correct me if I'm wrong, but
9  Mr. Salinas was made — well, came to work with you
10  before Mr. Ash got there, right?
11   A.   You mean in tire building?
12   Q.   Yes. When — when — you were made supervisor
13  before Mr. Ash got there?
14   A.   Yes.
15   Q.   And did Guadalupe Salinas come to your unit
16  to — to — to help you —
17   A.   To supervise, no.
18   Q.   Yes.
19   A.   No.
20   Q.   Do you remember when Mr. Salinas went —
21   A.   No, I don't. I don't remember. I — all I
22  remember it was the last three weeks or less — four
23  weeks that I was there.
24   Q.   Okay. Do you know who assigned him to your
25  shift?
```

Page 69

1    A.   I don't know. I think it was Russell Ash. I
2  really didn't know.
3    Q.   Okay. Had he been a supervisor before?
4    A.   I don't remember.
5    Q.   But – and I think you've already clarified that
6  when he first worked – went to work with you on your
7  shift, you had not been told that he was a supervisor and
8  so a little situation –
9    A.   Oh, you're talking about the last four weeks,

Page 71

1  tires. I would do all – all those things for my
2  operators.
3    Q.   Okay. Were there operators that had problems
4  even knowing how to build the tires?
5    A.   Yes.
6    Q.   And what would you do with them?
7    A.   I used to talk to them and explain to them that
8  they had – they needed to make their goals and they had
9  good material. And I would ask them what was the

Page 73

1    Q.    Okay. So it wasn't just getting your workers to
2    work faster in order to meet your quota. There was a
3    problem with the quality of tires you were building as
4    well?
5    A.    Yes.
6    Q.    Were you ever reprimanded because of the quality
7    of tires that your unit was producing?
8    A.    Yes.
9    Q.    Who did that?
10    A.    Steve Harrison.
11    Q.    Okay. How – how did that occur?
12    A.    Well, because at the end where – when the tires
13    are cooked, I mean, you – they – they inspect them, and
14    then they find, you know, the problems. So he would come
15    to me and ask me, "Hey, this number or this operator is
16    not building on good quality," so you have to talk to him
17    or you have to keep on checking their – their tires, you
18    know, three or four times in – in – on the night, so
19    that's what I would do.
20    Q.    Okay. Getting back to the meetings, were these
21    meetings every day?
22    A.    Which meetings are you talking about?
23    Q.    That you had with Mr. – well, I – I'm – my –
24    let's redo that one. My understanding is the only
25    meetings you had were with Mr. Ash.

Page 74

1    A.    Yes.
2    Q.    Okay. And were those meetings every day?
3    A.    Yes.
4    Q.    Did they have to do mostly with production?
5    A.    Sometimes production. Yes, mostly production,
6    but sometimes other problems we had with the operators.
7    Q.    Okay. Did he ever suggest to you strategies to
8    use to try to motivate your operators?
9    A.    The only ones I remember that when he used – he
10    told me to time them by the minutes, by the hour, by
11    the – you know –
12    Q.    Yeah.
13    A.    – by – by the day or – yes.
14    Q.    Anything else?
15    A.    No.
16    Q.    I mean, you already told us about, well, fire
17    them, but that's a last-ditch effort. Okay. Do you
18    remember how long Mr. Ash was at the Brownsville plant?
19    A.    No, I don't.
20    Q.    Do you remember how long he was there after you
21    left?
22    A.    Yes.
23    Q.    The plant is no longer in business, right?
24    A.    That's what I heard, yes.
25    Q.    Okay. Everybody was laid off, right?

Page 75

1    A.    I guess. I don't know.
2    Q.    Okay. Do you – do you maintain contact with
3    anybody –
4    A.    No.
5    Q.    – there still? Tell me about the production
6    reports. As an operator did you have to fill these out?
7    A.    For them?
8    Q.    No, for you. When you were an operator –
9    A.    Oh, yes, I had to fill –
10    Q.    – did you have to fill them out?
11    A.    Yes, yes.
12    Q.    How did that change when you became a
13    supervisor?
14    A.    They were the same.
15    Q.    Okay. But you no long – I'm sorry. You no
16    longer had to fill out your personal production, did you,
17    or did you?
18    A.    No, no.
19    Q.    Okay.
20    A.    Because I was not building tires all – all
21    night. I mean, I was not an operator.
22    Q.    Right. So what kind of reports did you have to
23    fill out after you became supervisor?
24    A.    I had to fill a report where – every hour I
25    used to pick up the production and those were the reports

Page 76

1    I would hand in for Russell.
2    Q.    So is it safe to say that there are two kinds of
3    reports that come from every shift, one from an operator
4    and one from the supervisor?
5    A.    Well, yes, because the operator would fill the
6    ones they used and that's – from there we get the amount
7    that – of tires they would build, and then I would write
8    them down on my report.
9    Q.    Okay. Did you always fill out your reports
10    completely?
11    A.    Yes.
12    Q.    And was that a requirement for you to do as
13    supervisor?
14    A.    Yes.
15    Q.    You had to fill out all the blanks, right?
16    A.    Yes. I had to fill the reports for the absence,
17    too – for the absence.
18    Q.    Okay. When – when you were an operator
19    building tires, were you also required to fill in all the
20    blanks of the report?
21    A.    For the – for – for the tire builder –
22    Q.    Yeah.
23    A.    – yes, yes.
24    Q.    Okay. Did – did you ever get talked to because
25    your reports were not complete?

**Page 77**

1  A.  No.

2  Q.  Now, you have made a claim that you were

3  demoted. Do you understand that?

4  A.  Yes.

5  Q.  Okay. What are you calling a demotion?

6  A.  Well, I remember that I was – I was still a

7  supervisor on the day shift, and after a few weeks, I

8  don't remember if it was – I don't remember which week

9  of July or August that Russell Ash told Steve Harrison to

10  put me back to build tires. So I build tires about four

11  weeks or five. I'm not very sure, around there, five

12  weeks – four or five weeks.

13  Q.  Okay. And then what happened?

14  A.  And then the supervisor from second shift had

15  left the work and Steve Harrison ask me again if I wanted

16  to – to be the supervisor – the second shift

17  supervisor. So I told him yes, I – I – I wanted to

18  take it, so I started working on the second shift.

19  Q.  Okay. Is that when you switched times?

20  A.  I don't remember the – the times when I

21  switched – I mean the dates I don't remember, but, yes,

22  I was building tires for five weeks. I was took down

23  from supervisor to building tires and –

24  Q.  Okay.

25  A.  – then – and then to supervisor.

**Page 78**

1  Q.  So you remained supervisor during the day shift?

2  A.  Uh-huh.

3  Q.  And then you went back to building tires?

4  A.  Yes.

5  Q.  Then you became supervisor of the afternoon

6  shift?

7  A.  Yes.

8  Q.  Is that when your time changed, when you went to

9  the afternoon shift and stayed there?

10  A.  Yes.

11  Q.  Okay. When you went back to building tires, was

12  your salary affected?

13  A.  No.

14  Q.  You remained at the same supervisor's salary –

15  A.  No, it didn't –

16  Q.  – even though –

17  A.  – it didn't got (sic) to affect because when –

18  when we were a supervisor and then they would take you

19  off, then you was – I think it was – you would stay

20  with the same pay for four weeks or four, but then –

21  then I was moved again to supervisor –

22  Q.  Okay.

23  A.  – but I call it demoted because, yes, I – I

24  did not supervise for four or five weeks.

25  Q.  Okay.

**Page 79**

1  A.  That's why.

2  Q.  Do you know the reason for that?

3  A.  Well, up to my knowledge, Russell Ash told Steve

4  Harrison to take me off of supervisor because he did want

5  me to be a supervisor because I was a women (sic), so

6  that's why Steve told me he had to take me off.

7  Q.  And this is what Steve Harrison told you?

8  A.  Yes.

9  Q.  Did Mr. Ash ever tell you why you went back to

10  building tires?

11  A.  No, he never did.

12  Q.  So the only explanation you know of is what

13  Mr. Harrison told you?

14  A.  Yes. He told me that I had to go back to build

15  tires because Russell Ash did not wanted (sic) me to be a

16  supervisor.

17  Q.  Okay. But yet then you were made supervisor –

18  A.  Yes, but –

19  Q.  – four weeks later?

20  A.  Yes. Then after that there was the position on

21  second shift, so Steve talked to him and he let me be a

22  supervisor again.

23  Q.  Okay. When you say "him," I need to make sure

24  it's Mr. Ash –

25  A.  Russell Ash –

**Page 80**

1  Q.  – right?

2  A.  – yes.

3  Q.  Okay. Were there any other women supervisors?

4  A.  When I was a supervisor, no.

5  Q.  Not at all during the period of time?

6  A.  When I started, no. I was the first

7  supervisor – women (sic) supervisor there.

8  Q.  Okay. At the time you went to the afternoon

9  shift, were there any other women supervisors?

10  A.  I don't remember, but there was another lady

11  there on the shipping department, but I – I don't

12  remember when she started.

13  MS. LEEDS:    Are you okay?

14  THE VIDEOGRAPHER:    (Moving head up and

15  down)

16  Q.  (BY MS. LEEDS) Who became supervisor when you

17  were sent back to building tires?

18  A.  Steve Harrison took on my place.

19  Q.  Your place?

20  A.  Yes.

21  Q.  Okay.

22  A.  He was supervising, and up to my knowledge, he

23  was still manager of the unit.

24  Q.  Okay. So this obviously was before you were

25  told not to talk to Steve Harrison anymore?

Page 81

1   A.   Oh, yes. When he told me to talk to him, it was
2   about four weeks or three weeks before he was gone.
3   Q.   So late –
4   A.   Late.
5   Q.   – much later?
6   A.   Yes.
7   Q.   Okay. In your meetings with Mr. Ash, tell me
8   how – how was his style?
9   A.   Excuse me, how?
10  Q.   If you had to describe Mr. Ash's management
11  style, how would you describe it?
12  A.   Gosh.
13  Q.   And be honest.
14  A.   I – I want to be honest, but it's – it's very
15  hard, I mean, to remember all that because for me it
16  was – it was very hard. He treated me so bad and it's
17  hard for me to – for me to go back and remember all
18  that, but –
19  Q.   Well, we have already had several depositions in
20  this case, and other people have told us that he is very
21  loud. Was he with you?
22  A.   Yes. He's – he – he always used to use very
23  bad words –
24  Q.   Okay.
25  A.   – to talk to us –

Page 82

1   Q.   Was –
2   A.   – supervisors.
3   Q.   – was he very aggressive in his style?
4   A.   Yes.
5   Q.   Other people have described him as sometimes
6   being mean.
7   A.   Well, I don't know if he was mean or he was
8   trying to do his job, but he was overdoing it. I mean,
9   that's my point of view.
10  Q.   Okay.
11  A.   He was overdoing it. I mean, I don't know if
12  he – if – if it was because I was a lady. I mean, I
13  don't know, but for me I have never worked with somebody
14  like him. I mean, I have a lot of bosses. I've worked
15  several places, and I never had those kind of problems.
16  I mean, I never felt so sick – I mean so sad. Like I
17  tell you, I don't know if it's because I'm a lady – I'm
18  a woman. I don't know.
19  Q.   But is it safe to say that he treated most
20  everybody that way?
21  A.   I couldn't say that, no –
22  Q.   Okay. Did you –
23  A.   – no.
24  Q.   – ever see him act that way with other people?
25  A.   Yes.

Page 83

1   Q.   Okay. Who did you see him act that way with?
2   A.   Well, one day I was getting – starting my shift
3   and Steve – Steve Harrison was leaving his shift, and I
4   don't know what went wrong with Steve and him, but I
5   heard Russell telling him that "What – what is the
6   fucking happening with you? You're not doing your job.
7   Do you – do you know what I'm going to do with you? I'm
8   going to shove your head on the toilet," so –
9   Q.   Okay.
10  A.   – it was – it was hard to hear that, I mean –
11  Q.   Yes.
12  A.   – because Steve – all supervisors there would
13  really try hard to get production.
14  Q.   Did you ever hear Mr. Ash talk that way with
15  anybody else?
16  A.   Well, yes, yes.
17  Q.   Who else?
18  A.   Some – with several of the supervisors –
19  Q.   Okay.
20  A.   – but I think it was the way he – he used to
21  talk because they were men. I mean –
22  Q.   Okay.
23  A.   – so I don't know.
24  Q.   All right. Were you – when was it that you
25  were put on salary?

Page 84

1   A.   I don't remember, but I got my – I got my copy.
2   I got a copy, but I don't remember the date.
3   Q.   Okay. That was after you were made supervisor,
4   right?
5   A.   Yes.
6   Q.   Was it explained to you that once you were on
7   salary you would not be able to get overtime?
8   A.   I was explain by Steve Harrison only when he
9   would tell me to stay overtime I would get paid overtime.
10  Q.   So Mr. Harrison told you that you would get paid
11  overtime?
12  A.   Yes. And there was one day that I worked – one
13  week – I mean, yeah, one week that I worked 30 hours
14  overtime because Steve had told me that I had to stay,
15  load up machines and all that, so I worked 30 – 30 hours
16  overtime, so Russell would only pay 16 hours.
17  Q.   Okay. Was this –
18  A.   But I don't know – I really didn't know what
19  was the really truth between him – Steve and Russell
20  Ash.
21  Q.   Right. Was this when you were on the afternoon
22  shift?
23  A.   Yes.
24  Q.   Okay. And you were on salary at the time,
25  right?

Page 85

1    A.    Yes.
2    Q.    And Mr. Harrison told you you were going to get
3    overtime?
4    A.    I don't remember.
5    Q.    Okay. But he – he had asked –
6    A.    Oh, he –
7    Q.    – you –
8    A.    – Mr. – you – you're talking about Steve,
9    yes –
10    Q.    Yes. Steve –
11    A.    – yes, yes.
12    Q.    – Steve told you you were going to get
13    overtime –
14    A.    Yes.
15    Q.    – and so obviously you thought you were going
16    to get overtime, right?
17    A.    Well, I thought I was going to get paid, but I
18    didn't, yes.
19    Q.    You got paid part –
20    A.    Part and –
21    Q.    – of that?
22    A.    – Steve went to talk to Russell about those
23    hours that he had – he had order me to work those hours,
24    but Russell Ash said he could not pay me all the
25    30 hours.

Page 86

1    Q.    Was it ever explained to you that salaried
2    employees do not get overtime regardless of how –
3    A.    No.
4    Q.    – much they work?
5    A.    They never explain to me that, and, well, I – I
6    stay because he told me I was going to get paid, so –
7    Q.    Yeah. Well, and he asked you to, right?
8    A.    Yes. So I had to obey orders, so I expected
9    that I – they – they were going to pay me.
10    Q.    Yeah.
11    THE VIDEOGRAPHER:    I just need to change
12    tape real quick.
13    (Recess at 5:24 p.m.)
14    THE VIDEOGRAPHER:    Okay.
15    Q.    (BY MS. LEEDS) Just in case you do remember, do
16    you remember – that's a terrible question.
17    Do you remember at all when this overtime
18    situation occurred? We know it was when you were working
19    3:00 to 11:00, but do you know when during that time
20    period in terms of when Mr. Harrison was there, or was it
21    still, you know, when you could talk to Mr. Harrison?
22    A.    Yes. The – it was still when I – he talk to
23    me. He was still talking to me.
24    Q.    Do you remember if it was summer, winter? Was
25    it cold?

Page 87

1    A.    No, I don't remember. I really don't.
2    Q.    Okay.
3    A.    I don't want to say that one date and, no, I
4    don't remember.
5    Q.    Okay. When – when you had these meetings –
6    did you ever attend anything called a production meeting?
7    A.    With who?
8    Q.    With anybody.
9    A.    (Moving head side to side)
10    Q.    So the only meetings you had were with Mr. Ash,
11    you and maybe Mr. Salinas on occasion?
12    A.    Yes.
13    Q.    Were you ever late to any of those meetings?
14    A.    No.
15    Q.    Do you recall a particular meeting in August of
16    2001 when you didn't call in?
17    A.    To work?
18    Q.    Yeah. Well, you were late to a production
19    meeting.
20    A.    No, I don't remember.
21    Q.    Okay. So you don't – you wouldn't remember
22    what Mr. Ash told you as a result of that?
23    A.    No, I don't remember.
24    Q.    Okay. What about another meeting also in August
25    that you said that you had not been able to stay to get

Page 88

1    the materials ready the day before? Do you remember a
2    meeting in which that was discussed?
3    A.    Yes. I remember he told me that why I didn't
4    filled out the – the machines that he had told me, but
5    I – I told him I didn't heard him, and I didn't remember
6    he told – telling me to do that that night –
7    Q.    Okay.
8    A.    – specifically that night –
9    Q.    Okay.
10    A.    – yes.
11    Q.    Do you remember anything else he told you?
12    A.    On that day I don't really remember.
13    Q.    Did he say anything to you about not doing your
14    job properly?
15    A.    He would say that every day. He said I was – I
16    was not doing my – my job properly, that I was not
17    getting any tires, that what was the f-u-c-k happening
18    with me. And I use to tell him that I was doing all –
19    all my – all that I could do, you know, to motivate the
20    tire builders to build tires and that I was doing all –
21    all I could, I mean. And there was several times I told
22    him that if – if he felt that I was not doing my job
23    right that he could put somebody else and put me in
24    another job. So he use to answer me that he – I was
25    nobody to tell him what to do.

Page 89

1  Q.   Okay. Was this a time period when Lupe was
2  already working with you?
3  A.   I don't remember if he was there already.
4  Q.   Okay.
5  A.   I really don't remember.
6  Q.   Do you know if he was there at that meeting?
7  A.   No, no, I don't remember.
8  Q.   Okay. What about timing your -- your employees,
9  did Mr. Ash ever talk to you about that?
10  A.   Yes.
11  Q.   What would he say?
12  A.   Well, he said I had to time the -- the -- the
13  tire builders, yes.
14  Q.   Did he ever tell you that you were not timing
15  the tire builders?
16  A.   I think there was -- there was one day that I
17  did not time the tire builders because I had other
18  problems with the other operators with material and I did
19  not have the time to time them, so he really got mad. He
20  start yelling at me and telling me that right on my
21  face -- I mean right here, "You're not doing your job."
22  He said, "What is happening? Why does" -- a word I just
23  told.
24  Q.   What -- I'm sorry. Were you done?
25  A.   Yes.

Page 90

1  Q.   Okay. What about him telling you that, you
2  know, it's your responsibility to make sure that the
3  machines run correctly, was it?
4  A.   Well, it was part of my job to check on every
5  operator that they would have a -- a good machine, or if
6  the machine would break, I would had to write -- write --
7  make a write note to where the mechanic used to go and
8  check.
9  Q.   Okay.
10  A.   So I would tell the mechanic he had to fix this
11  machine or the other machine, or, yes, it was my
12  responsibility, yes.
13  Q.   Okay. What about were you also required to
14  prepare the machines for the next shift coming in?
15  A.   Yes.
16  Q.   And did you ever have a problem with that?
17  A.   No, no. I would -- I -- most of the times I
18  would leave the machines with materials, the area clean
19  like he wanted it. I would do everything I could to keep
20  him -- to see if he could, you know -- but I would
21  never -- he would never say, "Hey, you did a good job,"
22  or "Hey, you're" -- he would never motivate nobody.
23  Q.   Okay. Did you take a leave of absence at one
24  point in time?
25  A.   I took several. I don't remember, yes.

Page 91

1  Q.   Okay. Was there one in July of 2001?
2  A.   Yes. I -- I believe, yes.
3  Q.   Okay. Where in the plant did your husband work?
4  A.   On that time I don't remember.
5  Q.   Okay. Was your husband injured?
6  A.   Yes, he was.
7  (Mr. Mattingly enters the room)
8  Q.   (BY MS. LEEDS) Where -- what machinery was he
9  injured on?
10  A.   On the extruder. I think it was the extruder.
11  I don't remember, yes.
12  Q.   Okay. Okay. How was he injured?
13  A.   My husband?
14  Q.   Yes.
15  A.   Well, I was not there when the accident happen,
16  so I couldn't tell you much.
17  Q.   Did he explain to you what happened?
18  A.   Well, not really --
19  MR. CISNEROS:   Let -- let me just --
20  A.   -- because --
21  MR. CISNEROS:   -- object real quick,
22  Eileen. You're not going to go into the terms of --
23  of --
24  MS. LEEDS:   No.
25  MR. CISNEROS:   -- all that kind of stuff --

Page 92

1  MS. LEEDS:   Not --
2  MR. CISNEROS:   -- because of the
3  confidentiality and all that kind of stuff that we --
4  we --
5  MS. LEEDS:   No. I just want to know if he
6  told her what happened.
7  MR. CISNEROS:   Okay. Not a problem.
8  They're getting into Benigno's situation with Titan.
9  MR. MATTINGLY:   Okay.
10  Q.   (BY MS. LEEDS) Did -- did he ever tell you what
11  happened?
12  A.   Well, he did, but he really doesn't remember
13  when he fell down or...
14  Q.   Oh, okay. So he fell?
15  A.   I --
16  Q.   It wasn't a situation where he got something
17  caught?
18  A.   I don't know. I don't know.
19  Q.   Okay.
20  A.   I couldn't tell you.
21  Q.   As a result of that, how was he injured?
22  A.   I couldn't answer you that question. I don't
23  know.
24  Q.   But was it -- was it severe?
25  A.   Oh, yes, it --

Page 93

1   Q.   Okay.
2   A.   – it – it is, it is.
3   Q.   It required you to –
4   MS. LEEDS:   Bye.
5   Q.   (BY MS. LEEDS) It required you to – to stay
6   home and help him?
7   (Mr. Cisneros leaves the room)
8   A.   It would – yeah. It would require for me to
9   stay, but I couldn't stay because I needed to work.
10   Q.   (BY MS. LEEDS) Okay. Well, my question is why
11   did you take a leave of absence?
12   A.   I don't remember which leave of absence you're
13   talking about.
14   Q.   The one close to when your husband was injured.
15   A.   I think it was my mother-in-law was very sick –
16   Q.   Okay. So –
17   A.   – and – and we had to go over there.
18   Q.   Okay.
19   A.   So I have a copy of that when my mother-in-law
20   was sick in the hospital. I have that copy.
21   Q.   Okay. So you didn't take a leave of absence
22   because your husband had injured?
23   A.   I don't remember if it would be after my husband
24   was injured. I really don't remember that – that
25   date –

Page 94

1   Q.   Okay.
2   A.   – but I only remember he said – there was one
3   time I – I asked for a leave of absence because of that,
4   but I don't remember the date or if – if it was before
5   or after.
6   Q.   When – when you did take this leave of absence,
7   do you remember how long it was for in July?
8   A.   No, I don't remember.
9   Q.   When you would take a leave of – do you
10   remember how many you took?
11   A.   Leave of absence or –
12   Q.   Yes.
13   A.   – vacation?
14   Q.   Leave of absences.
15   A.   No, I don't remember.
16   Q.   And this would have been a leave of absence that
17   you took about a month before you left.
18   A.   No, I – I don't remember.
19   Q.   Okay. Do you know if you got paid for that
20   leave of absence? Did you get paid when you went on
21   leave of absence?
22   A.   No, I don't remember.
23   Q.   Okay. Who authorized you to take that leave?
24   And we're talking about a month before you left the
25   company.

Page 95

1   A.   I believe it was Steve Harrison.
2   Q.   Okay. You think Steve Harrison was still there?
3   A.   I don't remember, but I – yes, I think he was
4   there. Uh-huh.
5   Q.   Did Mr. Ash ever authorize a leave of absence
6   for you?
7   A.   I don't remember.
8   Q.   Okay. Do you recall what Mr. Salinas' duties
9   were when he came to work on the shift with you after you
10   found out he was a supervisor?
11   A.   Well, yes. He was to help me to supervise the
12   people, yes.
13   Q.   Okay. Did you two get along?
14   A.   We used to – yeah, we always get along. He –
15   we – we would have every – each of us would have our
16   ways of working, but we were – we would always end up
17   dong the work –
18   Q.   Okay.
19   A.   – together.
20   Q.   Was there any confusion as to what he was
21   suppose to do and what you were suppose to do?
22   A.   No.
23   Q.   You knew what you were suppose to do –
24   A.   Yes.
25   Q.   – on your shift?

Page 96

1   A.   Yes.
2   Q.   And as far as you knew, he knew what he was
3   suppose to do?
4   A.   Yes.
5   Q.   Is – is it safe to say that you were
6   supervising certain employees and he was supervising
7   certain other employees?
8   A.   Not all the time. Only sometimes when Russell
9   when tell him, "You – you're going to supervise this
10   side and you're going to supervise this other side."
11   So –
12   Q.   Okay.
13   A.   – there were some days that we used to do that,
14   yes.
15   Q.   All right. Did you ever have any meetings with
16   Mr. Ash about Mr. Salinas? You did tell us about the one
17   that you had with Mr. Kolniak. What about with Mr. Ash?
18   A.   Yes. I do remember one day I went to talk to
19   Mr. Ash because Lupe Salinas was telling all my operators
20   not to do what I would tell them to do, and I was still
21   the supervisor. He would go and tell them not to put
22   attention to – to me because I was a woman and, I mean,
23   I was nobody to – you know. That he was – he was the
24   man there that they –
25   Q.   Mr. Salinas was saying –

Page 97

1    A.    Yes.
2    Q.    – this?
3    A.    Uh-huh.
4    Q.    Okay.
5    A.    So I went to talk to Russell Ash, but Russell
6    Ash would not hear me. He told me I was nobody to
7    talk – I mean to say anything, that I was there to –
8    only to supervise, that – he would never let me defend
9    myself in – to tell you on – on – on a whole way, I
10   mean –
11   Q.    Okay.
12   A.    – because I always felt because I was woman
13   that he would not let me defend myself, because there
14   were sometimes on the third shift this guy Gabriel
15   Atkinson, he would – he would for any little thing he
16   would argue with me or – you know. And I would go to
17   Russell and ask him if he could talk to Gabriel about
18   this, and he would say – he would never put attention to
19   me. So I would always feel sad and – because I was a
20   woman.
21   Q.    Okay. Did you ever complain to anyone other
22   than what you just told me about him telling your
23   operators on – was it one occasion or more than one
24   occasion that he talked to your operators –
25   A.    About what?

Page 98

1    Q.    – Lupe? You – you just told me that Lupe
2    would talk – tell your operators not to do what you had
3    told them to do, right?
4    A.    I don't remember if there – if I went to
5    Russell on other times, but...
6    Q.    Well, my question is how many – how frequent
7    was it that Lupe would tell your operators not to do what
8    you told them?
9    A.    He would always tell me, but I would never put
10   attention to him.
11   Q.    Okay.
12   A.    I mean, I would just do my work and –
13   Q.    Okay.
14   A.    – I would just try to do my best.
15   Q.    And I believe you – you told us that you went
16   to Mr. Ash once complaining about that?
17   A.    Uh-huh. Yes.
18   Q.    Okay. Did you ever complain about anything else
19   regarding Mr. Salinas?
20   A.    I don't remember.
21   Q.    Now, you eventually resigned, correct?
22   A.    Yes, correct.
23   Q.    Why?
24   A.    Why? Because every day since four weeks back or
25   before – before Steve left he would call me in – in the

Page 99

1    meetings every day and he would start yelling at me,
2    telling me that I was not doing my job, that I had to
3    do better, that I – and I would tell him that I was
4    doing my job, that I was trying to do – trying to get
5    the tire builders to make more tires, but he said,
6    "That's not enough. You got to do better," but he would
7    talk to me in a – in a real bad way –
8    Q.    Okay.
9    A.    – I mean.
10   Q.    And after you resigned, did you ever say
11   anything to Lupe Salinas?
12   A.    Not that I remember, no.
13   Q.    Okay. You didn't go to him and tell him, "Well,
14   you wanted my job, here it is"?
15   A.    No, ma'am. I never did do that, no.
16   Q.    Now, you have made a complaint that Mr. Ash
17   asked you out once.
18   A.    He not only ask me once, he ask me three
19   times –
20   Q.    Three –
21   A.    – out.
22   Q.    – times?
23   A.    Yes.
24   Q.    Okay. When did this occur?
25   A.    I believe the first time was on July he ask me

Page 100

1    to go drink a beer. There was a tavern in front of the
2    Titan Tire Company. So I told him no, that I – no, that
3    I didn't drink. I don't do that, so...
4    Q.    Now, you said July. Is this of 2000 or 2001?
5    A.    2000.
6    Q.    Of 2000?
7    A.    I remember – I believe it was 2000, yes.
8    Q.    Okay. And you said, "No, thank you," right?
9    A.    I said, "No, I – I – I don't drink."
10   Q.    Okay. What – when else did he say something?
11   A.    And then there was another time he said, "Are
12   you sure you don't want to go and you don't want to go
13   drink and let's, you know, talk?" I said, "No, because I
14   am married. I don't – I don't do that."
15   Q.    Okay. When did that occur?
16   A.    I remember that that was on – I believe was
17   September – about September.
18   Q.    Of 2000?
19   A.    Yes.
20   Q.    Okay. And what else?
21   A.    And then again on – on November. I don't
22   remember the exact day, but he told me, "Are you sure you
23   don't want to go out? Whenever I go to a plant that I
24   start working on a plant as the plant manager, I – and I
25   date a lady or – and it's my girlfriend or if she

Case 1:02-cv-00176   Document 25   Filed in TXSD on 09/26/2003   Page 50 of 135
BSA        Guillermina M͡elongo v. Titan Tire, Et Al   Guillerm͡  Montelongo–9/10/03        XMAX(26/26)
Page 101

1  marries me, I always build them a house, and I let them
2  have it. Are you sure you don't want to go drink with
3  me?" I said, "No, I don't do that."
4     Q.   Did he ever ask you for anything more than a
5  drink?
6     A.   No. Not that I remember, no.
7     Q.   Okay. So is it safe to say that on three
8  occasions he asked you to go drink a beer with him?
9     A.   He ask me to go out and drink.
10    Q.   Go out and –
11    A.   Yes.
12    Q.   – drink? Okay.
13    A.   Let's say he ask me as a date.
14    Q.   That's how you understood it?
15    A.   Yes. Uh-huh.
16    Q.   Okay. Do you have any knowledge that he asked
17 anybody else in the plant out?
18    A.   I remember this lady that was working in the
19 office. Her name was – gees, I – I can't remember. I
20 have it on my papers there, Criselda Macias.
21    Q.   Criselda?
22    A.   Criselda. She told me that he ask her out, too.
23    Q.   Okay. Anybody else?
24    A.   And Ms. Julia Hutton, she was an operator for
25 me. She was – he – she told me that he ask her out,

1  too, and he – and she heard him like – I don't – I
2  don't remember if it was the – the second time or the
3  last – the last time when he ask me out –
4     Q.   Okay.
5     A.   – Ms. – Ms. Hutton heard him asking me.
6     Q.   What's her last name?
7     A.   Julia Hutton.
8     Q.   Hutton?
9     A.   H-u-t-t-o-n.
10    Q.   Okay. You're – you're saying that she heard
11 him ask you out?
12    A.   Yes. I – but I don't remember if it was the
13 last – the – the second or the last time.
14    Q.   Okay. But one of the times?
15    A.   Yes.
16    Q.   Where were you when these requests were made?
17    A.   I was always on the tire building department.
18    Q.   Were you in the day shift or the afternoon
19 shift?
20    A.   The – I – I remember it was – the first time
21 it was on the first shift. The other two times I don't
22 remember.
23    Q.   Okay. Did you tell anybody that this had
24 happened to you?
25    A.   I told first to Johnny Garcia. He knew about

1  it.
2     Q.   Okay. What did you tell him?
3     A.   I told him that Russell had – had ask me to go
4  out.
5     Q.   Uh-huh. Do you remember when you told him this?
6     A.   No, no –
7     Q.   Was it –
8     A.   – I don't.
9     Q.   – was it after all three events?
10    A.   I don't remember.
11    Q.   Okay. Did you tell anybody else?
12    A.   Well, the – the reason that Steve Harrison knew
13 about it is because one day I was starting my shift and
14 Russell Ash had ask him to – he told him to try to get
15 rid of that fucking bitch, meaning that it was me. And
16 he ask me, "Why does he hate you too much – too much?"
17 And I – I told him – "Well," I told him, "you don't
18 know this, but I'm going to tell you right now. I don't
19 know if – if it's because of this. I don't know. I
20 don't know, but I'm going to tell you he ask me out three
21 times, but I had – I always said no. I don't know if
22 that's – that's why he's being mean with me," or I don't
23 know what was –
24    Q.   When – when –
25    A.   – but that's what – that's – that was the

1  time when Steve Harrison knew about it.
2     Q.   Okay. Was there ever a time that Mr. Ash was
3  nice to you?
4     A.   The first week that he got there he – he went
5  to meet with everybody in the plant. That – that was
6  the only time I – I remember –
7     Q.   Okay.
8     A.   – and I want to be honest. One day I lost my
9  check and he made a check for me right away.
10    Q.   Okay. It wasn't – what kinds of interactions
11 did you have with Mr. Ash before Mr. Harrison was removed
12 as your supervisor? Did you ever meet with him?
13    A.   With who?
14    Q.   With Mr. Ash.
15    A.   I don't remember when – when – I don't
16 really – I really don't remember when Steve was took off
17 as unit manager. Like I was telling you a while ago, I
18 never knew when.
19    Q.   Okay. But we know that it was close to when you
20 and he left, right?
21    A.   Uh-huh.
22    Q.   So it was close to August of 2001 because that's
23 when you left.
24    A.   That you – I mean, can you rephrase –
25    Q.   Yes.

Page 105

1   A.   – the...
2   Q.   In terms of the – the – the year, Mr. Harrison
3   stopped being your supervisor about four weeks before he
4   left, right?
5   A.   You mean the production stuff –
6   Q.   Yes.
7   A.   – yes.
8   Q.   So that it was at that point that you were
9   working directly with Mr. Ash?
10   A.   Yes.
11   Q.   Okay. Before then how had you interacted with
12   Mr. Ash?
13   A.   Before that Mr. Ash would talk to Steve
14   Harrison –
15   Q.   Okay.
16   A.   – and Steve – Steve Harrison would tell me
17   the – what he – he said –
18   Q.   So –
19   A.   – but he – if – if Steve Harrison would
20   always told me that Mr. Ash would always say – he
21   never – he would say, "You've got to talk to that
22   fucking bitch. She's not doing her job," or "Take her
23   out of that job," or whatever. Steve always went to tell
24   me all that, but I always kept it to myself because –
25   Q.   Okay.

Page 106

1   A.   – I needed my job.
2   Q.   When – when Steve found out about these, was
3   that during the period of time that you were not suppose
4   to talk to him about production?
5   A.   I was still talking to him –
6   Q.   Okay.
7   A.   – yes.
8   Q.   When is it that you told Mr. Harrison?
9   A.   I don't remember the exact date, but –
10   Q.   I'm not asking you the exact date, but when in
11   terms of when everything happened here when did you tell
12   Mr. Harrison?
13   A.   I don't remember.
14   Q.   Was it before you went to the second shift?
15   A.   No. I cannot answer that question because I
16   don't remember.
17   Q.   Okay. Do you have any recollection of the
18   timing in which you told Mr. Harrison?
19   MR. MATTINGLY:   Objection; form.
20   A.   It wasn't remember.
21   Q.   (BY MS. LEEDS) Okay. Do you know if he did
22   anything?
23   A.   Not that I know, no, he didn't did anything.
24   Q.   Did he tell you that he went to talk to anybody?
25   A.   I remember he told me – he would always tell

Page 107

1   me, "Don't – try not to get near the office where
2   Russell Ash is. He hates you. He doesn't like you.
3   Don't go near there. Try to avoid him." So I was – I
4   was already scared because sometimes he would – I would
5   see coming – coming in through the line and I would say,
6   "Oh, my gosh, he's coming." So I was already afraid of
7   him.
8   Q.   Okay. When did – did Mr. Harrison tell you
9   this?
10   A.   I think it was when Russell Ash started to –
11   telling him to get rid of me.
12   Q.   And when was this?
13   A.   I think it was – it was before – after the
14   first time he made advances to me, yes.
15   Q.   Okay. Which was July which was – Mr. Ash had
16   just gotten there.
17   A.   Yes.
18   Q.   Okay. So how long had Mr. Ash been there?
19   A.   I don't remember.
20   Q.   Was it the first week he was there?
21   A.   I – I don't remember the exact days, no.
22   Q.   No. I don't asking you exact dates. I'm just
23   asking you how long had Mr. Ash been there. You said he
24   asked you out for the first time in July of –
25   A.   Uh-huh.

Page 108

1   Q.   – 2000 –
2   A.   Uh-huh.
3   Q.   – and Mr. Ash started working there in July of
4   2000. Can you remember if it was the first week or the
5   second week?
6   A.   That Steve would tell me that he would talk to
7   him about me like that?
8   Q.   No. That Mr. Ash asked you out.
9   A.   Oh, the exact week I don't remember on – on
10   July.
11   Q.   Okay. So is it your testimony that Mr. Harrison
12   knew that – or that Mr. Ash was being aggressive towards
13   you after July of 2000?
14   A.   I don't remember the exact days. No, I cannot
15   answer that.
16   Q.   Okay. You just told us that it was after the
17   first time he had asked you out, right?
18   A.   Yes.
19   Q.   Okay. He asked –
20   A.   It was after that, but I don't remember the –
21   the dates or...
22   Q.   Do you know how soon it was after the first
23   time?
24   A.   No.
25   Q.   Because it was only two months in between the

Page 109

1  first and the second.
2     A.   Yes. I really don't know the date. I don't – I
3  don't remember.
4     Q.   Did you have any interactions with Mr. Ash
5  before Mr. Harrison told you to stay away from Mr. Ash?
6     A.   Well, by that time, yes, there were several
7  times he would go to the line and told me – tell me that
8  I had to work with – with my operators.
9     Q.   Okay. So he had already been hard and
10 aggressive with you before Steve told you to stay away
11 from Mr. Ash?
12    A.   Yes.
13    Q.   Okay. Who's Martha Sanchez?
14    A.   Martha Sanchez was the accountant.
15    Q.   Uh-huh. Okay. What is it that she knows about
16 this case?
17 MR. MATTINGLY:   Objection; form.
18    A.   I don't – I don't know.
19    Q.   (BY MS. LEEDS) You have named her as a witness.
20    A.   Martha Sanchez?
21    Q.   Yes.
22    A.   Oh, Martha Sanchez, excuse me. She was – she
23 was not the accountant. I was – I thought it was
24 Martha, the – the one used to work in the
25 accountant. She was working on the human resource.

Page 110

1     Q.   Okay.
2     A.   She told me that Russell Ash had ask her – ask
3  her to go, too, with – with him one day. I don't
4  remember the date.
5     Q.   Okay. Does she know anything about what
6  happened with you?
7     A.   No, I never told her.
8     Q.   Okay. Who is Rose Guajardo?
9     A.   I think she was the secretary – Russell Ash's
10 secretary.
11    Q.   Okay. What does she know about this case to
12 your knowledge?
13    A.   I don't know. I don't know how – how much she
14 knows.
15    Q.   Did you ever talk to her?
16    A.   I don't remember.
17    Q.   Okay. What about Lucio Rangel?
18    A.   Lucio Rangel, he was the supervisor there.
19    Q.   Which shift?
20    A.   I don't remember if it was the day shift.
21    Q.   Okay. What does he know about this case?
22    A.   I don't remember. It's been a long time for me.
23    Q.   Okay. Do you know that you have been named as a
24 witness in Johnny Garcia's case?
25    A.   No, I don't.

Page 111

1     Q.   Do you know that you have been named as a
2  witness in Steve Harrison's case?
3     A.   No.
4     Q.   Have either of them ever talked to you about
5  their lawsuits?
6     A.   No.
7     Q.   Do you know why Johnny Garcia left?
8     A.   No.
9     Q.   Do you know why Steve Harrison left?
10    A.   No.
11    Q.   Have you ever had a lawsuit before?
12    A.   Myself –
13    Q.   Yes.
14    A.   – no.
15    Q.   Have you ever been involved in a lawsuit of any
16 kind?
17    A.   Not that I remember.
18    Q.   Do you know if your husband has?
19    A.   My husband, yes.
20    Q.   Okay. What – what kinds of lawsuits has he
21 been involved in?
22    A.   Only with Titan Tire.
23    Q.   He is suing Titan for his injury, correct?
24    A.   Yes.
25    Q.   Have you ever been convicted of a crime?

Page 112

1     A.   No.
2     Q.   Have you ever been arrested?
3     A.   No.
4     Q.   Other than what Mr. Harrison told you that
5  Mr. Ash didn't want you to be supervisor because you're a
6  woman, did you ever hear of any other comments attributed
7  to Mr. Ash about not wanting women to work or be
8  supervisors?
9     A.   I don't remember, but I think – I remember
10 say – I remember Lucio Rangel saying that when they had
11 them one – several meetings he would talk really bad
12 about me.
13    Q.   About you?
14    A.   Yes.
15    Q.   Okay. What about women in general?
16    A.   He would always talk about the whole operators
17 as the fucking bitches.
18    Q.   Okay. That was his term of the operators in the
19 plant?
20    A.   On the women, yes.
21    Q.   Okay. Was he anymore gracious to the men?
22    A.   I don't know. I couldn't – I couldn't answer
23 that.
24    Q.   Okay. Did you ever complain – oh, I believe
25 you – you told me you did tell Johnny Garcia, right –

Page 113

1   A.   Yes.
2   Q.   – about the fact that Mr. Ash had asked you
3   out?
4   A.   Uh-huh.
5   Q.   Okay. When you told Mr. Garcia, was that when
6   he still worked there?
7   A.   Yes. He was still working there.
8   Q.   Okay. When you told Mr. Harrison about what had
9   occurred between you and Mr. Ash, did Mr. Harrison ever
10  suggest to you that you report it to somebody?
11  A.   I don't remember, but – no, I don't remember
12  him telling me that I had to report it.
13  Q.   Were you ever told –
14  A.   And the reason that I did not report it is –
15  was because I needed my job. I wanted to obtain my job.
16  I knew that if I – if I talked about it he would fire me
17  right away.
18  Q.   Why did you think that?
19  A.   Because he – I – I always knew he didn't – he
20  didn't like me there. He didn't want me there anymore.
21  Q.   Okay. But then –
22  A.   And at that time I needed – I really needed my
23  job.
24  Q.   Well, he started acting that way after the first
25  time he asked you out, right?

Page 114

1   A.   Uh-huh.
2   Q.   And you think that he started treating you that
3   way because you said no?
4   A.   I don't know. I really can't say.
5   Q.   Okay. Because he asked you out twice again
6   after that.
7   A.   Uh-huh. Yes.
8   Q.   So he started treating you bad after the first
9   time, right?
10  A.   Right.
11  Q.   Okay. But then he still asked you out –
12  A.   Uh-huh.
13  Q.   – twice again?
14  A.   Yes.
15  Q.   Okay. Have you gone to see any type of medical
16  doctor for any mental anguish that you have suffered as a
17  result of what occurred to you?
18  A.   Yes. I went to see Dr. Pelly once. I'm not
19  sure if it was once or two times.
20  Q.   Okay. For what?
21  A.   Because I had too much depression. I felt with
22  a lot of stress, so I even – I don't know . I really
23  didn't feel I was myself anymore –
24  Q.   Okay. And what –
25  A.   – because – and –

Page 115

1   Q.   – did he do for you?
2   A.   – and he prescribe me some medication and –
3   Q.   What did he prescribe?
4   A.   – and he advise me to quit the job.
5   Q.   Oh, so you went to see him before you left
6   the – the plant?
7   A.   No, no, no. I went there when I was working.
8   Q.   Oh, okay. When?
9   A.   I'm not sure if it was on October of 2001.
10  Q.   Okay. So you went to see him – wait, October
11  2001 or October 2000?
12  A.   I'm not sure that the – I'm sure of the year,
13  but it was –
14  Q.   Okay.
15  A.   – on October.
16  Q.   Because you left in August, right?
17  A.   Yes.
18  Q.   Okay. So if you went to see him October and you
19  were still working, it had to have been October of 2000.
20  A.   Well, yes, I think I have my papers. I have
21  my –
22  Q.   Okay. But you're sure you were still working
23  when you went to –
24  A.   Oh, yes –
25  Q.   – him?

Page 116

1   A.   – yes.
2   Q.   Okay. Have you gone to see anybody after you
3   left the plant?
4   A.   I went to see this doctor in – in Harlingen.
5   Me and my husband were sent there.
6   Q.   By whom?
7   A.   By Michael Cowen.
8   Q.   Okay. Your attorney?
9   A.   Yes.
10  Q.   Okay.
11  A.   My husband attorney, not – I mean, on his
12  case –
13  Q.   No, I –
14  A.   – not mine.
15  Q.   – understand, but an attorney sent you –
16  A.   Yes –
17  Q.   – there?
18  A.   – yes.
19  Q.   What kind of doctor was this?
20  A.   She was a counselor, I guess. I don't know.
21  Q.   Okay. Do you know why they sent you?
22  A.   Me and my husband were – were – we had a lot
23  of depression. I mean, we were going through all that –
24  Q.   Okay.
25  A.   – and –

Page 117

1   Q.   What was wrong with your husband?
2   MR. MATTINGLY:   Objection; form.
3   A.   I couldn't – I couldn't answer that. He would
4   have to answer that, not me. I can't.
5   Q.   (BY MS. LEEDS) Did you –
6   A.   I can answer mine, but not him.
7   Q.   Yeah. Well, what did you notice was wrong with
8   him?
9   A.   He had a lot of depression.
10   Q.   Okay. Like
11   A.   He was feeling –
12   Q.   – what?
13   A.   – sad, not feeling like him. I mean, he used
14   to be very – he used to make a lot of exercise and walk
15   or –
16   Q.   What part of his body was hurt in his accident?
17   A.   His whole arm with the collarbone.
18   Q.   His arm?
19   A.   His whole arm and all this part right here –
20   Q.   Okay.
21   A.   – part of his face, all the...
22   Q.   Has he recuperated?
23   A.   I can't answer that. I don't know.
24   Q.   Well, you see him every day. Do you –
25   A.   Yes.

Page 118

1   Q.   – see he that he's still –
2   A.   No –
3   A.   – hurt?
4   Q.   – no, he hasn't recover any.
5   Q.   Okay. When – was he in the hospital?
6   A.   Several times, yes.
7   Q.   For this injury?
8   A.   Oh, yes –
9   Q.   Okay.
10   A.   – several times.
11   Q.   When – when – after your husband was injured,
12   did Mr. Ash ever go visit you?
13   A.   He went to visit our house one time, yes.
14   Q.   Okay. And he went there because of your
15   husband's injury?
16   A.   Yes.
17   Q.   Okay. Did he ever go visit your husband at the
18   hospital?
19   A.   My husband had the accident on Thursday. He
20   went to visit him I believe – I don't – I'm not sure,
21   but it was three or four days later.
22   Q.   Okay. So your husband was already home by that
23   time?
24   A.   No.
25   Q.   Oh, he was in the hospital?

Page 119

1   A.   He was in the hospital.
2   Q.   So Mr. Ash went to see him twice?
3   A.   One time at my house and then at the hospital.
4   Q.   Okay. And your husband was injured –
5   A.   But he –
6   Q.   – close –
7   A.   – didn't see my husband. He just talked to me.
8   In the hospital –
9   Q.   Okay.
10   A.   – he only talked to me.
11   Q.   All right. And this was close to the period of
12   time in which you left the company?
13   A.   No, I don't – I don't – I don't remember. My
14   husband got – got hurt on March 29, I believe –
15   March 29.
16   Q.   Okay. And you left in August?
17   A.   Yes.
18   Q.   Okay. But in any event this was after all of
19   the three invitations?
20   A.   I don't remember. I don't – I don't remember
21   the dates.
22   Q.   Okay. Could you tell me that he asked you out
23   July, September, and November –
24   A.   Uh-huh.
25   Q.   – and this would have been March of the next

Page 120

1   year?
2   A.   I don't remember which year was my husband
3   injured. I don't – if it was March of 2000 or –
4   Q.   Well, he was injured –
5   A.   – I think it was in 2000.
6   Q.   He was –
7   A.   He was injured –
8   Q.   – injured the same year you left the company,
9   right –
10   A.   March.
11   Q.   – 2001?
12   A.   Gees, I don't remember.
13   Q.   Okay.
14   MS. LEEDS:   Can we take a break?
15   THE VIDEOGRAPHER:   The time is 6:02, and
16   you're off the record.
17   (Recess 6:02 p.m. to 6:08 p.m.)
18   THE VIDEOGRAPHER:   The time is 6:08, and
19   you're on the record.
20   Q.   (BY MS. LEEDS) Ms. Montelongo, that's all we
21   have for you right now. Thank you very much.
22   MS. LEEDS:   We'll pass the witness. I just
23   want to thank the interpreter for his being here and his
24   tremendous work, and I'm really sorry I did this, but it
25   did go a lot faster.

Page 121

1 THE INTERPRETER: Thank you.
2 E X A M I N A T I O N
3 BY MR. MATTINGLY:
4 Q. Just one question for clarification. Ms. Leeds
5 asked you a question, Minnie, about if you'd ever been
6 involved in a lawsuit. I believe your answer was no, and
7 then she asked you about your husband's lawsuit –
8 A. Uh-huh.
9 Q. – Benigno Rico, and you understand that you
10 were part of that lawsuit; is that correct?
11 A. I didn't understand that part.
12 Q. Okay. You understand that you had – you had a
13 loss of consortium claim in Benigno Rico's lawsuit?
14 MS. LEEDS: Just – just for – you don't
15 need to ask that because that's not a problem. I know
16 she is.
17 MR. MATTINGLY: Okay. Well –
18 MS. LEEDS: She has a consortium claim, so
19 you don't need to –
20 MR. MATTINGLY: Well, thank you.
21 MS. LEEDS: – clarify that.
22 MR. MATTINGLY: Then we'll stipulate. I
23 appreciate –
24 MS. LEEDS: Okay.
25 MR. MATTINGLY: – it, Ms. Leeds. No

Page 122

1 further questions.
2 MS. LEEDS: Thank you.
3 THE WITNESS: Okay.
4 MR. MATTINGLY: Thanks.
5 THE WITNESS: Thank you.
6 THE VIDEOGRAPHER: The time –
7 MR. MATTINGLY: At this time.
8 THE VIDEOGRAPHER: – is 6:09, and you're
9 off the record.
10 *(The proceedings concluded at 6:09 p.m.)*
11 -oOo-

Page 123

1 IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
2 BROWNSVILLE DIVISION
3 GUILLERMINA MONTELONGO )
)
4 VS. ) CIVIL ACTION NO B-02-176
) *(JURY REQUESTED)*
5 TITAN TIRE CORPORATION OF )
TEXAS AND RUSSELL ASH )
6
7 *********************************************
8 FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF GUILLERMINA MONTELONGO
9 SEPTEMBER 10, 2003
10 *********************************************
11
12 I, CAROLYN NEWMAN, a Certified Shorthand Reporter in
13 and for the State of Texas, do hereby certify that the
14 facts stated by me in the caption hereto are true, that
15 the foregoing deposition transcript of GUILLERMINA
16 MONTELONGO, the witness hereinbefore named, was at the
17 time mentioned taken by me in stenograph, the said
18 witness having been by me first duly cautioned and sworn
19 upon her oath to tell the truth, the whole truth, and
20 nothing but the truth, and later transcribed from
21 stenograph by me
22 I further certify that I am neither attorney or
23 counsel for, nor related to or employed by any of the
24 parties to the action in which this deposition is taken,
25 and further that I am not a relative or employee of any

Page 124

1 attorney or counsel employed by the parties hereto, or
2 financially interest in the action.
3 I further certify that the above and foregoing
4 deposition transcript as set forth in typewriting is a
5 full, true and correct transcript of the proceedings had
6 at the time of taking said deposition.
7 Certified to by me this 25th day of September, 2003.
CAROLYN NEWMAN
CERTIFIED SHORTHAND REPORTER
13 STATE OF TEXAS
CERT. NO 4193 EXP. DATE: 12/31/03
POCKRUS REPORTING SERVICE
15 P.O. BOX 531786
HARLINGEN, TEXAS 78553
16 1-800-423-7713
1-800-423-7730 (FAX)

Page 125

```
 1                    CHANGES AND SIGNATURE
 2  PAGE   LINE      CHANGE                    REASON
25                   GUILLERMINA MONTELONGO
```

Page 126

```
 1      I, GUILLERMINA MONTELONGO, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct. except as noted above
 6                    GUILLERMINA MONTELONGO
 8  THE STATE OF TEXAS        )
 9  COUNTY OF CAMERON         )
11      Before me,                              , on this
12  day personally appeared GUILLERMINA MONTELONGO. known to
13  me (or proved to me under oath or through
14                               ) (description of
15  identity card or other document) to be the person whose
16  name is subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same for the
18  purposes and consideration therein expressed.
19              Given under my hand and seal of office
20  this     day of          , 2003.
24                    NOTARY PUBLIC IN AND FOR
25                    THE STATE OF TEXAS
```

**Look-See Concordance Report**

- - -

UNIQUE WORDS: **1,038**
TOTAL OCCURRENCES: **5,327**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **20,147**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 5

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

**– DATES –**

**12/31/03** [1]
*124:13*
**August** [5]
*62:17; 77:9; 87:24; 115:16; 119:16*
**August of 2001** [2]
*87:15; 104:22*
**August the 3rd** [1]
*6:14*
**August the 10th** [1]
*62:18*
**July** [8]
*77:9; 94:7; 99:25; 100:4; 107:15, 24; 108:10; 119:23*
**July, 2000** [1]
*62:6*
**July of 2000** [3]
*66:10; 108:3, 13*
**July of 2001** [1]
*91:1*
**March** [2]
*119:25; 120:10*
**March 29** [2]
*119:14, 15*
**March of 2000** [1]
*120:3*
**November** [2]
*100:21; 119:23*
**October** [2]
*115:15, 18*
**October, 2000** [1]
*115:11*
**October, 2001** [1]
*115:10*
**October of 2000** [1]
*115:19*
**October of 2001** [1]
*115:9*
**September** [3]
*100:17; 119:23*

**September, 2003** [1]
*124:7*
**SEPTEMBER 10, 2003** [1]
*123:9*

**– 0 –**

**08288382** [1]
*17:23*

**– 1 –**

**1-800-423-7713** [1]
*124:16*
**1-800-423-7730** [1]
*124:16*
**10** [2]
*38:17; 123:9*
**10th** [1]
*62:18*
**11:00** [3]
*26:19; 61:6; 86:19*
**12/31/03** [1]
*124:13*
**13** [2]
*16:2, 23*
**15** [3]
*16:1, 23; 38:17*
**16** [1]
*84:16*
**1952** [1]
*6:14*
**1973** [1]
*10:1*
**1986** [2]
*7:18; 14:24*
**1997** [1]
*10:2*
**1998** [2]
*14:15; 15:1*

**– 2 –**

**2** [1]
*16:6*
**20** [1]
*16:1*
**200** [1]
*39:16*
**2000** [15]
*61:24; 62:6; 66:10; 100:4, 5, 6, 7, 18; 108:1, 4, 13; 115:11, 19; 120:3, 5*
**2001** [8]
*62:18; 87:16; 91:1; 100:4; 104:22; 115:9, 11; 120:11*
**2002** [1]
*62:19*
**2003** [3]
*123:9; 124:7; 126:20*
**25th** [1]
*124:7*
**28** [1]
*15:25*
**29** [2]
*119:14, 15*

**– 3 –**

**30** [5]

**15:25; 84:13, 15;**
**85:25**
**32** [1]
*15:23*
**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** [1]
*17:13*
**3:00** [4]
*26:19; 61:6, 10; 86:19*
**3:30** [1]
*26:2*
**3:46** [1]
*6:2*
**3rd** [1]
*6:14*

**– 4 –**

**4193** [1]
*124:13*
**4:45** [2]
*59:2, 4*
**4:51** [2]
*59:4, 5*

**– 5 –**

**5** [1]
*38:16*
**531786** [1]
*124:15*
**5:24** [1]
*86:13*

**– 6 –**

**6** [2]
*9:1, 2*
**6:02** [2]
*120:15, 17*
**6:08** [2]
*120:17, 18*
**6:09** [2]
*122:8, 10*

**– 7 –**

**78553** [1]
*124:15*
**7:00** [2]
*26:2; 61:10*

**– 9 –**

**98** [3]
*12:7, 8, 9*
**99** [1]
*12:7*

**– A –**

**abandon** [1]
*47:12*
**able** [3]
*46:6; 84:7; 87:25*
**absence** [14]
*45:23; 76:16, 17; 90:23; 93:11, 12, 21; 94:3, 6, 11, 16, 20, 21; 95:5*
**absences** [1]
*94:14*
**absolutely** [2]
*28:1; 58:24*
**accident** [3]

**91:1o, 117:16; 118:19**
**accountant** [3]
*109:14, 23, 25*
**acknowledged** [1]
*126:17*
**act** [2]
*82:24; 83:1*
**acting** [1]
*113:24*
**ACTION** [1]
*123:4*
**action** [2]
*123:24; 124:2*
**advance** [1]
*44:23*
**advances** [1]
*107:14*
**advise** [1]
*115:4*
**affect** [1]
*78:17*
**affected** [1]
*78:12*
**affix** [1]
*126:2*
**afraid** [1]
*107:6*
**afternoon** [12]
*26:7, 9, 11, 19; 60:12; 61:2, 13; 78:5, 9; 80:8; 84:21; 102:18*
**afternoons** [1]
*59:18*
**ages** [1]
*15:20*
**aggressive** [3]
*82:3; 108:12; 109:10*
**air** [1]
*36:8*
**allowed** [1]
*53:14*
**alone** [1]
*49:13*
**amount** [4]
*10:12; 29:23, 24; 76:6*
**anguish** [1]
*114:16*
**answer** [13]
*13:24; 56:7; 57:18; 88:24; 92:22; 106:15; 108:15; 112:22; 117:3, 4, 6, 23; 121:6*
**answering** [1]
*14:3*
**answers** [15]
*6:25; 7:1, 4, 5, 8, 9, 12, 13; 13:18; 15:10; 28:4, 7, 8, 9; 42:5*
**Anybody** [1]
*101:23*
**anybody** [11]
*43:8; 44:13; 49:4; 75:3; 83:15; 87:8; 101:17; 102:23; 103:11; 106:24; 116:2*
**anymore** [8]
*9:7; 24:23; 63:20; 66:18; 80:25; 112:21; 113:20; 114:23*
**appeared** [1]
*126:12*

**appreciate** [1]
*121:23*
**area** [4]
*10:19; 34:4; 46:5; 90:18*
**areas** [2]
*70:24; 72:13*
**argue** [1]
*97:16*
**argument** [1]
*44:1*
**arm** [3]
*117:17, 18, 19*
**arrested** [1]
*112:2*
**ASH** [1]
*123:5*
**Ash** [93]
*24:16; 25:3, 8, 11, 13; 41:6; 44:4; 45:25; 49:19; 50:4; 52:6; 53:15, 20; 54:19, 23; 55:7; 56:14, 15, 18; 59:13, 16; 60:8, 13; 61:19; 62:1; 63:8, 19, 21; 64:4, 5, 14, 24; 65:1, 10, 22; 66:9; 67:7, 16, 20; 68:4, 10, 13; 69:1; 73:25; 74:18; 77:9; 79:3, 9, 15, 24, 25; 81:7; 83:14; 84:20; 85:24; 87:10, 22; 89:9; 95:5; 96:16, 17, 19; 97:5, 6; 98:16; 99:16; 103:14; 104:2, 11, 14; 105:9, 12, 13, 20; 107:2, 10, 15, 18, 23; 108:3, 8, 12; 109:4, 5, 11; 110:2; 112:5, 7; 113:2, 9; 118:12; 119:2*
**Ash's** [3]
*66:3; 81:10; 110:9*
**asking** [8]
*8:10; 22:7; 25:20; 38:11; 102:5; 106:10; 107:22, 23*
**assigned** [2]
*68:24; 70:5*
**associated** [1]
*44:20*
**assume** [1]
*48:20*
**Atkinson** [1]
*97:15*
**attain** [1]
*37:9*
**attend** [8]
*59:11, 23; 60:6, 15; 63:15; 67:20, 21; 87:6*
**attending** [1]
*61:20*
**attention** [3]
*96:22; 97:18; 98:10*
**attorney** [5]
*116:8, 11, 15; 123:22; 124:1*
**attributed** [1]
*112:6*
**August** [9]
*6:14; 62:17, 18; 77:9;*

87:15, 24; 104:22;
115:16; 119:16
**authorize** [1]
95:5
**authorized** [1]
94:23
**average** [1]
46:21
**avoid** [1]
107:3
**awhile** [1]
34:1

**– B –**

**B-02-176** [1]
123:4
**basically** [1]
33:2
**bathrooms** [1]
19:4
**beer** [2]
100:1; 101:8
**behavior** [2]
56:5; 57:14
**believe** [15]
30:10; 61:18; 62:17;
67:11; 69:19; 91:2;
95:1; 98:15; 99:25;
100:7, 16; 112:24;
118:20; 119:14; 121:6
**Benigno** [4]
14:10; 15:11; 121:9,
13
**Benigno's** [2]
15:18; 92:8
**bigger** [6]
20:10, 13; 29:13, 15;
47:16
**birth** [1]
6:13
**bitch** [2]
103:15; 105:22
**bitches** [1]
112:17
**blanks** [2]
76:15, 20
**body** [1]
117:16
**book** [1]
36:24
**born** [1]
6:15
**boss** [1]
66:15
**bosses** [1]
82:14
**Boulevard** [1]
9:5
**BOX** [1]
124:15
**break** [6]
39:25; 40:1; 58:21, 23;
90:6; 120:14
**breakdown** [2]
40:13; 41:17; 51:19
**breaking** [1]
57:23
**BROWNSVILLE** [1]
123:2
**Brownsville** [6]

6:18; 8:24; 9:18; 10:5;
16:10; 74:18
**build** [51]
12:21, 23; 18:13; 19:8;
27:13; 28:13; 29:10,
14; 30:15, 25; 31:4;
34:7, 8, 22; 37:18, 23,
24; 38:1, 12; 39:11,
12, 16; 41:1; 43:15;
45:21; 46:1, 4; 47:12;
49:8, 10, 15; 50:12,
15; 51:1; 52:19;
58:12; 70:10, 25; 71:4,
16; 72:7, 8, 19, 23;
76:7; 77:10; 79:14;
88:20; 101:1
**builder** [1]
30:21, 24; 76:21
**builders** [8]
45:17; 68:1; 70:10;
88:20; 89:13, 15, 17;
99:5
**building** [40]
12:25; 19:7, 12; 20:19;
21:1; 22:6, 14; 23:23;
27:10, 13; 29:21; 30:8;
35:21; 37:11; 38:23;
39:14; 46:8; 47:10, 17;
48:3, 12, 13, 14;
49:13; 50:20; 59:15,
24; 60:22; 68:11; 73:3,
16; 75:20; 76:19;
77:22, 23; 78:3, 11;
79:10; 80:17; 102:17
**builds** [1]
35:17
**built** [2]
38:13; 47:11
**burned** [1]
9:8
**Burnias** [4]
12:16, 17, 18
**business** [1]
74:23
**Bye** [1]
93:4

**– C –**

**California** [1]
16:20
**call** [3]
78:23; 87:16; 98:25
**calling** [1]
77:5
**CAMERON** [1]
126:9
**Canvas** [1]
28:14
**canvas** [1]
28:10
**caption** [1]
123:14
**carcass** [4]
31:18, 21, 22, 23
**card** [1]
126:15
**CAROLYN** [2]
123:12; 124:11
**Casandra** [1]
16:1

**case** [3]
81:20; 86:15; 109:16;
110:11, 21, 24; 111:2;
116:12
**cash** [2]
10:13, 14
**caterpillar** [1]
38:3
**caught** [1]
92:17
**cautioned** [1]
123:18
**Central** [1]
9:5
**CERT** [1]
124:13
**CERTIFICATE** [1]
123:8
**CERTIFIED** [1]
124:12
**Certified** [2]
123:12; 124:7
**certify** [3]
123:13, 22; 124:3
**CHANGE** [1]
125:2
**change** [13]
13:1; 30:16; 47:5, 16,
25; 53:13; 54:19; 55:4,
5, 21; 56:4; 75:12;
86:11
**changed** [6]
12:22; 26:7, 18; 27:10;
61:13; 78:8
**CHANGES** [1]
125:1
**changes** [1]
27:6
**changing** [1]
57:14
**charge** [1]
72:13
**check** [6]
17:19; 40:7; 90:4, 8;
104:9
**checking** [1]
73:17
**children** [2]
15:14, 18
**Chuck** [5]
23:7, 16; 41:6; 45:4,
25
**CISNEROS** [18]
8:12, 14; 10:23; 11:1;
16:7; 17:21; 27:25;
28:10, 12, 14; 30:5;
58:25; 60:17; 91:19,
21, 25; 92:2, 7
**Cisneros** [1]
93:7
**CIVIL** [1]
123:4
**claim** [3]
77:2; 121:13, 18
**clarification** [1]
121:4
**clarified** [1]
69:5
**clarify** [2]
64:17; 121:21
**class** [1]

36:10
**classes** [1]
36:12
**clean** [8]
46:5; 66:25; 67:1;
70:24; 90:18
**cleaning** [7]
8:22; 12:20; 17:25;
19:1, 4; 27:12; 30:2
**closed** [2]
10:3, 9
**coemployees** [1]
42:11
**cold** [1]
86:25
**collarbone** [1]
117:17
**coming** [4]
90:14; 107:5, 6
**comments** [1]
112:6
**common** [2]
14:10
**Company** [1]
100:2
**company** [9]
9:16; 36:1, 17, 25;
37:3; 47:6; 94:25;
119:12; 120:8
**compensation** [1]
10:7
**complain** [3]
97:21; 98:18; 112:24
**complaining** [1]
98:16
**complaint** [1]
99:16
**complete** [1]
76:25
**completely** [2]
47:12; 76:10
**comply** [1]
72:2
**concerning** [1]
42:13
**concluded** [1]
122:10
**conduct** [1]
36:18
**confidentiality** [1]
92:3
**confused** [2]
23:13; 65:20
**confusion** [1]
95:20
**consider** [1]
56:4
**consideration** [1]
126:18
**consortion** [2]
121:13, 18
**contact** [1]
75:2
**continuously** [1]
55:12
**convicted** [1]
111:25
**cooked** [2]
31:24; 73:13
**cooperate** [1]
53:3

36:10
**copy** [4]
84:1, 2; 93:19, 20
**CORPORATION** [1]
123:5
**correctly** [2]
30:19; 90:3
**counsel** [2]
123:23; 124:1
**counselor** [1]
116:20
**count** [2]
39:3, 4
**COUNTY** [1]
126:9
**COURT** [1]
123:1
**Cowen** [1]
116:7
**crime** [1]
111:25
**Criselda** [3]
101:20, 21, 22
**Curing** [1]
32:19
**curing** [1]
32:18
**cut** [1]
72:16
**cutting** [1]
72:15

**– D –**

**daily** [2]
60:1, 6; 61:20
**DATE** [1]
124:13
**date** [11]
6:13; 84:2; 87:3;
93:25; 94:4; 100:25;
101:13; 106:9, 10;
109:2; 110:4
**dates** [5]
62:15; 77:21; 107:22;
108:21; 119:21
**Datsun** [1]
48:13
**day** [42]
18:15; 35:12, 24; 37:9;
39:6, 11, 16, 17;
40:19; 41:14; 50:6, 8;
58:4; 59:17; 60:3;
66:24; 73:21; 74:2, 13;
77:7; 78:1; 83:2;
84:12; 88:1, 12, 15;
89:16; 96:18; 98:24;
99:1; 100:22; 102:18;
103:13; 104:8; 110:3,
20; 117:24; 124:7;
126:12, 20
**days** [9]
40:16; 44:6; 66:6, 7;
70:1; 96:13; 107:21;
108:14; 118:21
**defend** [2]
97:8, 13
**demoted** [2]
77:3; 78:23
**demotion** [1]
77:5
**department** [11]

22:7; 23:4, 23; 27:16,
18; 29:21; 40:21;
46:8; 80:11; 102:17
depend [2]
29:17; 38:21
depending [3]
37:13; 47:5; 48:21
DEPOSITION [1]
123:8
deposition [5]
123:15, 24; 124:4, 6;
126:2
depositions [2]
19:10; 81:19
depression [3]
114:21; 116:23; 117:9
describe [2]
81:10, 11
described [1]
82:5
description [1]
126:14
Diego [1]
16:20
different-size [3]
35:7; 47:17; 48:4
direct [16]
21:12, 15, 22; 23:19;
24:8, 11, 12, 20;
25:18; 56:14; 60:14;
61:19; 63:8, 16; 64:5
discussed [2]
60:20; 88:2
DISTRICT [2]
123:1
divided [5]
19:15; 20:7; 46:10, 12,
15
DIVISION [1]
123:2
doctor [3]
114:16; 116:4, 19
document [1]
126:15
doesn't [5]
28:17; 32:6; 58:8;
92:12; 107:2
dong [1]
95:17
Dr [1]
114:18
drink [9]
100:1, 3, 9, 13; 101:2,
5, 8, 9, 12
driver's [2]
17:14, 23
drop [1]
52:23
drum [2]
31:15; 47:23
drums [2]
30:18; 47:16
duly [3]
6:6; 123:18
duties [6]
31:1; 45:16, 17; 47:4,
5; 95:8

– E –

early [1]

easily [1]
8:1
easy [1]
8:9
Edcouch [1]
16:4
educational [1]
7:15
effective [4]
52:20; 55:8; 56:4;
57:14
effort [1]
74:17
Eileen [1]
91:22
electric [1]
9:17
employed [3]
41:13; 123:23; 124:1
employee [6]
36:18, 20; 54:22; 55:1;
56:16; 123:25
employee's [1]
56:5
employees [7]
51:24; 52:10; 70:21;
86:2; 89:8; 96:6, 7
employment [5]
13:1; 26:10; 27:9;
30:3, 7
end [5]
11:16, 17; 66:24;
73:12; 95:16
English [7]
6:24; 7:2, 11; 8:2, 11;
13:23; 14:4
enters [2]
21:6; 91:7
event [2]
63:14; 119:18
events [1]
103:9
eventually [3]
26:18; 28:21; 98:21
Everybody [1]
74:25
everybody [2]
82:20; 104:5
everybody's [1]
66:15
exact [5]
32:17; 37:4; 100:22;
106:9, 10; 107:21, 22;
108:9, 14
example [2]
47:8; 53:17
except [1]
126:3
excluding [1]
30:2
Excuse [4]
14:1; 26:21; 28:16;
81:9
excuse [1]
109:22
executed [1]
126:17
exercise [1]
117:14
EXP [1]

124:13
expected [1]
86:8
explain [8]
18:18; 22:24; 31:3;
33:13; 71:7; 84:8;
86:5; 91:17
explained [2]
70:4; 84:6; 86:1
explanation [1]
79:12
expressed [1]
126:18
extent [1]
47:4
Extruder [2]
27:18, 19
extruder [12]
27:16, 20; 28:11; 29:7;
30:1, 7, 20; 33:7; 34:1;
35:2; 91:10

– F –

f-u-c-k [1]
88:17
face [2]
89:21; 117:21
fact [1]
113:2
facts [1]
123:14
faster [4]
51:25; 52:3; 73:2;
120:25
father's [1]
17:1
FAX [1]
124:16
feel [3]
71:11; 97:19; 114:23
feeling [2]
117:11, 13
fell [2]
92:13, 14
felt [4]
82:16; 88:22; 97:12;
114:21
field [1]
7:20
fields [2]
8:17, 20
figure [1]
62:22
FILING [1]
123:8
fill [14]
39:8; 47:6; 49:7; 75:6,
9, 10, 16, 23, 24; 76:5,
9, 15, 16, 19
filled [3]
39:3; 48:22; 88:4
filling [1]
49:12
final [1]
32:22
financially [1]
124:2
find [1]
73:14
finish [1]

34:21
fire [4]
56:22; 57:3; 74:16;
113:16
fired [1]
61:25
First [1]
26:1
first [37]
6:6; 7:19, 20; 12:20;
17:5, 24; 20:6, 18;
23:6, 21; 25:25; 35:10;
36:5; 37:11; 39:13;
45:13; 60:5; 61:8, 10;
66:9; 69:6; 80:6;
99:25; 102:20, 21, 25;
104:4; 107:14, 20, 24;
108:4, 17, 22; 109:1;
113:24; 114:8; 123:18
five [7]
58:9, 15; 77:11, 12,
22; 78:24
fix [1]
90:10
floor [1]
66:25
fluctuated [1]
46:21
follows [1]
6:7
Ford [1]
47:10
foregoing [4]
123:15; 124:3; 126:1,
16
form [7]
30:5; 32:10, 11; 60:17;
106:19; 109:17; 117:2
forth [1]
124:4
found [2]
95:10; 106:2
four [18]
31:14; 36:7; 61:25;
62:24; 67:12; 68:22;
69:9, 16; 73:18; 77:10,
12; 78:20, 24; 79:19;
81:2; 98:24; 105:3;
118:21
frequent [1]
98:6
front [2]
31:13; 100:1
fucking [4]
83:6; 103:15; 105:22;
112:17
full [1]
124:5

– G –

Gabriel [2]
97:14, 17
Gabrielle [1]
16:2
Garcia [14]
18:17; 21:7, 8, 15;
23:18; 25:6; 35:13;
41:7; 45:13; 49:6;
102:25; 111:7; 112:25;
113:5

Garcia's [1]
110:24
gave [1]
35:20
geared [1]
48:2
GED [3]
6:21; 7:15, 17
Gees [1]
120:12
gees [1]
101:19
girlfriend [1]
100:25
give [8]
10:7, 11; 45:18; 49:4;
51:24; 64:8; 65:13
Given [1]
126:19
given [2]
36:6; 44:24
goal [3]
41:15; 42:2; 51:8
goals [9]
40:9; 41:19; 42:7;
48:21; 50:12; 51:19;
58:18; 60:21; 71:8
goes [1]
54:2
Gosh [1]
81:12
gosh [1]
107:6
gotten [1]
107:16
gracious [1]
112:21
graduate [1]
6:20
green [1]
32:2; 35:15
group [2]
18:19; 19:12
Guadalupe [5]
42:15; 67:24; 68:7, 15;
70:18
Guajardo [1]
110:8
guess [4]
33:6; 36:8; 50:13;
56:9; 75:1; 116:20
GUILLERMINA [8]
6:5; 123:3, 8, 15;
125:25; 126:1, 6, 12
Guillermina [2]
6:12; 17:3
guy [1]
97:14

– H –

H-u-t-t-o-n [1]
102:9
Haggar [1]
11:19
Haggard [3]
9:24; 10:17; 11:7
half [7]
26:14; 35:13; 37:25;
38:1, 13; 51:2
hand [1]

36:20; 76:1; 126:19
**handed** [1]
17:22
**happening** [7]
40:24; 57:19; 64:16;
65:22; 83:6; 88:17;
89:22
**harassment** [1]
43:18
**hard** [15]
52:18; 53:1, 5; 54:23;
55:1; 56:16, 21; 57:17;
58:2; 81:15, 16, 17;
83:10, 13; 109:9
**harder** [5]
51:25; 52:14; 55:8;
56:10; 70:21
**HARLINGEN** [1]
124:15
**Harlingen** [1]
116:4
**Harrison** [71]
13:6, 15; 20:20; 21:21;
23:3, 8, 17, 18; 25:3;
26:24; 27:6; 41:4;
49:6, 18; 53:11; 54:6,
16; 55:7, 19, 20; 56:3,
4; 59:12; 60:14; 62:4,
7, 24; 63:1, 15, 19;
64:4, 19; 65:2, 13, 16;
67:9, 12, 13; 73:10;
77:9, 15; 79:4, 7, 13;
80:18, 25; 83:3; 84:8,
10; 85:2; 86:20, 21;
95:1, 2; 103:12; 104:1,
11; 105:2, 14, 16, 19;
106:8, 12, 18; 107:8;
108:11; 109:5; 111:9;
112:4; 113:8, 9
**Harrison's** [1]
111:2
**hasn't** [1]
118:4
**hate** [1]
103:16
**hates** [1]
107:2
**He's** [2]
45:14; 81:22
**he's** [4]
15:23; 103:22; 107:6;
118:1
**head** [4]
12:10; 80:14; 83:8;
87:9
**hear** [4]
83:10, 14; 97:6; 112:6
**heard** [6]
74:24; 83:5; 88:5;
102:1, 5, 10
**heavy** [2]
72:18, 19
**held** [1]
61:1
**help** [19]
42:23; 43:15, 16; 44:9,
10; 45:18; 46:1; 49:7,
11; 53:7; 58:14;
68:16; 70:9, 14, 22,
23; 72:25; 93:6; 95:11
**hereby** [1]

123:13; 126:2
**hereinbefore** [1]
123:16
**hereto** [2]
123:14; 124:1
**Herrera** [7]
15:23, 25; 16:1, 18;
17:3, 6
**Hey** [3]
73:15; 90:21, 22
**high** [1]
6:20
**Hilberto** [2]
15:23; 16:3
**hired** [3]
12:4, 14, 19
**hoist** [1]
31:10
**hold** [1]
62:15
**home** [2]
93:6; 118:22
**honest** [4]
71:13; 81:13, 14;
104:8
**hook** [1]
11:12
**Horace** [10]
10:20, 22, 23, 25;
11:1, 21; 12:12
**hospital** [7]
93:20; 118:5, 18, 25;
119:1, 3, 8
**hotel** [1]
8:21
**hour** [4]
41:1; 49:24; 74:10;
75:24
**hours** [9]
46:11, 14, 15; 84:13,
15, 16; 85:23, 25
**house** [3]
101:1; 118:13; 119:3
**hugh** [2]
38:3
**human** [1]
109:25
**hurt** [3]
117:16; 118:3; 119:14
**husband** [21]
17:5; 91:3, 5, 13;
93:14, 22, 23; 111:18,
19; 116:5, 11, 22;
117:1; 118:11, 17, 19,
22; 119:4, 7, 14; 120:2
**husband's** [3]
14:9; 118:15; 121:7
**Hutton** [3]
101:24; 102:5, 7, 8
**hydraulics** [1]
36:11

— I —

**I'd** [1]
59:8
**I've** [3]
17:22; 25:14; 82:14
**idea** [2]
18:10; 47:9
**identity** [1]

126:15
**impossible** [1]
41:16
**impression** [1]
22:17
**in-between** [1]
24:8
**incentive** [1]
51:25
**increase** [2]
44:20, 22
**Indiana** [2]
7:24; 16:22
**individual** [1]
51:24
**industrial** [1]
38:3
**injured** [13]
91:5, 9, 12; 92:21;
93:14, 22, 24; 118:11;
119:4; 120:3, 4, 7, 8
**injury** [3]
111:23; 118:7, 15
**inspect** [1]
73:13
**inspected** [1]
32:25
**inspecting** [1]
11:17
**instituted** [2]
51:11, 14
**instruction** [1]
49:4
**instructions** [1]
35:21
**instrument** [1]
126:16
**interact** [1]
66:22
**interacted** [1]
105:11
**interactions** [2]
104:10; 109:4
**interest** [1]
124:2
**INTERPRETER** [3]
13:25; 14:3; 121:1
**Interpreter** [10]
6:4; 7:1, 5, 9, 13;
13:18; 15:10; 28:4, 8;
42:5
**interpreter** [8]
6:7; 7:6; 8:3, 4, 7;
15:7; 28:2; 120:23
**inventory** [1]
43:13
**invitations** [1]
119:19
**involved** [3]
111:15, 21; 121:6
**Irene** [2]
16:16, 17
**Isabel** [2]
16:1, 21

— J —

**Jaime** [4]
15:25; 16:7, 8, 9
**Jerry** [1]
27:15

**job** [28]
7:19, 20; 8:20; 12:3;
19:5; 52:16; 59:8;
62:10, 17; 82:8; 83:6;
88:14, 16, 22, 24;
89:21; 90:4, 21; 99:2,
4, 14; 105:22, 23;
106:1; 113:15, 23;
115:4
**jobs** [2]
52:17; 55:13
**Joe** [2]
43:10, 22
**Johnny** [20]
18:17; 21:7, 8, 15;
23:18, 25; 24:1, 4;
25:5, 12; 35:13, 24;
41:7; 45:8, 13; 49:6;
102:25; 110:24; 111:7;
112:25
**Jr** [1]
15:25
**Julia** [2]
101:24; 102:7
**July** [13]
62:6; 66:10; 77:9;
91:1; 94:7; 99:25;
100:4; 107:15, 24;
108:3, 10, 13; 119:23
**JURY** [1]
123:4

— K —

**keep** [6]
38:22; 50:10; 52:21;
57:15; 73:17; 90:19
**kept** [2]
55:25; 105:24
**kill** [1]
58:4
**kinds** [11]
19:1; 20:1, 3; 30:15;
41:10; 59:23; 66:22;
70:19; 76:2; 104:10;
111:20
**knowing** [1]
71:4
**knowledge** [6]
24:15; 59:15; 79:3;
80:22; 101:16; 110:12
**Kolniak** [5]
43:10, 22, 24; 44:15;
96:17

— L —

**La** [2]
6:16, 18
**lack** [3]
40:12; 41:3; 42:2
**lady** [5]
80:10; 82:12, 17;
100:25; 101:18
**laid** [1]
74:25
**largest** [3]
38:5, 11, 12
**last** [13]
17:1, 5; 31:14; 66:6, 7;
68:22; 69:9, 16; 102:3,
6, 13

**last-ditch** [1]
74:17
**Late** [1]
81:4
**late** [5]
61:2, 13; 81:3; 87:13,
18
**late-afternoon** [2]
26:23; 27:5
**law** [1]
14:10
**lawsuit** [1]
111:11, 15; 121:6, 7,
10, 13
**lawsuits** [1]
111:5, 20
**layers** [4]
28:5; 29:4, 5; 30:20
**leading** [2]
33:8, 22
**leadman** [1]
27:15
**Leave** [1]
94:11, 14
**leave** [16]
34:19; 46:5; 67:1;
90:18, 23; 93:11, 12,
21; 94:3, 6, 9, 16, 20,
21, 23; 95:5
**leaves** [2]
19:3; 93:7
**leaving** [1]
83:3
**LEEDS** [54]
6:9; 8:16; 10:25; 11:3;
13:19, 23; 14:2, 5, 6;
15:11; 16:9; 17:22, 24;
19:6; 21:10; 25:9, 11;
26:21, 22; 28:1, 18;
51:21; 53:22; 54:1, 2;
59:7; 60:19; 67:18, 19;
80:13, 16; 86:15; 91:8,
24; 92:1, 5, 10; 93:4,
5, 10; 106:21; 109:19;
117:5; 120:14, 20, 22;
121:14, 18, 21, 24;
122:2
**Leeds** [2]
121:4, 25
**legally** [1]
14:13
**Let's** [3]
36:5; 45:2; 54:14;
101:13
**let's** [6]
25:24; 54:13; 57:22;
73:24; 100:13
**license** [2]
17:14, 23
**liked** [1]
51:7
**LINE** [1]
125:2
**line** [2]
107:5; 109:7
**listen** [1]
53:9; 54:22; 55:17
**live** [3]
16:3, 19, 24
**lives** [3]

16:4, 10, 20

**living** [1]
14:19

**load** [1]
84:15

**located** [1]
72:9

**longest** [1]
38:14

**lose** [1]
70:25

**loss** [1]
121:13

**lost** [1]
104:8

**lot** [18]
8:11; 20:3; 36:24;
40:8; 45:23; 49:7;
53:2, 4; 57:20; 58:5;
60:2; 82:14; 114:22;
116:22; 117:9, 14;
120:25

**loud** [1]
81:21

**Lucio** [3]
110:17, 18; 112:10

**Lupe** [9]
67:22; 70:14, 17; 89:1;
96:19; 98:1, 7; 99:11

**– M –**

**ma'am** [20]
12:24; 18:2, 12; 22:21;
23:15; 30:23; 32:3;
34:15; 35:5, 22; 37:10,
12, 15, 19, 21; 39:9,
23; 44:12; 49:3; 99:15

**machine** [51]
11:10, 13; 19:11, 15,
16, 17, 18, 23; 20:5;
21:19; 27:20, 21, 22;
29:7; 30:1, 7, 11, 14,
15, 20; 31:2, 7, 9, 25;
32:2, 19, 20; 33:7, 9,
11, 12; 34:1, 9, 10, 14,
17, 20; 35:2, 6, 7, 25;
40:12, 15; 45:20;
47:24; 48:13; 90:5, 6,
11

**machinery** [7]
18:1, 11; 35:17; 59:20,
23; 91:8

**machines** [35]
11:12, 18, 23; 12:20,
21; 19:2, 24; 20:2, 3,
12; 24:25; 27:12;
29:18; 37:8; 39:25;
40:1; 41:17; 42:25;
46:23; 47:2, 11; 48:6,
12, 18; 50:20; 51:19;
57:23; 66:25; 67:1;
70:23; 84:15; 88:4;
90:3, 14, 18

**Macias** [1]
101:20

**mad** [3]
43:17; 53:19; 89:19

**maid** [2]
8:21, 24

**maiden** [1]

**main** [1]
25:22

**maintain** [1]
75:2

**man** [1]
96:24

**management** [1]
81:10

**manager** [38]
13:5, 9, 16; 20:22, 23,
24; 21:2; 22:1, 4, 5, 6,
8, 10, 15, 17, 18, 25;
23:3, 5, 9, 12, 17, 18;
24:14; 40:21; 41:15;
45:3; 59:14, 15; 66:4,
5, 11, 12; 80:23;
100:24; 104:17

**manner** [1]
53:18

**manuals** [1]
36:20

**manufacture** [1]
11:5

**March** [5]
119:14, 15, 25; 120:3,
10

**Marie** [1]
16:1

**married** [6]
14:7, 11, 14, 19;
16:13; 100:14

**marries** [1]
101:1

**Martha** [5]
109:13, 14, 20, 22, 24

**Material** [1]
42:25

**material** [18]
28:7, 11, 21; 30:21;
31:2, 9; 40:3, 7; 41:17;
45:19; 67:1; 71:9, 22,
23, 25; 89:18

**materials** [4]
40:12; 57:24; 88:1;
90:18

**MATTINGLY** [11]
92:9; 106:19; 109:17;
117:2; 121:3, 17, 20,
22, 25; 122:4, 7

**Mattingly** [1]
91:7

**mean** [54]
8:6; 18:19; 19:8; 22:6;
25:8, 14; 30:25; 33:1,
17; 42:23; 43:19;
46:11, 15; 47:22; 50:1,
6; 51:18, 19; 56:8;
57:19; 64:13; 65:4;
68:11; 70:11; 71:11;
73:13; 74:16; 75:21;
77:21; 81:15; 82:6, 7,
8, 11, 12, 14, 16;
83:10, 21; 84:13;
88:21; 89:21; 96:22;
97:7, 10; 98:12; 99:9;
103:22; 104:24; 105:5;
116:11, 23; 117:13

**meaning** [1]
103:15

**means** [1]

26:1

**measure** [2]
72:21, 22

**mechanic** [2]
90:7, 10

**medical** [1]
114:15

**medication** [1]
115:2

**meet** [6]
14:21; 40:9; 53:8;
73:2; 104:5, 12

**meeting** [9]
39:22; 42:6; 60:16;
87:6, 15, 19, 24; 88:2;
89:6

**meetings** [32]
59:9, 10, 17, 23; 60:1,
6, 11, 15, 20, 22; 61:1,
16, 20, 24; 62:1, 25;
63:14; 67:19, 25; 68:3;
73:20, 21, 22, 25;
74:2; 81:7; 87:5, 10,
13; 96:15; 99:1;
112:11

**memory** [2]
26:15; 67:18

**men** [2]
83:21; 112:21

**mental** [1]
114:16

**mentioned** [2]
41:21; 123:17

**Michael** [1]
116:7

**Michigan** [1]
7:24

**mind** [1]
55:21

**mine** [2]
116:14; 117:6

**Minnie** [1]
121:5

**minute** [5]
37:25; 38:13; 49:20;
51:2

**minutes** [3]
38:16, 17; 74:10

**model** [2]
38:21; 47:20; 49:10

**molds** [1]
30:16

**money** [1]
10:15

**Monique** [1]
16:1

**MONTELONGO** [8]
6:5; 123:3, 8, 16;
125:25; 126:1, 6, 12

**Montelongo** [7]
6:10, 12; 7:25; 16:25;
17:3; 59:7; 120:20

**month** [2]
94:17, 24

**months** [4]
9:11, 21; 27:14;
108:25

**Moore** [2]
19:3; 21:6

**morning** [2]
26:12; 61:2

**mostly** [2]
74:4, 5

**Motel** [2]
9:1, 2

**mother-in-law** [2]
93:15, 19

**motivate** [4]
70:10; 74:8; 88:19;
90:22

**motivated** [1]
57:17

**move** [6]
17:20; 21:19; 24:24;
27:13; 29:8; 34:22

**moved** [3]
24:4; 35:6; 78:21

**Moving** [3]
12:10; 80:14; 87:9

**moving** [1]
45:9

**MR** [29]
8:12, 14; 10:23; 11:1;
16:7; 17:21; 27:25;
28:10, 12, 14; 30:5;
58:25; 60:17; 91:19,
21, 25; 92:2, 7, 9;
106:19; 109:17; 117:2;
121:3, 17, 20, 22, 25;
122:4, 7

**Mr** [123]
12:16; 25:13; 27:6;
42:15, 18; 43:9, 19,
24; 44:4, 14, 15;
53:17; 54:19, 23; 55:7,
19, 20; 56:3, 4, 14, 15,
18; 60:13; 62:1, 3, 4,
7, 24; 63:1, 8, 15, 19,
21; 64:4, 5, 19, 24;
65:1, 2, 13, 16; 66:3,
9; 67:7, 9, 12, 13, 16,
20; 68:4, 9, 10, 13, 20;
69:16; 73:23, 25;
74:18; 79:9, 13, 24;
81:7, 10; 83:14; 84:10;
85:2, 8; 86:20, 21;
87:10, 11, 22; 89:9;
91:7; 93:7; 95:5, 8;
96:16, 17, 19, 25;
98:16, 19; 99:16;
104:2, 11, 14; 105:2,
9, 12, 13, 20; 106:8,
12, 18; 107:8, 15, 18,
23; 108:3, 8, 11, 12;
109:4, 5, 11; 112:4, 5,
7; 113:2, 5, 8, 9;
118:12; 119:2

**Mrs** [1]
17:7

**MS** [54]
6:9; 8:16; 10:25; 11:3;
13:19, 23; 14:2, 5, 6;
15:11; 16:9; 17:22, 24;
19:6; 21:10; 25:9, 11;
26:21, 22; 28:1, 18;
30:6; 32:1; 42:6;
51:21; 53:22; 54:1, 2;
59:7; 60:19; 67:18, 19;
80:13, 16; 86:15; 91:8,
24; 92:1, 5, 10; 93:4,
5, 10; 106:21; 109:19;
117:5; 120:14, 20, 22;
121:14, 18, 21, 24;
122:2

**Ms** [11]
6:10; 7:25; 19:3; 21:6;
59:7; 101:24; 102:5;
120:20; 121:4, 25

**Myself** [1]
111:12

**myself** [7]
31:10; 46:6; 67:21;
97:9, 13; 105:24;
114:23

**– N –**

**Name** [1]
10:21

**name** [15]
6:10; 10:20; 11:4;
12:15; 14:9; 16:15, 25;
17:1, 2, 5; 37:3, 4;
101:19; 102:6; 126:16

**named** [4]
109:19; 110:23; 111:1;
123:16

**names** [2]
15:20; 17:9

**narrow** [1]
72:4

**NEWMAN** [2]
123:12; 124:11

**nice** [1]
104:3

**night** [5]
43:12; 73:18; 75:21;
88:6, 8

**nights** [1]
45:23

**Nobody** [1]
25:18

**nobody** [5]
53:20; 88:25; 90:22;
96:23; 97:6

**Nonetheless** [1]
7:6

**nonetheless** [1]
65:13

**nonresponsive** [2]
25:10; 54:1

**North** [1]
7:22

**NOTARY** [1]
126:24

**note** [1]
90:7

**noted** [1]
126:3

**notice** [1]
117:7

**November** [2]
100:21; 119:23

**number** [8]
16:6; 17:12, 16, 17,
23; 20:12, 13; 73:15

**– O –**

**oath** [2]
123:19; 126:13

**obey** [2]
86:8

**Object** [1]

**54:1**

**object** [3]
25:9; 53:23; 91:21

**Objection** [5]
30:5; 60:17; 106:19;
109:17; 117:2

**obtain** [1]
113:15

**obviously** [4]
55:25; 64:3; 80:24;
85:15

**occasion** [4]
55:16; 87:11; 97:23,
24

**occasions** [1]
101:8

**occur** [3]
73:11; 99:24; 100:15

**occurred** [6]
25:2; 27:6, 7; 86:18;
113:9; 114:17

**occurring** [1]
56:1

**October** [6]
115:9, 10, 11, 15, 18,
19

**office** [1]
101:19; 107:1; 126:19

**Oh** [9]
10:13, 25; 13:25;
14:25; 20:23; 22:9;
23:5; 27:24; 28:24;
51:17; 58:22; 59:25;
66:24; 69:9; 71:21;
72:14; 75:9; 81:1;
85:6; 92:14, 25; 107:6;
108:9; 109:22; 115:5,
8, 24; 118:8, 25

**oh** [2]
59:25; 112:24

**Ohio** [1]
7:24

**Okay** [379]
8:14, 15, 16, 20; 9:6,
12, 18, 23; 10:17;
11:3, 7, 11, 14, 19, 21;
12:3, 6, 11, 14, 25;
13:4, 22; 14:12, 23;
15:2, 5, 11, 14, 20, 23,
24; 16:19, 21, 23, 25;
17:2, 4, 9, 18; 18:13;
19:6, 14, 18, 24; 20:1,
7, 11, 16, 25; 21:4, 10,
14, 20; 22:13, 22;
23:2, 11, 16, 24; 24:4,
18; 25:1, 5, 9, 16, 19;
26:3, 18; 27:1, 5, 9,
21; 28:18, 21; 29:7,
12, 16, 20, 25; 30:10,
13, 17, 19, 24; 31:6,
11, 19; 32:1, 4, 8, 18,
22; 33:1, 6, 13, 19, 23,
25; 34:11, 19, 24;
35:14; 36:10, 20; 37:7;
38:2, 5, 9, 20; 39:2, 7,
21; 40:2, 5, 10, 23;
41:5, 7, 9, 20, 24;
42:6, 10, 21; 43:2, 5,
11, 21; 44:3, 7, 13, 17,
24; 45:2, 11, 24; 46:3,
17; 47:17, 21; 48:2,

**object** [1]
120:22

**pass** [1]
120:22

**pay** [6]
44:20, 22; 78:20;
84:16; 85:24; 86:9

**Pelly** [1]
114:18

**people** [24]
19:12, 18; 25:21;
29:20; 34:5, 17; 36:14;
41:21; 45:23; 46:20;
48:3; 49:14, 20; 50:3,
8; 53:4; 58:2, 10, 15;
70:16; 81:20; 82:5, 24;
95:12

**period** [10]
26:22; 27:1; 34:16;
40:10; 63:7; 80:5;
86:20; 89:1; 106:3;
119:11

**periods** [1]
58:17

**person** [5]
30:11, 14; 41:16;
55:23; 126:15

**personal** [1]
75:16

**personally** [1]
126:12

**persons** [1]
51:7

**ph** [1]
9:13

**phone** [2]
9:13, 16

**pick** [1]
75:25

**pickup** [1]
48:14

**place** [5]
34:24; 45:2; 58:15;
80:18, 19

**places** [2]
72:10; 82:15

**Plant** [3]
66:4, 5, 11

**plant** [41]
10:3, 5, 9, 19, 20;
11:4; 18:4, 7; 22:8, 18,
25; 23:1, 5, 8, 12, 17;
25:15, 16; 27:3; 35:20;
41:14; 45:2; 51:12, 15;
53:18; 60:13; 61:24;
62:4, 6; 66:12; 74:18,
23; 91:3; 100:23, 24;
101:17; 104:5; 112:19;
115:6; 116:3

**please** [3]
6:10; 15:20; 28:16

**ply** [2]
43:14; 72:1

**plys** [8]
28:15, 23, 24, 25;
40:16; 72:2, 16

**POCKRUS** [1]
124:14

**point** [8]
20:21; 22:3; 24:19;
29:12; 44:17; 82:9;
90:24; 105:8

**policies** [1]

**operation** [2]
20:23; 22:5

**Operations** [1]
22:8

**operations** [9]
13:4, 9, 16; 20:21;
22:1, 4, 17; 23:17;
59:10

**operator** [17]
11:10; 19:16, 22;
38:22; 39:7; 40:9;
53:8; 72:21; 73:15;
75:6, 8, 21; 76:3, 5,
18; 90:5; 101:24

**operators** [19]
41:18, 25; 52:2; 53:2;
57:12; 68:1; 71:2, 3;
74:6, 8; 89:18; 96:19;
97:23, 24; 98:2, 7;
109:8; 112:16, 18

**ops** [1]
21:2

**ORAL** [1]
123:8

**order** [8]
29:17; 47:5; 48:21;
65:17; 67:11; 72:23;
73:2; 85:23

**ordered** [1]
43:12

**orders** [4]
47:1; 64:9; 65:14;
86:8

**orientation** [4]
36:1, 6, 8, 17

**overdoing** [2]
82:8, 11

**overtime** [11]
84:7, 9, 11, 14, 16;
85:3, 13, 16; 86:2, 17

**– P –**

**p.m.** [3]
59:4; 86:13; 120:17;
122:10

**P.O.** [1]
124:15

**package** [2]
10:7, 8

**PAGE** [1]
125:2

**paid** [7]
84:9, 10; 85:17, 19;
86:6; 94:19, 20

**pamphlets** [1]
36:21

**papers** [6]
49:8, 12; 62:21; 64:13;
101:20; 115:20

**Part** [1]
85:20

**part** [10]
30:2; 33:4; 34:21;
85:19; 90:4; 117:16,
19, 21; 121:10, 11

**parties** [2]
123:24; 124:1

**parts** [2]
9:17; 33:9; 34:6, 12

**36:18**

**position** [4]
12:19; 66:3, 10; 79:20

**prefer** [1]
8:4

**prepare** [1]
90:14

**prepping** [1]
21:19

**prescribe** [2]
115:2, 3

**press** [3]
28:4, 8; 31:14

**presser** [7]
31:25; 32:9, 13, 15,
18, 19, 20

**pressers** [1]
11:15

**pressing** [1]
24:25

**pressure** [1]
36:8

**pretty** [1]
13:11

**problem** [15]
8:7, 8; 40:17; 43:8;
51:12, 15; 57:16;
71:14, 19, 21; 72:9;
73:3; 90:16; 92:7;
121:15

**problems** [18]
40:14; 41:9; 42:10, 14;
44:14; 51:17, 20;
57:21, 22, 25; 58:1;
67:6; 71:3, 10; 73:14;
74:6; 82:15; 89:18

**procedure** [1]
32:22

**proceedings** [2]
122:10; 124:5

**producing** [1]
73:7

**product** [3]
32:1; 33:18; 65:6

**production** [37]
37:8; 39:6, 22; 40:25;
41:3, 8, 15; 42:2, 7;
48:21; 51:12, 15, 17;
53:9; 58:4, 11, 18;
60:19, 20; 64:14, 23;
65:18; 66:20; 67:5, 6;
74:4, 5; 75:5, 16, 25;
83:13; 87:6, 18; 105:5;
106:4

**production-quota** [1]
41:9

**productions** [1]
64:13

**progress** [1]
27:11

**promoted** [2]
45:6; 48:24

**promotion** [1]
44:25

**properly** [2]
88:14, 16

**proved** [1]
126:13

**PUBLIC** [1]
126:24

**pulled** [1]

*(continued from left columns)*

**18, 24; 49:9, 12, 17,**
21, 23; 50:7, 13, 24;
51:4, 6, 9, 21; 52:5;
53:6, 22; 54:9, 16;
55:11; 56:3, 9; 57:3, 5,
11, 16, 22; 58:3, 13,
20; 59:19, 22; 60:5,
10, 19; 61:5, 12, 15;
62:3, 7, 11, 20, 22;
63:7, 14, 21; 64:1, 17;
65:1, 9, 13, 19, 25;
66:15, 17, 22; 67:3, 6,
15, 17, 23; 68:3, 8, 24;
69:3, 15, 19; 70:8, 12,
16; 71:3, 12, 19; 72:6,
11, 20; 73:1, 11, 20;
74:2, 7, 17, 25; 75:2,
15, 19; 76:9, 18, 24;
77:5, 13, 19, 24;
78:11, 22, 25; 79:17,
23; 80:3, 8, 21, 24;
81:7, 24; 82:10, 22;
83:1, 9, 19, 22; 84:3,
17, 24; 85:5; 86:14;
87:2, 5, 21, 24; 88:7,
9; 89:1, 4, 8; 90:1, 9,
13, 23; 91:1, 3, 5, 12;
92:7, 9, 19; 93:1, 10,
16, 18, 21; 94:1, 19,
23; 95:2, 8, 13, 18;
96:12; 97:4, 11, 21;
98:11, 13, 18; 99:8,
13, 24; 100:8, 10, 15,
20; 101:7, 12, 16, 23;
102:4, 10, 14, 23;
103:2, 11; 104:2, 7,
10, 19; 105:11, 15, 25;
106:6, 17, 21; 107:8,
15, 18; 108:11, 16, 19;
109:9, 13, 15; 110:1,
5, 8, 11, 17, 21, 23;
111:20; 112:15, 18,
21, 24; 113:5, 8, 21;
114:5, 11, 15, 20, 24;
115:10, 14, 18, 22;
116:2, 8, 10, 21, 24;
117:10, 20; 118:5, 9,
14, 17, 22; 119:4, 9,
16, 18, 22; 120:13;
121:12, 17, 24; 122:3

**okay** [9]
14:2, 5, 25; 23:5;
43:15; 80:13; 92:14;
115:8

**old** [4]
12:21; 17:25; 18:10;
33:12

**oldest** [1]
15:21

**Omni** [2]
9:13, 16

**ones** [7]
38:7; 39:13, 18; 47:12;
49:7; 74:9; 76:6

**oOo-IN** [1]
122:11

**operate** [3]
32:13, 15; 34:13

**operating** [11]
11:12, 17, 23; 31:5, 9;
35:4, 17; 45:20; 50:19;

34:22

**purposes** [1]
126:18

**puts** [1]
30:20

**putting** [3]
33:9; 34:17; 70:14

— Q —

**quality** [5]
71:20, 22; 73:3, 6, 16
**Question** [5]
13:17; 15:9; 18:24;
42:4; 51:16
**question** [23]
10:14; 13:13; 18:5, 23;
22:12; 33:24; 36:4;
42:3; 43:7; 48:2;
50:13; 51:13; 54:2;
55:9; 56:7; 57:18;
86:16; 92:22; 93:10;
98:6; 106:15; 121:4, 5
**questions** [3]
8:8, 9; 122:1
**quick** [3]
13:12; 86:12; 91:21
**quicker** [2]
8:11; 37:20
**quit** [4]
12:4; 62:10, 17; 115:4
**quota** [6]
39:19; 40:11, 19; 50:1;
51:10; 73:2
**quotas** [3]
37:8, 13; 39:10

— R —

**rack** [2]
39:3, 4
**racks** [3]
38:25; 39:1; 70:23
**rah-rah** [1]
60:2
**Ramiro** [2]
12:16, 17
**Rangel** [3]
110:17, 18; 112:10
**read** [3]
7:2; 16:5; 126:1
**real** [4]
53:19; 86:12; 91:21;
99:7
**realized** [1]
70:2
**reask** [1]
13:14
**REASON** [1]
125:2
**reason** [7]
41:13; 42:8, 24; 69:15;
79:2; 103:12; 113:14
**recall** [7]
33:25; 41:2; 46:20, 23;
60:5; 87:15; 95:8
**receive** [2]
35:23, 25
**Recess** [3]
59:4; 86:13; 120:17
**recollection** [2]
62:23; 106:17

**recommened** [1]
45:14
**record** [7]
6:3, 11; 59:3, 6;
120:16, 19; 122:9
**recover** [1]
118:4
**recuperated** [1]
117:22
**redo** [1]
73:24
**refer** [1]
59:16
**referred** [1]
17:7
**referring** [2]
41:21; 42:1
**regarding** [1]
98:19
**regardless** [1]
86:2
**related** [2]
40:12; 123:23
**relationship** [3]
14:24; 42:14, 18
**relative** [1]
123:25
**remain** [2]
12:25; 61:12; 66:12
**remained** [3]
24:10; 78:1, 14
**remember** [175]
8:18, 25; 9:21, 25;
10:12; 12:15, 22, 24;
13:3, 4, 7, 10, 18, 25;
19:25; 20:4, 14, 15;
21:8, 16; 24:9; 25:4, 7;
26:3, 5, 6, 8, 13, 16;
29:14, 20, 22, 24;
32:17; 34:25; 35:12;
36:3, 7, 14, 19; 37:22;
38:7, 8; 39:10, 13, 18;
42:9, 19; 43:14; 44:16,
24; 45:1; 47:3; 59:25;
60:4, 18, 22; 61:3, 14,
17; 62:5, 16, 18; 63:7,
10, 13, 17, 18; 68:2,
20, 21, 22; 69:4, 18;
72:14; 74:9, 18, 20;
77:6, 8, 20, 21; 80:10,
12; 81:15, 17; 84:1, 2;
85:4; 86:15, 16, 17,
24; 87:1, 4, 20, 21, 23;
88:1, 3, 5, 11, 12;
89:3, 5, 7; 90:25; 91:4,
11; 92:12; 93:12, 23,
24; 94:2, 4, 7, 8, 10,
15, 18, 22; 95:3, 7;
96:18; 98:4, 20; 99:12;
100:7, 16, 22; 101:6,
18, 19; 102:2, 12, 20,
22; 103:5, 10; 104:6,
15, 16; 106:9, 13, 16,
20, 25; 107:19, 21;
108:4, 9, 14, 20;
109:3; 110:4, 16, 20,
22; 111:17; 112:9, 10;
113:11; 119:13, 20;
120:2, 12
**remove** [1]
63:18

**removed** [5]
24:11, 13, 19; 63:16;
104:11
**rephrase** [4]
13:8; 18:6; 55:11;
104:24
**report** [12]
24:15, 16; 63:19, 21;
66:19; 75:24; 76:8, 20;
113:10, 12, 14
**REPORTER** [5]
10:21; 28:16; 31:20,
22; 124:12
**Reporter** [1]
123:12
**REPORTING** [1]
124:14
**reporting** [1]
64:4
**reports** [7]
75:6, 22, 25; 76:3, 9,
16, 25
**reprimand** [1]
42:2
**reprimanded** [3]
41:12; 42:7; 73:6
**reprimands** [1]
41:10
**REQUESTED** [1]
123:4
**requests** [1]
102:16
**require** [1]
93:8
**required** [5]
63:15; 76:19; 90:13;
93:3, 5
**requirement** [1]
76:12
**resigned** [2]
98:21; 99:10
**resisting** [1]
52:11
**resource** [1]
109:25
**respond** [1]
64:23
**responsibility** [2]
90:2, 12
**rest** [2]
30:7; 59:1
**result** [3]
87:22; 92:21; 114:17
**Rico** [5]
14:10; 16:1, 2; 17:7;
121:9
**Rico's** [1]
121:13
**rid** [2]
103:15; 107:11
**Right** [6]
18:9; 30:4; 50:9;
75:22; 84:21; 114:10
**right** [59]
14:16; 15:14; 16:23;
18:7; 22:4; 24:20;
26:19; 27:3; 29:18;
30:3; 35:2; 37:20;
41:2; 44:4, 21; 45:20;
47:24; 50:1, 17; 54:19;
55:14; 56:1, 10; 57:24;

61:7, 63:23; 64:5;
68:10; 69:22; 70:16;
74:23, 25; 76:15; 80:1;
83:24; 84:4, 25; 85:16;
86:7; 88:23; 89:20, 21;
96:15; 98:3; 100:8;
103:18; 104:9, 20;
105:4; 108:17; 112:25;
113:17, 25; 114:9;
115:16; 117:19;
119:11; 120:9, 21
**rolls** [2]
31:12; 70:22
**Roman** [2]
15:25; 16:19
**room** [6]
8:21; 19:3; 21:6; 59:1;
91:7; 93:7
**rooms** [1]
8:22
**Rosa** [2]
15:25; 16:21
**Rose** [1]
110:8
**run** [3]
19:16, 18; 90:3
**running** [1]
19:22
**RUSSELL** [1]
123:5
**Russell** [50]
24:15, 17; 25:3, 8, 11,
15; 41:6; 45:25;
49:19; 50:4; 52:6, 8;
53:15, 20; 59:13, 16,
17; 60:8, 11; 61:19;
62:3, 6; 64:14; 65:7,
10, 22; 69:1; 76:1;
77:9; 79:3, 15, 25;
83:5; 84:16, 19; 85:22,
24; 96:8; 97:5, 17;
98:5; 103:3, 14; 107:2,
10; 110:2, 9

— S —

**sad** [3]
82:16; 97:19; 117:13
**safe** [6]
29:25; 52:10; 76:2;
82:19; 96:5; 101:7
**safety** [1]
36:1
**salaried** [1]
86:1
**salary** [5]
78:12, 14; 83:25; 84:7,
24
**Salinas** [17]
42:15, 18; 43:9, 19;
44:14; 67:24; 68:9, 15,
20; 69:16; 87:11;
95:8; 96:16, 19, 25;
98:19; 99:11
**San** [1]
16:20
**Sanchez** [4]
109:13, 14, 20, 22
**sat** [1]
31:12
**saying** [9]

7:10; 24:18; 43:17;
53:19; 57:5; 64:18;
96:25; 102:10; 112:10
**scared** [1]
107:4
**school** [2]
6:17, 20
**schooling** [1]
6:22
**seal** [1]
126:19
**second** [9]
77:14, 16, 18; 79:21;
102:2, 13; 106:14;
108:5; 109:1
**secretary** [2]
110:9, 10
**section** [1]
34:19
**Security** [1]
17:12
**seminars** [2]
35:19, 20
**send** [1]
35:19
**separation** [1]
10:8
**SEPTEMBER** [1]
123:9
**September** [4]
100:17; 119:23; 124:7
**SERVICE** [1]
124:14
**setting** [1]
34:6
**severe** [1]
92:24
**sewing** [1]
11:10
**Shanholtzer** [1]
27:15
**She's** [1]
105:22
**sheet** [2]
39:6; 40:25
**shift** [49]
25:22, 25; 26:1, 4, 7,
9, 23; 27:2, 5; 29:21;
42:20, 22; 46:15, 18;
48:3, 16; 61:6, 9, 13,
16; 68:25; 69:7, 21;
70:5; 76:3; 77:7, 14,
16, 18; 78:1, 6, 9;
79:21; 80:9; 83:2, 3;
84:22; 90:14; 95:9, 25;
97:14; 102:18, 19, 21;
103:13; 106:14;
110:19, 20
**shifts** [2]
46:16, 17
**shipping** [1]
80:11
**Short-term** [1]
67:18
**SHORTHAND** [1]
124:12
**Shorthand** [1]
123:12
**shove** [1]
83:8
**show** [2]

58:8, 10
**showing** [1]
  58:2
**sic** [7]
  39:25; 40:1; 66:20;
  78:17; 79:5, 15; 80:7
**sick** [3]
  82:16; 93:15, 20
**SIGNATURE** [1]
  125:1
**signature** [1]
  126:2
**Silva** [1]
  53:17
**situation** [5]
  39:21; 69:8; 86:18;
  92:8, 16
**Six** [1]
  6:23
**six** [3]
  9:21; 15:17; 58:9
**size** [6]
  37:13; 38:5, 10, 21;
  47:11, 20
**sizes** [1]
  38:16
**Slacks** [1]
  9:24
**slower** [1]
  52:3
**smaller** [3]
  29:24; 47:13, 16
**smallest** [1]
  37:23
**Smith** [5]
  23:7, 16; 41:6; 45:4,
  25
**Social** [1]
  17:12
**somebody** [9]
  24:7; 42:16, 17; 50:14;
  54:4; 58:6; 82:13;
  88:23; 113:10
**somewhere** [2]
  38:24; 39:5
**sorry** [5]
  9:15; 48:13; 75:15;
  89:24; 120:24
**sort** [1]
  7:15
**SOUTHERN** [1]
  123:1
**Spanish** [9]
  8:12, 13, 18; 13:21;
  18:22, 25; 27:23; 28:3,
  12
**speak** [1]
  7:2
**specifically** [1]
  88:8
**specifications** [3]
  40:3; 41:18; 72:3
**spick-and-span** [1]
  46:5
**spoke** [1]
  41:2
**spread** [1]
  31:24
**start** [8]
  15:2; 36:5; 53:18;
  56:10; 64:3; 89:20;

99:1; 100:24
**started** [42]
  8:21; 9:13; 10:1; 11:8;
  12:6, 20; 13:5, 12;
  14:19, 24; 15:10;
  17:25; 18:7, 25; 19:6;
  20:9, 18; 21:1; 23:6;
  25:25; 27:10, 12; 36:5;
  37:11; 39:13; 51:18,
  22; 60:11; 61:8, 23,
  24; 62:25; 66:9;
  77:18; 80:6, 12;
  107:10; 108:3; 113:24;
  114:2, 8
**Starting** [1]
  15:21
**starting** [2]
  83:2; 103:13
**STATE** [3]
  124:13; 126:8, 25
**State** [1]
  123:13
**state** [2]
  6:10; 7:23
**stated** [1]
  123:14
**STATES** [1]
  123:1
**stating** [1]
  54:10
**stay** [12]
  21:21; 70:13; 78:19;
  84:9, 14; 86:6; 87:25;
  93:5, 9; 109:5, 10
**stayed** [3]
  27:2; 56:12; 78:9
**stenograph** [2]
  123:17, 21
**Steve** [75]
  13:6, 15; 20:20; 21:21;
  23:3, 8, 17, 18; 24:2,
  3, 5, 8, 10; 25:3;
  26:23; 41:4; 43:12;
  45:8; 49:6, 18; 52:8;
  53:11; 54:6, 16; 59:12,
  13, 14; 60:8, 13;
  61:25; 63:19; 64:15;
  65:5, 23; 66:18, 19,
  21, 23; 67:16; 73:10;
  77:9, 15; 79:3, 6, 7,
  21; 80:18, 25; 83:3, 4,
  12; 84:8, 14, 19; 85:8,
  10, 12, 22; 95:1, 2;
  98:25; 103:12; 104:1,
  16; 105:13, 16, 19, 23;
  106:2; 108:6; 109:10;
  111:2, 9
**stipulate** [1]
  121:22
**stop** [3]
  27:13; 40:7; 72:22
**stopped** [2]
  13:15; 105:3
**strategies** [2]
  70:20; 74:7
**stress** [1]
  114:22
**structure** [1]
  18:21
**structured** [1]
  19:7

**stuff** [5]
  36:9; 67:9; 91:25;
  92:3; 105:5
**style** [3]
  81:8, 11; 82:3
**subscribed** [1]
  126:16
**sudden** [1]
  25:7
**suffered** [1]
  114:16
**suggest** [2]
  74:7; 113:10
**suing** [1]
  111:23
**summer** [1]
  86:24
**supervise** [8]
  45:21; 46:4; 68:17;
  78:24; 95:11; 96:9, 10;
  97:8
**supervised** [1]
  46:20
**supervising** [7]
  24:21; 43:3; 52:1;
  69:14; 80:22; 96:6
**supervision** [2]
  44:8; 46:24
**supervisor** [87]
  11:19, 20; 12:11;
  18:18, 20; 20:18; 21:4,
  9, 14, 15, 24; 23:19;
  24:5, 8, 11, 12, 20;
  25:2; 26:24; 40:20;
  44:2, 5, 11, 18; 45:5,
  12, 16; 46:17; 48:24;
  49:2, 5; 53:11, 12;
  54:5, 17, 20; 56:14,
  24; 57:1; 59:21; 60:1,
  7, 14, 15; 61:6, 8, 12,
  15, 20; 63:9, 16; 64:5,
  6; 68:12; 69:3, 7, 22;
  75:13, 23; 76:4, 13;
  77:7, 14, 16, 17, 23,
  25; 78:1, 5, 18, 21;
  79:4, 5, 16, 17, 22;
  80:4, 7, 16; 84:3;
  95:10; 96:21; 104:12;
  105:3; 110:18; 112:5
**supervisor's** [1]
  78:14
**supervisors** [9]
  41:2; 46:7; 60:24;
  80:3, 9; 82:2; 83:12,
  18; 112:8
**suppose** [9]
  30:25; 37:7; 39:11;
  67:7; 95:21, 23; 96:3;
  106:3
**sweeping** [1]
  19:4
**switched** [2]
  77:19, 21
**sworn** [4]
  6:4, 6, 7; 123:18

– T –

**tabs** [1]
  38:22
**takes** [2]

37:10; 50:14
**talk** [59]
  40:20, 21; 41:7, 19,
  20; 42:16, 17; 43:10,
  23; 49:18; 52:15;
  53:12, 15; 54:14;
  55:23; 57:11, 22;
  59:13; 60:8; 64:15;
  65:2, 7, 8, 9, 16;
  66:17; 67:2, 4, 12, 16;
  71:7; 73:16; 80:25;
  81:1, 25; 83:14, 21;
  85:22; 86:21, 22; 89:9;
  96:18; 97:5, 7, 17;
  98:2; 99:7; 100:13;
  105:13, 21; 106:4, 24;
  108:6; 110:15; 112:11,
  16
**talked** [12]
  42:13; 43:8; 44:13;
  57:23, 24; 76:24;
  79:21; 97:24; 111:4;
  113:16; 119:7, 10
**talking** [20]
  22:5, 15; 23:24; 33:17;
  36:1; 49:25; 53:3;
  59:8, 22; 66:7, 21;
  69:9; 70:20; 71:25;
  73:22; 85:8; 86:23;
  93:13; 94:24; 106:5
**Talks** [1]
  36:25
**talks** [1]
  49:5
**tape** [1]
  86:12
**tavern** [1]
  100:1
**teach** [1]
  71:16
**team** [1]
  52:18
**telling** [14]
  52:21; 54:3; 57:3;
  68:3; 83:5; 88:6;
  89:20; 90:1; 96:19;
  97:22; 99:2; 104:17;
  107:11; 113:12
**term** [1]
  112:18
**terminate** [1]
  25:15
**terminated** [2]
  25:13; 62:4
**terms** [5]
  49:5; 86:20; 91:22;
  105:2; 106:11
**terrible** [1]
  86:16
**testified** [1]
  6:6
**testimony** [2]
  61:22; 108:11
**TEXAS** [6]
  123:1, 5; 124:13, 15;
  126:8, 25
**Texas** [8]
  6:16, 18, 19; 16:4;
  17:22; 37:4; 52:16;
  123:13
**Thank** [5]

17:24; 120:21; 121:1;
  122:2, 5
**thank** [3]
  100:8; 120:23; 121:20
**Thanks** [1]
  122:4
**There's** [1]
  30:14
**therein** [1]
  126:18
**they'd** [1]
  31:23
**They're** [1]
  92:8
**thick** [2]
  72:4, 18
**thin** [3]
  72:4, 5, 18
**third** [1]
  97:14
**Three** [2]
  28:16; 99:20
**three** [20]
  9:11; 31:13; 46:9, 16,
  17; 61:25; 62:9, 11,
  23; 67:12; 68:22;
  73:18; 78:20; 81:2;
  99:18; 101:7; 103:9,
  20; 118:21; 119:19
**Thursday** [1]
  118:19
**ties** [1]
  47:13
**timed** [3]
  50:19; 51:4; 52:7
**times** [13]
  37:16; 44:23; 73:18;
  77:19, 20; 88:21;
  90:17; 98:5; 99:19, 22;
  102:14, 21; 103:21;
  109:7; 114:19; 118:6,
  10
**timing** [8]
  49:25; 50:10; 51:11,
  14, 24; 52:4, 11; 89:8,
  14; 106:18
**TIRE** [1]
  123:5
**Tire** [3]
  12:5; 100:2; 111:22
**tire** [44]
  19:12; 22:6, 14; 23:23;
  28:6, 18, 22; 30:21,
  22, 24, 25; 31:4, 7, 16;
  32:2, 4, 5, 6, 24; 33:1;
  35:7, 24; 38:11, 12,
  18; 45:17; 46:7;
  47:15; 49:22; 50:12,
  15; 51:1; 59:15; 68:1,
  11; 70:10; 72:8;
  76:21; 88:20; 89:13,
  15, 17; 99:5; 102:17
**Tires** [5]
  14:16, 18; 37:3, 4;
  59:8
**tires** [89]
  12:21, 23; 13:1; 18:13;
  19:7, 8; 20:6, 8, 9, 12,
  13, 19; 21:1; 27:10,
  13, 14; 28:13; 29:11,
  13, 21; 30:8, 15;

34:23; 35:15, 17, 21;
37:11, 14, 18, 20, 23,
24; 38:3, 8, 15, 23;
39:11, 16; 41:1; 42:24;
43:4, 15; 45:22; 46:1,
4; 47:10, 11, 18; 48:4,
13, 14; 49:8, 10, 13,
15; 50:20; 52:19;
58:12; 59:24; 60:3;
70:10, 23; 71:1, 4, 17,
20; 72:24; 73:3, 7, 12,
17; 75:20; 76:7, 19;
77:10, 22, 23; 78:3,
11; 79:10, 15; 80:17;
88:17, 20; 99:5
**TITAN** [1]
123:5
**Titan** [24]
12:5, 6, 14; 13:2;
14:16, 18, 21; 15:2,
12; 17:25; 18:6, 19;
26:11; 27:10; 30:8;
37:3, 4; 41:13; 59:8;
92:8; 100:2; 111:22,
23
**toilet** [1]
83:8
**towards** [2]
48:2; 108:12
**train** [3]
18:14, 15; 49:14
**trained** [5]
20:5, 6; 33:7; 35:1, 24
**training** [7]
7:14; 35:7, 11, 16, 25;
36:1; 48:25
**transcribed** [1]
123:20
**transcript** [3]
123:15; 124:4, 5
**translated** [5]
13:17; 15:9; 18:24;
42:4; 51:16
**tread** [4]
28:19; 40:15; 72:17
**treated** [2]
81:16; 82:19
**treating** [2]
114:2, 8
**tremendous** [1]
120:24
**truck** [1]
48:14
**trucks** [1]
47:10
**true** [3]
123:14; 124:5; 126:3
**truth** [6]
23:21; 71:10; 84:19;
123:19, 20
**tubes** [1]
32:7
**twice** [3]
114:5, 13; 119:2
**type** [1]
114:15
**typewriting** [1]
124:4

— U —

**Uh-huh** [34]
9:3; 15:13; 17:21;
21:25; 24:6; 29:2;
31:17; 32:12; 33:5;
34:2; 37:1; 39:18;
48:15; 50:18; 55:18,
22; 56:17; 67:10;
78:2; 95:4; 97:3;
98:17; 101:15; 103:5;
104:21; 107:25; 108:2;
109:15; 113:4; 114:1,
7, 12; 119:24; 121:8
**undergo** [2]
35:7; 48:25
**understand** [23]
7:10; 8:1, 3, 5, 10;
10:14; 13:13; 14:20;
15:6, 8; 18:5, 22;
22:16; 30:19; 33:23;
42:3; 51:13; 55:9;
77:3; 116:15; 121:9,
11, 12
**understanding** [3]
19:9; 22:11; 73:24
**understood** [1]
101:14
**Uniforms** [1]
11:6
**unit** [10]
19:11; 23:22; 53:12;
59:14; 64:8, 18; 68:15;
73:7; 80:23; 104:17
**UNITED** [1]
123:1

— V —

**vacation** [1]
94:13
**VIDEOGRAPHER** [10]
6:2; 59:2, 5; 80:14;
86:11, 14; 120:15, 18;
122:6, 8
**VIDEOTAPED** [1]
123:8
**view** [1]
82:9
**Villa** [2]
6:16, 18
**visit** [4]
118:12, 13, 17, 20
**VS** [1]
123:4

— W —

**wait** [1]
115:10
**walk** [1]
117:14
**wanted** [12]
41:15; 49:20; 65:11,
12; 66:20; 70:9; 77:15,
17; 79:15; 90:19;
99:14; 113:15
**wanting** [1]
52:24; 112:7
**watch** [1]
51:3
**ways** [1]
95:16
**We'll** [1]

120:22
**we'll** [1]
121:22
**We're** [1]
14:10
**we're** [1]
94:24
**week** [9]
35:11; 77:8; 84:13;
104:4; 107:20; 108:4,
5, 9
**weeks** [23]
36:7; 61:25; 62:9, 11,
24; 67:12; 68:22, 23;
69:9, 17; 70:7; 77:7,
11, 12, 22; 78:20, 24;
79:19; 81:2; 98:24;
105:3
**weren't** [1]
35:4
**What's** [2]
6:13; 102:6
**what's** [1]
14:9; 32:2
**Whenever** [1]
100:23
**Whichever** [1]
15:22
**Who's** [1]
109:13
**wide** [1]
72:3
**wife's** [1]
16:15
**winter** [1]
86:24
**WITNESS** [8]
8:13; 10:22, 24; 15:7;
17:20; 31:21; 122:3, 5
**Witness** [10]
6:25; 7:4, 8, 12; 8:18;
18:22, 25; 28:3, 7, 9
**witness** [7]
8:12; 109:19; 110:24;
111:2; 120:22; 123:16,
18
**woman** [5]
82:18; 96:22; 97:12,
20; 112:6
**women** [7]
79:5; 80:3, 7, 9; 112:7,
15, 20
**word** [1]
89:22
**words** [6]
8:5, 7; 43:18; 53:19;
81:23
**work** [57]
8:9, 16; 9:10, 12, 20,
23; 10:17, 18; 11:8,
24; 16:12; 18:8, 25;
19:1; 25:21; 28:17;
33:10; 38:2; 45:17;
51:25; 52:7, 13, 17,
18, 24; 53:5; 54:3, 23;
55:8, 13, 25; 56:21,
22; 57:17; 58:2, 10;
66:7; 68:9; 69:6, 11,
16, 20; 70:21; 73:2;
77:15; 85:23; 86:4;
87:17; 91:3; 93:9;

95:5, 17; 98:12; 109:8,
24; 112:7; 120:24
**worked** [14]
9:25; 14:16; 18:19;
19:11; 34:1; 37:2;
38:5; 69:6; 82:13, 14;
84:12, 13, 15; 113:6
**worker** [1]
55:16
**workers** [7]
33:8, 22; 55:8, 12;
57:17; 68:1; 73:1
**working** [41]
7:20; 8:21; 9:13; 10:1;
12:4, 6; 13:5, 8, 12,
15; 14:18; 15:2, 12;
23:6, 22; 25:25; 26:23;
33:16; 34:4, 5; 51:22;
52:2; 53:18; 55:1;
56:10, 12, 16; 71:11;
77:18; 86:18; 89:2;
95:16; 100:24; 101:18;
105:9; 108:3; 109:25;
113:7; 115:7, 19, 22
**works** [1]
16:11
**wouldn't** [6]
52:9; 54:22, 23; 70:24,
25; 87:21
**Write** [1]
55:20
**write** [10]
7:2; 38:23; 39:5;
40:24; 54:7, 13; 76:7;
90:6, 7
**write-up** [1]
54:8
**writing** [1]
16:5
**wrong** [5]
44:10; 68:8; 83:4;
117:1, 7

— Y —

**Yeah** [15]
20:14; 36:22; 40:14;
43:25; 46:13; 52:25;
58:6; 60:22; 66:8;
70:19; 74:12; 86:7, 10;
87:18; 117:7
**yeah** [6]
36:24; 44:22; 51:17;
84:13; 93:8; 95:14
**year** [10]
11:25; 12:1; 13:20;
26:6; 61:24; 105:2;
115:12; 120:1, 2, 8
**years** [4]
6:22; 8:17; 9:25;
13:11
**yelling** [1]
89:20; 99:1
**you'd** [1]
121:5
**You've** [3]
57:23, 24; 105:21
**you've** [1]
69:5
**yourself** [2]
36:18; 51:4



# TITAN TIRE CORPORATION
# OF TEXAS

## EMPLOYEE HANDBOOK
## FOR HOURLY EMPLOYEES

TITAN TIRE CORPORATION OF TEXAS
6700 PAREDES LANE ROAD
BROWNSVILLE, TX 78520
(956) 542-6878





EXHIBIT

E

# TITAN TIRE CORPORATION
# OF TEXAS

## EMPLOYEE HANDBOOK
## FOR HOURLY EMPLOYEES

**TITAN TIRE CORPORATION OF TEXAS**
**6700 PAREDES LANE ROAD**
**BROWNSVILLE, TX 78520**
**(956) 542-6878**

**Welcome!  We are pleased to have you with us.**

This is your handbook.  It is meant to be an informative guide to the principles, policies, procedures and benefits of our company.  By acquainting yourself with this book, you will have a better understanding of  what we expect from you  and what you may expect from the company.

If you do not understand something, please ask about it.  You will find we try to be a friendly group and want you to feel at home quickly.  You are now part of an organization that has grown and prospered through the whole-hearted efforts of every person who works here.

This employee handbook will be updated, changed, and occasionally modified to keep it current with the ever-changing conditions of our business.  What does not change is our belief that for all of us who earn our livelihood at the company, our job security here is created through producing quality products delivered on time, so that we will have satisfied customers who place repeat orders with our company, and not with our competitors.

We hope that you will be happy working at our company.  We welcome your ideas, suggestions, or dissatisfactions about the operations of the company.  We welcome the opportunity to hear your concerns and think through to resolutions of the challenges that we may face.  We are certain that it is this type of teamwork which will result in the continuing development of our business as a growing, prosperous enterprise through which we all can mutually benefit.

It has been, and will continue to be, our policy to offer competitive wage rates and benefits  so that we can attract and retain our valuable employees.  This is because, in our opinion, our most important asset is a loyal, enthusiastic employee.

Maurice Taylor
President &
Chief Executive Officer

# ABOUT YOUR EMPLOYEE HANDBOOK

This handbook does not create a contract between the Company and any person for employment or for the provision of any benefit. No commitments regarding employment or continuation of the programs or policies contained in this handbook are made. Neither this handbook, any other communication, nor any Company practice is intended to create, imply or guarantee any term of employment or benefit at any time. Only the President of the Company may make an agreement for employment and such agreement must be in writing.

All employees are always free to terminate their employment with the Company at their will. Similarly, the Company has the right to terminate employment at any time, with or without cause.

This handbook supersedes any and all previous handbooks and unwritten policies. You will receive updates and information through various notices as well as orally; however, the Company reserves the right to make changes in content or application of its policies as it deems appropriate and these changes may be implemented even if they have not been communicated, reprinted, or substituted in this handbook.

Neither the establishment of a health care plan or any other benefits, nor any amendment thereof will be construed as giving to any participant or any other person any legal or equitable right against the Plan Administrator and/or the Company. The adoption and maintenance of the Plan shall not be deemed to be a contract of employment between the Company and the employee. Nothing contained herein shall give any employee the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any employee at any time, with or without cause, nor shall it interfere with the employee's right to terminate his/her employment at any time. The Company reserves the right at its sole discretion to modify or terminate plans or policies at any time or to revoke this handbook in part or whole unilaterally at any time.

3

# ACKNOWLEDGMENT AND RECEIPT
# OF THE EMPLOYEE HANDBOOK

**I agree to comply with all the policies, procedures and requirements of the Company, and I understand that my employment can be terminated at any time at the sole discretion of either the Company or myself.  I also understand that no representative of the Company, other than the President has the authority to make any agreement to the contrary.   The Company may at any time add, change, or rescind any policy or practice at its sole discretion without notice.   I acknowledge receipt of the Employee handbook which I have read and fully understand.**

_____

**Employee Name (Please Print)**

_____

**Employee Signature                                    Date**

**This form remains in the handbook.  You will be given a copy to sign acknowledging that you have received this handbook and the copy will be kept in your personnel file.  If you want a copy of the signed acknowledgment, please tell your Human Resources Manager.**

4

# INTRODUCTION

This handbook is not a contract but has been developed to provide information for hourly employees of Titan Tire Corporation of Texas, hereinafter referred to in this handbook as the "Company". **The Company remains an at-will employer meaning that you may quit at any time for any reason and you may be terminated at any time for any reason with or without cause.**

**This handbook is not all-inclusive, but offers general guidelines only. It is your responsibility to check with your Human Resources Department for complete copies of policies and procedures.** It is intended to give you an overview of the benefits, policies, and procedures of the Company. If you have any questions regarding this handbook, please see your Supervisor or Human Resources Manager.

Keep this handbook handy for future reference and refer any questions you may have to your Supervisor or to the Human Resources Department.

# OUR EMPLOYEES

The greatest assets the Company has are the employees. We value your knowledge and encourage you to submit ideas for improvements and inform us of any problems you may have. The Company has an open door policy for all employees. If your supervisor cannot give you the assistance you need, then bring it to the attention of the Operations Manager. If you still feel the matter has not been resolved, contact the Corporate Human Resources Department. Use whichever method you are most comfortable with for attention to your concern.

# TRIAL EMPLOYMENT PERIOD

The first 120 days of employment are considered a trial employment period during which a new employee and the Company supervisors are getting acquainted. For this reason, the trial employment period is not shortened even though the employee may make very rapid progress in learning the job.

Your wages and position have been based on representations made by you on your application and in the interview process. If your performance and productivity are below the necessary capacity and skill level represented, your position and wages may be adjusted accordingly, or your employment may be terminated.

Time off from work for any reason during the Trial Employment Period may lead to disciplinary action up to and including termination of employment.

5

The Trial Employment Period ends on Sunday following the completion of 120 days of employment (plus any time to make up for time off).

**The Company remains an at-will employer meaning that you may quit at any time for any reason and you may be terminated at any time for any reason with or without cause.**

## THE CUSTOMER

Never forget our customers. They do not have to buy from us. They buy our products only when they think our quality, price, and delivery are better than our competitors. Each employee has to keep his/her own paycheck coming by seeing that the customer is satisfied. The customer is satisfied when our products:

> *are up to QUALITY standards.*
> *have no excess COST.*
> *are delivered ON TIME.*

## MANAGEMENT

### Supervisor

Your Supervisor is responsible for your training, production, quality of work, and your day-to-day welfare. The Supervisor is the one with and for whom you work, and you should feel free to go to him/her with any question or suggestion. The Supervisor is interested in you and all problems associated with your work, and considers any opportunity to help you a privilege. If you have any questions concerning this handbook or your work, ask your Supervisor.

### Operations Manager

The Operations Manager is responsible for the overall plant operation. The Operations Manager will help you with any problem which you cannot easily discuss with your Supervisor or the Department Manager.

## SENIORITY

The Company values the experience and loyalty of its employees. Therefore, when other conditions are equal, the more senior employee is favored in promotions, choice of shift, or lack-of-work layoffs. The Company will not promote employees either on disciplinary probation and/or with demonstrated performance deficiencies.

Naturally, in any business, there are times when it becomes necessary to go outside the organization for particular talents. Insofar as possible, however, the Company gives first consideration to its own qualified employees in filling positions which have become open.

6

Length of service with the Company becomes an increasingly valuable asset with each passing year. It has a bearing on many aspects of our employment policies. Vacations, for example, are affected by length of time in the organization.

## JOB POSTING POLICY

Because the Company believes in promoting employees from within when possible, the Company has established a job-posting program to give all employees an opportunity to apply for positions that interest them and for which they are qualified. Vacancies below the management level are posted for three days on designated bulletin boards. Postings include the job title, minimum hiring specifications, and closing date for filing applications. To apply for a posted position, you must meet the minimum hiring specifications for the position, have a good overall work record, and have been in your current position for at least 6 months. The Human Resources Department will contact you regarding the status of your candidacy.

## REDUCTION IN WORK FORCE

Although the Company seeks to provide a stable employment opportunity, if it becomes necessary to reduce the work force, the Company will make every effort to lay off probationers first and/or those employees either on disciplinary probation and/or with demonstrated performance deficiencies. It must be recognized, however, that an employee with seniority may not be qualified to do the job a skilled employee is doing, and the job must be performed. Under such circumstances, it may be necessary to keep certain skilled employees. Employees who have had disciplinary and/or performance problems will be considered for lay-off.

## RECORDING YOUR HOURS OF WORK

It is necessary to record the time actually worked in order to prepare paychecks, to make government reports and for other purposes. Ask your Supervisor to explain the method of recording your hours of work to you. <u>Each employee is required to log in at the beginning of his/her shift and log out at the end of his/her shift.</u> Failure to clock in and out as scheduled will result in loss of pay and or disciplinary measures. (The term "clocking" refers to the system of reporting and recording your time that is used by your location (i.e., time clock, time sheet, badge swipe, etc).

Employees are responsible for filling out their own time sheets, time cards or other designated means of reported time worked, signing the appropriate record, and turning the designated record in to the Supervisor. Failure to sign his or her own record or signing any record other than his or her own, or falsifying your record, or that of another employee's, are serious offenses and may lead to appropriate disciplinary action including termination.

7

## HOURS OF WORK

Hours of work are chiefly determined by customer needs. Hourly paid employees are provided a thirty minute lunch period and two (2) fifteen minute breaks for an eight hour shift, or three (3) fifteen minute breaks for a twelve hour shift. **See your Supervisor or the Human Resources Manager for the correct hours in which you are expected to work.**

## MANDATORY OVERTIME

Since work volume cannot always be controlled, you may be needed to work mandatory overtime. Your Supervisor will attempt to provide you with reasonable notice when the need for overtime work arises. Please remember, however, that advance notice may not always be possible.

Overtime vacancies will first be filled with volunteers from among the labor grade and job classification of persons normally performing the work. Seniority will have the advantage only insofar as equal distribution of overtime may be served.

Persons who have been assigned to work overtime, whether voluntary or involuntary, shall be expected to report to work as scheduled. Failure to report shall be subject to disciplinary action, including termination as specified for any other nonappearance for a regularly scheduled work time.

## ABSENCE FROM WORK

Regular attendance and punctuality are part of your job responsibility. You are expected to be present and on time for every scheduled shift. When unexpected illness or accident prevent you from doing this, notify the Supervisor on duty at least one hour before the start of a shift. Be sure you notify the Supervisor and not a co-worker. Failure to show up for a scheduled shift without prior approval may result in termination. For medical related absences a doctor's certificate may be required before returning to work. The Company reserves the right at its discretion to require you to submit to a physical examination by a physician designated by the Company.

**It is _your_ responsibility to check with your Human Resources Department or Supervisor for the attendance policy along with the absentee call-in procedure and telephone numbers.**

**Any employee off three days with no call-in is considered to have voluntarily quit. Any employee with two separate incidents of no-call will be considered to have voluntarily quit.**

**Absenteeism or tardiness that is unexcused or excessive in the judgment of the Company is grounds for disciplinary action, up to and including, termination.**

## PHYSICAL EXAMINATIONS

Employees may be required to undergo a physical examination and/or drug screen in the following cases: (1) when an employee has been absent for more than one week because of illness or non-compensable disability; (2) prior to returning from a layoff; (3) where the nature of an employee's occupation may require periodic examination in accordance with State or Federal regulations; (4) upon return from leave of absence (5) for a work related injury; (6) when an employee has caused damage to Company property or persons; (7) when involved in an accident on the premises or with Company property or vehicles. **This list is not all-inclusive but offers general guidelines only.**

## PAY

Changes in job content, changes in the Company's business, changes in the country's economy, competitive forces, and other factors must be taken into account in determining our rates of pay.

Jobs are rated by difficulty and amount of training needed. Our rates of pay are based on an expected level of performance. It is necessary for the Company to be able to count on known amounts of work so that we can determine what our costs will be. Only by knowing our costs can we expect to satisfy our customers and get orders from them. Customer orders are the only source for our jobs.

The Company will pay time and one-half for all time worked in excess of 40 hours in any one work week. Hours worked on the seventh day, after working six full work days in any work week, will be paid at double your regular rate. Work required on scheduled holidays will also be paid at double your regular rate. The work week is Monday through Sunday.

Check with your Supervisor or Human Resources Manager as to when paychecks will be issued. There are to be no deviations from the procedure except for extreme personal emergency or when checks are issued earlier due to a holiday or other reasons determined by the Company.

## LEAVES OF ABSENCE

The Company recognizes that eligible employees may need time off from work for certain conditions and intends to provide unpaid leaves of absence consistent with our need to serve our business. Under qualifying events, you may be granted a leave of absence for the following circumstances: Family and Medical Leave, Military Leave, Funeral Leave, and Jury Duty Leave. The employee will be required to verify the need and to provide advanced notice as defined in the policy. **It is your responsibility to see your Human Resources Manager for the complete policy and the appropriate forms to request a leave of absence for any reason.** A request for leave of absence under false pretense may be cause for termination of employment. **The following guidelines are not all inclusive;** but state examples of procedure from the Leave of Absence Policy.

9

- Employee must be full time with no less than two years of service with the company or otherwise meet eligibility requirements as set forth by the Family and Medical Leave Act ("FMLA").

- Employees who request a leave because of their own or a covered relative's serious health condition, may be required to submit proof to the Human Resources Department of the existence of the medical condition and the need for leave.

- When leave is foreseeable, employees must provide the Company with at least 30 days advanced notice (e.g., the expected birth or adoption of a child).

- In the event of an emergency, you must notify your immediate Supervisor or the Human Resources Department at your earliest convenience.

- Medical certification will be required when the leave request is for the employee's serious health condition or a covered relative's serious health condition.

- The employee granted a leave of absence will be required to substitute paid leave (e.g., unused vacation time) for unpaid leave and such paid leave will run concurrently with FMLA qualifying situations, except while an employee receives money pursuant to a worker's compensation claim.

- It is the policy of the Company that the employee's portion that is normally paid by the employee for health insurance and/or any other benefits (life insurance, disability insurance, etc) shall be the responsibility of the employee on leave and will be due on the first of each month. The <u>maximum</u> amount of time that the company will pay or co-pay for the employee's health insurance while the employee is on any kind of leave, including time away from work due to a work related injury, is 12 weeks. COBRA notification will be sent to the employee on the last day of the leave.

- With the exception of employees on military leave or jury duty, or in cases of legitimate circumstances, employees on leave of absence are not permitted to work for another employer during the leave.

- Employees returning from any leave of absence will be required to take a physical examination and/or drug screen prior to returning to duty.

- **In accordance with the Company's policy on leave of absence, other absences, or work related injuries, employment will end if the employee is not able to return to his/her job after being off work 12 weeks from the onset of the leave or if the employee exceeds 12 weeks of leave in a 12 month period.**

10

**Family and Medical Leave (FMLA).** The FMLA leave provides for family and/or medical leave, pregnancy leave, parental leave, and other disability leave. It enables eligible employees to receive up to 12 weeks of unpaid leave per year when they are unable to work due to a serious health condition, or need time off from work for the birth or adoption of a child or to care for a spouse or immediate family member (e.g., wife, husband, mother, father, child) who has a serious health condition. Employees will be required to substitute paid leave (unused vacation time) for unpaid leave and such leave will run concurrently with FMLA entitlement.

In order for an employee to be eligible to take leave under FMLA, the employee must (1) have been employed by the employer for at least 12 months; and 2) have been employed for at least 1,250 hours of service during the 12 month period immediately preceding commencement of the leave. If an employee is eligible for FMLA leave, the employee is entitled to a total of 12 workweeks of leave during any 12-month period. **For purposes of Company policy, when an eligible employee takes FMLA leave, the "12-month period" within which they may take their leave, will be measured forward from the date the employee's first FMLA leave begins.** Therefore, an employee would be entitled to 12 weeks of leave during the following 12 months, beginning on the first date FMLA leave is taken. The next 12-month period would begin twelve months after the first date FMLA leave was taken in the previous 12 month period.

FMLA does not supersede any state or local law that provides a greater level of rights or benefits than those afforded by federal law.

Regarding a worker's compensation absence, an employee's FMLA entitlement will run concurrently with a worker's compensation absence when the injury is one that meets the criteria for a serious health condition. Worker's compensation is considered paid leave so the employee will not be compelled to substitute paid leave (vacation time). As of the date worker's compensation benefits cease and if further leave is approved, the paid leave substitution provision becomes applicable.

**In accordance with the Company's policy on leave of absence, other absences, or work related injuries, employment will end if the employee is not able to return to his/her job after being off work 12 weeks. The Company is unable to keep positions open because it affects production and efficiency.**

**The employee will be responsible for insurance premiums as set forth in the "Benefit Premium" section of the policy. Contact your personnel office for the necessary procedure forms and further information regarding the Family and Medical Leave Policy.**

**Funeral leave**. Full time employees will be eligible for up to two work days paid leave for the death of an immediate family member. Paid leave will apply to days on or before the funeral and during the normal 40 hour work week. If an employee needs additional days off, the employee may request additional unpaid leave from the Supervisor or the Human Resources Manager. For purposes of this policy, immediate family will include parent, step-parent, parent-in-law, step-parent-in-law, spouse, child, step-child, grandparent, grandchild, brother and sister. Night differential will be paid when applicable. Hours of paid or unpaid leave will not be counted when figuring overtime premium.

In the event, the death of an immediate family member as defined above occurs while the employee is on previously scheduled vacation, the employee will receive two additional vacation days provided the death can be verified to compensate for the funeral pay commitment.

**Military leave**. A military leave is granted to an employee regardless of the amount of service time with the Company who leaves active employment to enter the Armed Forces of the United States or to an employee in the Armed Forces Reserve or National Guard who is required to return to active duty or participate in a period of short term training. Employees who take a military leave of absence are entitled to retain and accrue benefits tied to seniority and participate during the leave in insurance and other benefits not determined by seniority to the same extent as employees granted other types of leaves. Provisions of a military leave will be governed by applicable state and federal law.

**Jury Duty Leave.** When a full time employee of the Company is called to serve on jury duty, the Company will grant the leave as an excused absence provided the employee has given proper documentation to his/her supervisor upon receiving the notice. Provisions of the leave will be determined by applicable state law. Where an employee's extended absence would have a serious effect on the operating efficiency of a department or the Company, the Company may request the court to excuse the employee from jury duty.

**The maximum amount of time that the Company will pay or co-pay for the employee's health insurance while the employee is on any kind of leave, including time away from work due to a work related injury, is 12 weeks. COBRA notification will be sent to the employee on the last day of the leave.**

---

The Company will comply with specific mandates and statutes of federal and state leave laws. The Company will review all circumstances creating the need for a leave of absence and shall grant the leave in compliance with federal and state laws.

---

12

## EMPLOYEE BENEFITS

**Neither the establishment of a health care plan or any other benefits, nor any amendment thereof will be construed as giving to any participant or any other person any legal or equitable right against the Plan Administrator and/or the Company. The adoption and maintenance of the Plan shall not be deemed to be a contract of employment between the Company and the employee. Nothing contained herein shall give any employee the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any employee at any time, with or without cause, nor shall it interfere with the employee's right to termination of his/her employment at any time. The Company reserves the right at its sole discretion to modify or terminate plans or policies at any time or to revoke this handbook in part or whole unilaterally at any time.**

The word "benefits" refers to programs offered by the Company to each employee in the form of holidays, vacations, group insurance, etc. In total, the Company's benefit program represents a sizable contribution to the well-being and protection of our employees and their families. The Company reserves the right to amend or terminate any of its benefit programs or to require or increase employee premium contributions toward any benefits with or without advance notice at its discretion. For more complete information regarding any of our benefit programs, please contact the Human Resources Department.

## HOLIDAYS

**The Company reserves the right at its sole discretion to modify or terminate plans or policies at any time or to revoke this handbook in part or whole unilaterally at any time.**

There will be nine paid holidays observed for everyone eligible on the active payroll and qualifying on the day the holiday is observed. These are New Year's Day, Good Friday, Memorial Day, July 4, Labor Day, Thanksgiving, Friday after Thanksgiving, Christmas Eve, and Christmas Day. Holidays falling on Saturday or Sunday may be observed on the preceding Friday or the following Monday.

To be eligible for holiday pay, an employee must work his/her regularly scheduled hours the workday preceding and the workday following the holiday unless an approved vacation day or other excused and/or paid day off has been pre-authorized. The employee must be on the active payroll at least sixty days prior to the holiday observed. An exception will be made when the failure to work is for one of the following listed reasons, provided the employee works during either the week before or the week after the holiday:

A.    Provable illness reported on time to the Supervisor.

B.    Death of mother, father, brother, sister, spouse, child, grandparent, spouse's mother or father.

C.    An absence specifically excused by the Company.

13

When figuring overtime pay, the hours paid for a holiday or vacation will be counted as if they were hours worked.

## VACATION

It is the purpose of the Vacation Policy to provide employees an opportunity for rest and recreation for personal health, well-being, and for efficient performance. Vacation benefits described apply to all regular full time hourly employees. **It is your responsibility to contact the Human Resources Department for a copy of the complete policy.**

### Vacation Eligibility.

Vacation time is awarded based on length of service. Vacation time is accrued for the first year, but it cannot be taken until the employee has completed one full year. Please check with your Human Resources Department to see whether your facility's vacation period is defined as July 1 through June 30 or by anniversary date. The initial vacation qualification is earned at the end of a twelve month period commencing with the employee's date of hire as a regular full time employee.

Vacation earned is based on years of service. After one (1) year of full time employment, employees are eligible to receive 40 hours of paid vacation; after two (2) years of full time employment, employees are eligible to receive 80 hours of paid vacation; and after nine (9) years of full time employment, employees are eligible to receive 120 hours of paid vacation.

### Vacation Provisions.

Vacations must be taken during the scheduled vacation period and may not be carried over. Employees who have remaining vacation at the start of the new vacation period will receive pay in lieu of time off.

In the event the Company requests an employee's vacation be changed due to unavoidable conflict or deadlines, the employee's vacation may be deferred.

When an employee is eligible for one week or more of vacation, one full week must be taken by the employee. (Vacation days in conjunction with holidays during the week off satisfies this requirement). Remaining vacation time may be taken in increments of no less than one day unless otherwise approved by the employee's supervisor/manager of the department.

Vacation request forms will be issued to schedule vacations. Vacations will be granted based on seniority for requests within two weeks after forms are issued. Requests submitted after the two week period will be granted on first come, first served basis. Every attempt will be made to accommodate all requests, but because of departmental manning requirements, the number of employees off for vacation at one time will be determined solely by management on an individual department basis.

14

### Vacation Pay.

Vacation pay is at the employee's current regular rate of pay, exclusive of any bonuses or other special forms of compensation and is subject to legally-required and voluntary payroll deductions.

Vacation checks will normally be issued during the regular scheduled pay period. In order to receive vacation pay in advance of your scheduled vacation, a two week's notice must be given.

## VACATION ALLOCATION DURING PLANT SHUTDOWN

Up to forty-hours of vacation time must be reserved to be taken during the plant shutdown. The vacation shutdown schedule will be announced well in advance for vacation planning purposes. Some employees may be scheduled to work during all or part of the shutdown period. Maintenance employees are expected to work all scheduled days during established plant maintenance shut-downs unless approved otherwise by Supervision. The Company will endeavor to provide some work during shutdown for employees who have less than one year of service, but this is not guaranteed.

Vacation pay will be paid prior to the shutdown.

## HEALTH AND LIFE INSURANCE

**Neither the establishment of a health care plan or any other benefits, nor any amendment thereof will be construed as giving to any participant or any other person any legal or equitable right against the Plan Administrator and/or the Company. The adoption and maintenance of the Plan shall not be deemed to be a contract of employment between the Company and the employee. Nothing contained herein shall give any employee the right to be retained in the employ of the Company or to interfere with the right of the Company to discharge any employee at any time, with or without cause, nor shall it interfere with the employee's right to termination of his/her employment at any time. The Company reserves the right at its sole discretion to modify or terminate plans or policies at any time or to revoke this handbook in part or whole unilaterally at any time.**

Hospital, Medical and Surgical insurance for you and your dependents is available through the Company's insurance package once you have successfully completed your trial employment period. A separate booklet has been prepared for you setting forth in detail coverage and claim procedures. Eligibility for health insurance is on the day following 120 days of full time continuous employment.

The Company provides life insurance equivalent to one year's pay (regular time) at the Company's sole expense. Employees will be eligible for life insurance the first day of the month following date of hire. Optional insurance coverages may be purchased by the employee through payroll deduction.

Each employee must sign up for insurance coverage, designate the beneficiary for the life insurance, and authorize a deduction for his/her paycheck to pay for insurance options. Any changes in address, beneficiary, or dependents must be reported to the Human Resources Department. Employees must annually renew their authorization for deductions with the Human Resources Department.

The Company will discontinue all insurance coverages in the following situations:

1. The employee fails to reimburse the company for the total amount of insurance premiums on the first of the month when on leave of absence.

2. In the event the employee does not return for duty on the day following the end of an approved leave;

3. In the event the physician says an employee will not be able to return to work indefinitely.

## 401K RETIREMENT PLAN

The Company offers a 401(k) Retirement Plan in which the Company contributes 50% of employee investment up to 6% of gross pay. Eligibility is the first of the month following six (6) months of continuous employment. You will be contacted to attend an informational meeting prior to your eligibility. A summary plan description will also be issued to you which gives the details on eligibility and the benefits.

## EDUCATIONAL ASSISTANCE POLICY

It is the policy of the Company to encourage educational advancement by offering tuition reimbursement. To be eligible for educational assistance, the employee must have at least one (1) year of active employment at the time the course commences. The employee's proposed educational program must be in keeping with the general scope of the present or future needs of the Company.

Applications for educational assistance require the approvals of the Human Resources Department Manager and the Operations Manager. Completed application forms will be returned to the employee with the necessary approval signatures. In no case is an employee to assume the Company's approval of any course until the completed application form has been returned to the employee with the necessary signatures.

- Upon satisfactory completion of the approved course(s), tuition and lab fees will be reimbursed 100% with a passing grade of "C" or better. There is no reimbursement for a "D" or "F" grade.

- Maximum reimbursement per calendar year is $1000.00.

- Unapproved correspondent courses and books are not eligible for any reimbursement.

16

## WORKER'S COMPENSATION

The Company carries Worker's Compensation Insurance for on the job injuries. If you are injured on the job, you must immediately report such injury to your Supervisor or Human Resources Department and an injury report form must be completed. This ensures that the Company can assist you in obtaining appropriate medical treatment. Your failure to follow this procedure may result in the appropriate worker's compensation report not being filed in accordance with the law, which may consequently jeopardize your claim for benefits in connection with a work-related injury. **Failure to report an injury to your Supervisor or falsifying information may result in disciplinary action up to and including termination of employment.** In the event of a work-related injury, you will be required to submit to a drug/alcohol screening test.

**It is the policy of the Company that the employee's portion that is normally paid by the employee for health insurance and/or any other benefits (life insurance, disability insurance, etc.) shall be the responsibility of the employee on leave and will be due on the first of each month. The maximum amount of time that the company will pay or co-pay for the employee's health insurance while the employee is on any kind of leave, including time away from work due to a work related injury, is 12 weeks. COBRA notification will be sent to the employee on the last day of the 12 weeks of being off work. In accordance with the Company's policy on leave of absence, other absences, or work related injuries, employment will end if the employee is not able to return to his/her job after being off work 12 weeks. The Company is unable to keep positions open because it affects production and efficiency.**

## RULES AND REGULATIONS

It is essential to the successful operation of the business and the welfare of all employees that fairly established standards of discipline, health, safety, attendance, workmanship and honesty be maintained. To achieve these important standards, the Company finds it necessary and advantageous to have rules and regulations designed to safeguard the best interest of all the employees of the Company.

**The following rules and regulations should not be viewed as being all inclusive.** Types of behavior and conduct that the Company considers inappropriate and which could lead to disciplinary action up to and including termination of employment without prior warning, at the sole discretion of the company, include, but are not limited to:

1.  Creating unsanitary conditions, contributing to such conditions, or conducting oneself in such a way that would be offensive or unhealthy to normal sanitation and health expectations of the Company and its employees.

2.  Being away from your work station without authorization or wasting time at your work station or in any other areas of the facility during working hours.

3.  Unauthorized soliciting of employees and/or distribution of written or printed matter in violation of the Company's Solicitation and Distribution Policy.

4.  Failure to wear clothing appropriate for the work being performed, such as safety glasses, safety shoes, or other safety equipment.

5.  Unauthorized posting or removal of notices, signs, or writing in any form on bulletin boards or Company property.

6.  Failure to be at one's work station on time at the start of the shift or after break or after lunch.

7.  Stopping work or making preparations to leave work (such as washing up or changing clothes) before the designated times for lunch period or before the specified quitting time.

8.  Failure to notify your supervisor that you have completed your assigned duties so he/she can allocate your next assignment.

9.  Receiving or placing personal phone calls. Employees will not be called away from their work stations to receive telephone calls, except in cases of family emergency.

10.  Interfering or failing to cooperate with Company guards in the performance of their duties.

11.  Engaging in malicious or idle gossip causing detriment to the Company or its employees.

12.  Receiving unauthorized or personal visitors.

13.  Initiating or participating in lotteries, pools, or other games of chance or form of gambling.

14.  Failure to clock in at the beginning of the shift or clocking in more than 15 minutes before the shift without authorization. (The term "clocking" means the designated procedure used at your location to record your time and attendance).

15.  Failure to clock out at the end of shift. Failure to immediately leave the plant at the end of the shift unless authorized. (The term "clocking" means the designated procedure used at the location to record your time and attendance).

16.  Using another's badge or pass, permitting another to use your badge or pass or failure to wear badge in plain site where required or failure to have and show identification card upon request by plant security, company representative or supervision.

17.  Smoking in any area of the facility which is designated as "No Smoking".

18.  Careless or poor workmanship.

19.  Accepting gifts, kickbacks, or other acts of approbation or remuneration from customers, vendors, or other employees in excess of $25.00.

20.  Failure to maintain work station and work equipment in a neat and orderly condition at all times.

18

21. Failure to properly dispose of litter, wastepaper, refuse, cans, and other debris in the waste cans or designated receptacles.

22. Eating during times other than designated lunch periods and/or eating in areas other than designated lunch or break rooms.

23. Improper attire or inappropriate personal appearance.

24. Failure to treat all customers, visitors, and fellow employees in a courteous and professional manner.

25. Failure to immediately report accidents and/or personal injury to the supervisor on the same day of injury.

26. Abuse, misuse or careless or deliberate damage to property, tools or equipment belonging to the Company, to another employee, or to Company visitors or customers.

27. Possession, sale or use of alcohol or drugs on Company property, reporting to work under the influence of same, or violating the Company Drug Free Workplace Policy.

28. Committing or threatening any act of violence or any acts causing bodily harm to any employee, Supervisor, or any other person while on Company premises.

29. Harassing, threatening, intimidating, coercing, interfering with or using abusive language to any other employee or Supervisor.

30. Possession of or use of firearms, explosives or other weapons on Company property at any time.

31. Theft or misappropriation of property of the Company, or of its employees or visitors. Removal from the premises of any Company owned or leased equipment, tools, material or other property unless authorized. Removal from the premises without proper authorization any employee lists, blueprints, Company records, or confidential information or data of any kind.

32. Falsifying (including omitting pertinent facts) or altering any Company record or report, such as an application for employment, leave of absence request, a medical report, a production record, a time record, an expense account, an absentee report, an accident report, shipping and receiving records, or any other Company records.

33. Engaging in immoral conduct or indecent acts on Company property or being convicted of a felony of moral turpitude which may reflect on or have an effect on the good name or welfare of the Company.

34. Fighting or engaging in brawling on the premises at any time.

19

35. Insubordination or refusal by an employee to follow management's instructions concerning a job-related matter.

36. Sleeping during work hours.

37. Refusal to complete an assigned shift or leaving assigned department or work area during working hours without notifying your supervisor.

38. Failure to follow shop rules, safety or fire and emergency regulations.

39. Failing to use prescribed safety equipment; performing unsafe acts or failure to follow safety procedures which could cause injury to self or others, including altering or overriding any safety device.

40. Restricting production output or inciting others to do so; causing, leading, participating in, or attempting to cause an unauthorized work stoppage or slowdown.

41. Concealing or failing to report a significant error or damage to equipment, tools and/or materials to your supervisor. Failure to immediately report to designated authority any and all information of events or instances that may involve damage, theft or accident (industrial or otherwise).

42. Refusing to submit or comply with the Company's Alcohol and Drug Policy.

43. Excessive absenteeism and/or tardiness or any other violation of the attendance policy such as failure to call in your absence to the appropriate phone number as designated by your HR Manager and/or Supervisor.

44. Breach of ethics concerning confidentiality of Company or employee information or improper disclosure of trade secrets or confidential information.

45. Carrying on personal activities during working hours without permission.

46. Unauthorized use and/or misappropriation of the Company's property, machinery, computers, phones, on line services, or contacts for non-business work or personal use or gain.

47. Distracting the attention of others, causing confusion by unnecessary shouting, horseplay, scuffling, running, throwing things or demonstrating in the plant.

48. Directing vulgar, abusive or profane language to a fellow employee or violating the Company's Harassment and Sexual Harassment Policy.

49. Refusing to allow examination of contents of outgoing boxes, parcels, lunch pails, or other items by plant security, Company representative or supervision.

50. Failure to report suspicious, unethical or illegal conduct by fellow employees, customers, or suppliers to management.

**The rules above are not all-inclusive but offer general guidelines only. You may terminate your employment at any time, with or without cause, and the Company retains the same right. Further, the Company continually updates and reviews its policies, and accordingly, its rules and regulations are subject to change at the sole discretion of the Company with or without prior notice.**

## GENERAL GUIDELINES FOR CORRECTIVE ACTION

In a prior section called "Rules and Regulations," you will find many of the common-sense rules stated that each of us follow and as stated, **these rules are not all inclusive. Management reserves the right at its sole discretion to determine discipline and/or corrective action for inappropriate behavior.**

The following procedures are generally utilized with respect to discipline for employees who have completed the Trial Employment Period. It is the policy of the Company that any conduct in its view which interferes with or adversely affects employment is grounds for disciplinary action ranging from oral warnings to immediate discharge. Generally, the situation will first be discussed and reviewed with the employee before action is taken.

1. No employee will be interviewed or disciplined for what a Supervisor thinks might be a serious violation (more than a verbal reprimand) without having a second management person present.

2. No written reprimand will be placed in your personnel file unless a copy is offered to you and you are given a chance to write your comments. In the case of a written reprimand, if there is no other discipline in your file for one year following the reprimand, the record of the reprimand will be considered inactive and will not receive further consideration. You may examine your personnel file by submitting a written request to the Personnel Office. The Personnel Manager will schedule an appointment for you within 5 days of your request. You may at any time have any written comment you wish placed in your file; but no documents may be removed from the file.

3. No discipline will be decided upon without giving you an opportunity to present your side of the story. If the Supervisor believes you should immediately leave the plant, an interview will be scheduled at the earliest convenient time.

4. If the offense is serious, a corrective action or even discharge may be the penalty for a first offense.

21

The Company continually updates and reviews its policies, and accordingly, its Guidelines for Corrective Action is subject to change at the sole discretion of the Company with or without prior notice.

The Company is an at-will employer meaning that you may quit at any time for any reason and you may be terminated at any time for any reason with or without cause.

## DRUG-FREE WORKPLACE

On November 18, 1988, Congress passed legislation which requires government contractors and federal grant recipients to adopt policies aimed at creating a drug-free workplace. The Company is a government contractor and must comply with the statute. Accordingly, the Company is mandated to establish and maintain certain policies to prohibit violation of drug laws in the workplace.

It is your responsibility to contact the Human Resources Department or your supervisor for a complete copy of the Company's drug policy. This policy is posted on the bulletin boards. All employees are required to abide by this policy as a condition of employment and continued employment with the Company. Employees who violate this policy are subject to disciplinary action which may include termination of employment.

## <u>POSSESSION OR USE OF DRUGS/ALCOHOL PROHIBITED</u>

All employees are hereby placed on notice that the unlawful manufacture, dispensation, sale, possession, or use of a controlled substance in the company workplace is prohibited.

In addition, the manufacture, distribution, dispensation, sale, possession or use of alcohol or drug paraphernalia on the Company premises, or while engaged in Company business is prohibited. Furthermore, employees are prohibited from being under the influence of drugs or alcohol while at work or engaged in Company business, or from having their ability to work impaired as a result of drug or alcohol use. In addition, the use of alcohol or drugs during break time, including lunch or dinner breaks, is prohibited. Violation of any of this policy is grounds for immediate termination of employment for the first offense.

Employees are advised that the Company fully cooperates with local law enforcement and government agencies in any investigations related to the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance by its employees or subcontractors.

## ALCOHOL AND DRUG TESTING

The purpose of drug and alcohol testing is to provide a safe workplace and to provide help to those addicted to drugs or alcohol.

A.    **Applicants for Company positions (including contract labor) shall be required to submit to blood, urine and/or other medical testing for alcohol, drugs and controlled substance usage as part of their pre-employment medical examination as a condition of employment.** If the test results demonstrate the presence of undisclosed prescribed or unauthorized drugs or controlled substances or an unacceptable level of alcohol, the applicant will not be permitted to commence work for the Company, or will be terminated if the applicant has already commenced work. Applicants will be notified of the need to take a drug/alcohol test prior to the testing. Refusal to take the test, or test results reporting a presence of illegal drugs, the illegal use of controlled substances, or an unacceptable level of alcohol shall be a basis for rejecting an applicant.

B.    **For purposes of determining eligibility for workers' compensation, employees will be required to submit to a drug/alcohol screening test when they suffer a work-related injury which requires treatment by a doctor or hospitalization.**

C.    **Employees may also be required to submit to a drug/alcohol screening test when a Supervisor has cause to believe that an employee is impaired (intoxicated or under the influence of drugs).** Cause to believe an employee is impaired is based upon, but not limited to, the observation of an employee exhibiting one or more of the following symptoms: erratic behavior; unusual or excessive drowsiness; alcohol on the breath; slurred or incoherent speech; unusually aggressive behavior; unexplained changes in mood; lack of otherwise normal dexterity; lack of coordination.

D.    **Employees may also be required to submit to a physical examination, including drug/alcohol screening test if, during the course of their employment, they cause or contribute to damage to Company property or bodily injury to any person.**

E.    **Employees may also be required to submit to a drug/alcohol screening test upon recall from layoff and/or return from any Leave of Absence in excess of 7 days.**

F.    In the event there is cause for the Company to believe that an employee is intoxicated or under the influence of drugs, the Company has the sole discretion to determine whether it will discharge the employee immediately or whether it will require the employee to submit to a drug/alcohol screening test.

## OBLIGATION TO SUBMIT TO DRUG/ALCOHOL SCREEN

Employees ordered to submit to a drug/alcohol screen for any of the reasons provided in the policy shall be informed of the reasons why they are being asked to submit to a drug/alcohol screen. Employees who refuse or fail to submit to a drug/alcohol screen within one hour of being ordered to submit to such a screen, shall be informed that their refusal or failure    constitutes insubordination and is a violation of this policy.  Refusal or failure to submit to a drug/alcohol screen is cause for immediate termination for the first offense.

## CONSEQUENCES OF WORKPLACE DRUG CONVICTION OR POSITIVE TEST

An employee convicted of any criminal drug statute violation that occurred in the workplace may be terminated.  In the event a required drug/alcohol screen reveals the use of illegal drugs, illegal use of controlled substances and/or alcohol, the employee will be terminated.

## CONFIDENTIALITY

All drug screen reports will be considered strictly confidential.  Drug screen reports will be provided to appropriate managers and administrators depending on the identity of the employee and the nature of the inappropriate behavior.  Drug screen reports will be placed in an employee's personnel file and will be expunged upon termination of employment if the employee was evaluated for substance abuse and successfully completed treatment.

## SEARCH POLICY

The Company has a responsibility in maintaining a safe and healthy work environment for all of its employees and a property right in the equipment, inventory and the workplace facility.  **It is your responsibility to contact the Human Resources Department or your supervisor for a complete copy of the Company's search policy.**

Use or possession of illegal drugs, alcoholic beverages, firearms and weapons is not permitted on Company property, including the company's parking areas,  at any time.  Other situations which may require investigation utilizing search procedures include reasonable suspicion that an employee is or is about to be engaged in criminal conduct, willful gross misconduct or conduct that has an adverse economic impact on the Company.

To enforce this policy, the Company reserves the right to conduct searches and inspections (including medical exams) of employee's persons, personal effects, lockers or personal vehicles located on Company property for the purpose of determining if any employees are using or in possession of any such illegal items.  Such searches may be made from time to time by authorized Company representatives without prior warning.

**The refusal by any employee to submit to a search, inspection, or examination of one's personal property may result in discipline up to and including discharge.**

24

# SMOKING POLICY

It is not the intent of the Company to take issue with individual smoking preferences. However, it is the intent of the Company to recognize individual rights and to accommodate certain preferences of legal tobacco products by providing policy and procedure to ensure a safe and productive working environment. **The Surgeon General has warned that smoking can be dangerous to your health. The Company recommends that employees do not smoke. It is your responsibility to contact the Human Resources Department or your supervisor for a complete copy of the  Company's Smoking Policy.**

<u>**Courtesy and Complaint Resolution**</u>.  Employees are expected to exercise common courtesy towards their coworkers in complying with the smoking policy.   If a dispute arises, employees may express their concerns to their supervisors or managers.   If supervisors or managers cannot resolve the dispute quickly or completely, the problem should be reported to the Human Resources Manager.

<u>**Designated Areas**</u>.    Designated areas will be marked  in which smoking will be allowed.  If any area is not designated as smoking, it means no smoking is allowed.  Employees can smoke outside the building on their breaks and at lunch as long as  there are no signs stating "No Smoking". Areas requested for authorization of smoking will be evaluated.  The Operations Manager will have the final determination in indicating areas authorized for smoking.

<u>**Smoking is prohibited**</u>:

>In areas where the ventilation system prevents the recirculation of air;
>In areas where volatile materials are used or stored;
>In areas of where fire and/or safety sensitivity regulations are required or restricted by government regulations;
>In areas specifically designated as "no smoking areas".

>**Smoking privileges will be revoked if management determines at its sole discretion that such activity interferes with productivity or attention to quality.**

<u>**Housekeeping and Safety Requirements**</u>:

Cigarettes must be properly put out and discarded in the proper containers. Cigarette papers and other paper refuse must be discarded in waste receptacles. If smoking is permitted at  the employee's work station, the employee is expected to provide an ash tray.  Disposing of cigarettes on shop floors, in company parking lots or entry ways, or other areas resulting in poor housekeeping habits may be cause for disciplinary action and policy change.

## FIRE PREVENTION

Every precaution is taken against the possibility of fire but the full cooperation of all employees is essential to assure effective fire prevention. Each employee is expected to familiarize himself or herself with the location of fire extinguishers and department exits so that he/she will be able to conduct himself/herself properly and calmly at any time such an emergency might arise. Special extinguishers are provided for various types of fires and are identified as such. For more information, consult your safety director or a copy of the safety manual can be obtained from your Human Resources Manager.

## SAFETY

**The Company is making every effort to provide you and your fellow workers with a safe and sanitary working environment. Your cooperation and participation is essential to our mutual accomplishment of a fully safe and accident-free job site. Safe working conditions and safe workers depend upon safety awareness and action by all employees at all times. Failure to follow safety rules will subject an employee to corrective discipline according to the work rules. <u>Safety is a part of your job</u>. We have Safety Committee Meetings in which employees identify problem areas and suggest solutions. Your Supervisor will instruct you on safe methods and how to use them. Safety Manuals are located in each Personnel Department for further guidance and/or inquiries.**

## SAFETY RULES

**The following list of safety rules is not all inclusive but serves as general guidelines only.**

1. Never operate any machine or equipment unless you are specifically authorized to do so by your supervisor.

2. Do not operate defective equipment. Do not use broken hand tools. Report defective or hazardous equipment to your supervisor.

3. Obtain full instructions from your supervisor before operating a machine with which you are not familiar.

4. Never start on any hazardous job without being completely familiar with the safety techniques which apply to it. Check with your supervisor if in doubt.

5. Make sure all safety attachments are in place and properly adjusted before operating any machine.

6. Do not operate any machine or equipment at unsafe speeds. Shut off equipment which is not in use.

7. Report any unsafe or potentially unsafe condition or hazard to your supervisor.

8. Wear all protective garments and equipment necessary to be safe on the job. Wear proper shoes. Sandals or other open-toed or thin-soled shoes are not to be worn.

9. Do not wear loose, flowing clothing, or long hair while operating moving machinery.

10. If you should receive an injury, no matter how small, immediately notify your supervisor. Prompt attention to a small cut or scratch may avoid a serious infection.

11. Never repair or adjust any machine or equipment unless you are specifically authorized to do so by your supervisor.

12. Never oil, clean, repair, or adjust any machine while it is in motion.

13. Never repair or adjust any electrically driven machine without opening and properly tagging the main switch.

14. Put tools and equipment away when they are not in use.

15. Do not lift items which are too bulky or too heavy to be handled by one person. Ask for assistance.

16. Keep all aisles, stairways, and exits clear of skids, boxes, air hoses, equipment, and spillage.

17. Do not place equipment and materials so as to block emergency exit routes, fire boxes, sprinkler shutoffs, machine or electrical control panels, or fire extinguishers.

18. Stack all materials neatly and make sure piles are stable.

19. Keep your work area, machinery and all Company facilities which you use clean and neat.

20. Do not participate in horseplay, or tease or otherwise distract fellow workers. Do not run on company premises-always walk.

21. Power truck operators must wear their seatbelts properly secured at all times and safeguard other workers at all times; workers must show courtesy to power truck operators.

22. Never take chances. If you are unsure, ask your supervisor.

## HAZARD COMMUNICATIONS - RIGHT TO KNOW

All employees working with or potentially exposed to hazardous chemicals, will be appropriately informed and trained concerning the hazards of chemicals to which they may be exposed in their work place.

All employees will be informed of the details of the Hazard Communication Program including an explanation of the labeling system and the material safety data sheets, and how employees can use the appropriate hazard information. The Safety Coordinator is responsible for the overall coordination of the training program.

We will provide employees with training when new hazards are introduced and added to the "chemical inventory list", or before non-routine tasks are to be performed that could involve exposure to hazardous chemicals. Reinforcement of training will be conducted through topics at safety meetings, as appropriate.

The extent of information transmitted to employees during the training sessions will be dictated by the degree of hazard presented by the chemicals. The applicable MSDS's, the text of the OSHA Hazard Communication Standard, the inventory list of hazardous chemicals, and the written program will be used as sources of information during the training sessions.

## SAFETY EQUIPMENT

Safety equipment, such as gloves, ear muffs or plugs, respirators, dust masks, safety glasses, lifting belts, and hazardous chemical protective clothing, where and when required, will be furnished by the Company. When any of these items become worn out through normal use on the job or are damaged while on the job through no fault of the employee, they will be replaced at no charge. Worn out or damaged items should be turned into his/her Supervisor, who will issue replacements.

All employees required to wear safety shoes, or those who elect to wear safety shoes, will be issued a one time $20.00 shoe allowance.

**Check with your Supervisor for additional safety equipment requirements.**

## GOOD HOUSEKEEPING

The plant facilities and equipment represent a very substantial investment by the Company to provide the tools necessary for our work. They will serve us best, and last longer, if each employee takes pride in maintaining his/her work equipment and work station in a neat and orderly condition at all times.

In particular, care should be taken to prevent litter of any kind from accumulating. All wastepaper and refuse should be deposited in the waste receptacles which are located throughout the plant. Areas should be cleared at the end of each work day and important papers, prints, drawings, and other materials put away. Pride in cleanliness and neatness is a trait universally admired.

## LOST AND FOUND

Although the Company cannot be responsible for property lost or stolen on Company premises, it will help employees to protect belongings and to recover lost articles. In cases of a loss, promptly inform the Human Resources Department. When finding an article, deliver it to the Human Resources Department so that its owner can be found.

## ELECTRONIC COMMUNICATION POLICY

Employees are expected to make use of Company facilities only for the business purposes of the Company. For example, computers are not to be used to play personal computer games. Accordingly, materials that appear on computer, E-Mail, voice mail, facsimiles and the like are presumed to be for business purposes, the work product belongs to the Company and all the materials are subject to review by the Company at any time without notice to the employee. Employees are not to have any expectation of privacy with respect to any material on Company property. **It is your responsibility to contact the Human Resources Department or your supervisor for a complete copy of the Company's Electronic Communication Policy.**

## QUESTIONS, COMPLAINTS, AND SUGGESTIONS

Sometimes each of us let small things build up and multiply inside us. Don't do it. Questions, suggestions, complaints, or concerns should be expressed to your Supervisor, voiced at any employee meetings, reported in the suggestion box or brought up at birthday meetings or employee meetings.

If you bring up a question, complaint, suggestion, or grievance in any of these ways and no one gives you a definite verbal answer about what will be done, you have a right to ask to speak to your Supervisor, your Human Resources Manager, or the Operations Manager.

Sometimes the answer won't be what you want, but your thoughts deserve to be considered.

If you are not satisfied with the answer, you may pursue the matter by using the following written complaint procedure.

**Step 1:** An employee who has a complaint may present it to his/her Supervisor as soon as possible after the occurrence which caused the complaint. The decision of the Supervisor will be rendered to the employee promptly within ten (10) days from the time the employee presents the complaint. If the complaint regards your supervisor, your complaint should be taken directly to the Department Manager, Human Resources Manager, or the Operations Manager. If you do not feel comfortable with any of the managers listed, or the manager is not available, you may contact the Corporate Human Resources Department in Quincy.

**Step 2:** In the event the complaint is not settled under Step 1, the employee may, within five (5) working days from the time of the decision from the Supervisor, submit the complaint in writing to the Human Resources Manager who will make every attempt to resolve the complaint.

**Step 3:** If the employee is not satisfied, he/she may request a meeting with the Operations Manager.

**Step 4:** If the employee is still not satisfied, he/she may write directly to the CEO c/o Titan, 2701 Spruce Street, Quincy IL. 62301.

Any complaint should promptly be brought to the attention of someone in the Company Management. Delay makes it difficult to get all the facts straight. Also, the Company wants to correct anything that is wrong as quickly as possible.

30

## CHANGE IN PERSONAL STATUS

It is very important that the Company always has correct and up-to-date information about you. It may be necessary to get word to you at home about something urgent. Government and insurance regulations require that your dependents be properly listed. Therefore, you must promptly notify the Human Resources Department whenever there is a change in your name, address, phone number, marital status, insurance beneficiaries, or dependents.

## EMPLOYEE'S RIGHT TO PRIVACY

Employee Access. An employee may examine his/her personnel records by providing written request to the Human Resources Manager in advance. Records exempt from this inspection include potential job assignments or predictions of future salary and planning information. Regarding any item in the file, an employee has the right to dispute the item by providing a written statement of disagreement with the item, all in the presence of a Human Resources Manager. The employee may not actually remove any item from the file.

Disclosure of Employee Information. All requests for information on a current, retired, or terminated employee must be referred to the Human Resources Department. Information will be given in response to duly authorized requests from law-enforcement agencies, including investigations, summonses, subpoenas, and judicial orders.

## TERMINATION OF EMPLOYMENT PROCEDURE

When an employee has voluntarily or involuntarily terminated his/her employment with the Company, the employee will be escorted by designated officials to his/her locker, desk, or other assigned work area to collect all personal items before leaving the premises. The employee will not be permitted to re-enter the plant, office, or remain on any parking lot areas without prior approval from the Human Resources Manager. Final pay will be received in compliance with applicable state laws.

## SOLICITATION, DISTRIBUTION & BULLETIN BOARD POLICY

No Solicitation. Employees may not solicit or advocate support for any non-Company cause or organization during their working time or during the working time of the employee to whom such activity is directed.

No Distribution. Employees may not distribute or circulate any non-Company materials during their working time or during the working time of the employee to whom such activity is directed. Also, employees may not distribute such materials in work areas at any time.

<u>Bulletin Boards</u>. The posting of written materials on Company bulletin boards must be approved in advance by the Human Resources Department. Bulletin boards are located in various areas of the plant to inform employees of facts, events, bids, etc. It is the employee's responsibility to read the bulletins. One or more "official" bulletin boards(s) will be designated and the location(s) communicated to all employees.

<u>Non-employees</u>. Solicitation or distribution of literature for any purpose, at any time, by non employees, is prohibited anywhere on Company property.

**Check with your Human Resources Department for a copy of the complete policy.**

## VISITORS

Visitors will be required to obtain a Visitor's Security Pass upon registration. Visitors will not be allowed in manufacturing, warehouse or office areas without permission and must be accompanied in all manufacturing and warehouse areas by an authorized escort. Visitors are required to wear safety glasses, suitable shoes and any other safety equipment required while in the plant area.

## FAIR EMPLOYMENT PRACTICES

It is the purpose of this section to inform you of your rights as an employee and further to acquaint you with the laws governing this Company and its compliance with these regulations. This section will provide you with information in reporting any charge you may have if you feel your rights have been infringed upon as well as establishing the policy that the Company will not tolerate behavior from any employee or employees in violation of the laws governing this Company. The following are examples of laws governing the workplace and its employees. **It is your responsibility to contact the Human Resources Department or your supervisor for a complete copy of the Company's Fair Employment Policy.**

<u>**Americans with Disabilities Act of 1990.**</u>

Title I of the ADA prohibits discrimination in employment against any qualified individual with a disability. The ADA also imposes affirmative obligations to accommodate disabilities in employment. The term "disability" is defined as a physical or mental impairment that substantially limits one or more of the major life activities of an individual.

32

### Title VII of the Civil Rights Act of 1964

You as an employee are guaranteed by law certain protected rights under Title VII of the Civil Rights Act of 1964. This Act prohibits employers from discriminating against any job applicant or employee on the basis of race, color, religion, sex, or national origin.

All jobs, facilities, opportunities, and other advantages at the Company, are on a completely nondiscriminating basis without regard for race, color, religion, sex, nationality, age, or any other artificial distinction that does not affect the ability to perform the assigned job.

### Nondiscrimination

Neither the Company, nor anyone working at the Company will tolerate discrimination on the basis of race, color, sex, creed, religious belief, handicap, national origin, or age.

### Harassment

Title VII prohibits harassment in the place of employment and is defined as a form of misconduct which interferes with work and wrongfully deprives employees of the opportunity to work in an enjoyable and productive environment. Threatening, intimidating, coercing, annoying, or persistently disturbing another employee will be considered a serious violation of the Company's policy. Harassment is prohibited and is a violation of the law.

Harassment creates a hostile work environment, violates a victim's civil rights and will not be tolerated. All incidents of harassment are to be reported. A confidential investigation will be conducted. All employees are expected to cooperate with such an investigation. Violation of this policy will lead to discipline, which can include immediate discharge.

Racial harassment includes any jokes, slurs or obscene gestures aimed at individuals based on race. Similarly, age harassment includes any jokes, slurs or obscene gestures aimed at individuals based on age.

Sexual harassment includes any acts, statements or suggestions indicating that an employee's job security, professional advancement, salary, benefits, work assignment or other conditions of employment depend upon tolerating sexual harassment or will be adversely affected by refusing to condone sexual harassment anywhere in the workplace. It also includes any acts, statements or suggestions that an employee's physical attractiveness or perceived lack of physical attractiveness in the eyes of the harasser is a factor in obtaining and securing professional opportunities.

Any employee who believes that he or she is a victim of harassment or who observes such harassment, should immediately report the conduct to a supervisor, the personnel department or any officer of the Company. The matter will be investigated and appropriate action will be taken. Violation of this Company policy may lead to discipline, including termination.

## Responding to Harassment:

If you feel you are a victim of harassment or sexual harassment:

1. Respond by making your feelings known. Calmly tell the harasser that the comments or behavior are unwanted and that you want them to stop.

2. Record the specifics of the incident including the time, place, and others who may have witnessed the behavior or your reactions. Write down the exact words or actions that were used.

3. Report the harassment to your supervisor and/or Human Resources Manager as soon as possible. If your supervisor is the one harassing you, you may report it to the Human Resources Manager, Corporate Human Resources Department or Operations Manager whichever you feel most comfortable.

## Retaliation Prohibited

The Company prohibits any form of retaliation against employees for bringing bona fide complaints or providing information about harassment. However, if an investigation of a complaint shows that the complaint or information was false, the individual who provided the false information will be subject to disciplinary action, up to and including termination.

## Complaint Procedure

A. Purpose:

The object of this complaint procedure is to provide a mechanism that will allow employees to alert management of discrimination.

B. Procedure:

(1) An employee who has a complaint may present it to his/her Supervisor as soon as possible after the occurrence which caused the complaint. The decision of the Supervisor will be rendered to the employee promptly within ten (10) days from the time the employee presents the complaint. If the complaint regards your supervisor, your complaint should be taken directly to the Department Manager, Human Resources Manager, or the Operations Manager. If you do not feel comfortable with any of the managers listed, or the manager is not available, you may contact the Corporate Human Resources Department in Quincy.

(2) In the event the complaint is not settled under Paragraph (1), the employee may, within five (5) days from time of decision of the Supervisor, submit the complaint in writing to the Human Resources Manager who will make every attempt to resolve the complaint.

(3) If the employee is not satisfied, he/she may request a meeting with the Operations Manager.

(4) If for any reason you feel you cannot or prefer not to take your complaint to your supervisor, Human Resources Manager, or Operations Manager, you may contact the Corporate Human Resources Department or Corporate Headquarters in Quincy and every attempt to resolve the complaint will be made.

## Complaint Investigation

All complaints of harassment will be investigated promptly and in as impartial and confidential a manner as possible. Employees are required to cooperate in any investigation. A timely resolution of each complaint will be reached.

**The Company is an at-will employer. That is, either you or the Company may terminate the employment relationship at any time, with or without cause. The at-will relationship remains in full force and effect notwithstanding any statements to the contrary made by Company personnel or set forth in any documents.**

35

## INDEX (Alphabetical)

| TOPIC | PAGE |
|---|---|
| 401K Retirement Plan | 16 |
| About Your Employee Handbook | 3 |
| Absence From Work | 8 |
| Acknowledgment of Receipt of Handbook | 4 |
| Change in Personal Status | 31 |
| Complaint Investigation | 35 |
| Complaint Procedure | 35 |
| Corrective Action | 21 |
| Drug-Free Work Place | 22 |
| Educational Assistance Policy | 16 |
| Electronic Communication Policy | 29 |
| Employee Benefits | 13 |
| Employee's Right to Privacy | 31 |
| Fair Employment Practices | 32 |
| Family and Medical Leave Act | 11 |
| Fire Prevention | 26 |
| Funeral Leave | 12 |
| Good Housekeeping | 29 |
| Harassment | 33 |
| Health and Life Insurance | 15 |
| Holidays | 13 |
| Hours of Work | 8 |
| Introduction | 5 |
| Job Postings | 7 |
| Leaves of Absence | 9 |
| Management | 6 |
| Mandatory Overtime | 8 |
| Our Employees | 5 |
| Pay | 9 |
| Physical Examinations | 9 |
| Questions, Complaints and Suggestions | 29 |
| Recording Your Hours of Work | 7 |
| Reduction in Work Force | 7 |
| Rules and Regulations | 17 |
| Safety | 26 |
| Search Policy | 24 |
| Seniority | 6 |
| Sexual Harassment | 33 |
| Smoking Policy | 25 |
| Solicitation, Distribution & Bulletin Board Policy | 31 |
| Termination of Employment Procedure | 31 |
| The Customer | 6 |
| Trial Employment Period | 5 |
| Vacation | 14 |
| Visitors | 32 |
| Worker's Compensation | 17 |



**TITAN TIRE CORPORATION OF TEXAS**
**6700 PAREDES LANE ROAD**
**BROWNSVILLE, TX 78520**
**(956) 542-6878**

*EXHIBIT 16*

# ACKNOWLEDGMENT AND RECEIPT
# OF THE EMPLOYEE HANDBOOK

I agree to comply with all the policies, procedures and requirements of the Company, and I understand that my employment can be terminated at any time at the sole discretion of either the Company or myself. I also understand that no representative of the Company, other than the President has the authority to make any agreement to the contrary. The Company may at any time add, change, or rescind any policy or practice at its sole discretion without notice. I acknowledge receipt of the Employee handbook which I have read and fully understand.

Guillermina Montelongo

**Employee Name (Please Print)**

M. Montelongo                    11-25-98

**Employee Signature**                    **Date**

This form remains in the handbook. You will be given a copy to sign acknowledging that you have received this handbook and the copy will be kept in your personnel file. If you want a copy of the signed acknowledgment, please tell your Human Resources Manager.

4

Sent by: TITAN TIRE          5152659478;          05/C  8  8:59;  JetFax #754;Page 1/1

## Titan Tire Corporation
### Employment or Change of Status

Montelenga  Guillermina _____  _____ 4133 _____  3-1-99 _____
Last          First      Initial        Dept    Clock           Effective Date

**A. Change of Status:** (check one)

_____ a. Job Bid      _____ b. Job Assignment    _____c. Shift Change    _____d. Personal Disq.

_____ e. Comp. Disq.    _____ f. Cutback    _____g. Recall    _____h. Neg. Job    _____ j. Req. Bid

**Leave of Absence Status:** (check one) _____ a. Personal  _____ b. Industrial  _____ c. Military

_____ RTW  Last day worked_____  Date of Injury (industrial) _____    _____ d. Union

**Light Duty:** (check one)

Place on light duty_____  Return to Original Position_____    Date of Injury _____

**Termination:** (check one)

_____ a. Quit    _____ b. Terminated    _____c. Retire    _____d. Layoff    _____e. Deceased

Last Day Worked_____        Uniforms returned_____  I.D. Card returned_____

**Employment Status:** (check one)

_____ a. New Hire    _____ b. Rehire    _____c. Reinstate    _____d. Recall from Layoff

**B. New Hire:**    SSN_____    Seniority Date_____

Race ___ B-Black ___ O-API ___N-Amer Indian ___H-Hispanic ___W-White ___H-Handicap

___ M-Male ___ F-Female ___S-Single ___M-Married ___V-Veteran ___W-Viet Vet

Date of Birth_____    Phone Number_____

**C. Address:** _____
        Street          Apt. #            Town            Zip

**D. JOB CHANGE: From:**            To:

Class #/Shift_____    Job Title_____

Pursuant to the provisions of 9.6 (m)    Class #_____ POMG #_____

of the CBA, I wish to disqualify from the    SHIFT: ___1-11-7 ___2-7-3 ___3-3-11 ___A ___B

above listed job.                ___C ___D ___E-10:30p-7am ___F-11p-7:30am

Signed_____        ___G-6:30a-3pm ___H-7a-3:30pm ___I-2:30p-11p

Steward_____        ___J-3p-11:30pm ___K-3:30p-12am Rate_____

                    L.G._____  Mach #_____ Bid #_____

Check if recall rights____        FOREMAN_____ Check if open job____

Check here if copy to dept._____    Qualified, pay top of grade (check here)_____

Remarks  Current Rate - 6⁰⁵/hr._____

_____ New Rate  - 6.25/hr.  Effective 3-1-99_____

_____ 3-1-99                Beth Augares  3-1-99
Supt. Signature    Date            H. R. Manager        Date

EXHIBIT
C
ALL-STATE LEGAL®

Sent by: TITAN TIRE                5152659476;          05/08/90  9 59;   Jetfax #754;Page 1/1

**Titan Tire Corporation**
Employment or Change of Status

Montelongo Guillermma _____ 4133 _____ 5-31-99
Last          First        Initial       Dept      Clock              Effective Date

**A. Change of Status:** (check one)

____ a. Job Bid    ____ b. Job Assignment    ____c. Shift Change    ____d. Personal Disq.

____ e. Comp. Disq.    ____ f. Cutback    ____g. Recall    ____h. Neg. Job    ____ j. Req. Bid

**Leave of Absence Status:** (check one) ____ a. Personal ____ b. Industrial ____ c. Military

___ RTW Last day worked_____ Date of Injury (industrial) _____ ____ d. Union

**Light Duty:** (check one)

Place on light duty_____ Return to Original Position_____    Date of Injury _____

**Termination:** (check one)

____ a. Quit    ____ b. Terminated    ____c. Retire    ____d. Layoff    ____e. Deceased

Last Day Worked_____    Uniforms returned_____  I.D. Card returned_____

**Employment Status:** (check one)

____ a. New Hire    ____ b. Rehire    ____c. Reinstate    ____d. Recall from Layoff

**B. New Hire:**    SSN_____    Seniority Date_____

Race  ___ B-Black ___ O-API ___N-Amer Indian ___H-Hispanic ___W-White ___H-Handicap

___ M-Male    ___ F-Female ___S-Single ___M-Married ___V-Veteran ___W-Viet Vet

Date of Birth_____    Phone Number_____

**C. Address:** _____
            Street            Apt. #                Town              Zip

**D. JOB CHANGE:** From:        To:

Class #/Shift_____    Job Title_____

Pursuant to the provisions of 9.6 (m)    Class #_____ POMG #_____

of the CBA, I wish to disqualify from the    SHIFT: ___1-11-7 ___2-7-3 ___3-3-11 ___A ___B

above listed job.    ___C ___D ___E-10:30p-7am ___F-11p-7:30am

Signed_____    ___G-6:30a-3pm ___H-7a-3:30pm ___I-2:30p-11p

Steward_____    ___J-3p-11:30pm ___K-3:30p-12am Rate_____

                              L.G._____ Mach #_____ Bid #_____

Check if recall rights____    FOREMAN_____ Check if open job____

Check here if copy to dept._____  6 25  Qualified, pay top of grade (check here)_____

Remarks  Current Pay _____
         New Pay  6 50    EFF 5-31-99

Supt. Signature _____  Date        H. R. Manager _____  Date        un7/88

SANT BY: TITAN TIRE ;        5152859478;        05/0_.98   8:59;   JetFax #754;Page 1/1

**Titan Tire Corporation**
Employment or Change of Status

Montelongo  Guillermina _____ 4133 _____ 8-2-99
Last       First     Initial    Dept     Clock          Effective Date

**A. Change of Status: (check one)**

____ a. Job Bid    ____ b. Job Assignment    ____ c. Shift Change    ____ d. Personal Disq.

____ e. Comp. Disq.    ____ f. Cutback    ____ g. Recall    ____ h. Neg. Job    ____ j. Req. Bid

**Leave of Absence Status: (check one)** ____ a. Personal ____ b. Industrial ____ c. Military

____ RTW  Last day worked_____  Date of Injury (industrial) _____    ____ d. Union

**Light Duty: (check one)**

Place on light duty_____  Return to Original Position_____    Date of Injury _____

**Termination: (check one)**

____ a. Quit    ____ b. Terminated    ____ c. Retire    ____ d. Layoff    ____ e. Deceased

Last Day Worked_____    Uniforms returned_____   I.D. Card returned_____

**Employment Status: (check one)**

____ a. New Hire    ____ b. Rehire    ____ c. Reinstate    ____ d. Recall from Layoff

**B. New Hire:**    SSN_____    Seniority Date_____

Race ___ B-Black ___ O-API ___ N-Amer Indian ___ H-Hispanic ___ W-White ___ H-Handicap

___ M-Male ___ F-Female ___ S-Single ___ M-Married ___ V-Veteran ___ W-Viet Vet

Date of Birth_____    Phone Number _____

**C. Address:** _____
        Street            Apt. #            Town            Zip

**D. JOB CHANGE: From:**            To:

Class #/Shift_____    Job Title_____

Pursuant to the provisions of 9.6 (m)    Class #_____ POMG #_____

of the CBA, I wish to disqualify from the    SHIFT: ___1-11-7 ___2-7-3 ___3-3-11 ___A ___B

above listed job.    ___C ___D ___E-10:3Cp-7am ___F-11p-7:3Cam

Signed_____    ___G-6:30a-3pm ___H-7a-3:3Cpm ___I-2:3Cp-11p

Steward_____    ___J-3p-11:30pm ___K-3:3Cp-12am  Rate_____

        L.G._____ Mach #_____ Bid #_____

Check if recall rights____    FOREMAN_____ Check if open job____

Check here if copy to dept.____    Qualified, pay top of grade (check here)____

Remarks____ Old Pay - 6⁵⁰ _____
        New Pay - 6⁷⁵    cR 8-2-99

_____ Beth     8-6-99
Supt. Signature    Date    H. R. Manager    Date

Sent by: TITAN TIRE          5152659478;          09/13  `Y 10:41AM;JetFax #174;Page 10/20

Sent by: TITAN TIRE          5152659478;          05/08/98  8:5    JetFax #754;Page 1/1

**Titan Tire Corporation**
Employment or Change of Status

Montelongo  Guillermina          4/33                    8-30-99
Last          First          Initial          Dept          Clock          Effective Date

**A. Change of Status: (check one)**

____ a. Job Bid      ____ b. Job Assignment      ____ c. Shift Change      ____ d. Personal Disq.

____ e. Comp. Disq.      ____ f. Cutback      ____ g. Recall      ____ h. Neg. Job      ____ j. Req. Bid

**Leave of Absence Status: (check one)** ____ a. Personal ____ b. Industrial ____ c. Military

__ RTW Last day worked_____ Date of Injury (industrial) _____ ____ d. Union

**Light Duty: (check one)**

Place on light duty____ Return to Original Position____ Date of Injury _____

**Termination: (check one)**

____ a. Quit      ____ b. Terminated      ____ c. Retire      ____ d. Layoff      ____ e. Deceased

Last Day Worked_____      Uniforms returned____      I.D. Card returned____

**Employment Status: (check one)**

____ a. New Hire      ____ b. Rehire      ____ c. Reinstate      ____ d. Recall from Layoff

**B. New Hire:**  SSN 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  Seniority Date 11-30-98

Race ___ B-Black ___ O-API ___ N-Amer Indian _H-Hispanic ___W-White ___H-Handicap

___ M-Male _F-Female ___ S-Single _M-Married ___V-Veteran ___W-Viet Vet

Date of Birth_____      Phone Number_____

**C. Address:** _____
Street          Apt #          Town          Zip

**D. JOB CHANGE: From:**          To:

Class #/Shift_____          Job Title Leadperson

Pursuant to the provisions of 9.6 (m)          Class #_____ PGMG #_____

of the CBA, I wish to disqualify from the          SHIFT: __1-11-7 __2-7-3 __3-3-11 __A __B

above listed job          __C __D __E-10:30p-7am __F-11p-7:30am

Signed_____          __G-6:30a-3pm __H-7a-3:30pm __I-2:30p-11p

Steward_____          __J-3p-11:30pm __K-3:30p-12am Rate____

          L.G.____ Mach #_____ Bid #_____

Check if recall rights____          FOREMAN_____ Check if open job____

Check here if copy to dept.____          Qualified, pay top of grade (check here)____

Remarks 7.50  New Pay _____

_____          _____

          B. Cynada

Supt. Signature          Date          H. R. Manager          Date          4/17/98

# TITAN TIRE CORPORATION OF TEXAS

**Employment or Change of Status**                                    ion Date: 11/11/99

# Montelongo, Guillermina                 4133          11/28/99

Last                    First        Initial          Dept      Clock          Effective Date

## A. Change of Status:

_____ a. Job Assignment     _____ b. Shift Change     _____ c. Promotion     _____ d. Demotion

$ _7.50_ e. Old Pay Rate  $ _8.00_ f. New Pay Rate     Current Dept. Head Signature_____

New Dept. Head Signature_____

**Leave of Absence:**

_____ a. Personal     _____ b. Industrial     _____ c. Millitary

Last day worked ____/____/____, RTW ____/____/__     Approved____ Disapproved ____

**Restricted Duty:**

Place on light duty _____ Return to Original Position _____     Date of Injury ____/____/____

**Termination:**

_____ a. Quit     _____ b. Terminated     _____ c. Retire     _____ d. Layoff     _____ e. Deceased

Last day worked ____/____/____ Uniforms returned ___     I.D. Card returned ___ Key Returned___

**New Hire**     SSN ___-__-____     Date of Hire ____/____/____

Race:___B-Black     ____O-API     ____ N-Amer Indian     _____ H-Hispanic     ____W-White     ____ H-Handica

____ M-Male     ____ F-Fem     ____ S-Single     _____ M-Married     _____ V-Veteran     _____ W-Viet Vet

## C. Address: _____

Street              Apt. #              City/State              Zip

## D. Job Change

Current Job Title _____     New Job Title _____

Current Shift _____     New Shift _____

Current Supervisor _____     New Supervisor _____

Effective Date of Job Chang ____/____/____

**Remarks** _____

_____ 1 yr Top pay _____

_____ no leave Team Leader _____

Department Head Signature     Date          H.R. Manager Signature     12-3-99    Date

Operations Manager     Date



## PAYROLL DEDUCTION AUTHORIZATION

## TITAN TIRE CORPORATION OF TEXAS
## COMPANY LOGO HAT

I THE UNDERSIGNED AUTHORIZE TITAN TIRE CORPORATION OF TEXAS TO PAYROLL DEDUCT :

Total number requested :    _____1_____    $9.85    (Red and Blue Cap)

Total number requested:    _____    $11.55    (Brown Cap)

9.85

PLUS TAX  FROM MY PAY CHECK FOR THE PURCHASE OF A COMPANY LOGO HAT.

#4133

Name: Guillermina Montelongo_____    Date: 12-15-99_____

Signature H. montelongo_____

H. montelongo

TIRE CORPORATION OF TEXAS
Employment or Change of Status

MONTELONG        MINNIE        TIRE PRODUCTION    4133    7MAR 00
Last                                  First    Initial    Dept.        Clock    Effective Date

**A. CHANGE OF STATUS:**

_____ A. Job Assignment    _____ B. Shift Change    X C. Promotion    _____ D. Demotion

$ _____ E. New Hire Rate    $ _____ F. Old Pay Rate    $ 8.00 G. New Pay Rate 8.25 H. Change Life Ins.

*Current Department Head Signature:* _____ SPM _____

*New Department Head Signature:* _____

**LEAVE OF ABSENCE:**

_____ A. Personal    _____ B. Industrial    _____ C. Military    _____ D. Jury Duty

_____ RTW  Last Day Worked _____/_____/_____  Approved _____  Disapproved _____

**RESTRICTED DUTY:**

Placed on light duty _____    Return to original position _____    Date of injury _____/_____/_____

**TERMINATION:**
_____ A. Quit    _____ B. Terminated    _____ C. Rehire    _____ D. Layoff    _____ E. Deceased

Last Day Worked _____/_____/_____    Uniforms returned _____    I.D. Card Returned _____

**B. NEW HIRE**            SSN _____-_____-_____            DATE OF HIRE _____/_____/_____

_____ Black    _____ O-AP    _____ N-Amer Ind    _____ H-Hispanic    _____ W-White

_____ Male    _____ Female    _____ S-Single    _____ M-Married    _____ V-Veteran    _____ W-Viet Vet

Telephone Number _____    Date of Birth: _____

**C. ADDRESS**    Street            Apt. #            City / State            Zip

**D. JOB CHANGE**

Current Job Title  OPERATOR            New Job Title  SUPERVISOR (IN TNG)

Current Shift  7-3                    New Shift  7-3

Current Supervisor  FRANK            New Supervisor  ~~FRA~~ STEVEN

Effective Date of Job Change 07 / MAR / 00

**REMARKS:** _____ Accepted trail period for Supervisor
will get .25 _____

_____ SPM _____    7MAR 00        H. Quellan
Department Head Signature    Date            H.R. Manager Signature            Date

_____ (signature) _____
Operations Manager Signature        Date

*White - HR        Canary - Payroll*        _____/_____/_____    *Payroll Entry Date*

Form: Titan8  2/2000

**TITAN TIRE CORPORATION OF TEXAS**
Employment or Change of Status

_TIRE_

MONTELONGO        MINNE        PRODUCTION #133  20 MAR 00
Last                          First    Initial   Dept.                Clock   Effective Date

## A. CHANGE OF STATUS:

_____ A. Job Assignment _____ B. Shift Change __X__ C. Promotion _____ D. Demotion

$ _____ E. New Hire Rate $ _____ F. Old Pay Rate $8.00 G. New Pay Rate 10.00 H. Change Life Ins.

_Current Department Head Signature:_ _SPM_

_New Department Head Signature:_ _____

## LEAVE OF ABSENCE:

_____ A. Personal _____ B. Industrial _____ C. Military _____ D. Jury Duty

_____ RTW Last Day Worked ____/____/____ Approved _____ Disapproved _____

## RESTRICTED DUTY:

Placed on light duty _____ Return to original position _____ Date of injury ____/____/____

## TERMINATION:
_____ A. Quit _____ B. Terminated _____ C. Rehire _____ D. Layoff _____ E. Deceased

Last Day Worked ____/____/____ Uniforms returned _____ I.D. Card Returned _____

## B. NEW HIRE          SSN _____-_____-_____          DATE OF HIRE ____/____/____

_____ Black _____ O-AP _____ N-Amer Ind _____ H-Hispanic _____ W-White

_____ Male _____ Female _____ S-Single _____ M-Married _____ V-Veteran _____ W-Viet Vet

Telephone Number _____ Date of Birth: _____

## C. ADDRESS
Street              Apt. #           City / State           Zip

## D. JOB CHANGE

Current Job Title _TIRE BUILDER_ New Job Title _Supervisor_

Current Shift _7-3_ New Shift _7-3_

Current Supervisor _SPM_ New Supervisor _SPM_

Effective Date of Job Change _20 / MAR / 00_

REMARKS: _Promote to Supervisor_

_SPM_              20 MAR 00              _M. William_
Department Head Signature     Date              H.R. Manager Signature              Date

Operations Manager Signature     Date

**White - HR        Canary - Payroll**      ____/____/____ **Payroll Entry Date**

Form: Titan8  2/2000

## TITAN TIRE CORPORATION OF TEXAS
### Employment or Change of Status

Montelongo   Guillermina   22          4133        8/14/00

Last                    First    Initial  Dept.                Clock      Effective Date

### A. CHANGE OF STATUS:

_____ A. Job Assignment  _____ B. Shift Change  _____ C. Promotion  _____ D. Demotion

$ _____ E. New Hire Rate  $ 10.20 F. Old Pay Rate  $ 10.35 G. New Pay Rate  _____ H. Change Life Ins.

*Current Department Head Signature:* _____

*New Department Head Signature:* _____

### LEAVE OF ABSENCE:

_____ A. Personal  _____ B. Industrial  _____ C. Military  _____ D. Jury Duty

_____ RTW  Last Day Worked ____/____/____  Approved _____  Disapproved _____

### RESTRICTED DUTY:

Placed on light duty _____  Return to original position _____  Date of injury ____/____/____

### TERMINATION:

_____ A. Quit  _____ B. Terminated  _____ C. Rehire  _____ D. Layoff  _____ E. Deceased

Last Day Worked ____/____/____  Uniforms returned _____  I.D. Card Returned _____

### B. NEW HIRE          SSN _____-_____-_____          DATE OF HIRE ____/____/____

_____ Black  _____ O-AP  _____ N-Amer Ind  _____ H-Hispanic  _____ W-White

_____ Male  _____ Female  _____ S-Single  _____ M-Married  _____ V-Veteran  _____ W-Viet Vet

Telephone Number _____  Date of Birth: _____

### C. ADDRESS
_____
Street                    Apt. #                City / State              Zip

### D. JOB CHANGE

Current Job Title _____  New Job Title  Supervisor

Current Shift _____  New Shift  2nd Shift

Current Supervisor _____  New Supervisor  Russell Ash.

Effective Date of Job Change ____/____/____

**REMARKS:** _____ .15 cents 2nd Shift Δ _____

_____

_____

D. Montalvo                8/23/00

_____        _____
Department Head Signature    Date       H.R. Manager Signature          Date

M 8/23  (OK)

_____        
Operations Manager Signature  Date

*White - HR*      *Canary - Payroll*      ____/____/____  *Payroll Entry Date*

Form: Titan8  2/2000

**ITAN TIRE CORPORATION OF ___ AS**
' Employment or Change of Status

Montelongo    Guillermina    250    4/33    09-05-00
Last _____ First ___ Initial _ Dept. ____ Clock _ Effective Date

## A. CHANGE OF STATUS:

_____ A. Job Assignment  _____ B. Shift Change  _____ C. Promotion  _____ D. Demotion

$ _____ E. New Hire Rate  $ 10.35 F. Old Pay Rate  $ 10.55 G. New Pay Rate  _____ H. Change Life Ins.

*Current Department Head Signature:* _____

*New Department Head Signature:* _____

## LEAVE OF ABSENCE:

_____ A. Personal  _____ B. Industrial  _____ C. Military  _____ D. Jury Duty

_____ RTW  Last Day Worked _____/_____/_____  Approved _____  Disapproved _____

## RESTRICTED DUTY:

Placed on light duty _____  Return to original position _____  Date of injury _____/_____/_____

## TERMINATION:

_____ A. Quit  _____ B. Terminated  _____ C. Rehire  _____ D. Layoff  _____ E. Deceased

Last Day Worked _____/_____/_____  Uniforms returned _____  I.D. Card Returned _____

**B. NEW HIRE**    SSN _____-_____-_____    **DATE OF HIRE** _____/_____/_____

_____ Black  _____ O-AP  _____ N-Amer Ind  _____ H-Hispanic  _____ W-White

_____ Male  _____ Female  _____ S-Single  _____ M-Married  _____ V-Veteran  _____ W-Viet Vet

Telephone Number _____  Date of Birth: _____

**C. ADDRESS** _____
Street _____ Apt. # _____ City / State _____ Zip

**D. JOB CHANGE**

Current Job Title _____  New Job Title _____

Current Shift _____  New Shift _____

Current Supervisor _____  New Supervisor _____

Effective Date of Job Change _____/_____/_____

REMARKS: ' 20 Cents general increase _____

_____

_____

_____    S. Montalvo.   9-5-00
Department Head Signature ___ Date     H.R. Manager Signature ___ Date

_____  RA  04.08.00
Operations Manager Signature ___ Date

*White - HR*    *Canary - Payroll*    _____/_____/_____ *Payroll Entry Date*

Form: TitanB  2/2000

**..AN TIRE CORPORATION OF TEXAS**
' Employment or Change of Status

*Montelongo, Guillermina* 270       4133GWU  1-22-01
Last                          First    Initial   Dept.        Clock   Effective Date
                                                          16141GWV

**A. CHANGE OF STATUS:**

_____ A. Job Assignment  _____ B. Shift Change  _____ C. Promotion  _____ D. Demotion

$ _____ E. New Hire Rate  $ _____ F. Old Pay Rate  $ _____ G. New Pay Rate  _____ H. Change Life Ins.

Current Department Head Signature: _____ $25,000 annually ___ Overtime ra

New Department Head Signature: _____ $961.54 Bi-weekly ___ 8 hrs. = $15
                                                                    4 hrs = $7:

**LEAVE OF ABSENCE:**

_____ A. Personal  _____ B. Industrial  _____ C. Military  _____ D. Jury Duty

_____ RTW  Last Day Worked ____/____/____  Approved _____  Disapproved _____

**RESTRICTED DUTY:**

Placed on light duty _____  Return to original position _____  Date of injury ____/____/____

**TERMINATION:**
_____ A. Quit  _____ B. Terminated  _____ C. Rehire  _____ D. Layoff  _____ E. Deceased

Last Day Worked ____/____/____  Uniforms returned _____  I.D. Card Returned _____

**B. NEW HIRE**       SSN _____-_____-_____       **DATE OF HIRE** 11/30/1998

_____ Black  _____ O-AP  _____ N-Amer Ind  _____ H-Hispanic  _____ W-White

_____ Male  _____ Female  _____ S-Single  _____ M-Married  _____ V-Veteran  _____ W-Viet Vet

Telephone Number _____  Date of Birth: 8/3/52

**C. ADDRESS** _____
              Street              Apt. #              City / State              Zip

**D. JOB CHANGE**

Current Job Title _____  New Job Title _____

Current Shift _____  New Shift _____

Current Supervisor _____  New Supervisor _____

Effective Date of Job Change ____/____/____

**REMARKS:** _Change in pay status._

_____                    _A. Mancillas_  1/18/01
Department Head Signature    Date    H.R. Manager Signature    Date

_M 1/18_
Operations Manager Signature    Date

**White - HR      Canary - Payroll**    2/1/01  **Payroll Entry Date**

Form: Titan8  2/2000

## TITAN TIRE CORPORATION OF TEXAS
Employment or Change of Status

Montelongo    Guillermina

| Last | First | Initial | Dept. | Clock | Effective Date |

**A. CHANGE OF STATUS:**

_____ A. Job Assignment    _____ B. Shift Change    _____ C. Promotion    _____ D. Demotion

$ _____ E. New Hire Rate    $ _____ F. Old Pay Rate    $ _____ G. New Pay Rate    _____ H. Change Life Ins.

*Current Department Head Signature:* _____

*New Department Head Signature:* _____

**LEAVE OF ABSENCE:**

_____ A. Personal    _____ B. Industrial    _____ C. Military    _____ D. Jury Duty

_____ RTW   Last Day Worked ____/____/____    Approved _____    Disapproved _____

**RESTRICTED DUTY:**

Placed on light duty _____    Return to original position _____    Date of injury ____/____/____

**TERMINATION:**

_____ A. Quit    _____ B. Terminated    _____ C. Rehire    _____ D. Layoff    _____ E. Deceased

Last Day Worked ____/____/____    Uniforms returned _____    I.D. Card Returned _____

**B. NEW HIRE**    **SSN** _____-_____-_____    **DATE OF HIRE** ____/____/____

_____ Black    _____ O-AP    _____ N-Amer Ind    _____ H-Hispanic    _____ W-White

_____ Male    _____ Female    _____ S-Single    _____ M-Married    _____ V-Veteran    _____ W-Viet Vet

Telephone Number _____    Date of Birth: _____

**C. ADDRESS** _____

| Street | Apt. # | City / State | Zip |

**D. JOB CHANGE**

Current Job Title _____    New Job Title _____

Current Shift _____    New Shift _____

Current Supervisor _____    New Supervisor _____

Effective Date of Job Change ____/____/____

**REMARKS:** Out of work from 4/2 - 4/6/01. She had to stay home to take care of her common-law husband who got injured at work. OK to pay the week she was out.

_____    _____
Department Head Signature        Date        H.R. Manager Signature        Date

_____
M 4/14
Operations Manager Signature        Date

*White - HR*        *Canary - Payroll*        4/16/01 *Payroll Entry Date*

## TITAN TIRE CORPORATION OF TEXAS
### Employment or Change of Status

*Montelongo*          *Guillermina*          *220*                    *08/10/01*

Last                    First        Initial    Dept.              Clock      Effective Date

**A. CHANGE OF STATUS:**

_____ A. Job Assignment _____ B. Shift Change _____ C. Promotion _____ D. Demotion

$ _____ E. New Hire Rate  $ _____ F. Old Pay Rate  $ _____ G. New Pay Rate  _____ H. Change Life Ins.

*Current Department Head Signature:* _____

*New Department Head Signature:* _____

**LEAVE OF ABSENCE:**

_____ A. Personal _____ B. Industrial _____ C. Military _____ D. Jury Duty

_____ RTW  Last Day Worked _____/_____/_____  Approved _____  Disapproved _____

**RESTRICTED DUTY:**

Placed on light duty _____  Return to original position _____  Date of injury _____/_____/_____

**TERMINATION:**

✓ A. Quit _____ B. Terminated _____ C. Rehire _____ D. Layoff _____ E. Deceased

Last Day Worked *08/9/01*  Uniforms returned _____  I.D. Card Returned _____

**B. NEW HIRE**          SSN _____-_____-_____          **DATE OF HIRE** _____/_____/_____

_____ Black _____ O-AP _____ N-Amer Ind _____ H-Hispanic _____ W-White

_____ Male _____ Female _____ S-Single _____ M-Married _____ V-Veteran _____ W-Viet Vet

Telephone Number _____  Date of Birth: _____

**C. ADDRESS** _____

Street                      Apt. #                          City / State                    Zip

**D. JOB CHANGE**

Current Job Title _____  New Job Title _____

Current Shift _____  New Shift _____

Current Supervisor _____  New Supervisor _____

Effective Date of Job Change _____/_____/_____

**REMARKS:** ____ *VOLUNTARY RESIGNATION - NO NOTICE GIVEN*

_____ *LAST DAY WORKED   8/9/01* _____

_____

_____

Department Head Signature              Date

*Joe Rahuel*      *8/10/01*

H.R. Manager Signature          Date

*(8/6-8/9/01)*

*Worked 4 days of the pay period.*

*4 days × 96.15 = 384.60*
*Daily Rate*

*M#/11*

Operations Manager Signature          Date

*8/16/01*      **Payroll Entry Date**

*White - HR          Canary - Payroll*

Form: Titan8  2/2000

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO          )
                                )
                                ) CIVIL ACTION NO: B-02-176
                                )        (JURY REQUESTED)
                                )
TITAN TIRE CORPORATION OF       )
TEXAS, AND RUSSELL ASH          )

*****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

JOHNNY GARCIA

JULY 9, 2003

*****************************************

    ORAL AND VIDEOTAPED DEPOSITION of **JOHNNY GARCIA**,
produced as a witness at the instance of the Defendant,
and duly sworn, was taken in the above-styled and
numbered cause on the 9th day of July, 2003, from
2:55 p.m. to 4:45 p.m., before SUSAN POCKRUS, CSR in and
for the State of Texas, reported by oral stenography, at
the offices of Willette & Guerra, L.L.P., International
Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

CERTIFIED
COPY


EXHIBIT
D

***POCKRUS REPORTING SERVICE***
*MCALLEN 630-3331 * HARLINGEN 423-7703 * BROWNSVILLE 350-4940*

1    were an hourly employee.

2        Q.   Okay.  But you were a supervisor and you were

3    salary?

4        A.   Yes.

5        Q.   What was the difference?

6        A.   Actually, I was a manager, and I had

7    supervisors.

8        Q.   Okay.  During your employment with the

9    Brownsville plant, were you ever reprimanded for any

10   reason?

11       A.   No.

12       Q.   Well, did Russell Ash ever talk to you about not

13   meeting your production goals?

14       A.   No.

15       Q.   Did anybody ever talk to you about not meeting

16   your production quota?

17       A.   No.

18       Q.   Were there any other problems with Russell Ash?

19       A.   Not that I can recall right now.

20       Q.   How about with other people, that you know of,

21   other people that had problems with Russell?

22       A.   (No verbal response.)

23       Q.   Didn't anybody ever tell you, complain to you

24   about Russell?

25       A.   There was a lot of people, I would say,

1    complained.

2        Q.   And who were they?

3        A.   The employees, I guess.  I can't recall the

4    employees' name.

5        Q.   Well, what was it that they complained about?

6        A.   I guess the way he -- his character, I guess.

7        Q.   What about his character?

8        A.   Him being just, I guess, what they called,

9    I guess, mean, mad...

10               THE VIDEOGRAPHER:  Excuse me, I'm going to

11   have to switch tapes.

12               (Off the record at 3:50 p.m.)

13               (On the record at 4:00 p.m.)

14               THE VIDEOGRAPHER: 4:00 o'clock, you're on

15   the record.

16       Q.   (BY MS. MOORE)  Okay.  Mr. Garcia, you had an

17   opportunity to talk to your lawyer.  Is there anything

18   you'd like to change your testimony as of this point?

19       A.   No.

20               MR. HERNANDEZ:  I'm going to object.  There

21   was a change of a tape.  He did have an opportunity to

22   talk to his lawyer, but as you know, the court reporter

23   (sic) asked for a change of tape.

24               MS. LEEDS:  What is your objection?

25               MR. HERNANDEZ:  I object to the form of the

```
 1         Q.   (BY MS. MOORE)   Would you agree with me that
 2    he's an aggressive manager?
 3              MR. HERNANDEZ:  Objection to form.  If
 4    that's your -- if that's his interpretation.
 5              MS. LEEDS:  He already said he was.  Do we
 6    have to go back?
 7              MR. HERNANDEZ:  No, no, that's fine.
 8              MS. MOORE:  I'm breaking it down.
 9         Q.   (BY MS. MOORE)  And would you agree that
10    Russell, he wanted things -- was harsh?
11         A.   I guess, yeah.
12         Q.   Okay.  Would you -- would you agree that when
13    Russell wanted something done he was going to -- you
14    know, you had to get it done; would you agree with that?
15              MR. HERNANDEZ:  Objection to form.  If
16    that's they way it happened.
17         A.   Well, yeah.
18         Q.   (BY MS. MOORE)  Okay.  And would you agree
19    that -- and with Russell -- you know, with Russell Ash it
20    was either Russell's way or the highway, pretty much?
21              MR. HERNANDEZ:  Objection to form.
22         Q.   (BY MS. MOORE)  Would you agree?
23         A.   Yes.
24         Q.   Okay.  You didn't like his management style, did
25    you?
```

1      A.   No.

2      Q.   Okay.  Well, would you agree with me that

3  he -- Russell's management style, he used it with

4  everybody, it wasn't just to you; would you agree with

5  me?

6           MR. HERNANDEZ:  Objection to form.

7      A.   I guess.

8      Q.   (BY MS. MOORE)  Would you agree that a lot of

9  people didn't like the way Russell -- his management

10 style?

11          MR. HERNANDEZ:  Objection to form.

12     A.   Uh-huh, yes.

13     Q.   (BY MS. MOORE)  And when you say a lot of people

14 complained about his character as being mean and mad,

15 that's what they were complaining about, Russell being an

16 aggressive manager?

17          MR. HERNANDEZ:  Objection to form.  You can

18 answer.

19     A.   Yeah, yes.

20     Q.   (BY MS. MOORE)  Now, did you -- did Minnie ever

21 talk to you -- Minnie Montelongo ever talk to you about

22 any -- come to you with any complaints about Russell?

23     A.   No.

24     Q.   Did she ever complain to you about Russell in

25 any way?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO          )
                                )
                                )  CIVIL ACTION NO: B-02-176
                                )        (JURY REQUESTED)
                                )
TITAN TIRE CORPORATION OF       )
TEXAS, AND RUSSELL ASH          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF
JOHNNY GARCIA
JULY 9, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Susan Pockrus, Certified Shorthand Reporter in

and for the State of Texas, hereby certify to the

following:

That the witness, **JOHNNY GARCIA**, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on **July 28, 2003**, to the witness in care of **Mr. Carlos Hernandez, Attorney at Law, 201 North 1st Street, Harlingen, Texas,** for examination, signature and return to me by **August 27, 2003**.

That the amount of time used by each party at the deposition is as follows:

Mr. David A. Sanchez  - 00:00:00;

Mr. Carlos H. Cisneros - 00:00:00;

Mr. Carlos Hernandez - 00:00:00;

Ms. Melanie Ann Moore - 01:18:53;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. David A. Sanchez, MICHAEL R. COWEN, P.C., 520 East Levee Street, Brownsville, Texas 78520, appearing for the Plaintiff;

--AND-- Mr. Carlos Cisneros, CARLOS H. CISNEROS, P.C., 845 East Harrison St., Ste. A, Brownsville, Texas 78520;

Mr. Carlos Hernandez, ATTORNEY AT LAW, 201 North 1st Street, Harlingen, Texas 78550; appearing for the Plaintiff and the Deponent;

Ms. Melanie Ann Moore, Ms. Eileen Leeds, WILLETTE & GUERRA, L.L.P., International Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville, Texas 78521, appearing for the Defendant;

If returned, the original deposition was delivered to **Ms. Melanie Ann Moore**, Custodial Attorney;

That $ _373.25_ is the deposition officer's charges to the Defendants for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me this 28th day of July, 2003.


_____
SUSAN POCKRUS

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 5862    EXP. DATE: 12/31/03

POCKRUS REPORTING SERVICE
P.O. BOX 531786
HARLINGEN, TEXAS  78553
1-800-423-7713 (TOLL FREE)
1-956-350-4940 (PHONE)
1-956-350-3040 (FAX)

# Sexual Harassment Training
# March 12, 1999

## Sign In List

Guillermina Montelongo

José David Siso

Guadalupe Salinas

German Cardoza

Francisco Uribe

Jorge E. Martinez

Luis Rey

Manuel Muñoz

Ronaldo Wilson

EXHIBIT
F
ALL-STATE LEGAL®

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO         )
                               )
                               )  CIVIL ACTION NO: B-02-176
                               )        (JURY REQUESTED)
                               )
TITAN TIRE CORPORATION OF      )
TEXAS, AND RUSSELL ASH         )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

STEVE HARRISON

JULY 9, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of **STEVE HARRISON**, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 9th day of July, 2003, from 9:30 a.m. to 2:50 p.m., before SUSAN POCKRUS, CSR in and for the State of Texas, reported by oral stenography, at the offices of Willette & Guerra, L.L.P., International Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

CERTIFIED COPY



EXHIBIT
G

1      A.   And I'm going to generally accept that you're

2  telling me the truth --

3      Q.   Okay.

4      A.   -- as you recall it.

5      Q.   Now, you had a conversation with Minnie about

6  her concerns with Russell?

7      A.   Yes.

8      Q.   When was that -- first of all, when was that

9  conversation?

10     A.   Generally speaking, it was the last six months

11 from the time you told me, which would put it in the

12 spring of 2001, as I recall.

13     Q.   Okay.  Spring of 2001?

14     A.   Yes, ma'am.

15     Q.   Do you remember if it would have been April or

16 May?

17     A.   No, ma'am.

18     Q.   Okay.  Did she ever talk to you any -- about any

19 concerns before that time about Russell, before spring

20 2001?

21     A.   I do not recall before.

22     Q.   Do you recall the first time she talked to you

23 about any concerns she had about Russell?

24     A.   Generally speaking, yes.

25     Q.   What is it that she told you?

1    would be important that I thought it be handled properly.

2        Q.    Okay.  And what --

3        A.    I didn't think that it was supposed to be

4    something that would be discussed.  So I went to

5    Joe Kolniak, who was the Human Resources manager, and

6    that would be his job to investigate.

7        Q.    Okay.  Joe Kolniak, you just testified, was the

8    Human Resources manager at the time?

9        A.    Yes, ma'am.

10        Q.    And when did you talk to him?

11        A.    Generally speaking, it was that week.  It wasn't

12    right then, because I had to think about it.  And then I

13    said, "I need to tell somebody because this could" -- I

14    needed to tell Human Resource manager, because that's his

15    job.

16        Q.    What did you tell Joe Kolniak?

17        A.    I told the Human Resource manager that Minnie

18    had conversation with me concerning Russell Ash and

19    inappropriate -- she thought that it might be

20    inappropriate and she wanted to let somebody know.  And

21    he said he would take care of it.  I needed -- Joe said

22    that he would take care of it, I need not bother myself

23    anymore.  And I thanked him and I left.

24        Q.    Okay.  In reporting such an instance, are there

25    any forms that need to be filled out?

1    Q.   -- it with her?

2    A.   I told her I was going to tell the truth,

3  period.

4    Q.   Okay.  Do you know what Joe Kolniak -- after

5  you told him about what Russell allegedly did, did

6  Joe Kolniak do anything?

7    A.   I have no idea what Joe did or didn't do.

8    Q.   Did you ever follow up?

9    A.   I have no idea what Joe did or didn't do.

10         MS. MOORE:   Okay.  Objection;

11  nonresponsive.

12    Q.   (BY MS. MOORE)  Did you ever --

13    A.   I have no idea what Joe did or didn't do --

14         MS. MOORE:   I'm going to ask you to wait

15  until I ask a question --

16         MR. CISNEROS:   She's asked you if you

17  followed up.

18         MS. MOORE:   And when I ask the question,

19  then you can answer.

20    Q.   (BY MS. MOORE)  I'm going to ask you a question.

21  Did you follow up with Joe Kolniak to see if he did

22  anything?

23    A.   Yes.

24    Q.   And what happened, did you talk to him, did you

25  have a conversation with Joe Kolniak?

1    do you?

2        A.    I don't particularly care one way or the other.

3        Q.    Isn't it true that you have a pending lawsuit

4    against him and Titan Tires?

5            MR. CISNEROS:  Objection to form.  I'm

6    going to instruct my -- Mr. Harrison not to answer any

7    questions in connection with any attorney/client

8    communications in connection with that other lawsuit

9    that he's got.

10            MS. LEEDS:  We're not asking --

11        Q.    (BY MS. MOORE)  I'm not going to ask you

12    anything about that you've talked to your attorneys

13    about, I'm not going to ask you any of that.  What I want

14    to know is, isn't it true that you have a lawsuit against

15    Titan Tires and Russell Ash?

16            MR. CISNEROS:  Yeah, it's true.

17        A.    Yes, ma'am.

18        Q.    (BY MS. MOORE)  What is your lawsuit for?

19        A.    I was never told why I was discharged.  And

20    after 31 years, I think I deserve somebody to discharge

21    me properly.

22        Q.    Okay.  Well, what are you claiming?  What are

23    you saying that Russell did to file a lawsuit against

24    him?

25            MR. CISNEROS:  Objection to form.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO  )
           )
           ) CIVIL ACTION NO: B-02-176
           )   (JURY REQUESTED)
           )
TITAN TIRE CORPORATION OF )
TEXAS, AND RUSSELL ASH  )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF
STEVE HARRISON
JULY 9, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Susan Pockrus, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:

That the witness, **STEVE HARRISON**, was duly sworn by
the officer and that the transcript of the oral

deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on **July 28, 2003**, to the witness in care of **Mr. Carlos Hernandez, Attorney at Law, 201 North 1st Street, Harlingen, Texas,** for examination, signature and return to me by **August 27, 2003.**

That the amount of time used by each party at the deposition is as follows:

Mr. David A. Sanchez  - 00:00:00;

Mr. Carlos H. Cisneros - 00:00:00;

Mr. Carlos Hernandez - 00:00:00;

Ms. Melanie Ann Moore - 03:34:45;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. David A. Sanchez, MICHAEL R. COWEN, P.C., 520 East Levee Street, Brownsville, Texas 78520, appearing for the Plaintiff;

--AND-- Mr. Carlos Cisneros, CARLOS H. CISNEROS, P.C., 845 East Harrison St., Ste. A, Brownsville, Texas 78520;

Mr. Carlos Hernandez, ATTORNEY AT LAW, 201 North 1st Street, Harlingen, Texas 78550; appearing for the Plaintiff and the Deponent;

Ms. Melanie Ann Moore, Ms. Eileen Leeds, WILLETTE & GUERRA, L.L.P., International Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville, Texas 78521, appearing for the Defendant;

If returned, the original deposition was delivered to **Ms. Melanie Ann Moore**, Custodial Attorney;

That $ _987.30_ is the deposition officer's charges to the Defendants for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me this 28th day of July, 2003.


_____

SUSAN POCKRUS

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 5862   EXP. DATE: 12/31/03

POCKRUS REPORTING SERVICE
P.O. BOX 531786
HARLINGEN, TEXAS  78553
1-800-423-7713 (TOLL FREE)
1-956-350-4940 (PHONE)
1-956-350-3040 (FAX)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO    §
                          §
VS.                       §        CIVIL ACTION NO.    B-02-176
                          §                 (JURY REQUESTED)
TITAN TIRE CORPORATION OF  §
TEXAS, and RUSSELL ASH     §

## BUSINESS RECORDS AFFIDAVIT

THE STATE OF TEXAS      §
                        §
COUNTY OF CAMERON       §

BEFORE ME, the undersigned authority, personally appeared, **David Fines,** who, being by me duly sworn, deposes as follows:

I, the undersigned, am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am a Custodian of Records of **Titan Tires Corporation of Texas, 6700 Paredes Line Road.** Attached hereto are **53** page(s) of employment records for Guillermina Montelongo, former employee for the **Titan Tires Corporation of Texas.** These said records are kept in the regular course of business at the office of **Titan Tires Corporation of Texas** and it was in the regular course of business at the office of **Titan Tires Corporation of Texas** for a custodian, representative or employee with knowledge of the acts, events or conditions to make the record or to transmit information hereof to be included in such record and such record was made at or near the time of the act, event or condition recorded or reasonably soon thereafter. The records attached hereto are exact duplicated of the original, as it is a rule to not permit the original records to leave the premises. The source of information or the method or circumstances of preparation of information in this record indicates no lack of trustworthiness of same.

_____
**David Fines**

SUBSCRIBED AND SWORN TO by the said witness _Aide G Cervantes_ before me, the undersigned authority, on this the ___26___ day of September, 2003.

_____
Notary Public in and for the State of Texas

AIDE G. CERVANTES
MY COMMISSION EXPIRES
April 1, 2006