28

United States District Court
Southern District of Texas
FILED

OCT 2 0 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GUILLERMINA MONTELONGO | § | |
| | § | CIVIL ACTION NO. B-02-176 |
| VS. | § | |
| | § | |
| TITAN TIRE CORPORATION OF TEXAS | § | JURY DEMANDED |
| and RUSSELL ASH | § | |

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Guillermina Montelongo and asks the Court to deny Defendants' Motion for

Summary Judgment.

**I.**
**INTRODUCTION**

Plaintiff is Guillermina Montelongo and Defendants are Russell Ash and Titan Tire Company

of Texas.

On August 22, 2002, Plaintiff sued defendants for Sexual Harrassment under Title VII and

under the Texas Human Rights Act as well as for Intentional Infliction of Emotional Distress.

On September 13, 2002, Defendant Titan Tire filed Original Answer and an affirmative

defense. On October 2, 2002, Plaintiff filed an Amended Complaint. On December 23, 2002,

Defendant Russell Ash filed his Original Answer.

On September 26, 2003, Defendants filed a motion for summary judgment.

Summary judgment is improper in this case because there are genuine issues of fact on each

element of Plaintiff's causes of action for sexual harassment, and intentional infliction of emotional

distress. The fact issues preclude summary judgment.

## II.
## STATEMENT OF FACTS

Plaintiff was employed by Defendant Titan Tire Corporation of Texas on November 30, 1998. She worked as a tire builder until she was promoted to tire builder supervisor on March 7, 2000. A couple of years after Plaintiff had been working at Titan Tire, Defendant Russell Ash became the operations manager for the entire plant, and the Plaintiff's supervisor. In July 2000, just after Russell Ash arrived at the plant, he began to make inappropriate requests from Plaintiff, whom he had authority over. On several different occasions he asked her out on dates. At the first such encounter, the Plaintiff rejected Defendant Ash's advancements and informed him that she was married. Nevertheless, it did not stop Ash's further requests for dates with the Plaintiff. Guillermina Montelongo reported this to her then supervisor, Steve Harrison, who in turn reported it to the Human Resource Department. Joe Kolniak was in charge of such complaints and obviously did nothing about the situation. As a result of Plaintiff's rejections to inappropriate requests by Defendant Ash, Plaintiff was treated unfairly by Ash. She was demoted from her supervisory position. Before her decrease in pay took affect, she was given supervisory status once again and placed under Steve Harrison's charge. Soon after, Defendant Ash assigned Guadalupe Salinas to be supervisor where Plaintiff was assigned. At no point did Ash designate responsibilities or authorities among the two or even a chain of command. He simply placed another supervisor in Plaintiff's crew in order to cause problems for Plaintiff. Furthermore, Ash continued to use foul and vulgar language toward Plaintiff. On August 10, 2001, Plaintiff resigned her position due to the unwarranted pressures that Defendant Ash was placing upon her. It was obvious that as a result of her rejections to Ash's unwanted proposals, she was treated unfairly and inappropriately as she was placed in an unworkable environment, which left her no option but to resign in order to not compromise her

mental health.

## III.
## EXHIBITS

Exhibit A –    Plaintiff's First Amended Complaint

Exhibit B –    Plaintiff's deposition testimony

Exhibit C –    Steve Harrison's deposition testimony

Exhibit D –    Excerpt on Sexual Harassment from Titan Tire employee handbook

## IV.
## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To support a motion for summary judgment, "the moving party [has] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 90 S.Ct. 1598, 1608 (1970). " A fact is material only if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *MacDonald v. Delta Air Lines, Inc.*, 94 F.3rd 1437, 1440 (10th Cir.1996). "Certain Scenarios may arise where a material fact cannot be resolved without weighing the credibility of a particular witness or an individual–such as when the defendant's liability turns on an individual's state of mind and the plaintiff has presented circumstantial evidence probative of intent. In such a case, ...summary judgment is inappropriate because there is a sufficient quantum of evidence on either side for reasonable minds to differ and therefore the issue is 'genuine.' [I]ssues of credibility only defeat

summary judgement 'where an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility,'" *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir.1998).

Defendant cannot rely on conclusory statements to establish that Plaintiff has not presented evidence on an essential element of her claim. Rather, Defendants must demonstrate an absence of genuine factual dispute. See Celotex Corp. , 477 U.S. at 327, 106 S.Ct. at 2555. Only if Defendants meet their burden is Plaintiff required to respond by summary judgment proof to show a genuine issue of material fact. Fed. R. Civ. P. 56(e).

In determining whether there is a disputed issue of material fact that precludes summary judgment, the court must consider all evidence in the light most favorable to the Plaintiff as the nonmovant. Garcia v. Pueblo Country Club, 299 F.3d 1233, 1236-37 (10th Cir. 2002).

## V.
## ARGUMENTS AND AUTHORITIES

### There is a tangible employment action

A tangible employment action constitutes a significant change in employment status, such as hiring, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. During the middle of 2001, Plaintiff was demoted from supervisor to tire builder by Defendant Ash. At that point she was placed under the supervision of Steve Harrison. This lasted for about four or five weeks until a supervisor quit on the second shift and Steve Harrison recommended to Defendant Ash that Plaintiff be hired for that position. Even though, she was given a supervisory position after her initial demotion, it was only because someone quit their job and Titan Tire needed someone, who was qualified to fill the position. Had it not been

for Steve Harrison, Plaintiff would not have been given the opportunity. Because of this Plaintiff did suffer a tangible employment action, and her lawsuit must be classified as a quid pro quo claim, thereby holding Titan Tire Corporation vicariously liable for Defendant Ash's actions, *Burlington v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998).

### Plaintiff has established a hostile environment claim

Plaintiff has established that she was subjected to a hostile work environment because Russell Ash's conduct was sufficiently pervasive to alter the terms and conditions of Plaintiff's employment and created a working environment that was intimidating, insulting, and abusive to female employees. Workplace conduct actionable under Title VII include "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature; such misconduct constitutes prohibited "sexual harassment," whether or not it is directly linked to the grant or denial of an economic quid prop quo, where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment, *Meritor Savings Bank, FSB. v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399.65.

The severe or pervasive harassment test in the retaliation or sexual and racial discrimination context has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. Civil Rights Act of 1964, Sec.701 et seq., 42 U.S.C.A. Sec. 2000e et seq. In *Domb v. Metropolitan Life Ins. Co.*, the court denied the defendant's motion for summary judgment with respect to the argument of no hostile environment. *Domb. v. Metropolitan Life Ins. Co.* 2003 WL 21878784 (S.D.N.Y.). In that case the

hostile environment was created by using words, such as in the one before this Court. There was no touching, yet the District Court found that there existed an issue of material fact when the totality of the circumstances was reviewed, *Domb. v. Metropolitan Life Ins. Co.* 2003 WL 21878784 (S.D.N.Y.).

In *Wirtz v. Kansas Farm Bureau Services, Inc.,* the court held that "Summary judgements should seldom be used in employment discrimination cases; Employment discrimination cases often turn on the employer's intent, and the courts generally consider summary judgment inappropriate in deciding such questions of intent, *Wirtz v. Kansas Farm Bureau Services, Inc.,* 274 F.Supp.2d 1198, 12002. The court further held, "Thus even if some of the alleged conduct was not 'explicitly sexual in nature,' if it reasonably could be inferred that the conduct was related to gender or arose out of a context in which admittedly sex- and gender-related conduct occurred, then it is for the fact finder to decide whether such an inference should be drawn, Ibid at 1210. In the case before this Court, it can be reasonably inferred that the conduct was related to gender. Russell Ash asked the Plaintiff out because she was a female.

In *Ammon v. Baron Automotive Group*, the court held, "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact," *Ammon v. Baron Automotive Group*, 270 F.Supp2d 1293, 1307.

In *Southerland v. Sycamore Community School District Board of Education*, the Court held, "Defendant argues that staring is generally not enough, without more, to create a hostile work environment. Yet in this case, there was more. Plaintiff made it clear to Mr. Smith that she was uncomfortable with his notes and invitation to lunch and that she was happy in her marriage. Mr. Smith's staring, therefore, came after his attempts to gain time with Plaintiff were rebuffed, and could be viewed as retribution for Plaintiff's rejection," *Southerland v. Sycamore Community School*

*District Board of Education* 2003 WL 21960939. The facts in Southerland are very similar, however,

in the case before this Court, Defendant Ash used very foul and vulgar language when addressing

the Plaintiff, after she had rejected his invitations.

### Acts complained of do rise to the level of sexual harassment

Plaintiff testified that Russell Ash asked her on dates on three separate occasions, July,

September and November of the year 2000. On the first such instance she responded telling him that

she was not interested, and that she was married, (See pages 99 -100 of exhibit B). Furthermore,

Defendant Ash referred to female employees at Titan Tire as "fucking bitches," (See page 105 of

Exhibit C). Because Russell Ash did not take "NO" for an answer, Plaintiff was subjected to

unsolicited and unwanted advances. As a result of her rejections, Russell Ash began to retaliate by

making her life at work miserable, (see page 102 of Exhibit C). After she had become the first female

supervisor at Titan Tire in Brownsville, Ash demoted her from her supervisory position to tire

builder. He would also continue to harass her using foul and vulgar language, (see pages 77-79, 81-

83 of Exhibit B, and page 102 of Exhibit C).   In his final attempt to get rid of Plaintiff, he assigned

Guadalupe Salinas to assist her in supervising the employees she was responsible for in order to

create a hostile working environment for her. There was no clear chain of command or duties set out

for Plaintiff by Defendant Ash, (see page 70 of Exhibit B, and pages 164-165 of Exhibit C.)

### Russell Ash's conduct toward the Plaintiff was directly based on her sex

It is not in dispute that Russell Ash was an aggressive person at Titan Tire Corporation of

Texas. Aggressiveness is not necessarily a bad thing, however, when it is combined with sexual

advances, it easily becomes unbearable for a subordinate employee. Plaintiff testified that in July of

2000, Russell Ash asked her out for the first time, (see page 104 of Exhibit B). She also testified that

the only time Russell Ash was nice to her was when he first arrived in Brownsville, in July 2000.

It is obvious that after he was rejected by Plaintiff, he began to hold a grudge. Two more times in September and November of the same year, he repeated his request for a date with the Plaintiff. He obviously could not understand that she was happily married and simply not interested.

Furthermore, Russell Ash had no respect for female employees working at Titan Tire of Texas. He referred to female employees as "fucking bitches" even when he was in Plaintiff's presence, (see page 112 of Exhibit B and page 107-109 of Exhibit C).   Defendant Ash directly referred to Plaintiff as a "fucking bitch" when he told Steve Harrison that he needed to get rid of her, (see page 105 of Exhibit B). . There is no evidence that Russell Ash asked any male employees out on dates thereby treating both female and male employees the same.   Finally, Defendant Ash also attempted to entice Plaintiff by telling her that when he would be assigned to different locations within the company, he would get a girlfriend and build her a house and let her keep it when he would be moved again, (see page 100 of Exhibit B).

## Constructive discharge

Plaintiff resigned from her employment with Titan Tire on August 10, 2001.  She was constructively discharged due to the hostile work environment that was created as a result of Plaintiff rejecting the advances made by Defendant Ash.  As laid out above, the Plaintiff does have an effective claim proving a hostile work environment having demonstrated a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment," *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992).  Because the evidence does support a claim for hostile work environment, Plaintiff does maintain a cause of action based on constructive discharge.

### Defendant's affirmative defense

Although defendant has asserted the *Ellereth/Faragher* affirmative defense, it cannot support it.

Defendant provides a copy of Titan Tire's Employee Handbook as evidence that Defendant Titan Tire has exercised reasonable care to prevent any sexually harassing behavior. However commendable that may be, a policy is useless unless the employer takes action on a complaint against the harassing supervisor and not the employee. As defendant points out, the proper recourse for an employee is to report the conduct to the employee's supervisor and/or the Human Resource Manager, Corporate Human Resources Department or Operations Manager whichever the employee felt most comfortable doing. The policy further states that a confidential investigation would be conducted. (See exhibit D).

According to the Titan Tire Harrassment Policy, there are three steps that need to be taken in response to sexual harrassment. First, plaintiff testifies that she did tell Defendant Ash that she was happily married and was not interested in dating the Defendant, (see page 103 of Exhibit B). Second, she testified that in July, September and November of 2000, Defendant Ash asked her out, and she rejected him, (see pages 99-100 of Exhibit B). Finally, Plaintiff informed Steve Harrison as to why Ash hated Plaintiff so much. She told Harrison that Ash hated her and wanted to get rid of her because she rejected his sexual advances. This very conversation fulfilled Titan's policy of reporting the incident to employee's supervisor. She discussed it with Harrison, who was her supervisor, and he in turn reported it to Joe Kolniak, the Human Resources Manager. (see pages 81-82 and 89-91 of Exhibit C). Unfortunately, there is no evidence that there was ever an investigation completed. If it was, it was so confidential, that it never involved Steve Harrison or Guillermina

Montelongo. Steve Harrison was told by Kolniak that he would take care of it, and that Harrison

need not worry about it any further, (see page 82 of Exhibit C). The *Ellereth/Faragher* affirmative

defense requires an employee to reasonably take advantage of the employer's preventative measures

in order for an employer to be held liable. Montelongo reported to Harrison who in turn reported it

to Kolniak, the Human Resources Manager. Kolniak had knowledge and failed to take corrective

actions, therefore, Titan had knowledge and failed to take corrective action.

### Intentional infliction of emotional distress

In order to recover damages for intentional infliction of emotional distress the Plaintiff must

prove the following; "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme

and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the

resulting emotional distress was severe." *GTE Soutwest, Inc, v. Bruce*, 998 S.W. 2d 605 (Tex. 1998).

Plaintiff does have legally sufficient evidence to establish the necessary elements for a case

of intentional infliction of emotional distress. Plaintiff testified that the Rusell Ash was nice to her

only one time; when they first met. After that he asked her out three different times; twice after being

told that she was happily married and not interested. As a result, Ash treated Plaintiff very harshly

using vulgar and foul language to the point that Plaintiff had to seek medical attention to deal with

her depression. The continuous harsh treatment became such a hostile working environment that

plaintiff was forced to resign so as not to fall under the outrageous actions that she was being

subjected to. These acts were atrocious and intolerable and so extreme that they went beyond all

possible bounds of decency. It is not a disputed fact that Russell Ash exhibited this type of behavior

with others. If the others were treated to the same as Plaintiff, then they also have a viable claim

however, Plaintiff should not be punished for choosing to assert her claim. This treatment affected

her employment, ultimately causing her to resign because she could not take the pressure any longer.

## VI.
## CONCLUSION

Russell Ash's conduct toward his employee Guillermina Montelongo, was not only inappropriate, but offensive and violated the sexual harassment policy in effect at Titan Tire Corporation of Texas. Because Ash demoted Montelongo, she suffered a tangible effect from the harassment she experienced. Secondly, Ash created a hostile working environment for the Plaintiff after she rejected his advances toward her. The continual vulgar and offensive language as a result of Plaintiff's rejections were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. This same action was done knowingly and intentionally so as inflict emotional distress upon Plaintiff. For these reasons, Plaintiff asks the Court to deny Defendants' motion for summary judgment.

Respectfully submitted,
MICHAEL R. COWEN, P.C.
520 East Levee Street
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
Michael R. Cowen
Texas Bar No. 00795306

Carlos Cisneros
Texas Bar No. 00793508
Chuck Mattingly
Texas Bar No. 00791202
CISNEROS & MATTINGLY, P.C.
845 E. Harrison
Brownsville, Texas 78520
Telephone (956) 504-2260
Facsimile (956) 504-5988

## CERTIFICATE OF SERVICE

I, Michael R. Cowen, P.C., hereby certify that I sent a copy of the foregoing document to all opposing counsel of record in the manner indicated below on this the 20ᵗʰ day of October, 2002.

Eileen M. Leeds                          **Via Facsimile (956) 541-1846**
WILLETTE & GUERRA, L.L.P.                **& Regular U.S. Mail**
3505 Chica Blvd, Suite 460
Brownsville, TX 78521

_____
Michael R. Cowen, P.C.

**Exhibit A- Plaintiff's First Amended Complaint**

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

## DISTRICT OF

GUILLERMINA MONTELONGO

### SUMMONS IN A CIVIL CASE

V.

CASE NUMBER: B-02-176

TITAN TIRE CORPORATION OF TEXAS
AND RUSSELL ASH

TO: (Name and address of defendant)

Mr. Russell Ash
1000 E. Madison Street
Brownsville, Texas 78520

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Mr. Michael R. Cowen
Law Offices of Michael R. Cowen, P.C.
520 EastLevee Street
Brownsville, Texas 78520

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Michael N. Milby, Clerk

| | |
|---|---|
| CLERK | DATE  12-12-02 |

(BY) DEPUTY CLERK

0000    2

AO 440 (Rev. 10/93) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

☐ Other (specify): _____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
Date                                          Signature of Server

_____
Address of Server

0000

1)   As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**FILE COPY**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GUILLERMINA MONTELONGO | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-02-176 |
| | § | JURY DEMANDED |
| TITAN TIRE CORPORATION OF TEXAS | § | |
| and RUSSELL ASH | § | |

United States District Court
Southern District of Texas
RECEIVED

OCT 0 2 2002

Michael N. Milby, Clerk of Court

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Guillermina Montelongo files this Amended Complaint against Defendants Titan Tire Corporation of Texas and Russell Ash, seeking compensatory and exemplary damages as a result of the sexual harrassment and other workplace torts that Defendants committed.

### I.
### PARTIES

1.1    Plaintiff is an individual residing in Cameron County, Texas.

1.2    Defendant Titan Tire Corporation of Texas is a Texas corporation with its principal place of business in Brownsville, Texas. It may be served by personal service upon its registered agent, Titan Wheel International, Inc., 6700 Parades Line Road, Brownsville, Texas 78520.

1.3    Defendant Russell Ash is a United States Citizen residing in Uruguay. He may be served with process at his current place of employment, FUNSA, Camino Corrales 3076, P.O. Box 15-175, District No. 5, 12000, Montevideo, Uruguay.

### II.
### VENUE & JURISDICTION

2.1    The unlawful employment practices alleged in this Complaint were committed in Cameron County in the Southern District of Texas.

0000    4

2.2    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. sections 1337 and

     1343(4) and 42 U.S.C. section 2000e-5(f). Plaintiff also invokes the Court's pendent

     jurisdiction. This is an action brought pursuant to Title VII of the Civil Rights Act of 1964,

     as amended, the Texas Labor Code, and the common law.

## III.
## BACKGROUND

3.1    Guillermina Montelongo ("Plaintiff") began working for Defendant Titan Tire Corporation

     of Texas ("Titan") on or about November 30, 1998.

3.2    Defendant Russell Ash was Plaintiff's supervisor.

3.3    Ash made repeated romantic advances toward Plaintiff.

3.4    Plaintiff declined each of Ash's advances.

3.5    The very first time Ash asked Plaintiff out, Plaintiff declined and said she did not drink and

     that she was married.

3.6    Because of Ash's unwelcome advances, Plaintiff sought medical attention at Valley Doctor's

     Clinic in or around October 2000. A doctor wrote a note to Titan saying that Plaintiff needed

     time off due to stress and symptoms of severe depression.

3.7    When Ash discovered his attempts at wooing the Plaintiff had failed, Ash retaliated by

     demoting Plaintiff.

3.8    After demoting her, Ash continued to retaliate against the Plaintiff by harassing her. Once,

     in front of other employees, Ash said he "needed to fire [Plaintiff] or find a way to fire

     [Plaintiff] because [she] was a fucking bitch." In addition, Ash constantly yelled at Plaintiff.

3.9    Defendant Ash's conduct was sufficiently pervasive to alter the terms and conditions of

     Plaintiff's employment and created a working environment that was intimidating, insulting

5

and abusive to female employees.

3.10    As a result of Ash's sexual harassment, Plaintiff was obliged to resign her employment on

or around August 10, 2001 and was thereby constructively discharged.

## IV.
## FIRST CAUSE OF ACTION: TITLE VII VIOLATION

4.1    Defendants discriminated against Plaintiff because of her sex in violation of section 703(a)

of Title VII by constructively terminating and otherwise discriminating against her, by

engaging in, tolerating or failing to prevent the sexual harassment alleged above and by

failing to take affirmative action to correct and redress these unlawful employment practices.

Defendants also discriminated against Plaintiff in violation of section 704 of Title VII by

constructively terminating her because of her opposition to the unsolicited and unwelcome

sexual advances forced upon her and the other sexual harassment in her workplace.

4.2    Plaintiff believes that the effect of the defendants' unlawful employment practices had been

to limit, classify and discriminate against females in ways which jeopardize and tend to

deprive them of employment opportunities and otherwise adversely affect their status as

employees because of their sex in violation of Title VII; and Plaintiff, a victim of such

practices, is now and will continue to be unlawfully deprived of income in the form of wages

and prospective benefits, and other monetary and non-monetary benefits due to her solely

because of her sex in sums to be proved at trial.

4.3    Defendant has acted maliciously or with reckless indifference to Plaintiff's rights under

federal law.

4.4    Plaintiff is entitled to recover from the Defendants reasonable attorneys' fees as provided in

section 706(k) of Title VII.

0000    6

## V.
## SECOND CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

5.1    During Plaintiff's employment, Defendant Ash's conduct exceeded the bounds of decency tolerated in the State of Texas. The harassment which ultimately caused the termination of Plaintiff's employment was either intended to cause her severe emotional distress or was perpetrated with reckless indifference to the likelihood that it would cause severe emotional distress. Defendants are, therefore, liable to the Plaintiff for all damages proximately resulting from the distress she has suffered relating to Defendant Ash's conduct.

## VI.
## THIRD CAUSE OF ACTION: TEXAS LABOR CODE VIOLATION

6.1    Defendants' discrimination against Plaintiff because of her sex violated the Texas Human Rights Commission Act.

## VII.
## VICARIOUS LIABILITY

7.1    Defendant Titan is vicariously liable for the misfeasant and malfeasant conduct of its employees, because those employees are agents of Titan.

## VIII.
## JURY DEMAND

8.1    Plaintiff demands trial by jury.

## IX.
## PRAYER FOR RELIEF

9.1    WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that citation be issued and defendants be served and that Plaintiffs recover judgment against Defendants, jointly and severally, for actual damages, exemplary damages, prejudgment interest, post-judgment interest, and court costs.

0000    7

Respectfully submitted,
MICHAEL R. COWEN, P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
Telephone (956) 541-4981
Facsimile (956) 504-3674

By: _____
Michael R. Cowen
Texas Bar No. 00795306

Carlos Cisneros
Texas Bar No. 00793508
Chuck Mattingly
Texas Bar No. 00791202
CISNEROS & MATTINGLY, P.C.
845 E. Harrison
Brownsville, Texas 78520
Telephone (956) 504-2260
Facsimile (956) 504-5988

## CERTIFICATE OF SERVICE

I, Michael R. Cowen, P.C., hereby certify that I sent a copy of the foregoing document to all opposing counsel of record in the manner indicated below on this the _2__ day of October, 2002.

Eileen M. Leeds                         Via Facsimile (956) 541-1846
WILLETTE & GUERRA, L.L.P.               & Regular U.S. Mail
3505 Chica Blvd, Suite 460
Brownsville, TX  78521

_____
Michael R. Cowen, P.C.

0000  3

**Exhibit B- Plaintiff's deposition testimony**

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3   GUILLERMINA MONTELONGO          )
                                    )
4   VS.                             )   CIVIL ACTION NO. B-02-176
                                    )        (JURY REQUESTED)
5   TITAN TIRE CORPORATION OF       )
    TEXAS AND RUSSELL ASH           )

6

7

8      ***********************************************

9           ORAL AND VIDEOTAPED DEPOSITION OF

10              GUILLERMINA MONTELONGO

11                SEPTEMBER 10, 2003

12     ***********************************************

13

14

15

16      ORAL AND VIDEOTAPED DEPOSITION of GUILLERMINA

17   MONTELONGO, produced as a witness at the instance of the

18   Defendants, and duly sworn, was taken in the above-styled

19   and numbered cause on the 10th day of September, 2003,

20   from 3:47 p.m. to 6:09 p.m. before Carolyn Newman, CSR in

21   and for the State of Texas, reported by oral stenography,

22   at the offices of Michael R. Cowen, P.C., 520 East Levee

23   Street, Brownsville, Texas, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.                    ORIGINAL

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF
         Mr. Carlos Cisneros
3        Mr. Charles E. Mattingly, Jr.
         CISNEROS & MATTINGLY, P.C.
4        845 East Harrison, Suite A
         Brownsville, Texas   78520
5
     FOR THE DEFENDANT
6        Ms. Eileen M. Leeds
         Ms. Melanie A. Moore
7        WILLETTE & GUERRA, L.L.P.
         International Plaza, Suite 460
8        3505 Boca Chica Boulevard
         Brownsville, Texas   78521
9
     ALSO PRESENT:
10       Mr. Russell Ash, Defendant
         Mrs. Claudia Garza, Videographer
11       Mr. Julio Galvan, Interpreter
         Ms. Carolyn Newman, CSR
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# T A B L E   O F   C O N T E N T S

PAGE

AGREEMENTS OF COUNSEL . . . . . . . . . . . . . .    4

EXAMINATION OF GUILLERMINA MONTELONGO

    By Ms. Leeds . . . . . . . . . . . . . . .    6

    By Mr. Mattingly . . . . . . . . . . . . .  121

FILING CERTIFICATION . . . . . . . . . . . . . .  123

CHANGES AND SIGNATURE  . . . . . . . . . . . . .  125

WITNESS' SIGNATURE CERTIFICATE . . . . . . . . .  126

OBJECTIONS

    Mr. Cisneros . . . . . . . . . . . . 30, 60, 91

    Mr. Mattingly . . . . . . . . . . 106, 109, 117

    Ms. Leeds . . . . . . . . . . . . . . . 25, 54

EXHIBITS

NO.    DESCRIPTION                    MK'D   ID'D

(None were marked)

0000 12

4

## A G R E E M E N T S

1

2      It was agreed by and between counsel for the

3    Plaintiff and Defendant that no objections need be made

4    by any party at the time of taking said deposition,

5    except objections as to the form of the question or the

6    responsiveness of the answer, which if not made during

7    the deposition are waived; but if and when said

8    deposition, or any portion thereof, is offered in

9    evidence at the trial of this cause by any party thereto,

10   it shall be subject to any and all legal objections, such

11   objections to be made at the time of tender, the same as

12   though the witness were on the stand personally

13   testifying;

14      It is further agreed that Mr. Julio Galvan may

15   act as the interpreter for the taking of said deposition,

16   and the oath of the interpreter was sworn to;

17      It is further agreed that the original

18   deposition transcript was delivered on the 25th day of

19   September, 2003, for examination and signature and is to

20   be returned to Pockrus Reporting Service.  If and when

21   the original deposition transcript is returned with the

22   correction sheet containing the changes made by the

23   witness, if any, a copy of the changes will be forwarded

24   to all counsel of record;

25      It was further agreed that in the event the

0000 13

5

1   original deposition is not signed by the witness within

2   thirty (30) days and filed at the time of trial or

3   hearing, that the original or a certified copy of said

4   deposition may be used as though the witness had signed

5   original deposition.

6                        -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        0000 11

6

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  The time is 3:46, and

3  you're on the record.

4              (Interpreter sworn)

5              GUILLERMINA MONTELONGO,

6  having been first duly sworn, testified through the duly

7  sworn interpreter as follows:

8              E X A M I N A T I O N

9  BY MS. LEEDS:

10     Q.  Ms. Montelongo, would you please state your name

11  for the record.

12     A.  Guillermina Montelongo.

13     Q.  What's your date of birth?

14     A.  August the 3rd of 1952.

15     Q.  Where were you born?

16     A.  In La Villa, Texas.

17     Q.  Where did you go to school?

18     A.  In La Villa, Texas, and here in Brownsville,

19  Texas.

20     Q.  So did you graduate from high school?

21     A.  I took out my GED.

22     Q.  How many years of schooling did you have?

23     A.  Six.

24     Q.  That was all in English, correct?

25     A.  (Witness answers)  Correct.

0000 15

7

1          (Interpreter answers)   Correct.

2      Q.   You know how to read, write, and speak English,

3  do you not?

4      A.   (Witness answers)   Correct.

5          (Interpreter answers)   Correct.

6      Q.   Nonetheless, we are here with an interpreter

7  here today, correct?

8      A.   (Witness answers)   Correct.

9          (Interpreter answers)   Correct.

10      Q.   But you understand everything I'm saying when I

11  say it in English, don't you?

12      A.   (Witness answers)   Correct.

13          (Interpreter answers)   Correct.

14      Q.   When -- did you have any other training after

15  your GED of an educational sort?

16      A.   No.

17      Q.   When did you get your GED?

18      A.   In 1986.

19      Q.   What was your first job?

20      A.   My first job was working in the field.

21      Q.   Where?

22      A.   In the North.

23      Q.   Do you know what state?

24      A.   Indiana and -- and Michigan and Ohio.

25      Q.   Ms. Montelongo, so that this can go a little

8

1   more easily, because sometimes since you do understand

2   me, can we try to do this in English, and if you don't

3   understand something, then we use the interpreter?

4      A.   I would prefer the interpreter because there are

5   some big words that I do not understand.

6      Q.   And that's what I mean.  When there are those

7   big words, we can use the interpreter with no problem.  I

8   have no problem doing that, but when the questions are

9   easy questions such as "Where did you work," and you do

10  understand me, I'm just asking you because it will go a

11  lot quicker if we do this in English.

12              MR. CISNEROS:  (To the witness in Spanish)

13              THE WITNESS:  (In Spanish)

14              MR. CISNEROS:  Okay.

15     A.   Okay.

16     Q.   (BY MS. LEEDS)  Okay.  How long did you work in

17  he fields, how many years?

18     A.   (Witness in Spanish)  I don't remember.  It's

19  been a long time.

20     Q.   Okay.  What was your next job after the fields?

21     A.   I started working on a hotel as a maid -- a room

22  maid cleaning rooms.

23     Q.   Where?

24     A.   Here in Brownsville --

25     Q.   Do you remember --

9

1       A.   -- at Motel 6.

2       Q.   Motel 6?

3       A.   Uh-huh.

4       Q.   Which one?

5       A.   The one that used to be on Central Boulevard.

6       Q.   Okay.

7       A.   It's not there anymore.

8       Q.   The one that burned?

9       A.   Yes.

10      Q.   How long did you work there?

11      A.   Only about three months.

12      Q.   Okay.  Then where did you work?

13      A.   Then I started working on the Omni (ph) phone.

14 It was...

15      Q.   I'm sorry.  I didn't get that.  The what?

16      A.   It was a Omni phone company where they used to

17 make parts -- electric parts.

18      Q.   Okay.  Here in Brownsville?

19      A.   Yes.

20      Q.   How long did you work there?

21      A.   I don't remember, about I think six months more

22 or less.

23      Q.   Okay.  Next where did you work?

24      A.   Haggard Slacks.

25      Q.   Do you remember what years you worked there?

0000 13

10

1    A.    Yes.  I started working there in 1973 until

2    1997.

3    Q.    Is that when the plant closed?.

4    A.    Yes.

5    Q.    Was that in the Brownsville plant?

6    A.    Yes.

7    Q.    Did they give you a -- a compensation package or

8    a separation package or something like that when the

9    plant closed?

10    A.    Yes.

11    Q.    What did they give you?

12    A.    I don't remember the amount, but they do --

13    Q.    Oh, it -- it was cash?

14    A.    Not cash.  I don't understand the question.

15    Q.    Well, was it money?

16    A.    Yes.

17    Q.    Okay.  Where did you next work after Haggard?

18    A.    Then I -- let me see.  Then I work in the -- in

19    the same area in the same plant when they close, but it

20    was from the name of Horace Small plant.

21             THE REPORTER:  Name of what?

22             THE WITNESS:  Horace Small.  Horace --

23             MR. CISNEROS:  Horace --

24             THE WITNESS:  -- Small.

25             MS. LEEDS:  Oh, Horace.

11

1        MR. CISNEROS: -- Horace, Horace, Horace
2   Small.
3        Q.   (BY MS. LEEDS)  Okay.
4        A.   That's the name of the plant.
5        Q.   What did they manufacture?
6        A.   Uniforms.
7        Q.   Okay.  What -- what did you do at Haggard?
8        A.   When I started to work there?
9        Q.   Sure.
10       A.   I used to -- a machine operator sewing --
11       Q.   Okay.
12       A.   -- and then operating other machines, a hook
13  machine --
14       Q.   Okay.
15       A.   -- pressers.
16       Q.   What were you doing at the end?
17       A.   At the end I was inspecting and operating
18  machines.
19       Q.   Okay.  Were you ever a supervisor at Haggar?
20       A.   No, not -- not a supervisor.
21       Q.   Okay.  What about Horace Small what were you
22  doing?
23       A.   I was operating machines.
24       Q.   How long did you work there?
25       A.   About a year and something more or less.

12

1   Q.   A little over a year?

2   A.   Yes.

3   Q.   Okay.  What happened to that job?

4   A.   I quit working there because I got hired in

5   Titan Tire.

6   Q.   Okay.  So you started working with Titan around

7   '98 or '99?

8   A.   '98.

9   Q.   '98?

10   A.   (Moving head up and down)

11   Q.   Okay.  How -- were you ever a supervisor at

12   Horace Small?

13   A.   No.

14   Q.   Okay.  At Titan who hired you?

15   A.   I don't remember his name.  I think it was

16   Mr. Burnias -- Ramiro Burnias.

17   Q.   Ramiro Burnias?

18   A.   Burnias.

19   Q.   What position were you hired for?

20   A.   Well, at first we started cleaning machines --

21   old machines, and then I was put to build tires.

22   Q.   Do you remember when you were changed and put to

23   build tires?

24   A.   No, ma'am, I don't remember.

25   Q.   Okay  How long did you remain in the building

13

1   tires before your next change in the employment there at
2   Titan?

3        A.   I don't remember.

4        Q.   Okay.  Do you remember who the operations
5   manager was at the time you started working?

6        A.   Steve Harrison.

7        Q.   Do you remember when it was that -- or let me
8   rephrase that.  How long were you working when he was no
9   longer operations manager?

10       A.   I don't remember that.

11       Q.   Was it a long time over years, or was it pretty
12  quick after you started working?

13       A.   I don't really understand the question.

14       Q.   Let me -- let me reask it.  How long were you
15  working there when Steve Harrison stopped being
16  operations manager?

17            (Question translated)

18       A.   (Interpreter answers)  I do not remember.

19       Q.   (BY MS. LEEDS)  Do you know if it was over a
20  year?

21       A.   No (in Spanish).

22       Q.   Okay.

23            MS. LEEDS:  We need that in English, her
24  answer.

25            THE INTERPRETER:  Oh.  "I do not remember."

14

1  Excuse me.

2            MS. LEEDS: That's okay, that's okay.

3            THE INTERPRETER: She -- she was answering

4  in English and...

5            MS. LEEDS:   That's okay.

6      Q.   (BY MS. LEEDS)  Before we go any further, are

7  you married?

8      A.   Yes.

9      Q.   Who -- what's your husband's name?

10     A.   Benigno Rico, common -- only common law.  We're

11 not married --

12     Q.   Okay.

13     A.   -- legally.

14     Q.   How -- how long have you been married with him?

15     A.   Since 1998.

16     Q.   He worked at Titan Tires, also, right?

17     A.   Yes.

18     Q.   Was he working at Titan Tires before you got

19 married or started living with him?

20     A.   I don't -- I don't understand.

21     Q.   Did you meet him at Titan?

22     A.   No.

23     Q.   Okay.  Do you know --

24     A.   No.  We started our relationship in 1986.

25     Q.   Oh, okay.

15

1     A.   We got together in 1998.

2     Q.   Okay.  Did you start working at Titan before he

3 did?

4     A.   Yes.

5     Q.   Okay.

6     A.   I don't understand that one.

7          THE WITNESS:  (To the interpreter)  I

8 didn't understand that one.  It was before --

9          (Question translated)

10    A.   (Interpreter answers)  I started after.

11    Q.   (BY MS. LEEDS)  Okay.  So -- so Benigno was

12 working at Titan and then you went to Titan?

13    A.   Uh-huh.

14    Q.   Okay.  Do you -- you have children, right?

15    A.   Yes.

16    Q.   How many?

17    A.   I have six.

18    Q.   Are they all Benigno's children?

19    A.   No, only two.

20    Q.   Okay.  What names and ages, please?

21    A.   Starting from the oldest?

22    Q.   Whichever way you want.

23    A.   Okay.  Hilberto Herrera, he's 32.

24    Q.   Okay.

25    A.   Jaime Herrera, 30; Roman Herrera, Jr., 28; Rosa

16

1  Isabel Herrera, 20; Casandra Marie Rico, 15; Monique
2  Gabrielle Rico, 13.

3      Q.   Where does Hilberto live?

4      A.   He lives in Edcouch, Texas.

5      Q.   What about -- I can't read my writing here --

6  number 2?

7           MR. CISNEROS:   Jaime.

8      A.   Jaime.

9      Q.   (BY MS. LEEDS)  Jaime.

10     A.   He lives here in Brownsville.

11     Q.   Do you know where he works?

12     A.   No, not work.

13     Q.   Is he married?

14     A.   Yes.

15     Q.   Do you know what his wife's name?

16     A.   Irene --

17     Q.   Irene?

18     A.   -- Herrera.

19     Q.   Okay.  What Roman, where does he live?

20     A.   He lives in San Diego, California.

21     Q.   Okay.  Rosa Isabel?

22     A.   Indiana.

23     Q.   Okay.  And the other two are 15 and 13, right?

24     A.   They live with me.

25     Q.   Okay.  Is Montelongo your maiden name?

17

```
 1        A.   It's my father's last name.
 2        Q.   Okay.  Have you gone by any other name?
 3        A.   Guillermina Montelongo Herrera.
 4        Q.   Okay.
 5        A.   That was my first husband last name.
 6        Q.   And other than Herrera have you ever been
 7   referred to as Mrs. Rico?
 8        A.   Yes.
 9        Q.   Okay.  Are there any other names that you have
10   been -- that you have ever used?
11        A.   No.
12        Q.   What is your Social Security number?
13        A.   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.
14        Q.   Do you have a driver's license?
15        A.   Yes.
16        Q.   And what is its number if you know it?
17        A.   I don't know the number.  I have to --
18        Q.   Okay.
19        A.   -- check on it.
20             THE WITNESS:  Can I move it?
21             MR. CISNEROS:  Uh-huh.
22             MS. LEEDS:  I've been handed a Texas
23   driver's license number 08288382.
24        Q.   (BY MS. LEEDS)  Thank you.  When you first
25   started at Titan, you said you started by cleaning old
```

18

1  machinery?

2       A.   Yes, ma'am.

3       Q.   Do you know if that used to be a different kind

4  of plant before?

5       A.   I don't understand the question.

6       Q.   Let me -- let me rephrase it.  Titan had just

7  started a new plant, right, when you -- when you went to

8  work for them?

9       A.   Right.

10      Q.   Do you have any idea where -- where the old

11 machinery came from instead of new machinery?

12      A.   No, ma'am.

13      Q.   Okay.  When they put you to build tires, did

14 they train you?

15      A.   Yes.  They train me one day.

16      Q.   Who did that?

17      A.   Johnny Garcia.

18      Q.   Who was your supervisor -- well, explain to me

19 how Titan worked?  I mean, were you in a particular group

20 under a particular supervisor, or how -- what was the

21 structure there?

22      A.   (Witness in Spanish)  I don't understand the

23 question.

24               (Question translated)

25      A.   (Witness in Spanish)  When I started to work

19

1   there, we used to do all kinds of -- of work, cleaning
2   machines --

3                    (Ms. Moore leaves the room)

4       A.   -- sweeping, cleaning bathrooms.  We -- we used
5   to do any kind of job there.

6       Q.   (BY MS. LEEDS)  Okay.  But when you started
7   building tires, how was it structured?

8       A.   You mean how I would build the tires?

9       Q.   No.  My understanding is that -- and this is
10  from taking other depositions -- is that you -- you
11  worked like in a unit with a particular machine so that
12  you had your little group of people building a tire.

13      A.   Yes.

14      Q.   Okay.  That's what I'm trying to get at.  How
15  was that divided up, per machine?

16      A.   Per machine.  Every operator used to run a
17  machine.

18      Q.   Okay.  So how many people would run a machine
19  with you?

20      A.   Only one --

21      Q.   Just you?

22      A.   -- only -- only the operator that was running
23  the machine.

24      Q.   Okay.  How many machines were there?

25      A.   I don't remember.

20

1    Q.    Okay.  Do you know how many different kinds of

2  machines there were?

3    A.   We had a lot of kinds of machines.  I don't

4  remember how much -- how many.

5    Q.   Were you trained on only one machine?

6    A.   I was first trained on the small tires, yes.

7    Q.   Okay.  Is that how it was divided up, making

8  small tires and --

9    A.   We started with the small tires and then we went

10 big -- big then -- you know, bigger.

11   Q.   Okay.  Were there -- do you know if there were a

12 certain number of machines that made small tires and a

13 certain number that bigger tires?

14   A.   Yeah.  We did have some, but I don't remember

15 how many and of -- of each kind.  i don't remember.

16   Q.   Okay.

17   A.   It's been a long time.

18   Q.   Who was your supervisor when you first started

19 building tires?

20   A.   Steve Harrison.

21   Q.   So at that point he was no longer operations

22 manager?

23   A.   Oh, he was an operation manager.  Yes, he was

24 still the manager --

25   Q.   Okay.  Did --

21

```
 1        A.   -- when I started building tires.
 2        Q.   He was still the ops manager?
 3        A.   Yes.
 4        Q.   Okay.  Did you have another supervisor between
 5   you and he?
 6             (Ms. Moore enters the room)
 7        A.   I had Johnny Garcia for -- I don't -- I don't
 8   remember how long -- how long, but I had Johnny Garcia,
 9   too, as a supervisor --
10        Q.   (BY MS. LEEDS)  Okay.
11        A.   -- as my --
12        Q.   As your direct --
13        A.   Yes.
14        Q.   -- supervisor?  Okay.  Did -- how long did you
15   have Johnny Garcia as your direct supervisor?
16        A.   I don't remember, but it was not very -- very
17   long.
18        Q.   What happened to him?
19        A.   They move him to the prepping machine.
20        Q.   Okay.  Who came in after him?
21        A.   They -- Steve Harrison stay there.
22        Q.   As your direct --
23        A.   Yes.
24        Q.   -- supervisor?
25        A.   Uh-huh.
```

1    Q.   Was he still operations manager at that time?

2    A.   Yes.

3    Q.   But there did come a point in time when another

4 operations manager came in, right?

5    A.   When you're talking about an operation manager,

6 do you mean the manager from the tire building

7 department?  Is that what you're asking?

8    Q.   Well, the plant manager.  Operations --

9    A.   Oh, the --

10    Q.   -- manager --

11    A.   No, no, then I'm not -- I'm not understanding

12 your -- your question, no.

13    Q.   Okay.

14    A.   I was -- I -- I thought it was the tire building

15 manager that you were talking about.

16    Q.   Well, then, maybe I don't understand me.  I had

17 the impression that operations manager was the same thing

18 as the plant manager; is that not --

19    A.   No --

20    Q.   -- correct?

21    A.   -- ma'am.  No --

22    Q.   Okay.

23    A.   -- it's different.

24    Q.   Can you explain how -- what it really is?

25    A.   Well, because the plant manager was the manager

23

1  of the whole plant --

2      Q.   Okay.

3      A.   -- and Steve Harrison was manager of a certain

4  department.

5      Q.   Oh, okay.  Who was the plant manager when you

6  first started working?

7      A.   Chuck Smith.

8      Q.   Do you know if Steve Harrison was ever plant

9  manager?

10     A.   Yes, he was --

11     Q.   Okay.  That's --

12     A.   -- plant manager.

13     Q.   -- where I'm confused.  But that was before you

14 got there?

15     A.   Yes, ma'am.

16     Q.   Okay.  So that when you got there, Chuck Smith

17 was the plant manager.  Steve Harrison was operations

18 manager, and under Steve Harrison was Johnny Garcia, your

19 direct supervisor?

20     A.   I never knew -- I never knew the -- the -- I --

21 I never knew the truth who was first or was after because

22 they were both working on the unit -- on the

23 department -- tire building department.

24     Q.   Okay.  When you say "both," are you talking

25 about Johnny --

24

1    A.    Johnny and --

2    Q.    -- Steve?

3    A.    -- Steve.

4    Q.    Okay.  And then Johnny was moved and you were
5  left with Steve as a supervisor?

6    A.    Uh-huh.

7    Q.    Did a time come when somebody else came
8  in-between you and Steve as a direct supervisor?

9    A.    I don't remember.

10   Q.    Do -- do you think that maybe Steve remained as
11  your direct supervisor until he was removed from being
12  your direct supervisor?

13   A.    Yes.  He was removed because there was a time
14  that he was still a manager there that -- up to my
15  knowledge, but I could not report to him because Russell
16  Ash would not let me report to him, so I had to report to
17  Russell.

18   Q.    Okay.  But what I'm -- what I'm saying is there
19  came a point in time when he was removed as being your
20  direct supervisor, right?  He was still there, but he
21  wasn't supervising you --

22   A.    Yes.

23   Q.    -- anymore.

24   A.    There was a time where they move him to the
25  pressing machines.

25

1    Q.    Okay.    When that came -- when that time

2 occurred, did you ever have a different supervisor other

3 than Russell Ash or Steve Harrison?

4    A.    I don't remember.

5    Q.    Okay.    Do you know whatever happened to Johnny

6 Garcia?

7    A.    No.    We -- I only remember that all the sudden

8 he was gone.    I mean, Russell Ash had -- had let him go.

9         MS. LEEDS:    Okay.    I -- I need to object,

10 nonresponsive.

11    Q.    (BY MS. LEEDS)    When you say that Russell Ash

12 had let him go, do you know -- did Johnny tell you that

13 Mr. Ash had terminated him?

14    A.    No.    I've -- they told me -- I mean, the whole

15 plant knew that he was -- that Russell had terminate him.

16    Q.    Okay.    And when you say "the whole plant knew,"

17 was that because --

18    A.    Nobody told me direct to me --

19    Q.    Okay.

20    A.    -- if -- if that's what you're asking, no.

21    Q.    How many people would work during -- well, let

22 me ask you this:    What was your main shift?

23    A.    On what time?

24    Q.    Well, let's --

25    A.    When I started working, it was first shift.

26

1    Q.  First shift, which means what time to what time?

2    A.  From 7:00 to 3:30.

3    Q.  Okay.  Do you remember how long you were on that

4 shift?

5    A.  No, I don't remember.

6    Q.  Do you remember about what year it was that

7 changed to the afternoon shift?

8    A.  No, I don't remember.

9    Q.  Were you in the afternoon shift more of the

10 time -- during -- during your whole employment with

11 Titan, were you in the afternoon more than you were in

12 the morning?

13    A.  I don't remember.

14    Q.  Or do you think it was half and half, or do you

15 have any memory at all?

16    A.  No, I don't remember.  I don't want to say

17 that -- you know, because I don't -- I -- I'm not sure.

18    Q.  Okay.  But eventually you were changed to the

19 afternoon 3:00 to 11:00, right?

20    A.  Yes.

21        MS. LEEDS:  Excuse me.

22    Q.  (BY MS. LEEDS)  During the period of time when

23 you were working in the late-afternoon shift, was Steve

24 Harrison your supervisor then?

25    A.  Yes.

27

1    Q.  Okay.  So it was during that period of time

2 because you stayed at that -- on that shift until you

3 left the plant, right?

4    A.  Yes.

5    Q.  Okay.  So it was in that late-afternoon shift

6 that whatever changes occurred with Mr. Harrison

7 occurred?

8    A.  Yes.

9    Q.  Okay.  If you could tell me how your employment

10 changed at Titan.  You started building small tires, and

11 then how did you progress?

12    A.  I started cleaning machines like I told you.

13 Then I was move to build tires, and then we stop building

14 tires for -- for several months.  And then they put me

15 to -- Jerry Shanholtzer put me to -- as a leadman on the

16 extruder department.

17    Q.  On the what?

18    A.  Extruder department --

19    Q.  Extruder?

20    A.  -- extruder machine.

21    Q.  Okay.  And what does that machine do?

22    A.  That's the machine that makes -- I want to

23 say -- can I say it in Spanish?

24    Q.  Oh, yes --

25        MR. CISNEROS:  Yes.

1      Q.    (BY MS. LEEDS) -- absolutely.   That's why we

2  have an interpreter.

3      A.    (Witness in Spanish)

4            (Interpreter answers)   It's where you press

5  the -- the different layers of the -- of -- of the

6  tire --

7            (Witness answers)   It's the material --

8            (Interpreter answers)   -- where you press them.

9            (Witness answers)   -- the -- the --

10           MR. CISNEROS:   The canvas?

11     A.    -- extruder makes the material to --

12           MR. CISNEROS:   (In Spanish)

13     A.    -- build the tires --

14           MR. CISNEROS:   Canvas.

15     A.    -- the plys.

16           THE REPORTER:   Excuse me, please.   Three at

17  a time doesn't work.

18     Q.    (BY MS. LEEDS)   Okay.   Is that where the tire

19  tread is made?

20     A.    No.

21     Q.    Okay.   It's where the material that eventually

22  makes the tire is made?

23     A.    It's the -- the plys.   I don't know how to --

24     Q.    Oh, the plys --

25     A.    The plys.

29

1    Q.   -- the different --

2    A.   Uh-huh.

3    Q.   -- the different --

4    A.   -- layers --

5    Q.   -- layers?

6    A.   -- yes.

7    Q.   Okay.  Okay.  Then after the extruder machine --

8    A.   Then we move back --

9    Q.   -- where did you go?

10   A.   -- I -- I -- they put -- put me back to build

11 tires.

12   Q.   Okay.  At that point was it still the small

13 tires, or was it bigger tires?

14   A.   I don't remember.  We used to build small and

15 bigger and bigger or small.

16   Q.   Okay.

17   A.   It depend on what order we at.

18   Q.   But those would be on different machines, right?

19   A.   Yes.

20   Q.   Okay.  Do you remember how many people were on

21 your shift building tires in your department?

22   A.   No.  I don't remember, because sometimes we used

23 to have one certain amount, and then sometime we have

24 smaller amount, so I really don't remember.

25   Q.   Okay.  There came a -- well, is it safe to say

30

1  other than the time you were on the extruder machine --

2  and I'm excluding the cleaning part because that was at

3  the very beginning of your employment, right?

4      A.   Right.

5           MR. CISNEROS: Objection; form.

6      Q.   (BY MS. LEEDS)  Other than the time you were on

7  the extruder machine, was the rest of your employment at

8  Titan building tires?

9      A.   Yes.

10     Q.   Okay.  When -- and -- and I believe you told me

11 that it's one person per machine?

12     A.   Yes.

13     Q.   Okay.

14     A.   There's one person per machine, but on one

15 machine you -- you can build several kinds of tires

16 sometimes because we change the molds --

17     Q.   Okay.

18     A.   -- and the drums.

19     Q.   Okay.  Now, if -- if I understand you correctly,

20 the extruder machine puts the layers together, and then

21 would you as a tire builder take that material and make

22 the tire --

23     A.   Yes, ma'am.

24     Q.   -- out of it?  Okay.  As a tire builder, what

25 were you suppose to do?  I mean, I know build a tire, but

31

1    did you have certain duties? You had to go and get the

2    material and put it in the machine. Can you -- if -- if

3    you had to explain to me what you did when you were --

4        A.    To build a tire?

5        Q.    -- operating -- yes --

6        A.    Okay.

7        Q.    -- a tire machine?

8        A.    When you're -- when -- when you're -- when I was

9    operating the machine, I used to go get my material

10   myself with a hoist.

11       Q.    Okay.

12       A.    We got the big rolls and sat them on -- on the

13   front. Sometimes we used to put three or sometimes we

14   used to put four, and then at last we used a press to put

15   it on the drum so that -- that's going to be the whole

16   tire --

17       Q.    Uh-huh.

18       A.    -- which was called the carcass.

19       Q.    Okay.

20              THE REPORTER: It was called what?

21              THE WITNESS: The carcass.

22              THE REPORTER: The carcass.

23       A.    And we used to do the carcass and then they'd

24   take them and spread them and then cooked them on the

25   presser machine.

32

1    Q.   (BY MS. LEEDS)  Okay.  Is the product that came

2    out of your machine what's called a green tire?

3    A.   Yes, ma'am.

4    Q.   Okay.  Did that look like a tire -- what we know

5    as a tire?

6    A.   Well, it really doesn't look like a tire, but

7    they look like little tubes --

8    Q.   Okay.

9    A.   -- but then when you put them on the presser,

10   then they -- they get the form.

11   Q.   The form?

12   A.   Uh-huh.

13   Q.   Did you ever operate a presser?

14   A.   Yes.

15   Q.   How long did you operate a presser?

16   A.   Not very much.  I think -- well, I really don't

17   remember the exact time, but it wasn't very much.

18   Q.   Okay.  Is curing after presser?

19   A.   Curing, it's the presser machine.

20   Q.   Is the presser machine?

21   A.   Yes.

22   Q.   Okay.  And is that the final procedure --

23   A.   No.  They still --

24   Q.   -- for making a tire?

25   A.   -- had to be inspected.

0000 44

33

1      Q.   Okay.  But it -- I mean, is -- is the tire

2  basically made --

3      A.   Yes.

4      Q.   -- after that part?

5      A.   Uh-huh.

6      Q.   Okay.  When you went to the -- I guess the

7  extruder machine, were you trained on that machine?

8      A.   No.  I was only leading the -- the workers there

9  because they were putting the parts.  The machine was not

10 ready to work.

11     Q.   Was this a new machine?

12     A.   No, it was an old machine.

13     Q.   Okay.  When you say that it wasn't -- explain

14 that to me, wasn't --

15     A.   It's not a --

16     Q.   -- wasn't working.

17     A.   -- I mean, if you're talking about a new

18 product, new, new --

19     Q.   Okay.

20     A.   -- no, it was not a new.

21     Q.   So what were you doing?  You said you were

22 leading the workers there.

23     A.   Okay.  I -- then I don't understand the

24 question.

25     Q.   Okay.  You recall that -- that -- you told me

34

1  that you worked for awhile on the extruder machine.

2      A.   Uh-huh.

3      Q.   What were you doing -- what were you doing when
4  you were working in that area?

5      A.   When I was working with the people that was
6  setting the parts --

7      Q.   -- to build the --

8      A.   -- to build --

9      Q.   -- machine?

10     A.   -- that machine, yes.

11     Q.   Okay.  Did you --

12     A.   So they came in in parts.

13     Q.   Got you.  Did you ever actually operate that
14  machine?

15     A.   No, ma'am.

16     Q.   So you were merely there during a period of time
17  in which other people were putting the machine together?

18     A.   Yes.

19     Q.   Okay.  And when -- did you leave that section
20  when the machine was put together?

21     A.   Only part of it.  I didn't finish because in
22  that time they pulled me -- they move me back to build
23  tires.

24     Q.   Okay.  Do you know who took your place?

25     A.   I don't remember.

0000 43

35

1    Q.  So actually, you didn't have to be trained on
2  the extruder machine, right --
3    A.  No.
4    Q.  -- because you weren't operating it?
5    A.  No, ma'am.
6    Q.  When you moved to a different machine -- a
7  different-size tire machine, would you undergo training
8  then?
9    A.  No.
10    Q.  So once you got that first -- did you tell me it
11  was a week of training?
12    A.  No.  I -- I remember it was one day or a day and
13  a half by Johnny Garcia -- .
14    Q.  Okay.
15    A.  -- on the green tires, small tires.
16    Q.  Was that the only training that you had on
17  operating the machinery that actually builds the tires?
18    A.  Yes.
19    Q.  Did they ever send you to any seminars, or did
20  they have any seminars in the plant that gave you any
21  kind of instructions on building the tires?
22    A.  No, ma'am.
23    A.  In -- did you -- did you receive -- other than
24  the -- the day that Johnny trained you on the tire
25  machine, did you receive any other kind of training or

1    orientation, safety training, talking about the company,

2    anything like that?

3        A.   I don't -- I don't remember any.  I need to --

4    that question I need to...

5        Q.   Let's start about when you first started there,

6    were you given some kind of orientation?

7        A.   Yes.  We had -- I remember we had four weeks, I

8    guess, of orientation of the air pressure and all that

9    stuff --

10       Q.   Okay.

11       A.   -- hydraulics.

12       Q.   Was that kind of like little classes?

13       A.   Yes.

14       Q.   Do you remember how many people were in your

15   class?

16       A.   No.

17       Q.   What about orientation as to the company

18   policies or you are to conduct yourself as an employee?

19       A.   I don't remember.

20       Q.   Okay.  Did they hand you any employee manuals or

21   pamphlets or anything like --

22       A.   Yeah.

23       Q.   -- that?

24       A.   We got one book, yeah, where it says a lot of --

25       Q.   Talks about the company?

37

1    A.    Uh-huh.

2    Q.    Who was it that you think you actually worked

3 for, the name of the company?  Was it Titan Tires of

4 Texas?  Was it Titan Tires, or do you know the exact name

5 of --

6    A.    No, I never did.

7    Q.    Okay.  Were you suppose to -- when you were on

8 these production machines, did they have quotas for you

9 to -- to attain in a particular day?

10    A.    Yes, ma'am.

11    Q.    Was that since you first started building tires?

12    A.    Yes, ma'am.

13    Q.    Were the quotas different depending on the size

14 of the tires?

15    A.    Yes, ma'am.

16    Q.    Is that because it takes different times to --

17    A.    Yes.

18    Q.    -- build different tires?

19    A.    Yes, ma'am.

20    Q.    Small tires are quicker, right?

21    A.    Yes, ma'am.

22    Q.    Do you remember how long it would take you to

23 build one of the smallest tires?

24    A.    Well, when I used to build the small tires, I

25 usually took not more than a minute and a half -- minute

38

1   and a half to build one.

2        Q.   Okay.  What about -- did you ever work on those

3   hugh, hugh, you know, industrial caterpillar tires?

4        A.   No, not on those.

5        Q.   Okay.  What was the largest size you ever worked

6   on?

7        A.   I don't remember, but we did big ones, big

8   tires.  I don't remember --

9        Q.   Okay.

10        A.   -- the -- the size.

11        Q.   How long is the largest tire -- what I'm asking

12   you is how long did it take you to build the largest tire

13   you ever built?  It took you a minute and a half for the

14   small one.  What was the longest time?

15        A.   Well, we had several -- several kind of tires,

16   several sizes.  Sometimes they took 5 minutes, some

17   10 minutes, some 15.

18        Q.   For one tire?

19        A.   Yes.

20        Q.   Okay.

21        A.   It depend on what model, what size.

22        Q.   How would you as an operator keep tabs on how

23   many tires you were building?  Did you have to write it

24   down somewhere?  How did --

25        A.   No, because we had racks and we used to put them

39

1  on racks --

2      Q.   Okay.

3      A.   -- and then we count.  We filled out the rack

4  and then we count the rack.

5      Q.   And did you have to write that down somewhere?

6      A.   Yes, on our production sheet every day.

7      Q.   Okay.  Is that something the operator had to

8  fill out?

9      A.   Yes, ma'am.

10     Q.   Do you remember what the quotas were for any of

11 the tires you build, how many in a day you were suppose

12 to build?

13     A.   I only remember the first ones when I started

14 building.

15     Q.   And what was that?

16     A.   I used to build 200 tires a day.

17     Q.   A day?

18     A.   Uh-huh, small ones.  I don't remember what was

19 the quota, but more or less that's what I -- what I used

20 to do.

21     Q.   Okay.  Did you ever get into a situation where

22 you were not meeting production?

23     A.   Yes, ma'am.

24     Q.   And when did that happen?

25     A.   That happen when the machines got break (sic)

1  because machines would get break (sic) very often --

2      Q.    Okay.

3      A.    -- or the material was not on the specifications

4  we needed.

5      Q.    Okay.  What else?

6      A.    So that -- that's why -- that's when we had to

7  stop and check material or take material -- material off

8  and put the -- put one on, and that would take a lot of

9  time, you know, for the operator to not meet their goals.

10     Q.    Okay.  Were -- was there ever a period of time

11 in which you were not making your quota that was not

12 directly related to a lack of materials or machine

13 breakdown?

14     A.    Yeah.  There were several problems.  Sometimes

15 it -- it was the machine, sometimes the -- the tread,

16 sometimes the plys.  Some -- some days it would be a

17 different -- different problem.

18     Q.    What would happen when you did not make all the

19 quota for a particular day?

20     A.    The supervisor would go and talk to you or the

21 department manager go talk -- went -- went to talk to you

22 and ask you why --

23     Q.    Okay.

24     A.    -- or what was happening.  And we had to write

25 it down on the production sheet what happened on that

41

1  hour why didn't -- they didn't build those tires.

2      Q.  All right.  What supervisors do you recall spoke

3  to you about your lack of production?

4      A.  Steve Harrison.

5      Q.  Okay.

6      A.  Russell Ash, Chuck Smith.  That's all.

7      Q.  Okay.  Did Johnny Garcia ever talk to you?

8      A.  No, not -- not about production.

9      Q.  Okay.  Other than production-quota problems, did

10  you ever have any other kinds of -- of reprimands or, you

11  know, something that would have been not -- let me -- let

12  me just ask you this:  Were you ever reprimanded for any

13  reason while you were employed at Titan?

14      A.  Well, yes.  Every -- every day because the plant

15  manager or the production manager wanted the goal from

16  each person, but sometimes it was impossible because the

17  machines would breakdown or material was not on the

18  specifications, and the operators could not do their

19  goals, so they would talk to me, yes.

20      Q.  Okay.  And when you say "they" would talk to

21  you, is -- is that referring to the people you mentioned

22  above?

23      A.  Yes --

24      Q.  Okay.

25      A.  -- the operators.

42

1    Q.   So you -- you are -- you are referring to the
2  lack of a production goal as a reprimand?
3    A.   I don't understand the question.
4              (Question translated)
5    A.   (Interpreter answers)  Yes.
6    Q.   (BY MS. LEEDS)  Okay.  Other than not meeting
7  production goals, were you ever reprimanded for any other
8  reason?
9    A.   Not that I -- I don't remember, no.
10    Q.   Okay.  Did you ever have any problems with any
11  of your coemployees?
12    A.   No.
13    Q.   Were you ever talked to concerning your
14  relationship or maybe some problems that you had with
15  Mr. Guadalupe Salinas?
16    A.   Did I talk -- if -- if I talk to somebody?
17    Q.   No.  Did somebody talk to you about your
18  relationship with Mr. Salinas?
19    A.   Not that I remember.  Only when they put him on
20  my shift.
21    Q.   Okay.  What happened then?
22    A.   Well, they just put him in my shift so he could
23  help me, but we -- I really didn't need -- I mean,
24  because the reason that we were not getting tires was
25  because all machines were -- were down.  Material was not

43

1    good --

2        Q.    Okay.

3        A.    -- so it was not my -- my supervising that was

4    not getting the tires --

5        Q.    Okay.

6        A.    -- done.

7        Q.    Before we get there, my question is simply were

8    you ever talked to by anybody about a problem that you

9    had with Mr. Salinas?

10       A.    I talk to Joe Kolniak --

11       Q.    Okay.

12       A.    -- about one night that Steve had ordered me to

13   make the inventory for the -- I think they were the -- I

14   don't remember, but it was a kind of ply we used to use

15   to build tires, okay?  So they put him to help me, so I

16   asked him to help me because I was doing something else.

17   So he went -- he got very mad and saying very -- really

18   bad words, harassment, really bad words.

19       Q.    You -- when you say "he," you mean Mr. Salinas?

20       A.    Yes.

21       Q.    Okay.

22       A.    And I went to tell Joe Kolniak, so he went --

23   he -- he went to talk to both of us.

24       Q.    Mr. Kolniak did?

25       A.    Yeah.  But -- but at that time -- by the time --

44

1  by that time that -- that we had that argument, I did not

2  know that he was a supervisor --

3      Q.   Okay.

4      A.   -- because Mr. Ash did not tell me right away

5  that he was a supervisor.  He told me that after several

6  days --

7      Q.   Okay.

8      A.   -- so I thought he was under my supervision so

9  that's why I asked him to help me.

10     Q.   Well, was it wrong for you to ask him to help

11 you even if he was a supervisor?

12     A.   No, ma'am.

13     Q.   Okay.  Was there anybody else that ever talked

14 to you about any problems you had with Mr. Salinas other

15 than Mr. Kolniak?

16     A.   Not that I remember.

17     Q.   Okay.  There was a point in time when you were

18 actually made supervisor, correct?

19     A.   Correct.

20     Q.   Was that associated with an increase in pay?

21     A.   Well, it -- it -- not right away because --

22 yeah, it -- they did increase my pay, but they put it on

23 probably after a few times advance.

24     Q.   Okay.  Do you remember when you were given the

25 promotion?

POCKRUS REPORTING SERVICE
MCALLEN 630-3331 * HARLINGEN 423-7703 * BROWNSVILLE 350-4940

45

1       A.   No, I don't remember.

2       Q.   Okay.  Let's try to place it.  Who was plant

3  manager?

4       A.   Chuck Smith.

5       Q.   And who was your supervisor when you were

6  promoted?

7       A.   At that time I don't -- I don't -- I really

8  didn't know if it was Johnny or Steve because it was that

9  time when they were moving.  I -- I really didn't know

10 who was --

11      Q.   Okay.

12      A.   -- but the one that put me on for supervisor

13 first was Johnny Garcia.

14      Q.   He's the one that recommended you?

15      A.   Yes.

16      Q.   What were your duties as supervisor?

17      A.   My duties were to work with the tire builders,

18 help them in anything they needed, give them their

19 material they needed.

20      Q.   You were no longer operating a machine, right?

21      A.   Yes.  I -- yes.  I used to supervise and build

22 tires when there was -- when -- sometimes there were

23 nights that a lot of people was absence --

24      Q.   Okay.

25      A.   -- so I was ask by Russell Ash or Chuck Smith to

0000 54

46

1  help them build tires, so I used to build tires, too, and

2  I used --

3      Q.   Okay.

4      A.   -- to build tires, supervise.  And I had to

5  leave my clean -- spick-and-span clean my whole area, and

6  I use to be able to do it myself.

7      Q.   How many supervisors were there in the tire

8  building department?

9      A.   There were three.

10     Q.   How were they divided?

11     A.   What do you mean, by hours or --

12     Q.   Well, the -- were they divided --

13     A.   Yeah.  They --

14     Q.   -- by hours?

15     A.   -- were divided by hours, I mean, on shift --

16  three shifts.

17     Q.   Okay.  So three shifts, one supervisor per

18  shift?

19     A.   Yes.

20     Q.   Do you recall how many people you supervised?   I

21  know it fluctuated, but an average.

22     A.   No, I don't.

23     Q.   Do you recall how many machines were under your

24  supervision?

25     A.   No, I don't, because sometimes they were -- or

0000 55

47

1  they were ask for certain orders.  We didn't use some of

2  the machines and we used others, so it's -- no, I don't

3  remember.

4      Q.   So you would -- your duties or the extent of

5  your duties would change depending on the order that the

6  company was trying to fill at the time?

7      A.   Yes.

8      Q.   So if you were -- and this is an example.  I

9  have no idea if this correct or not.  If you were

10 building tires for, say, Ford trucks, then you would be

11 using the machines that built those size tires and

12 abandon completely the -- the ones that would build the

13 smaller ties?

14     A.   No, not -- not necessarily because we used to

15 have sometimes too much into each -- each tire, or we

16 could change the drums to make it bigger or smaller.

17     Q.   Okay.  So you could be building different-size

18 tires at the same time?

19     A.   On the -- at the same time, no, no.  It had to

20 be one -- one -- one size, one model.

21     Q.   Okay.

22     A.   It had to go -- be one by one.  I mean, if we

23 did one small, it had to be a small drum --

24     Q.   I know that's -- that's per machine, right?

25     A.   Yes.  You had to change the whole -- the whole

48

1  thing.

2      Q.   Okay.   My -- my question is geared towards your

3  shift.   During your shift could people be building

4  different-size tires --

5      A.   Yes.

6      Q.   -- on different machines --

7      A.   Yes.

8      Q.   -- at the same time?

9      A.   Yes.

10     Q.   That was what I was getting at.

11     A.   Yes.

12     Q.   So you could be building machines for a little

13 Datsun and building machine -- tires -- I'm sorry --

14 building tires for a pickup truck --

15     A.   Uh-huh.

16     Q.   -- on the same shift?

17     A.   Yes.

18     Q.   Okay.   But different machines?

19     A.   Yes.

20     Q.   And I -- I would assume also that there were

21 different production goals depending on the order that

22 was trying to be filled?

23     A.   Yes.

24     Q.   Okay.   When you were promoted to supervisor, did

25 you undergo any training at that time --

49

1    A.    No.

2    Q.    -- on how to be a supervisor?

3    A.    No, ma'am.

4    Q.    Did anybody give you any instruction or any

5    talks or anything in terms of what to do as a supervisor?

6    A.    Steve Harrison was the -- and Johnny Garcia were

7    the ones that help me a lot, and they told me how to fill

8    papers out and -- and how build tires, too.

9    Q.    Okay.

10    A.    They told me how to build certain model tires,

11    so, yes, they did.  They did help me.

12    Q.    Okay.  Other than filling papers and -- and just

13    building tires, which are things that you can do alone,

14    did they train you at all on how to get your people to

15    build tires?

16    A.    Yes.

17    Q.    Okay.  How did they do that?

18    A.    Steve Harrison used to talk to me on how to talk

19    to them or -- and Russell Ash showed me how to -- and

20    told me how he wanted me to time the people by minute --

21    Q.    Okay.

22    A.    -- or by tire --

23    Q.    Okay.

24    A.    -- by the hour, yes.

25    Q.    When you're talking about timing, when -- I

50

1  mean, you had a -- you always had a quota, right?

2      A.   Yes.

3      Q.   Did you always have to time people?

4      A.   Not always.  Russell -- at least Russell Ash

5  used to tell me that I didn't have to time them all every

6  day.  I mean, not every day --

7      Q.   Okay.

8      A.   -- the same people or not every day --

9      Q.   Right.

10     A.   -- but I had to keep on timing -- timing them so

11  we could know how many time they -- they were taking to

12  build a tire and why they were not getting their goals.

13     Q.   Okay.  And I guess that's why question, because

14  when you time somebody, you know how long it takes them

15  to build a tire --

16     A.   Yes.

17     Q.   -- right?

18     A.   Uh-huh.

19     Q.   Were you ever timed when you were operating the

20  machines building tires?

21     A.   If they time me?

22     Q.   Yes.

23     A.   No --

24     Q.   Okay.

25     A.   -- they never.

51

1       Q.   How did you know you could build a small tire in

2  a minute and a half?

3       A.   By looking at my watch.

4       Q.   Okay.  So you timed yourself?

5       A.   Yes.

6       Q.   Okay.  Why did you do that?

7       A.   Because I was one of the persons that I liked

8  always to make my -- my goal --

9       Q.   Okay.

10      A.   -- my quota.

11      Q.   At the time that timing was instituted, was

12 there a production problem at the plant?

13      A.   I don't understand the question.

14      Q.   At the time timing was instituted, was there a

15 production problem at the plant?

16               (Question translated)

17      A.   Oh, yeah.  We had the -- the production problems

18 since we started.  I mean, we never -- they never made

19 the goals because machines would breakdown.  I mean, we

20 had problems all the time.

21      Q.   (BY MS. LEEDS)  Okay.  And that's since you

22 started working there?

23      A.   Yes.

24      Q.   So did timing the individual employees give any

25 of them an incentive to work harder or faster?

52

1      A.   Well, in my time when I was supervising there

2 and I used to time my operators, instead of working

3 faster, they would go slower because they didn't -- they

4 didn't like me timing them.

5      Q.   Okay.

6      A.   And they would tell me to tell Russell Ash why

7 they were being timed, that they were not going to work,

8 and I used to tell Russell.  I used to tell Steve, but

9 they wouldn't do nothing.

10      Q.   Is it safe to say, then, that your employees

11 were resisting your timing of them?

12      A.   Yes.

13      Q.   What did you try to do to get them to work

14 harder?

15      A.   I used to talk to them and tell them that we

16 needed the job here in Texas.  We really didn't have too

17 much jobs around, and we really need to work together as

18 a team, and sometimes we -- they did work hard.  They

19 did.  They used to build more tires.

20      Q.   How effective was that?  Did -- did you have to

21 keep telling them that?

22      A.   Yes.

23      Q.   Would they drop back to their -- you know, to --

24 to not wanting to work as --

25      A.   Yeah.

53

1     Q.   -- hard?

2     A.   There were -- there were a lot of operators that

3  would not cooperate when you were talking to them.   There

4  were a lot -- there were several people that they would

5  work hard --

6     Q.   Okay.

7     A.   -- and they would help.

8     Q.   When a certain operator would not meet

9  production and would not listen to you, what would you

10 do?

11    A.   I would tell Steve Harrison, my supervisor --

12 my -- my unit supervisor, and he would talk to them.

13    Q.   Would that change anything?

14    A.   I was not -- I really was not allowed to really

15 talk to them because Russell Ash would not let me in a

16 way that I used to go tell him, well, like, for -- for

17 example, Mr. Silva, sometimes he would come -- as a

18 manner he would get on the plant, start working and would

19 come mad saying real bad words to me.   And I would tell

20 them that they -- Russell Ash would say that I was nobody

21 to tell him what to do, so --

22         MS. LEEDS:   Okay.   I -- I need to

23 object   --

24    A.   -- I could do any -- I -- I couldn't do too much

25 on that, so...

54

1           MS. LEEDS:   Object, nonresponsive.

2        Q.   (BY MS. LEEDS)  My question really goes to other

3   than you telling them, "Come on.  We need to work

4   together," and somebody didn't do that, did you just go

5   to your supervisor and -- and tell them?

6        A.   Yes, because I was -- sometimes Steve Harrison

7   would tell me that I had to write a -- make them a

8   write-up --

9        Q.   Okay.

10       A.   -- or, you know, stating --

11       Q.   Yes.

12       A.   -- that why, but then when I was -- when I used

13   to write them, then he would say, "No, let's -- let's not

14   do this.  Let's just talk to them."  So that's -- that's

15   what happen.

16       Q.   Okay.  This is when Steve Harrison was your

17   supervisor --

18       A.   Yes.

19       Q.   -- right?  Did that change when Mr. Ash became

20   your supervisor?

21       A.   On what?

22       Q.   When you had an employee that wouldn't listen to

23   you and wouldn't work hard, would you go to Mr. Ash and

24   tell him that --

25       A.   Yes.                              0000 63

55

```
 1        Q.  -- you had an employee that wasn't working hard?
 2        A.  Yes --
 3        Q.  And --
 4        A.  -- but it would not change.
 5        Q.  Nothing would change?
 6        A.  No.
 7        Q.  So was either of them, Mr. Ash or Mr. Harrison,
 8   effective in getting the workers to work harder?
 9        A.  I -- I really don't understand the question.  I
10   don't.
11        Q.  Okay.  Let me -- let me rephrase it.  You told
12   me that you would continuously tell your workers to --
13   to -- "You need to work together.  We need the jobs down
14   here," right?
15        A.  Yes.
16        Q.  And on occasion you would have a worker that
17   just didn't listen to you.
18        A.  Uh-huh.
19        Q.  You would go to Mr. Harrison.  Sometimes
20   Mr. Harrison would tell you, "Write him up," but then
21   change his mind --
22        A.  Uh-huh.
23        Q.  -- and go talk to the person?
24        A.  Yes.                              · 0000 61
25        Q.  But obviously, it didn't work because it kept
```

56

1    occurring, right?

2        A.    Yes.

3        Q.    Okay.  So what Mr. Harrison was doing -- would

4    you consider what Mr. Harrison did as effective to change

5    that employee's behavior?

6        A.    I don't know.  I -- I don't -- I don't know.  I

7    don't -- I don't know how to answer that question.  I

8    mean, it's...

9        Q.    Okay.  Well, it -- I guess because they didn't

10   start working harder, right?

11       A.    Yes.

12       Q.    They stayed not working?

13       A.    Yes.

14       Q.    When Mr. Ash became your direct supervisor, you

15   would go to Mr. Ash and tell him you had a particular

16   employee that was not working hard.

17       A.    Uh-huh.

18       Q.    What would Mr. Ash do?

19       A.    Well, sometimes he would tell me -- tell me to

20   tell them to -- they had to -- they had to do it.  They

21   had to work hard, and sometimes he would tell you -- he

22   would tell me, "If they don't want to work, fire them."

23   So -- but then I could not do that.  I was told that by

24   him, but I could not do that because my -- my supervisor

25   would not let me.

57

1    Q.  Well, wasn't he your supervisor?

2    A.  Yes.

3    Q.  Okay.  But he was the one telling you fire them?

4    A.  Yes.

5    Q.  Okay.  So why are you saying that you

6  couldn't --

7    A.  He would not --

8    Q.  -- do that?

9    A.  -- let me.  He would tell me that, but then he

10  would not let me do that.

11    Q.  Okay.  Did he ever talk to the -- to the

12  operators himself?

13    A.  Yes.

14    Q.  Was that effective in changing their behavior?

15    A.  No.  They would keep on doing the same thing.

16    Q.  Okay.  So there really was a problem with your

17  workers in getting them motivated to work hard?

18    A.  I don't know how to answer that question, you

19  know.  I really didn't know what was happening.  I mean,

20  there was -- there were -- there were a lot of -- a lot

21  of problems we had.

22    Q.  Okay.  Well, let's talk about those problems.

23  You've talked to me about the machines breaking down.

24  You've talked to me about not having the right materials.

25  What other problems were there?

0000 66

1    A.   Well, one of the -- the problems we really had
2  hard there was the people not showing up to work --
3    Q.   Okay.
4    A.   -- every day, and that would kill the production
5  down a lot.
6    Q.   Yeah.  If somebody --
7    A.   Yes.
8    Q.   -- doesn't show, then you can't --
9    A.   And sometimes -- sometimes up to five or six
10 people were not -- they -- they would not show to work,
11 and then there was no production.  And that's when I had
12 to build tires, too --
13    Q.   Okay.
14    A.   -- so I could help.
15    Q.   But you could not take the place of five people?
16    A.   No.
17    Q.   So was it those periods of time that you would
18 not make your production goals?
19    A.   No.
20    Q.   Okay.  Did -- tell me --
21    A.   Can we have a break?  Can we have --
22    Q.   Oh, yes --
23    A.   -- a break?
24    Q.   -- yes, absolutely.
25         MR. CISNEROS:  Do you need to go to the

59

1  rest room?

2          THE VIDEOGRAPHER:  The time is 4:45, and

3  you're off the record.

4          (Recess 4:45 p.m. to 4:51 p.m.)

5          THE VIDEOGRAPHER:  The time is 4:51, and

6  you're on the record.

7      Q.  (BY MS. LEEDS)  Ms. Montelongo, we have been

8  talking about your job at Titan Tires, and I'd like to

9  ask you about the meetings that they used to have.  When

10 you were in operations, what kind of meetings did they

11 have at which you had to attend?

12     A.  Only the -- after Steve Harrison was not -- now,

13 when Russell Ash would not let me talk to Steve.  He

14 was -- Steve was still the -- the unit manager -- the

15 tire building manager there up to -- up to my knowledge,

16 but then Russell Ash would not let me refer to him.  So I

17 had -- I would go with Russell to the meetings every day

18 in the afternoons.

19     Q.  Okay.  This is when you were operating

20 machinery?

21     A.  No, when I was a supervisor.

22     Q.  Okay.  I'm talking about when you were operating

23 machinery what kinds of meetings did you attend when you

24 were building tires?

25     A.  Oh, oh.  I don't remember.  I don't remember.

60

1       Q.   Did you have daily meetings with your supervisor

2  to, you know, rah-rah you into building a whole lot of

3  tires that day?

4       A.   No, not that I remember.  I don't remember.

5       Q.   Okay.  Do you recall that the first time you had

6  to attend daily meetings was after you became a

7  supervisor?

8       A.   Only when Russell Ash would not let Steve talk

9  to me --

10      Q.   Okay.

11      A.   -- I started with the meetings with Russell in

12 the afternoon.

13      Q.   Before Mr. Ash got to the plant when Steve

14 Harrison was your direct supervisor and you were a

15 supervisor, did you have meetings you had to attend --

16 any kind of meeting?

17           MR. CISNEROS:   Objection; form.

18      A.   I don't remember.

19      Q.   (BY MS. LEEDS)  Okay.  Were there production

20 meetings where production was discussed and production

21 goals?

22      A.   Yeah.  I remember there were meetings, but

23 they -- they would never ask me.  They were -- the -- all

24 the other supervisors would go, only not me.  I don't

25 know why.  I never did.

0000 63

61

1    Q.   Do you know if those meetings were held in the

2 morning and at that time you were in the late afternoon?

3    A.   I don't remember the time, but I do remember

4 they had some, yes.

5    Q.   Okay.   Let me ask you this:   When you were made

6 supervisor, you were on the 3:00 to 11:00 shift already,

7 right?

8    A.   No.   I started being a supervisor on the first

9 shift.

10    Q.   On the first -- the -- the 7:00 to 3:00?

11    A.   Yes.

12    Q.   Okay.   On -- how long did you remain supervisor

13 on that shift before you changed to the late afternoon?

14    A.   I -- I really don't remember the -- the...

15    Q.   Okay.   When you were a supervisor on the early

16 shift, did you ever go to any meetings?

17    A.   No, not that I remember.

18    Q.   And I believe what you're trying to tell me is

19 that it wasn't until Russell Ash became your direct

20 supervisor that you began attending daily meetings?

21    A.   Yes.

22    Q.   Is that your testimony?

23    A.   Not -- not since I started the -- when he got on

24 the plant there on year 2000, no.   Those meetings started

25 when about three or four weeks before Steve was fired.

62

1    Q.   The meetings with Mr. Ash?

2    A.   Yes.

3    Q.   Okay.  Do you know how long Mr. Russell had been

4  at the plant when Mr. Harrison was terminated?

5    A.   No, I don't remember.  I -- all I remember

6  Russell got in the plant on July 2000.

7    Q.   Okay.  And do you know when Mr. Harrison was let

8  go?

9    A.   Well, it was about three weeks before I -- I --

10  I quit my job.

11    Q.   Okay.  So about three weeks before you --

12    A.   More or less.  I'm not sure if it's --

13    Q.   No, I'm not --

14    A.   -- you know, the -- yes.

15    Q.   -- going to hold you to these dates.  Do you

16  remember when it was that you left?

17    A.   Yes.  I quit my job on August -- I believe it

18  was August the 10th of -- I don't remember if it was 2001

19  or 2002 --

20    Q.   Okay.

21    A.   -- but I have it on my papers.

22    Q.   Okay.  No.  We can -- we can figure that one

23  out, but it -- the best of your recollection it was three

24  to four weeks before that Mr. Harrison left?

25    A.   That I started the meetings?

0000 71

1    Q.   No, that Mr. Harrison left.

2    A.   Yes.

3    Q.   So he left --

4    A.   More or less.

5    Q.   -- before you did?

6    A.   More or less, yes.

7    Q.   Okay.  Do you remember how long a period of time

8    before that was it that Mr. Ash was your direct

9    supervisor?

10   A.   No, I don't.  I don't remember.

11   Q.   Was it a long, long time, or did it seem like a

12   short time?

13   A.   No, I don't -- I don't remember.

14   Q.   Okay.  But in any event meetings at which you

15   were required to attend did not begin until Mr. Harrison

16   was removed as your direct supervisor, correct?

17   A.   I -- I -- I don't remember or really I didn't

18   know when he was remove, but the only thing I remember is

19   that Mr. Ash would not let me report to Steve Harrison

20   anymore.

21   Q.   Okay.  You had to report to Mr. Ash --

22   A.   Yes.

23   Q.   -- right?

24   A.   So I really -- I -- I really didn't know when or

25   how --

64

```
 1      Q.   Okay.  But --

 2      A.   -- how --

 3      Q.   -- obviously, at the time that you had to start

 4 reporting to Mr. Ash, Mr. Harrison was no longer your

 5 direct supervisor, right?  Mr. Ash had become your direct

 6 supervisor.

 7      A.   Well, see, this is -- this is why I didn't know

 8 because in the -- in -- in the unit, he would give me

 9 orders.  He --

10      Q.   He --

11      A.   -- he would say, "You have to do this, you have

12 to do this," but then I would -- I -- it -- in -- in the

13 productions -- I -- I mean, the papers for the

14 production, I would have to go with Russell Ash.  I -- I

15 could not talk to -- to Steve, so, see, that's why I

16 didn't -- I didn't know what was happening really.

17      Q.   Okay.  Let me just clarify that because you said

18 in the unit he would tell you what to do.  You're saying

19 Mr. Harrison --

20      A.   Yes.

21      Q.   -- would tell you what to do --

22      A.   Yes.

23      Q.   -- but then in production you had to respond to

24 Mr. Ash?

25      A.   Yes.
```

*POCKRUS REPORTING SERVICE*
MCALLEN 630-3331 * HARLINGEN 423-7703 * BROWNSVILLE 350-4940

65

1    Q.   Okay.  When you say that you -- Mr. Ash said

2   that you couldn't talk to Mr. Harrison, how did that come

3   about?

4    A.   I don't know.  I never did.  I mean, all I know

5   is that it -- is I would go to Steve and tell -- tell

6   him, "Look, this -- this product says" -- he would say,

7   "Don't talk to me.  Russell will -- Russell does not want

8   you to talk to me."

9    Q.   Okay.  Would you talk to him about anything?

10    A.   Then I had to go with Russell Ash to -- to --

11   you know, to ask him what I wanted or what I needed or

12   what I wanted to tell him.

13    Q.   Okay.  But nonetheless, Mr. Harrison could give

14   you orders?

15    A.   Yes.

16    Q.   And you could not talk to Mr. Harrison about the

17   order?

18    A.   No, not about production or nothing of that.

19    Q.   Okay.

20    A.   See, this -- that's why I was confused because I

21   really didn't know.  I really didn't know what was

22   happening between them because Russell Ash would say one

23   thing and Steve would say another thing, so I was in

24   between --

25    Q.   Okay.

66

1    A.   -- or I didn't --

2    Q.   Let me -- let me ask you this:  What was

3  Mr. Ash's position?

4    A.   Plant manager.

5    Q.   Plant manager?

6    A.   Yes.  And so -- and those last days -- you're

7  talking about the last days that I work there?

8    Q.   Yeah.  As best you know, what did he come in as?

9  What did Mr. Ash -- when Mr. Ash first started there in

10  July of 2000, what was his position?

11    A.   Plant manager.

12    Q.   And did he remain plant manager until the time

13  you left?

14    A.   Yes.

15    Q.   Okay.  So he was everybody's boss?

16    A.   Yes.

17    Q.   Okay.  How is it that he told you not to talk to

18  Steve anymore?  What did he say to you?

19    A.   He said I was not to report to Steve on

20  production or on anything.  He didn't wanted (sic) me

21  talking to Steve at all.

22    Q.   Okay.  What kinds of things did you interact

23  with Steve about?

24    A.   Oh, well, because on -- at the end of the day, I

25  had to clean machines.  I had to clean the floor.  I had

1    to leave everything clean or material on the machines.

2    That's what we used to talk --

3        Q.    Okay.   That --

4        A.    -- but other than that I could not talk to him

5    about anything of production.

6        Q.    Okay.   So all production problems you were

7    suppose to go to Mr. Ash?

8        A.    Yes.

9        Q.    Other stuff you could go to Mr. Harrison for?

10       A.    Uh-huh.

11       Q.    And I believe you told us that that order not to

12   talk to Mr. Harrison came about three or four weeks .

13   before Mr. Harrison left?

14       A.    Yes.

15       Q.    Okay.   I don't know if I just asked you this:

16   How is it that Mr. Ash told you not to talk to Steve?

17   Did I just ask you that?   Okay.

18            MS. LEEDS:   Short-term memory is gone.

19       Q.    (BY MS. LEEDS)   When you had the meetings with

20   Mr. Ash, who would attend?

21       A.    Sometimes I would attend myself or sometimes

22   with -- when Lupe was there --

23       Q.    Okay.   Were --

24       A.    -- Guadalupe Salinas.

25       Q.    Were there ever any meetings with general

68

1  operators, tire builders, or, you know, general workers?

2      A.   Not that I remember.

3      Q.   Okay.  So you're telling me that your meetings

4  used to be one on one with Mr. Ash?

5      A.   Yes.  Sometimes --

6      Q.   Was --

7      A.   -- and sometimes with Guadalupe.

8      Q.   Okay.  And correct me if I'm wrong, but

9  Mr. Salinas was made -- well, came to work with you

10  before Mr. Ash got there, right?

11     A.   You mean in tire building?

12     Q.   Yes.  When -- when -- you were made supervisor

13  before Mr. Ash got there?

14     A.   Yes.

15     Q.   And did Guadalupe Salinas come to your unit

16  to -- to -- to help you --

17     A.   To supervise, no.

18     Q.   Yes.

19     A.   No.

20     Q.   Do you remember when Mr. Salinas went --

21     A.   No, I don't.  I don't remember.  I -- all I

22  remember it was the last three weeks or less -- four

23  weeks that I was there.

24     Q.   Okay.  Do you know who assigned him to your

25  shift?

6

1    A.  I don't know.  I think it was Russell Ash.  I

2  really didn't know.

3    Q.  Okay.  Had he been a supervisor before?

4    A.  I don't remember.

5    Q.  But -- and I think you've already clarified that

6  when he first worked -- went to work with you on your

7  shift, you had not been told that he was a supervisor and

8  so a little situation --

9    A.  Oh, you're talking about the last four weeks,

10  yes.

11    Q.  Well, did he ever go work with you before then?

12    A.  Before that?

13    Q.  Yes.

14    A.  On -- on supervising, no.

15    Q.  Okay.  What about for any other reason did

16  Mr. Salinas ever work with you before those last four

17  weeks?

18    A.  I don't remember.  No, I don't remember.

19    Q.  Okay.  So I believe you told us a little while

20  ago that when -- when he went to work with you on your

21  shift, at the very beginning you didn't know that he was

22  also a supervisor with you, right?

23    A.  Yes --

24    Q.  And --

25    A.  -- correct.

70

1    Q. -- -- it was a few days before you actually
2    realized that?

3    A.   Yes.

4    Q.   Do you know or was it ever explained to you why
5    he was assigned to your shift?

6    A.   No, no.  I -- they didn't tell me anything until
7    about two weeks later.

8    Q.   Okay.  What did they tell you?

9    A.   They put him there because they wanted to help
10   me to motivate the tire builders to build more tires, but
11   they never did.  I mean --

12   Q.   Okay.

13   A.   -- we stay the same.

14   Q.   So even putting Lupe there didn't help?

15   A.   No, it didn't.

16   Q.   Okay.  That's what people called him, right,
17   Lupe?

18   A.   Guadalupe.

19   Q.   Yeah.  Tell me something.  What kinds of
20   strategies would you use other than just talking to your
21   employees to try to get them to work harder?

22   A.   I would help them put their rolls on the
23   machines.  I would help them to put tires on the racks,
24   clean -- clean their areas so that they wouldn't -- they
25   wouldn't lose too much time so they would build more

000073

71

1  tires. I would do all -- all those things for my
2  operators.
3      Q.  Okay.  Were there operators that had problems
4  even knowing how to build the tires?
5      A.  Yes.
6      Q.  And what would you do with them?
7      A.  I used to talk to them and explain to them that
8  they had -- they needed to make their goals and they had
9  good material.  And I would ask them what was the
10  problems, so they would say the truth, that they didn't
11  feel like working.  I mean, they used to --
12      Q.  Okay.
13      A.  -- be very honest.
14      Q.  That's a problem.
15      A.  Yes.
16      Q.  Did you ever actually teach them how to build
17  tires?
18      A.  Yes.
19      Q.  Okay.  What -- was there ever a problem with
20  quality of the tires?
21      A.  Oh, yes.  We always had that problem with the
22  quality on the -- on the material.
23      Q.  On the material?
24      A.  Yes.
25      Q.  And when you say "the material," you're talking

72

1  about the -- the ply?

2      A.   The plys would not -- would not comply with our

3  specifications we needed.   Sometimes they were too wide,

4  too narrow, too thick, too -- too -- how you say, thin --

5  too thin --

6      Q.   Okay.

7      A.   -- so we could not build with that because then

8  that -- we would not build a good tire.

9      Q.   Where was that problem located?

10     A.   It would come from several places.

11     Q.   Okay.  Was that all before it got to you?

12     A.   Yes.

13     Q.   Who was in charge of those areas?

14     A.   Oh, I don't remember.  It's been a long time,

15  but there were several like the cutting -- cutting --

16  where they cut the plys, where they make the -- the plys,

17  where they make the tread.  Sometimes the tread was too

18  thick or too thin or too heavy or too -- too -- not too

19  heavy, so we couldn't build with those.

20     Q.   Okay.

21     A.   So we had to measure them.  The operator had to

22  stop, measure.  We had to do all that, so sometimes I

23  would do all that for them in order so they can build

24  more tires.  So I would -- I would try everything I could

25  to help them, yes.

73

1    Q.  Okay.  So it wasn't just getting your workers to

2 work faster in order to meet your quota.  There was a

3 problem with the quality of tires you were building as

4 well?

5    A.  Yes.

6    Q.  Were you ever reprimanded because of the quality

7 of tires that your unit was producing?

8    A.  Yes.

9    Q.  Who did that?

10    A.  Steve Harrison.

11    Q.  Okay.  How -- how did that occur?

12    A.  Well, because at the end where -- when the tires

13 are cooked, I mean, you -- they -- they inspect them, and

14 then they find, you know, the problems.  So he would come

15 to me and ask me, "Hey, this number or this operator is

16 not building on good quality," so you have to talk to him

17 or you have to keep on checking their -- their tires, you

18 know, three or four times in -- in -- on the night, so

19 that's what I would do.

20    Q.  Okay.  Getting back to the meetings, were these

21 meetings every day?

22    A.  Which meetings are you talking about?

23    Q.  That you had with Mr. -- well, I -- I'm -- my --

24 let's redo that one.  My understanding is the only

25 meetings you had were with Mr. Ash.

0000 82

*POCKRUS REPORTING SERVICE*
*MCALLEN 630-3331 * HARLINGEN 423-7703 * BROWNSVILLE 350-4940*

74

1    A.   Yes.

2    Q.   Okay.  And were those meetings every day?

3    A.   Yes.

4    Q.   Did they have to do mostly with production?

5    A.   Sometimes production.  Yes, mostly production,

6 but sometimes other problems we had with the operators.

7    Q.   Okay.  Did he ever suggest to you strategies to

8 use to try to motivate your operators?

9    A.   The only ones I remember that when he used -- he

10 told me to time them by the minutes, by the hour, by

11 the -- you know --

12    Q.   Yeah.

13    A.   -- by -- by the day or -- yes.

14    Q.   Anything else?

15    A.   No.

16    Q.   I mean, you already told us about, well, fire

17 them, but that's a last-ditch effort.  Okay.  Do you

18 remember how long Mr. Ash was at the Brownsville plant?

19    A.   No, I don't.

20    Q.   Do you remember how long he was there after you

21 left?

22    A.   No.

23    Q.   The plant is no longer in business, right?

24    A.   That's what I heard, yes.

25    Q.   Okay.  Everybody was laid off, right?

75

1    A.   I guess.  I don't know.

2    Q.   Okay.  Do you -- do you maintain contact with

3  anybody --

4    A.   No.

5    Q.   -- there still?  Tell me about the production

6  reports.  As an operator did you have to fill these out?

7    A.   For them?

8    Q.   No, for you.  When you were an operator --

9    A.   Oh, yes, I had to fill --

10    Q.   -- did you have to fill them out?

11    A.   Yes, yes.

12    Q.   How did that change when you became a

13  supervisor?

14    A.   They were the same.

15    Q.   Okay.  But you no long -- I'm sorry.  You no

16  longer had to fill out your personal production, did you,

17  or did you?

18    A.   No, no.

19    Q.   Okay.

20    A.   Because I was not building tires all -- all

21  night.  I mean, I was not an operator.

22    Q.   Right.  So what kind of reports did you have to

23  fill out after you became supervisor?

24    A.   I had to fill a report where -- every hour I

25  used to pick up the production and those were the reports

76

```
 1   I would hand in for Russell.
 2        Q.   So is it safe to say that there are two kinds of
 3   reports that come from every shift, one from an operator
 4   and one from the supervisor?
 5        A.   Well, yes, because the operator would fill the
 6   ones they used and that's -- from there we get the amount
 7   that -- of tires they would build, and then I would write
 8   them down on my report.
 9        Q.   Okay.  Did you always fill out your reports
10   completely?
11        A.   Yes.
12        Q.   And was that a requirement for you to do as
13   supervisor?
14        A.   Yes.
15        Q.   You had to fill out all the blanks, right?
16        A.   Yes.  I had to fill the reports for the absence,
17   too -- for the absence.
18        Q.   Okay.  When -- when you were an operator
19   building tires, were you also required to fill in all the
20   blanks of the report?
21        A.   For the -- for -- for the tire builder --
22        Q.   Yes.
23        A.   -- yes, yes.
24        Q.   Okay.  Did -- did you ever get talked to because
25   your reports were not complete?
```

0000 85

77

1    A.   No.

2    Q.   Now, you have made a claim that you were

3    demoted.  Do you understand that?

4    A.   Yes.

5    Q.   Okay.  What are you calling a demotion?

6    A.   Well, I remember that I was -- I was still a

7    supervisor on the day shift, and after a few weeks, I

8    don't remember if it was -- I don't remember which week

9    of July or August that Russell Ash told Steve Harrison to

10   put me back to build tires.  So I build tires about four

11   weeks or five.  I'm not very sure, around there, five

12   weeks -- four or five weeks.

13   Q.   Okay.  And then what happened?

14   A.   And then the supervisor from second shift had

15   left the work and Steve Harrison ask me again if I wanted

16   to -- to be the supervisor -- the second shift

17   supervisor.  So I told him yes, I -- I -- I wanted to

18   take it, so I started working on the second shift.

19   Q.   Okay.  Is that when you switched times?

20   A.   I don't remember the -- the times when I

21   switched -- I mean the dates I don't remember, but, yes,

22   I was building tires for five weeks.  I was took down

23   from supervisor to building tires and --

24   Q.   Okay.

25   A.   -- then -- and then to supervisor.

78

1    Q.    So you remained supervisor during the day shift?

2    A.    Uh-huh.

3    Q.    And then you went back to building tires?

4    A.    Yes.

5    Q.    Then you became supervisor of the afternoon

6    shift?

7    A.    Yes.

8    Q.    Is that when your time changed, when you went to

9    the afternoon shift and stayed there?

10   A.    Yes.

11   Q.    Okay.  When you went back to building tires, was

12   your salary affected?

13   A.    No.

14   Q.    You remained at the same supervisor's salary --

15   A.    No, it didn't --

16   Q.    -- even though --

17   A.    -- it didn't got (sic) to affect because when --

18   when we were a supervisor and then they would take you

19   off, then you was -- I think it was -- you would stay

20   with the same pay for three weeks or four, but then --

21   then I was moved again to supervisor --

22   Q.    Okay.

23   A.    -- but I call it demoted because, yes, I -- I

24   did not supervise for four or five weeks.

25   Q.    Okay.

79

1    A.   That's why.

2    Q.   Do you know the reason for that?

3    A.   Well, up to my knowledge, Russell Ash told Steve

4 Harrison to take me off of supervisor because he did want

5 me to be a supervisor because I was a women (sic), so

6 that's why Steve told me he had to take me off.

7    Q.   And this is what Steve Harrison told you?

8    A.   Yes.

9    Q.   Did Mr. Ash ever tell you why you went back to

10 building tires?

11    A.   No, he never did.

12    Q.   So the only explanation you know of is what

13 Mr. Harrison told you?

14    A.   Yes.  He told me that I had to go back to build

15 tires because Russell Ash did not wanted (sic) me to be a

16 supervisor.

17    Q.   Okay.  But yet then you were made supervisor --

18    A.   Yes, but --

19    Q.   -- four weeks later?

20    A.   Yes.  Then after that there was the position on

21 second shift, so Steve talked to him and he let me be a

22 supervisor again.

23    Q.   Okay.  When you say "him," I need to make sure

24 it's Mr. Ash --

25    A.   Russell Ash --

80

1    Q. -- right?

2    A. -- yes.

3    Q. Okay. Were there any other women supervisors?

4    A. When I was a supervisor, no.

5    Q. Not at all during the period of time?

6    A. When I started, no. I was the first

7 supervisor -- women (sic) supervisor there.

8    Q. Okay. At the time you went to the afternoon

9 shift, were there any other women supervisors?

10    A. I don't remember, but there was another lady

11 there on the shipping department, but I -- I don't

12 remember when she started.

13            MS. LEEDS: Are you okay?

14            THE VIDEOGRAPHER: (Moving head up and

15 down)

16    Q. (BY MS. LEEDS) Who became supervisor when you

17 were sent back to building tires?

18    A. Steve Harrison took on my place.

19    Q. Your place?

20    A. Yes.

21    Q. Okay.

22    A. He was supervising, and up to my knowledge, he

23 was still manager of the unit.

24    Q. Okay. So this obviously was before you were

25 told not to talk to Steve Harrison anymore?

0000 89

81

1      A.    Oh, yes.  When he told me to talk to him, it was

2  about four weeks or three weeks before he was gone.

3      Q.    So late --

4      A.    Late.

5      Q.    -- much later?

6      A.    Yes.

7      Q.    Okay.  In your meetings with Mr. Ash, tell me

8  how -- how was his style?

9      A.    Excuse me, how?

10     Q.    If you had to describe Mr. Ash's management

11 style, how would you describe it?

12     A.    Gosh.

13     Q.    And be honest.

14     A.    I -- I want to be honest, but it's -- it's very

15 hard, I mean, to remember all that because for me it

16 was -- it was very hard.  He treated me so bad and it's

17 hard for me to -- for me to go back and remember all

18 that, but --

19     Q.    Well, we have already had several depositions in

20 this case, and other people have told us that he is very

21 loud.  Was he with you?

22     A.    Yes.  He's -- he -- he always used to use very

23 bad words --

24     Q.    Okay.

25     A.    -- to talk to us --

0000 00

82

1    Q.   Was --

2    A.   -- supervisors.

3    Q.   -- was he very aggressive in his style?

4    A.   Yes.

5    Q.   Other people have described him as sometimes

6    being mean.

7    A.   Well, I don't know if he was mean or he was

8    trying to do his job, but he was overdoing it.  I mean,

9    that's my point of view.

10   Q.   Okay.

11   A.   He was overdoing it.  I mean, I don't know if

12   he -- if -- if it was because I was a lady.  I mean, I

13   don't know, but for me I have never worked with somebody

14   like him.  I mean, I have a lot of bosses.  I've worked

15   several places, and I never had those kind of problems.

16   I mean, I never felt so sick -- I mean so sad.  Like I

17   tell you, I don't know if it's because I'm a lady -- I'm

18   a woman.  I don't know.

19   Q.   But is it safe to say that he treated most

20   everybody that way?

21   A.   I couldn't say that, no --

22   Q.   Okay.  Did you --

23   A.   -- no.

24   Q.   -- ever see him act that way with other people?

25   A.   Yes.

83

1    Q.  Okay.  Who did you see him act that way with?

2    A.  Well, one day I was getting -- starting my shift

3  and Steve -- Steve Harrison was leaving his shift, and I

4  don't know what went wrong with Steve and him, but I

5  heard Russell telling him that "What -- what is the

6  fucking happening with you?  You're not doing your job.

7  Do you -- do you know what I'm going to do with you?  I'm

8  going to shove your head on the toilet," so --

9    Q.  Okay.

10    A.  -- it was -- it was hard to hear that, I mean --

11    Q.  Yes.

12    A.  -- because Steve -- all supervisors there would

13  really try hard to get production.

14    Q.  Did you ever hear Mr. Ash talk that way with

15  anybody else?

16    A.  Well, yes, yes.

17    Q.  Who else?

18    A.  Some -- with several of the supervisors --

19    Q.  Okay.

20    A.  -- but I think it was the way he -- he used to

21  talk because they were men.  I mean --

22    Q.  Okay.

23    A.  -- so I don't know.

24    Q.  All right.  Were you -- when was it that you

25  were put on salary?

84

A.   I don't remember, but I got my -- I got my copy.
I got a copy, but I don't remember the date.

Q.   Okay.  That was after you were made supervisor,
right?

A.   Yes.

Q.   Was it explained to you that once you were on
salary you would not be able to get overtime?

A.   I was explain by Steve Harrison only when he
would tell me to stay overtime I would get paid overtime.

Q.   So Mr. Harrison told you that you would get paid
overtime?

A.   Yes.  And there was one day that I worked -- one
week -- I mean, yeah, one week that I worked 30 hours
overtime because Steve had told me that I had to stay,
load up machines and all that, so I worked 30 -- 30 hours
overtime, so Russell would only pay 16 hours.

Q.   Okay.  Was this --

A.   But I don't know -- I really didn't know what
was the really truth between him -- Steve and Russell
Ash.

Q.   Right.  Was this when you were on the afternoon
shift?

A.   Yes.

Q.   Okay.  And you were on salary at the time,
right?

85

1       A.    Yes.

2       Q.    And Mr. Harrison told you you were going to get

3  overtime?

4       A.    I don't remember.

5       Q.    Okay. But he -- he had asked --

6       A.    Oh, he --

7       Q.    -- you --

8       A.    -- Mr. -- you -- you're talking about Steve,

9  yes --

10      Q.    Yes.  Steve --

11      A.    -- yes, yes.

12      Q.    -- Steve told you you were going to get

13 overtime --

14      A.    Yes.

15      Q.    -- and so obviously you thought you were going

16 to get overtime, right?

17      A.    Well, I thought I was going to get paid, but I

18 didn't, yes.

19      Q.    You got paid part --

20      A.    Part and --

21      Q.    -- of that?

22      A.    -- Steve went to talk to Russell about those

23 hours that he had -- he had order me to work those hours,

24 but Russell Ash said he could not pay me all the

25 30 hours.

86

1    Q.   Was it ever explained to you that salaried

2 employees do not get overtime regardless of how --

3    A.   No.

4    Q.   -- much they work?

5    A.   They never explain to me that, and, well, I -- I

6 stay because he told me I was going to get paid, so --

7    Q.   Yeah.  Well, and he asked you to, right?

8    A.   Yes.  So I had to obey orders, so I expected

9 that I -- they -- they were going to pay me.

10    Q.   Yeah.

11         THE VIDEOGRAPHER:  I just need to change

12 tape real quick.

13         (Recess at 5:24 p.m.)

14         THE VIDEOGRAPHER:  Okay.

15    Q.   (BY MS. LEEDS)  Just in case you do remember, do

16 you remember -- that's a terrible question.

17         Do you remember at all when this overtime

18 situation occurred?  We know it was when you were working

19 3:00 to 11:00, but do you know when during that time

20 period in terms of when Mr. Harrison was there, or was it

21 still, you know, when you could talk to Mr. Harrison?

22    A.   Yes.  The -- it was still when I -- he talk to

23 me.  He was still talking to me.

24    Q.   Do you remember if it was summer, winter?  Was

25 it cold?

87

1         A.   No, I don't remember.  I really don't.

2         Q.   Okay.

3         A.   I don't want to say that one date and, no, I

4    don't remember.

5         Q.   Okay.  When -- when you had these meetings --

6    did you ever attend anything called a production meeting?

7         A.   With who?

8         Q.   With anybody.

9         A.   (Moving head side to side)

10        Q.   So the only meetings you had were with Mr. Ash,

11   you and maybe Mr. Salinas on occasion?

12        A.   Yes.

13        Q.   Were you ever late to any of those meetings?

14        A.   No.

15        Q.   Do you recall a particular meeting in August of

16   2001 when you didn't call in?

17        A.   To work?

18        Q.   Yeah.  Well, you were late to a production

19   meeting.

20        A.   No, I don't remember.

21        Q.   Okay.  So you don't -- you wouldn't remember

22   what Mr. Ash told you as a result of that?

23        A.   No, I don't remember.

24        Q.   Okay.  What about another meeting also in August

25   that you said that you had not been able to stay to get

0000 96

88

1  the materials ready the day before?  Do you remember a

2  meeting in which that was discussed?

3      A.    Yes.  I remember he told me that why I didn't

4  filled out the -- the machines that he had told me, but

5  I -- I told him I didn't heard him, and I didn't remember

6  he told -- telling me to do that that night --

7      Q.    Okay.

8      A.    -- specifically that night --

9      Q.    Okay.

10      A.    -- yes.

11      Q.    Do you remember anything else he told you?

12      A.    On that day I don't really remember.

13      Q.    Did he say anything to you about not doing your

14  job properly?

15      A.    He would say that every day.  He said I was -- I

16  was not doing my -- my job properly, that I was not

17  getting any tires, that what was the f-u-c-k happening

18  with me.  And I use to tell him that I was doing all --

19  all my -- all that I could do, you know, to motivate the

20  tire builders to build tires and that I was doing all --

21  all I could, I mean.  And there was several times I told

22  him that if -- if he felt that I was not doing my job

23  right that he could put somebody else and put me in

24  another job.  So he use to answer me that he -- I was

25  nobody to tell him what to do.

89

1     Q.   Okay. Was this a time period when Lupe was

2 already working with you?

3     A.   I don't remember if he was there already.

4     Q.   Okay.

5     A.   I really don't remember.

6     Q.   Do you know if he was there at that meeting?

7     A.   No, no, I don't remember.

8     Q.   Okay.  What about timing your -- your employees,

9 did Mr. Ash ever talk to you about that?

10     A.   Yes.

11     Q.   What would he say?

12     A.   Well, he said I had to time the -- the -- the

13 tire builders, yes.

14     Q.   Did he ever tell you that you were not timing

15 the tire builders?

16     A.   I think there was -- there was one day that I

17 did not time the tire builders because I had other

18 problems with the other operators with material and I did

19 not have the time to time them, so he really got mad.  He

20 start yelling at me and telling me that right on my

21 face -- I mean right here, "You're not doing your job."

22 He said, "What is happening?  Why does" -- a word I just

23 told.

24     Q.   What -- I'm sorry.  Were you done?

25     A.   Yes.

90

1      Q.   Okay.  What about him telling you that, you

2  know, it's your responsibility to make sure that the

3  machines run correctly, was it?

4      A.   Well, it was part of my job to check on every

5  operator that they would have a -- a good machine, or if

6  the machine would break, I would had to write -- write --

7  make a write note to where the mechanic used to go and

8  check.

9      Q.   Okay.

10     A.   So I would tell the mechanic he had to fix this

11  machine or the other machine, or, yes, it was my

12  responsibility, yes.

13     Q.   Okay.  What about were you also required to

14  prepare the machines for the next shift coming in?

15     A.   Yes.

16     Q.   And did you ever have a problem with that?

17     A.   No, no.  I would -- I -- most of the times I

18  would leave the machines with materials, the area clean

19  like he wanted it.  I would do everything I could to keep

20  him -- to see if he could, you know -- but I would

21  never -- he would never say, "Hey, you did a good job,"

22  or "Hey, you're" -- he would never motivate nobody.

23     Q.   Okay.  Did you take a leave of absence at one

24  point in time?

25     A.   I took several.  I don't remember, yes.

91

```
 1        Q.    Okay.  Was there one in July of 2001?

 2        A.    Yes.  I -- I believe, yes.

 3        Q.    Okay.  Where in the plant did your husband work?

 4        A.    On that time I don't remember.

 5        Q.    Okay.  Was your husband injured?

 6        A.    Yes, he was.

 7                   (Mr. Mattingly enters the room)

 8        Q.    (BY MS. LEEDS)   Where -- what machinery was he

 9   injured on?

10        A.    On the extruder.  I think it was the extruder.

11   I don't remember, yes.

12        Q.    Okay.  Okay.  How was he injured?

13        A.    My husband?

14        Q.    Yes.

15        A.    Well, I was not there when the accident happen,

16   so I couldn't tell you much.

17        Q.    Did he explain to you what happened?

18        A.    Well, not really --

19                   MR. CISNEROS:  Let -- let me just --

20        A.    -- because --

21                   MR. CISNEROS:  -- object real quick,

22   Eileen.  You're not going to go into the terms of --

23   of --

24                   MS. LEEDS:  No.

25                   MR. CISNEROS:  -- all that kind of stuff --
```

92

```
 1              MS. LEEDS:  Not --
 2              MR. CISNEROS:  -- because of the
 3  confidentiality and all that kind of stuff that we --
 4  we --
 5              MS. LEEDS:  No.  I just want to know if he
 6  told her what happened.
 7              MR. CISNEROS:  Okay.  Not a problem.
 8  They're getting into Benigno's situation with Titan.
 9              MR. MATTINGLY:  Okay.
10      Q.  (BY MS. LEEDS)  Did -- did he ever tell you what
11  happened?
12      A.  Well, he did, but he really doesn't remember
13  when he fell down or...
14      Q.  Oh, okay.  So he fell?
15      A.  I --
16      Q.  It wasn't a situation where he got something
17  caught?
18      A.  I don't know.  I don't know.
19      Q.  Okay.
20      A.  I couldn't tell you.
21      Q.  As a result of that, how was he injured?
22      A.  I couldn't answer you that question.  I don't
23  know.
24      Q.  But was it -- was it severe?
25      A.  Oh, yes, it --
```

000101

93

1   Q.   Okay.

2   A.   -- it -- it is, it is.

3   Q.   It required you to --

4              MS. LEEDS:  Bye.

5   Q.   (BY MS. LEEDS)  It required you to -- to stay

6   home and help him?

7              (Mr. Cisneros leaves the room)

8   A.   It would -- yeah.  It would require for me to

9   stay, but I couldn't stay because I needed to work.

10  Q.   (BY MS. LEEDS)  Okay.  Well, my question is why

11  did you take a leave of absence?

12  A.   I don't remember which leave of absence you're

13  talking about.

14  Q.   The one close to when your husband was injured.

15  A.   I think it was my mother-in-law was very sick --

16  Q.   Okay.  So --

17  A.   -- and -- and we had to go over there.

18  Q.   Okay.

19  A.   So I have a copy of that when my mother-in-law

20  was sick in the hospital.  I have that copy.

21  Q.   Okay.  So you didn't take a leave of absence

22  because your husband had injured?

23  A.   I don't remember if it would be after my husband

24  was injured.  I really don't remember that -- that

25  date --

9

1      Q.   Okay.

2      A.   -- but I only remember he said -- there was one

3  time I -- I asked for a leave of absence because of that,

4  but I don't remember the date or if -- if it was before

5  or after.

6      Q.   When -- when you did take this leave of absence,

7  do you remember how long it was for in July?

8      A.   No, I don't remember.

9      Q.   When you would take a leave of -- do you

10 remember how many you took?

11     A.   Leave of absence or --

12     Q.   Yes.

13     A.   -- vacation?

14     Q.   Leave of absences.

15     A.   No, I don't remember.

16     Q.   And this would have been a leave of absence that

17 you took about a month before you left.

18     A.   No, I -- I don't remember.

19     Q.   Okay.  Do you know if you got paid for that

20 leave of absence?  Did you get paid when you went on

21 leave of absence?

22     A.   No, I don't remember.

23     Q.   Okay.  Who authorized you to take that leave?

24 And we're talking about a month before you left the

25 company.

0000103

95

1      A.    I believe it was Steve Harrison.

2      Q.    Okay.  You think Steve Harrison was still there?

3      A.    I don't remember, but I -- yes, I think he was

4  there.  Uh-huh.

5      Q.    Did Mr. Ash ever authorize a leave of absence

6  for you?

7      A.    I don't remember.

8      Q.    Okay.  Do you recall what Mr. Salinas' duties

9  were when he came to work on the shift with you after you

10 found out he was a supervisor?

11     A.    Well, yes.  He was to help me to supervise the

12 people, yes.

13     Q.    Okay.  Did you two get along?

14     A.    We used to -- yeah, we always get along.  He --

15 we -- we would have every -- each of us would have our

16 ways of working, but we were -- we would always end up

17 dong the work --

18     Q.    Okay.

19     A.    -- together.

20     Q.    Was there any confusion as to what he was

21 suppose to do and what you were suppose to do?

22     A.    No.

23     Q.    You knew what you were suppose to do --

24     A.    Yes.

25     Q.    -- on your shift?

96

```
1      A.   Yes.

2      Q.   And as far as you knew, he knew what he was

3   suppose to do?

4      A.   Yes.

5      Q.   Is -- is it safe to say that you were

6   supervising certain employees and he was supervising

7   certain other employees?

8      A.   Not all the time.  Only sometimes when Russell

9   when tell him, "You -- you're going to supervise this

10  side and you're going to supervise this other side."

11  So --

12     Q.   Okay.

13     A.   -- there were some days that we used to do that,

14  yes.

15     Q.   All right.  Did you ever have any meetings with

16  Mr. Ash about Mr. Salinas?  You did tell us about the one

17  that you had with Mr. Kolniak.  What about with Mr. Ash?

18     A.   Yes.  I do remember one day I went to talk to

19  Mr. Ash because Lupe Salinas was telling all my operators

20  not to do what I would tell them to do, and I was still

21  the supervisor.  He would go and tell them not to put

22  attention to -- to me because I was a woman and, I mean,

23  I was nobody to -- you know.  That he was -- he was the

24  man there that they --

25     Q.   Mr. Salinas was saying --
```

97

1    A.   Yes.

2    Q.   -- this?

3    A.   Uh-huh.

4    Q.   Okay.

5    A.   So I went to talk to Russell Ash, but Russell

6  Ash would not hear me.  He told me I was nobody to

7  talk -- I mean to say anything, that I was there to --

8  only to supervise, that -- he would never let me defend

9  myself in -- to tell you on -- on -- on a whole way, I

10  mean --

11    Q.   Okay.

12    A.   -- because I always felt because I was woman

13  that he would not let me defend myself, because there

14  were sometimes on the third shift this guy Gabriel

15  Atkinson, he would -- he would for any little thing he

16  would argue with me or -- you know.  And I would go to

17  Russell and ask him if he could talk to Gabriel about

18  this, and he would say -- he would never put attention to

19  me.  So I would always feel sad and -- because I was a

20  woman.

21    Q.   Okay.  Did you ever complain to anyone other

22  than what you just told you about him telling your

23  operators on -- was it one occasion or more than one

24  occasion that he talked to your operators --

25    A.   About what?

98

1      Q.    -- Lupe?  You -- you just told me that Lupe
2  would talk -- tell your operators not to do what you had
3  told them to do, right?
4      A.    I don't remember if there -- if I went to
5  Russell on other times, but...
6      Q.    Well, my question is how many -- how frequent
7  was it that Lupe would tell your operators not to do what
8  you told them?
9      A.    He would always tell them, but I would never put
10  attention to him.
11      Q.    Okay.
12      A.    I mean, I would just do my work and --
13      Q.    Okay.
14      A.    -- I would just try to do my best.
15      Q.    And I believe you -- you told us that you went
16  to Mr. Ash once complaining about that?
17      A.    Uh-huh.  Yes.
18      Q.    Okay.  Did you ever complain about anything else
19  regarding Mr. Salinas?
20      A.    I don't remember.
21      Q.    Now, you eventually resigned, correct?
22      A.    Yes, correct.
23      Q.    Why?
24      A.    Why?  Because every day since four weeks back or
25  before -- before Steve left he would call me in -- in the

99

1    meetings every day and he would start yelling at me,

2    telling to me that I was not doing my job, that I had to

3    do better, that I -- and I would tell him that I was

4    doing my job, that I was trying to do -- trying to get

5    the tire builders to make more tires, but he said,

6    "That's not enough.  You got to do better," but he would

7    talk to me in a -- in a real bad way --

8        Q.   Okay.

9        A.   -- I mean.

10       Q.   And after you resigned, did you ever say

11   anything to Lupe Salinas?

12       A.   Not that I remember, no.

13       Q.   Okay.  You didn't go to him and tell him, "Well,

14   you wanted my job, here it is"?

15       A.   No, ma'am.  I never did do that, no.

16       Q.   Now, you have made a complaint that Mr. Ash

17   asked you out once.

18       A.   He not only ask me once, he ask me three

19   times --

20       Q.   Three --

21       A.   -- out.

22       Q.   -- times?

23       A.   Yes.

24       Q.   Okay.  When did this occur?

25       A.   I believe the first time was on July he ask me

0000100

10

1  to go drink a beer.  There was a tavern in front of the
2  Titan Tire Company.  So I told him no, that I -- no, that
3  I didn't drink.  I don't do that, so....
4      Q.  Now, you said July.  Is this of 2000 or 2001?
5      A.  2000.
6      Q.  Of 2000?
7      A.  I remember -- I believe it was 2000, yes.
8      Q.  Okay.  And you said, "No, thank you," right?
9      A.  I said, "No, I -- I -- I don't drink."
10     Q.  Okay.  What -- when else did he say something?
11     A.  And then there was another time he said, "Are
12 you sure you don't want to go and you don't want to go
13 drink and let's, you know, talk?"  I said, "No, because I
14 am married.  I don't -- I don't do that."
15     Q.  Okay.  When did that occur?
16     A.  I remember that that was on -- I believe was
17 September -- about September.
18     Q.  Of 2000?
19     A.  Yes.
20     Q.  Okay.  And what else?
21     A.  And then again on -- on November.  I don't
22 remember the exact day, but he told me, "Are you sure you
23 don't want to go out?  Whenever I go to a plant that I
24 start working on a plant as the plant manager, I -- and I
25 date a lady or -- and it's my girlfriend or if she

101

1    marries me, I always build them a house, and I let them

2    have it. Are you sure you don't want to go drink with

3    me?" I said, "No, I don't do that."

4        Q.   Did he ever ask you for anything more than a

5    drink?

6        A.   No.  Not that I remember, no.

7        Q.   Okay.  So is it safe to say that on three

8    occasions he asked you to go drink a beer with him?

9        A.   He ask me to go out and drink.

10       Q.   Go out and --

11       A.   Yes.

12       Q.   -- drink?  Okay.

13       A.   Let's say he ask me as a date.

14       Q.   That's how you understood it?

15       A.   Yes.  Uh-huh.

16       Q.   Okay.  Do you have any knowledge that he asked

17   anybody else in the plant out?

18       A.   I remember this lady that was working in the

19   office.  Her name was -- gees, I -- I can't remember.  I

20   have it on my papers there, Criselda Macias.

21       Q.   Criselda?

22       A.   Criselda.  She told me that he ask her out, too.

23       Q.   Okay.  Anybody else?

24       A.   And Ms. Julia Hutton, she was an operator for

25   me.  She was -- he -- she told me that he ask her out,

102

1   too, and he -- and she heard him like -- I don't -- I

2   don't remember if it was the -- the second time or the

3   last -- the last time when he ask me out --

4       Q.   Okay.

5       A.   -- Ms. -- Ms. Hutton heard him asking me.

6       Q.   What's her last name?

7       A.   Julia Hutton.

8       Q.   Hutton?

9       A.   H-u-t-t-o-n.

10      Q.   Okay.  You're -- you're saying that she heard

11  him ask you out?

12      A.   Yes.  I -- but I don't remember if it was the

13  last -- the -- the second or the last time.

14      Q.   Okay.  But one of the times?

15      A.   Yes.

16      Q.   Where were you when these requests were made?

17      A.   I was always on the tire building department.

18      Q.   Were you in the day shift or the afternoon

19  shift?

20      A.   The -- I -- I remember it was -- the first time

21  it was on the first shift.  The other two times I don't

22  remember.

23      Q.   Okay.  Did you tell anybody that this had

24  happened to you?

25      A.   I told first to Johnny Garcia.  He knew about

103

1  it.

2      Q.   Okay.  What did you tell him?

3      A.   I told him that Russell had -- had ask me to go

4  out.

5      Q.   Uh-huh.  Do you remember when you told him this?

6      A.   No, no --

7      Q.   Was it --

8      A.   -- I don't.

9      Q.   -- was it after all three events?

10     A.   I don't remember.

11     Q.   Okay.  Did you tell anybody else?

12     A.   Well, the -- the reason that Steve Harrison knew

13 about it is because one day I was starting my shift and

14 Russell Ash had ask him to -- he told him to try to get

15 rid of that fucking bitch, meaning that it was me.  And

16 he ask me, "Why does he hate you too much -- too much?"

17 And I -- I told him -- "Well," I told him, "you don't

18 know this, but I'm going to tell you right now.  I don't

19 know if -- if it's because of this.  I don't know.  I

20 don't know, but I'm going to tell you he ask me out three

21 times, but I had -- I always said no.  I don't know if

22 that's -- that's why he's being mean with me," or I don't

23 know what was --

24     Q.   When -- when --

25     A.   -- but that's what -- that's -- that was the

104

1 time when Steve Harrison knew about it.

2      Q.   Okay.  Was there ever a time that Mr. Ash was

3 nice to you?

4      A.   The first week that he got there he -- he went

5 to meet with everybody in the plant.  That -- that was

6 the only time I -- I remember --

7      Q.   Okay.

8      A.   -- and I want to be honest.  One day I lost my

9 check and he made a check for me right away.

10      Q.   Okay.  It wasn't -- what kinds of interactions

11 did you have with Mr. Ash before Mr. Harrison was removed

12 as your supervisor?  Did you ever meet with him?

13      A.   With who?

14      Q.   With Mr. Ash.

15      A.   I don't remember when -- when -- I don't

16 really -- I really don't remember when Steve was took off

17 as unit manager.  Like I was telling you a while ago, I

18 never knew when.

19      Q.   Okay.  But we know that it was close to when you

20 and he left, right?

21      A.   Uh-huh.

22      Q.   So it was close to August of 2001 because that's

23 when you left.

24      A.   That you -- I mean, can you rephrase --

25      Q.   Yes.

105

1    A.    -- the...

2    Q.    In terms of the -- the -- the year, Mr. Harrison

3    stopped being your supervisor about four weeks before he

4    left, right?

5    A.    You mean the production stuff --

6    Q.    Yes.

7    A.    -- yes.

8    Q.    So that it was at that point that you were

9    working directly with Mr. Ash?

10   A.    Yes.

11   Q.    Okay.  Before then how had you interacted with

12   Mr. Ash?

13   A.    Before that Mr. Ash would talk to Steve

14   Harrison --

15   Q.    Okay.

16   A.    -- and Steve -- Steve Harrison would tell me

17   the -- what he -- he said --

18   Q.    So --

19   A.    -- but he -- if -- if Steve Harrison would

20   always told me that Mr. Ash would always say -- he

21   never -- he would say, "You've got to talk to that

22   fucking bitch.  She's not doing her job," or "Take her

23   out of that job," or whatever.  Steve always went to tell

24   me all that, but I always kept it to myself because --

25   Q.    Okay.

0000111

106

1    A.   I needed my job.

2    Q.   When -- when Steve found out about these, was

3  that during the period of time that you were not suppose

4  to talk to him about production?

5    A.   I was still talking to him --

6    Q.   Okay.

7    A.   -- yes.

8    Q.   When is it that you told Mr. Harrison?

9    A.   I don't remember the exact date, but --

10    Q.   I'm not asking you the exact date, but when in

11  terms of when everything happened here when did you tell

12  Mr. Harrison?

13    A.   I don't remember.

14    Q.   Was it before you went to the second shift?

15    A.   No.  I cannot answer that question because I

16  don't remember.

17    Q.   Okay.  Do you have any recollection of the

18  timing in which you told Mr. Harrison?

19              MR. MATTINGLY:  Objection; form.

20    A.   I don't remember.

21    Q.   (BY MS. LEEDS)  Okay.  Do you know if he did

22  anything?

23    A.   Not that I know, no, he didn't did anything.

24    Q.   Did he tell you that he went to talk to anybody?

25    A.   I remember he told me -- he would always tell

1  me, "Don't -- try not to get near the office where

2  Russell Ash is. He hates you. He doesn't like you.

3  Don't go near there. Try to avoid him." So I was -- I

4  was already scared because sometimes he would -- I would

5  see coming -- coming in through the line and I would say,

6  "Oh, my gosh, he's coming." So I was already afraid of

7  him.

8      Q.   Okay. When did -- did Mr. Harrison tell you

9  this?

10     A.   I think it was when Russell Ash started to --

11  telling him to get rid of me.

12     Q.   And when was this?

13     A.   I think it was -- it was before -- after the

14  first time he made advances to me, yes.

15     Q.   Okay. Which was July which was -- Mr. Ash had

16  just gotten there.

17     A.   Yes.

18     Q.   Okay. So how long had Mr. Ash been there?

19     A.   I don't remember.

20     Q.   Was it the first week he was there?

21     A.   I -- I don't remember the exact days, no.

22     Q.   No. I don't asking you exact dates. I'm just

23  asking you how long had Mr. Ash been there. You said he

24  asked you out for the first time in July of --

25     A.   Uh-huh.

108

1    Q.    -- 2000 --

2    A.    Uh-huh.

3    Q.    -- and Mr. Ash started working there in July of

4    2000.  Can you remember if it was the first week or the

5    second week?

6    A.    That Steve would tell me that he would talk to

7    him about me like that?

8    Q.    No.  That Mr. Ash asked you out.

9    A.    Oh, the exact week I don't remember on -- on

10    July.

11    Q.    Okay.  So is it your testimony that Mr. Harrison

12    knew that -- or that Mr. Ash was being aggressive towards

13    you after July of 2000?

14    A.    I don't remember the exact days.  No, I cannot

15    answer that.

16    Q.    Okay.  You just told us that it was after the

17    first time he had asked you out, right?

18    A.    Yes.

19    Q.    Okay.  He asked --

20    A.    It was after that, but I don't remember the --

21    the dates or...

22    Q.    Do you know how soon it was after the first

23    time?

24    A.    No.

25    Q.    Because it was only two months in between the

109

1   first and the second.

2       A.   Yes. I really don't know the date.   I don't -- I

3   don't remember.

4       Q.   Did you have any interactions with Mr. Ash

5   before Mr. Harrison told you to stay away from Mr. Ash?

6       A.   Well, by that time, yes, there were several

7   times he would go to the line and told me -- tell me that

8   I had to work with -- with my operators.

9       Q.   Okay.   So he had already been hard and

10  aggressive with you before Steve told you to stay away

11  from Mr. Ash?

12      A.   Yes.

13      Q.   Okay.   Who's Martha Sanchez?

14      A.   Martha Sanchez was the accountant.

15      Q.   Uh-huh.   Okay.   What is it that she knows about

16  this case?

17              MR. MATTINGLY:   Objection; form.

18      A.   I don't -- I don't know.

19      Q.   (BY MS. LEEDS)   You have named her as a witness.

20      A.   Martha Sanchez?

21      Q.   Yes.

22      A.   Oh, Martha Sanchez, excuse me.   She was -- she

23  was not the accountant.   I was -- I thought it was

24  Martha, the -- the one the used to work in the

25  accountant.   She was working on the human resource.

0000118

110

1    Q.   Okay.

2    A.   She told me that Russell Ash had ask her -- ask

3 her to go, too, with -- with him one day.  I don't

4 remember the date.

5    Q.   Okay.  Does she know anything about what

6 happened with you?

7    A.   No, I never told her.

8    Q.   Okay.  Who is Rose Guajardo?

9    A.   I think she was the secretary -- Russell Ash's

10 secretary.

11    Q.   Okay.  What does she know about this case to

12 your knowledge?

13    A.   I don't know.  I don't know how -- how much she

14 knows.

15    Q.   Did you ever talk to her?

16    A.   I don't remember.

17    Q.   Okay.  What about Lucio Rangel?

18    A.   Lucio Rangel, he was the supervisor there.

19    Q.   Which shift?

20    A.   I don't remember if it was the day shift.

21    Q.   Okay.  What does he know about this case?

22    A.   I don't remember.  It's been a long time for me.

23    Q.   Okay.  Do you know that you have been named as a

24 witness in Johnny Garcia's case?

25    A.   No, I don't.

0000113

111

1      Q.    Do you know that you have been named as a

2   witness in Steve Harrison's case?

3      A.    No.

4      Q.    Have either of them ever talked to you about

5   their lawsuits?

6      A.    No.

7      Q.    Do you know why Johnny Garcia left?

8      A.    No.

9      Q.    Do you know why Steve Harrison left?

10      A.    No.

11      Q.    Have you ever had a lawsuit before?

12      A.    Myself --

13      Q.    Yes.

14      A.    -- no.

15      Q.    Have you ever been involved in a lawsuit of any

16   kind?

17      A.    Not that I remember.

18      Q.    Do you know if your husband has?

19      A.    My husband, yes.

20      Q.    Okay.   What -- what kinds of lawsuits has he

21   been involved in?

22      A.    Only with Titan Tire.

23      Q.    He is suing Titan for his injury, correct?

24      A.    Yes.

25      Q.    Have you ever been convicted of a crime?

0000120

112

1    A.   No.

2    Q.   Have you ever been arrested?

3    A.   No.

4    Q.   Other than what Mr. Harrison told you that

5 Mr. Ash didn't want you to be supervisor because you're a

6 woman, did you ever hear of any other comments attributed

7 to Mr. Ash about not wanting women to work or be

8 supervisors?

9    A.   I don't remember, but I think -- I remember

10 say -- I remember Lucio Rangel saying that when they had

11 them one -- several meetings he would talk really bad

12 about me.

13    Q.   About you?

14    A.   Yes.

15    Q.   Okay.  What about women in general?

16    A.   He would always talk about the whole operators

17 as the fucking bitches.

18    Q.   Okay.  That was his term of the operators in the

19 plant?

20    A.   On the women, yes.

21    Q.   Okay.  Was he anymore gracious to the men?

22    A.   I don't know.  I couldn't -- I couldn't answer

23 that.

24    Q.   Okay.  Did you ever complain -- oh, I believe

25 you -- you told me you did tell Johnny Garcia, right --

113

1      A.   Yes.

2      Q.   -- about the fact that Mr. Ash had asked you

3  out?

4      A.   Uh-huh.

5      Q.   Okay.  When you told Mr. Garcia, was that when

6  he still worked there?

7      A.   Yes.  He was still working there.

8      Q.   Okay.  When you told Mr. Harrison about what had

9  occurred between you and Mr. Ash, did Mr. Harrison ever

10 suggest to you that you report it to somebody?

11     A.   I don't remember, but -- no, I don't remember

12 him telling me that I had to report it.

13     Q.   Were you ever told --

14     A.   And the reason that I did not report it is --

15 was because I needed my job.  I wanted to obtain my job.

16 I knew that if I -- if I talked about it he would fire me

17 right away.

18     Q.   Why did you think that?

19     A.   Because he -- I -- I always knew he didn't -- he

20 didn't like me there.  He didn't want me there anymore.

21     Q.   Okay.  But then --

22     A.   And at that time I needed -- I really needed my

23 job.

24     Q.   Well, he started acting that way after the first

25 time he asked you out, right?

0000122

114

1      A.   Uh-huh.

2      Q.   And you think that he started treating you that

3  way because you said no?

4      A.   I don't know.  I really can't say.

5      Q.   Okay.  Because he asked you out twice again

6  after that.

7      A.   Uh-huh.  Yes.

8      Q.   So he started treating you bad after the first

9  time, right?

10     A.   Right.

11     Q.   Okay.  But then he still asked you out --

12     A.   Uh-huh.

13     Q.   -- twice again?

14     A.   Yes.

15     Q.   Okay.  Have you gone to see any type of medical

16 doctor for any mental anguish that you have suffered as a

17 result of what occurred to you?

18     A.   Yes.  I went to see Dr. Pelly once.  I'm not

19 sure if it was once or two times.

20     Q.   Okay.  For what?

21     A.   Because I had too much depression.  I felt with

22 a lot of stress, so I even -- I don't know . I really

23 didn't feel I was myself anymore --

24     Q.   Okay.  And what --

25     A.   -- because -- and --

115

1    Q.   -- did he do for you?

2    A.   -- and he prescribe me some medication and --

3    Q.   What did he prescribe?

4    A.   -- and he advise me to quit the job.

5    Q.   Oh, so you went to see him before you left

6  the -- the plant?

7    A.   No, no, no.  I went there when I was working.

8    Q.   Oh, okay.  When?

9    A.   I'm not sure if it was on October of 2001.

10    Q.   Okay.  So you went to see him -- wait, October

11  2001 or October 2000?

12    A.   I'm not sure that the -- I'm sure of the year,

13  but it was --

14    Q.   Okay.

15    A.   -- on October.

16    Q.   Because you left in August, right?

17    A.   Yes.

18    Q.   Okay.  So if you went to see him October and you

19  were still working, it had to have been October of 2000.

20    A.   Well, yes, I think I have my papers.  I have

21  my --

22    Q.   Okay.  But you're sure you were still working

23  when you went to --

24    A.   Oh, yes --

25    Q.   -- him?

116

1    A.   -- yes.

2    Q.   Okay.  Have you gone to see anybody after you

3 left the plant?

4    A.   I went to see this doctor in -- in Harlingen.

5 Me and my husband were sent there.

6    Q.   By whom?

7    A.   By Michael Cowen.

8    Q.   Okay.  Your attorney?

9    A.   Yes.

10    Q.   Okay.

11    A.   My husband attorney, not -- I mean, on his

12 case --

13    Q.   No, I --

14    A.   -- not mine.

15    Q.   -- understand, but an attorney sent you --

16    A.   Yes --

17    Q.   -- there?

18    A.   -- yes.

19    Q.   What kind of doctor was this?

20    A.   She was a counselor, I guess.  I don't know.

21    Q.   Okay.  Do you know why they sent you?

22    A.   Me and my husband were -- were -- we had a lot

23 of depression.  I mean, we were going through all that --

24    Q.   Okay.

25    A.   -- and --

1    Q.   What was wrong with your husband?

2         MR. MATTINGLY:  Objection; form.

3    A.   I couldn't -- I couldn't answer that.  He would

4  have to answer that, not me.  I can't.

5    Q.   (BY MS. LEEDS)  Did you --

6    A.   I can answer mine, but not him.

7    Q.   Yeah.  Well, what did you notice was wrong with

8  him?

9    A.   He had a lot of depression.

10   Q.   Okay.  Like

11   A.   He was feeling --

12   Q.   -- what?

13   A.   -- sad, not feeling like him.  I mean, he used

14  to be very -- he used to make a lot of exercise and walk

15  or --

16   Q.   What part of his body was hurt in his accident?

17   A.   His whole arm with the collarbone.

18   Q.   His arm?

19   A.   His whole arm and all this part right here --

20   Q.   Okay.

21   A.   -- part of his face, all the...

22   Q.   Has he recuperated?

23   A.   I can't answer that.  I don't know.

24   Q.   Well, you see him every day.  Do you --

25   A.   Yes.

118

```
 1        Q.   -- see he that he's still --
 2        A.   No --
 3        A.   -- hurt?
 4        Q.   -- no, he hasn't recover any.
 5        Q.   Okay.  When -- was he in the hospital?
 6        A.   Several times, yes.
 7        Q.   For this injury?
 8        A.   Oh, yes --
 9        Q.   Okay.
10        A.   -- several times.
11        Q.   When -- when -- after your husband was injured,
12   did Mr. Ash ever go visit you?
13        A.   He went to visit our house one time, yes.
14        Q.   Okay.  And he went there because of your
15   husband's injury?
16        A.   Yes.
17        Q.   Okay.  Did he ever go visit your husband at the
18   hospital?
19        A.   My husband had the accident on Thursday.  He
20   went to visit him I believe -- I don't -- I'm not sure,
21   but it was three or four days later.
22        Q.   Okay.  So your husband was already home by that
23   time?
24        A.   No.
25        Q.   Oh, he was in the hospital?
```

0000127

119

1    A.   He was in the hospital.

2    Q.   So Mr. Ash went to see him twice?

3    A.   One time at my house and then at the hospital.

4    Q.   Okay.  And your husband was injured --

5    A.   But he --

6    Q.   -- close --

7    A.   -- didn't see my husband.  He just talked to me.

8  In the hospital --

9    Q.   Okay.

10   A.   -- he only talked to me.

11   Q.   All right.  And this was close to the period of

12 time in which you left the company?

13   A.   No, I don't -- I don't -- I don't remember.  My

14 husband got -- got hurt on March 29, I believe --

15 March 29.

16   Q.   Okay.  And you left in August?

17   A.   Yes.

18   Q.   Okay.  But in any event this was after all of

19 the three invitations?

20   A.   I don't remember.  I don't -- I don't remember

21 the dates.

22   Q.   Okay.  Could you tell me that he asked you out

23 July, September, and November --

24   A.   Uh-huh.

25   Q.   -- and this would have been March of the next

0000126

120

1   year?

2        A.   I don't remember which year was my husband

3   injured.  I don't -- if it was March of 2000 or --

4        Q.   Well, he was injured --

5        A.   -- I think it was in 2000.

6        Q.   He was --

7        A.   He was injured --

8        Q.   -- injured the same year you left the company,

9   right --

10       A.   March.

11       Q.   -- 2001?

12       A.   Gees, I don't remember.

13       Q.   Okay.

14            MS. LEEDS:  Can we take a break?

15            THE VIDEOGRAPHER:  The time is 6:02, and

16  you're off the record.

17            (Recess 6:02 p.m. to 6:08 p.m.)

18            THE VIDEOGRAPHER:  The time is 6:08, and

19  you're on the record.

20       Q.   (BY MS. LEEDS)  Ms. Montelongo, that's all we

21  have for you right now.  Thank you very much.

22            MS. LEEDS:  We'll pass the witness.  I just

23  want to thank the interpreter for his being here and his

24  tremendous work, and I'm really sorry I did this, but it

25  did go a lot faster.

0000123

121

1        THE INTERPRETER:  Thank you.

2              E X A M I N A T I O N

3   BY MR. MATTINGLY:

4        Q.   Just one question for clarification.  Ms. Leeds

5   asked you a question, Minnie, about if you'd ever been

6   involved in a lawsuit.  I believe your answer was no, and

7   then she asked you about your husband's lawsuit --

8        A.   Uh-huh.

9        Q.   -- Benigno Rico, and you understand that you

10  were part of that lawsuit; is that correct?

11       A.   I didn't understand that part.

12       Q.   Okay.  You understand that you had -- you had a

13  loss of consortion claim in Benigno Rico's lawsuit?

14              MS. LEEDS:  Just -- just for -- you don't

15  need to ask that because that's not a problem.  I know

16  she is.

17              MR. MATTINGLY:  Okay.  Well --

18              MS. LEEDS:  She has a consortion claim, so

19  you don't need to --

20              MR. MATTINGLY:  Well, thank you.

21              MS. LEEDS:  -- clarify that.

22              MR. MATTINGLY:  Then we'll stipulate.  I

23  appreciate --

24              MS. LEEDS:  Okay.

25              MR. MATTINGLY:  -- it, Ms. Leeds.  No

122

1  further questions.

2              MS. LEEDS:  Thank you.

3              THE WITNESS:  Okay.

4              MR. MATTINGLY:  Thanks.

5              THE WITNESS:  Thank you.

6              THE VIDEOGRAPHER:  The time --

7              MR. MATTINGLY:  At this time.

8              THE VIDEOGRAPHER:  -- is 6:09, and you're

9  off the record.

10             (The proceedings concluded at 6:09 p.m.)

11                       -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0000131

123

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO        )
                              )
VS.                           )    CIVIL ACTION NO. B-02-176
                              )         (JURY REQUESTED)
TITAN TIRE CORPORATION OF     )
TEXAS AND RUSSELL ASH         )

*********************************************

FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF GUILLERMINA MONTELONGO
SEPTEMBER 10, 2003

*********************************************


     I, CAROLYN NEWMAN, a Certified Shorthand Reporter in

and for the State of Texas, do hereby certify that the

facts stated by me in the caption hereto are true; that

the foregoing deposition transcript of GUILLERMINA

MONTELONGO, the witness hereinbefore named, was at the

time mentioned taken by me in stenograph, the said

witness having been by me first duly cautioned and sworn

upon her oath to tell the truth, the whole truth, and

nothing but the truth, and later transcribed from

stenograph by me.

     I further certify that I am neither attorney or

counsel for, nor related to or employed by any of the

parties to the action in which this deposition is taken,

and further that I am not a relative or employee of any

124

1   attorney or counsel employed by the parties hereto, or

2   financially interest in the action.

3       I further certify that the above and foregoing

4   deposition transcript as set forth in typewriting is a

5   full, true and correct transcript of the proceedings had

6   at the time of taking said deposition.

7       Certified to by me this 25th day of September, 2003.

8

9

10

11  _Carolyn Newman_

              CAROLYN NEWMAN
12
    CERTIFIED SHORTHAND REPORTER
13  STATE OF TEXAS
    CERT. NO.: 4193    EXP. DATE: 12/31/03
14
    POCKRUS REPORTING SERVICE
15  P.O. BOX 531786
    HARLINGEN, TEXAS  78553
16  1-800-423-7713
    1-800-423-7730 (FAX)
17

18

19

20

21

22

23

24

25

                                        0000133

125

CHANGES AND SIGNATURE

PAGE    LINE        CHANGE              REASON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

GUILLERMINA MONTELONGO

0000134

12

```
 1        I, GUILLERMINA MONTELONGO, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4
 5                              _____
 6                              GUILLERMINA MONTELONGO
 7
 8   THE STATE OF TEXAS         )
 9   COUNTY OF CAMERON          )
10
11       Before me, _____, on this
12   day personally appeared GUILLERMINA MONTELONGO, known to
13   me (or proved to me under oath or through _____
14   _____) (description of
15   identity card or other document) to be the person whose
16   name is subscribed to the foregoing instrument and
17   acknowledged to me that they executed the same for the
18   purposes and consideration therein expressed.
19            Given under my hand and seal of office
20   this _____ day of _____, 2003.
21
22
23                              _____
24                              NOTARY PUBLIC IN AND FOR
25                              THE STATE OF TEXAS
```

**Exhibit C- Steve Harrison's deposition testimony**

0000136

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO          )
                                )
                                )  CIVIL ACTION NO: B-02-176
                                )         (JURY REQUESTED)
                                )
TITAN TIRE CORPORATION OF       )
TEXAS, AND RUSSELL ASH          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

STEVE HARRISON

JULY 9, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of **STEVE**

**HARRISON**, produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on the 9th day of July, 2003, from

9:30 a.m. to 2:50 p.m., before SUSAN POCKRUS, CSR in and

for the State of Texas, reported by oral stenography, at

the offices of Willette & Guerra, L.L.P., International

Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville,

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto.

**ORIGINAL**

0000137

POCKRUS REPORTING SERVICE

2

# A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. David A. Sanchez
    MICHAEL R. COWEN, P.C.
    520 East Levee Street
    Brownsville, Texas  78520

    --AND--

    Mr. Carlos Cisneros
    CARLOS H. CISNEROS, P.C.
    845 East Harrison St., Ste. A
    Brownsville, Texas  78520


FOR THE PLAINTIFF AND THE DEPONENT:
    Mr. Carlos Hernandez
    ATTORNEY AT LAW
    201 North 1st Street
    Harlingen, Texas  78550


FOR THE DEFENDANTS:
    Ms. Melanie Ann Moore
    Ms. Eileen Leeds
    WILLETTE & GUERRA, L.L.P.
    International Plaza, Suite 460
    3505 Boca Chica Boulevard
    Brownsville, Texas  78521


ALSO PRESENT:
    Ms. Susan Pockrus, CSR
    Ms. Claudia Garza, Videographer
    Mr. Russell Ash, Defendant

0000138

POCKRUS REPORTING SERVICE

3

# T A B L E   O F   C O N T E N T S

PAGE

Agreements of Counsel . . . . . . . . . . . . . .    4


Examination of STEVE HARRISON

    By Ms. Moore . . . . . . . . . . . . . . . .    6


REPORTER'S CERTIFICATION . . . . . . . . . . . .  186

FILING CERTIFICATION . . . . . . . . . . . . . .  188

CHANGES AND SIGNATURE . . . . . . . . . . . . .  191

WITNESS' SIGNATURE CERTIFICATE . . . . . . . . .  192

EXHIBITS

    (None were marked)

0000139

4

1                    A G R E E M E N T S

2            It was agreed by and between counsel for the

3   Plaintiff and Defendants that no objections need be made

4   by any party at the time of taking said deposition,

5   except objections as to the form of the question or the

6   responsiveness of the answer, which if not made during

7   the deposition are waived; but if and when said

8   deposition, or any portion thereof, is offered in

9   evidence at the trial of this cause by any party thereto,

10  it shall be subject to any and all legal objections, such

11  objections to be made at the time of tender, the same as

12  though the witness were on the stand personally

13  testifying;

14            It was further agreed that the original

15  deposition transcript was delivered on the 28th day of

16  July, 2003, to **STEVE HARRISON**, in care of **Mr. Carlos**

17  **Hernandez, Attorney at Law 201 North 1st Street,**

18  **Harlingen, Texas,** for examination and signature and is to

19  be returned to Pockrus Reporting Service.  If and when

20  the original deposition transcript is returned with the

21  correction sheet containing the changes made by the

22  witness, if any, a copy of the changes will be forwarded

23  to all counsel of record;

24            It was further agreed that in the event the

25  original deposition is not signed by the witness within

0000110

5

1   thirty (30) days and filed at the time of trial or

2   hearing, that the original or a certified copy of said

3   deposition may be filed in Court and used herein as

4   though the witness had signed original deposition.

5

6                          -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

*

STEVE HARRISON,

having been first duly sworn, testified as follows:

*

E X A M I N A T I O N

BY MS. MOORE:

    Q.   Good morning, Mr. Harrison.  My name is Melanie Moore, and I represent Russell Ash and Titan Tire of Texas in a lawsuit the Guillermina Montelongo filed against both Mr. Ash and Titan Tire of Texas.

       Have you ever given your deposition before?

    A.   Yes.

    Q.   Okay.  so you understand the procedure, everything is under oath; and all the questions that I ask, if you don't understand something I ask you, just ask me to repeat it and I will?

    A.   Yes, ma'am.

    Q.   If at any time you need a break, just let me know and we'll go ahead and get you a break.

       Would you please state your full name.

    A.   My full name is Steven R. Harrison.

    Q.   And how old are you, Mr. Harrison?

    A.   I am 52 years old.

    Q.   What's your date of birth?

7

1    A.   1/15/51.

2    Q.   What is your current address?

3    A.   202 Rancho Viejo Boulevard.

4    Q.   Is that here in Brownsville?

5    A.   Brownsville, Texas, 78526.

6    Q.   And do you have a previous address here in

7    Brownsville, or have you lived there since you've lived

8    in Brownsville?

9    A.   No, ma'am.  I used to live at 640 Rancho

10   Escondido.

11   Q.   Is that also in Brownsville?

12   A.   Rancho Viejo.

13   Q.   Rancho Viejo.  Prior to living in Brownsville,

14   where did you live?

15   A.   Des Moines, Iowa.

16   Q.   And how long did you live there?

17   A.   All of my life, previous to coming to

18   Brownsville.

19   Q.   And when is it that you came to Brownsville?

20   A.   Approximately 1997, some month, I don't recall.

21   Q.   1997, you said?

22   A.   1997, yes, ma'am.

23   Q.   Are you currently married?

24   A.   Yes, ma'am.

25   Q.   And what is your wife's name?

```
 1        A.   My wife's name is -- my brain just went
 2   blank -- Rosie.
 3        Q.   And do you have any children?
 4        A.   Yes, I do.
 5        Q.   And what are their names and their ages?
 6        A.   I have a daughter called Amy, she's 28; I have a
 7   daughter called Jennifer, she is 27 now; and A son named
 8   Andrew, who is 23.
 9        Q.   And you've been married previously?
10        A.   Yes, ma'am.
11        Q.   And how long were you married?
12        A.   Pardon me?
13        Q.   How long were you married before then?
14        A.   Approximately two years.
15        Q.   Two years.  And what was her name?
16        A.   Bonnie.
17        Q.   Bonnie.  Do you know Bonnie's maiden name?
18        A.   Emerson.
19        Q.   Emerson?
20        A.   Yeah.
21        Q.   What's Rosie's maiden name?
22        A.   Salinas -- Salinas.
23        Q.   Did you graduate from high school?
24        A.   Yes, I did.
25        Q.   And where did you -- where did you attend
```

9

```
 1   high school?
 2        A.    Tech High School -- Des Moines Technical
 3   High School.
 4        Q.    And after high school did you attend any
 5   college?
 6        A.    Uh-huh.
 7        Q.    And where did you attend?
 8        A.    Upper Iowa University and Area 11 Community
 9   College, Ohio State University.
10        Q.    And the first one, what was it again, the first
11   college you attended?
12        A.    Upper Iowa.
13        Q.    And how long did you attend there?
14        A.    On and off about two years.
15        Q.    Did you receive any type of certificate, degree,
16   associate's?
17        A.    No.
18        Q.    And the next one was?
19        A.    Area Community College.
20        Q.    And how long did you attend there?
21        A.    On and off.
22        Q.    Okay.  On and off for how long?
23        A.    I went there every time I went to take a course
24   that would help me.  I took the welding course, I took a
25   labor law course, I took a home-building course.
```

0000145

10

1      Q.   Any other courses that you took there?

2      A.   I think I took hazard response course, some

3  other things.

4      Q.   Did you receive any type of certificates or

5  degrees?

6      A.   Uh-huh.

7      Q.   For each one of these, the welding?

8      A.   Uh-huh.

9      Q.   And how long were these courses?

10      A.   Weeks in duration.

11      Q.   More than three weeks?

12      A.   Uh-huh.

13          THE REPORTER:  I need a "yes" or "no,"

14  please.

15      Q.   (BY MS. MOORE)  More than three weeks?

16      A.   Yes.

17      Q.   Did you have like an approximate weeks

18  or -- maybe six weeks?

19      A.   No, ma'am, I don't have an approximate.

20      Q.   After that, where did you attend school?

21      A.   I went to several military schools and I don't

22  recall the dates.

23      Q.   What type of courses did you take?

24      A.   Leadership courses, logistics courses, tactical

25  courses, managerial staff college, multi-functional

11

1    course, supply management, maintenance management.

2        Q.   And did you receive some type of certificate?

3        A.   Sure.

4        Q.   From these?

5        A.   Sure.

6        Q.   And all of them?  All of them that you just

7    mentioned?

8        A.   As I recall, yes, ma'am.

9        Q.   Okay.  And did you attend any other type of

10   school, technical school, college, after that?

11       A.   I don't recall, I may or may not have.

12       Q.   When is the last time you actually attended

13   college, or what year?

14       A.   I don't recall, I didn't keep track of it.

15       Q.   Okay.  Let's go to your employment history.

16   I guess starting -- we're going to go backwards from the

17   time you were employed here in Brownsville at Titan

18   Tires.  We'll go backwards.  Where were you employed

19   prior to being employed at Brownsville at Titan Tires?

20            MR. HERNANDEZ:  Objection; form.  You can

21   answer it.

22       A.   I guess I don't understand your question.

23       Q.   (BY MS. MOORE)  Where were you employed

24   immediately before you were employed in Brownsville at

25   Titan Tires?

0000147

12

1          MR. HERNANDEZ:   Objection to form.   He was

2     employed with Titan International.

3          Q.   (BY MS. MOORE)   Okay.   Before you came to the

4     Brownsville plant were you employed by Titan?

5          A.   Before I came --

6          Q.   You were transferred down to Brownsville?

7          A.   Yes, ma'am.

8          Q.   Okay.   And where was it that you were working?

9          A.   Was I working before I came to Brownsville,

10    Texas?

11         Q.   Right.

12         A.   I was working in Des Moines, Iowa.

13         Q.   Okay.   And was that for Titan?

14         A.   That was for Titan.

15         Q.   Which entity, is that Titan International; do

16    you know?   Titan Marketing?

17         A.   I don't recall, they changed their name so many

18    times.

19         Q.   Okay.   And how long did you work?

20         A.   For?

21         Q.   For Titan.   And not in Brownsville, before, when

22    you were working in Des Moines.

23         A.   When Titan bought the factory from Pirelli, I

24    was an employee for Pirelli.   I also became an employee

25    for Titan at the time.

0000148

13

1    Q.   Do you remember what year that was?

2    A.   No, ma'am.

3    Q.   So you don't remember how long you've worked

4  under Titan after they bought Pirelli?

5    A.   I remember working for them several years before

6  I was transferred to Brownsville.

7    Q.   To Brownsville, okay.  And you said before you

8  worked for Pirelli, and how long did you work there?

9    A.   I think Pirelli -- you've got to understand, I

10  worked for the same facility my whole career and had

11  different, multiple owners.

12    Q.   Okay.  So you worked at -- before Pirelli, it

13  was owned by somebody else?

14    A.   Uh-huh.

15    Q.   Before that, it might have been owned by

16  somebody else?

17    A.   Uh-huh.

18    Q.   Do you remember the names of those?

19    A.   Armstrong Tire and Rubber Company.

20         MR. HERNANDEZ:  Let me instruct the witness

21  to answer "yes" or "no," and not to say "uh-huh" or

22  "huh-uh," as it will not come out on the record.

23         THE WITNESS:  I'm sorry.

24    Q.   (BY MS. MOORE)  Before, any other names other

25  than Armstrong, Pirelli, that you can recall?

14

1    A.    No.

2    Q.    And so, how long was it that you actually worked

3  in Des Moines at this tire plant?

4    A.    Approximately 26 years.

5    Q.    Now, when you first were employed, what were you

6  employed as?  What was your position?

7    A.    I don't recall, general laborer.

8    Q.    It would be just general labor?

9    A.    Uh-huh.

10    Q.    And what are some of the different positions you

11  held there in Des Moines?

12    A.    Machine operator, janitor, supervisor, manager.

13    Q.    Okay.  And when you were a supervisor,

14  what -- do you remember when that was when you became

15  a supervisor?

16    A.    I don't exactly, I don't recall the exact date,

17  no, ma'am.

18    Q.    Do you remember a year?

19    A.    No, ma'am.

20    Q.    Okay.  And what were your -- what type of

21  supervisor were you?  What were you supervising?

22    A.    A tire room supervisor.

23    Q.    Tire room?

24    A.    Uh-huh, yes, ma'am.

25    Q.    And what did that include?  What was it?  Did

0000150

1   you have a particular section, did you supervise the

2   entire --

3       A.   Yeah, I supervised tire builders and tire

4   employees in making tires.

5       Q.   Okay.  And you said you were a manager.  Is that

6   different than being a supervisor?

7       A.   Yes, ma'am.

8       Q.   And what were your duties as a manager?   What

9   did you manage?

10      A.   I was putting together some information for

11  Mr. Campbell.

12      Q.   Information as to what?  What kind of

13  information?

14      A.   Information in Brownsville, Texas.

15      Q.   And when were you a manager?

16      A.   I don't recall the exact date.

17      Q.   Was it the year before you came to Brownsville,

18  two years before?  Do you have an --

19      A.   I don't have the exact date.

20      Q.   And do you know how many years you were -- give

21  me an estimate of the number of years you were a

22  supervisor.  Was it more than five?

23          MR. CISNEROS:  Objection; form.

24      A.   I don't want to --

25          MR. CISNEROS:  But you can go ahead and

16

1  answer.

2      A.  I can't approximate.  I want to give you a

3  correct answer.

4      Q.  (BY MS. MOORE)  And can you estimate it?

5      A.  No.

6      Q.  Was it more than ten, less than ten?

7      A.  No.

8      Q.  Okay.

9          MR. CISNEROS:  Objection; form.

10     Q.  (BY MS. MOORE)  And what type of training did

11  you receive in order to become a supervisor?

12     A.  I'm sorry, I don't understand the question.

13     Q.  Did you -- what type of training have you had?

14     A.  A training from whom?

15     Q.  From --

16     A.  From?

17     Q.  When you were working for Pirelli or Armstrong

18  to become a supervisor, did anybody train you, or was it

19  just because you'd been working there and your basic

20  knowledge?  Did you have any type of special training to

21  become a supervisor?

22         MR. CISNEROS:  Objection to form.

23     A.  Okay.  I don't understand your question.

24     Q.  (BY MS. MOORE)  Okay.  Did you have any

25  training, as in did you take any -- did they send you to

17

1   any training courses?

2       A.   Did who send me to any training courses?

3       Q.   Your employer, whether it be Pirelli or

4   Armstrong, whenever you were working in Des Moines, Iowa.

5   In any of those 26 years before you came to Brownsville,

6   did you have any specific training, or was it just

7   on-the-job, day-to-day, hands-on training?  Did you take

8   any safety training courses, did you take any training as

9   to how to operate a machine, did you take any training as

10  to, you know, how to effectively supervise --

11              MR. CISNEROS:  Objection; form.  You can go

12  ahead and answer if you can.

13      A.   Yes.

14      Q.   (BY MS. MOORE)  And what types of training was

15  it?

16      A.   I have had some safety training.  I have had

17  some hazardous material training.  I have had some

18  training -- I don't recall the training, but I had

19  training courses, I had some training with a senior

20  supervisor.

21      Q.   When you say you had training with a senior

22  supervisor, what kind of training was that?

23      A.   What type of training?  Can you rephrase that?

24      Q.   Was it safety training, was it --

25      A.   No, ma'am.

0000153

18

```
 1         Q.    -- supervisor training?

 2         A.    Yes, ma'am.

 3         Q.    That training was to --

 4         A.    Be a supervisor, yes, ma'am.

 5         Q.    How to become a supervisor, okay.   And do you

 6    remember when that was?

 7         A.    When they?

 8         Q.    When they trained you to be a supervisor?

 9         A.    When they hired me to be a supervisor.

10         Q.    Okay.   And you don't remember when that was?

11         A.    Exactly, no, ma'am.

12         Q.    Okay.   Are you currently employed?

13         A.    Yes, ma'am.

14         Q.    And where are you employed?

15         A.    Currently, I work for Tipton Ford.

16         Q.    And how long have you been working there?

17         A.    Approximately a year-and-a-half.

18         Q.    Do you remember when you were transferred to the

19    Brownsville plant?

20         A.    The exact date, no, ma'am.

21         Q.    Okay.   Was it 1997?

22         A.    I believe so.

23         Q.    Okay.   And when you were transferred to

24    Brownsville, what was your job title or your position?

25         A.    I believe it was operations manager.
```

19

1    Q.   And what is an operations manager?

2    A.   It's a plant manager.

3    Q.   You oversee the entire plant?

4    A.   Yes, ma'am.

5    Q.   Did you -- at some point did your job title

6    change?

7    A.   Yes, ma'am.

8    Q.   What did it change to?

9    A.   It changed to production manager, manufacturing

10   manager.

11   Q.   And what did you do as a production manager?

12   A.   I oversaw production.

13   Q.   For the entire plant, or did you have a

14   particular section?

15           MR. CISNEROS:   Objection; form.

16   Q.   (BY MS. MOORE)   Division?

17           MR. CISNEROS:   Objection; form.

18   A.   When -- I don't know what you mean when you say

19   "entire plant."   That means one thing to somebody, it

20   means something else to somebody else, so I don't

21   understand.

22   Q.   (BY MS. MOORE)   Okay.   The operation -- okay.

23   You told me an operations manager oversees the entire

24   plant.   I understand there are several supervisors at a

25   plant where you, you know, they were in charge of

0000155

20

1   specific divisions in the plant and specific machines,

2   there are several supervisors.  Were you a production

3   manager for the -- did you oversee all the production

4   or did you have a certain section, certain type of

5   machine that you --

6         MR. CISNEROS:  Same -- same objection.

7   You can go ahead and answer, if you can.

8         A.  I'm trying to recall for you --

9         Q.  (BY MS. MOORE)  Okay.

10        A.  -- and answer the question you asked me.  In the

11  early stages there were not a lot of managers and there

12  were not a lot of supervisors, so I had more to oversee.

13        Q.  Okay.

14        A.  As we got larger and the operations managers

15  changed, I had less to oversee.

16        Q.  Okay.

17        A.  Does that make sense to you?

18        Q.  That does.  Who became the operations manager

19  after you were -- became the production manager?  Did

20  someone take that place?

21        A.  I believe his name is Chuck Smith.

22        Q.  Do you remember when that was?

23        A.  I don't recall the exact dates, no, ma'am.

24        Q.  Do you remember if it was a year after you were

25  there, a few months?  Do you remember the time frame?

0000156

21

```
 1              MR. CISNEROS:  Objection to form.
 2        A.   I do not recall the exact date.
 3        Q.   (BY MS. MOORE)   Okay.   What -- do you know the
 4   different types of tire machines that were used here at
 5   the Brownsville plant, what type of tires were being
 6   made?
 7              MR. HERNANDEZ:  Objection; form.   You can
 8   answer both questions, the one of tires and the machines.
 9        Q.   (BY MS. MOORE)   Okay.   What types of tires were
10   being made?
11        A.   Agricultural and industrial.
12        Q.   And within that did they have different types of
13   agricultural and industrial, like maybe larger tires,
14   smaller tires?
15        A.   There are multiple sizes of tires.
16        Q.   And so multiple -- were multiple sizes being
17   manufactured at the Brownsville plant?
18        A.   Yes, ma'am.
19        Q.   And did you have knowledge how to operate all
20   the machines at the Brownsville plant?
21        A.   No, ma'am.
22        Q.   Okay.   Were there some that you -- some that you
23   didn't -- do you recall which ones you didn't know how to
24   operate?
25              THE WITNESS:  Can I ask a question?
```

0000157

22

```
 1              MS. MOORE:  Do you want to -- Counsel, you

 2    know, you can go off the record.

 3              MR. CISNEROS:  Yes, we'll go off the

 4    record.

 5              THE VIDEOGRAPHER: Off the record at 9:50.

 6              (Off the record at 9:50 a.m.)

 7              (On the record at 10:00 a.m.)

 8              THE VIDEOGRAPHER:  The time is

 9    10:00 o'clock, and you're on the record.

10       Q.   (BY MS. MOORE)  Now, do you know the date

11    Minnie Montelongo was hired?

12              MR. HERNANDEZ:  Objection; form.  If you

13    know.

14       A.   No, ma'am.

15       Q.   (BY MS. MOORE)  Do you recall if it was when the

16    plant began in '97, maybe a year later?  Do you know?

17              MR. HERNANDEZ:  Same objection.

18       Q.   (BY MS. MOORE)  No idea?

19       A.   No, ma'am.

20       Q.   Okay.  Do you remember what position she was

21    hired at when she was hired?

22       A.   No, ma'am.

23       Q.   Now, do you know if she was ever a tire builder?

24       A.   Yes, ma'am.

25       Q.   And as a tire builder, what are the duties of a
```

23

1    tire builder?   What is it that they do?

2         A.   Duties of a tire builder are to assemble fabric,

3    build the green tire to standard.

4         Q.   Okay.   Do you know how long she was a tire

5    builder?

6         A.   No, ma'am.

7         Q.   Do you know if she received any training on how

8    to operate the machines?

9         A.   Yes, ma'am.

10        Q.   Do you know what type of training she received?

11        A.   How to operate the machine.

12        Q.   Do you know who trained her?

13        A.   Don't -- no, ma'am.

14        Q.   You know, the basic training, I guess, when

15   you're hired, how -- what does that consist of and how

16   long is -- or how long is it?

17        A.   I don't understand your question.

18        Q.   Well, if you hire a new employee that's never

19   worked on a tire machine, what is it that you do to train

20   that person?

21        A.   When?

22        Q.   When they're first hired.

23        A.   When they're first hired where?

24        Q.   Like at a plant, a tire plant, they say they --

25        A.   Which plant?

0000159

24

1        Q.    The Brownsville plant, we're talking about the

2   Brownsville plant.

3        A.    When?

4        Q.    Say they first are hired and say they've never

5   had any tire-building experience.  What is it that you do

6   to train them?  Is there a -- like a --

7        A.    Ma'am, I don't understand your question, because

8   each plant manager had a different philosophy.

9        Q.    Okay.  And what did you do?

10       A.    What did I do when?

11       Q.    To train, what was your philosophy when you were

12   operations manager or when you were production manager?

13                MR. HERNANDEZ:  Objection to form.  You can

14   answer.

15       A.    I don't recall.

16       Q.    (BY MS. MOORE)  You don't recall what?

17       A.    Specifically, no, I don't understand your

18   question.

19       Q.    Do you recall what type of -- when you were

20   operations manager, you came -- you hired -- do you

21   remember how many people were hired to work at the

22   Brownsville plant?

23                MR. HERNANDEZ:  Objection; form.  If you

24   can answer.

25       A.    I don't recall the exact number.

0000160

25

1       Q.   (BY MS. MOORE)   Okay.  Did those people that you

2   hired, the number of people that were hired, were there

3   some that had absolutely no tire-building experience?

4       A.   I believe they -- I don't know, I didn't review

5   their job applications.

6       Q.   Applications.

7       A.   So I don't know whether they did or didn't,

8   factually.

9       Q.   Okay.  Well -- and the basic question I'm just

10  trying to get at is, were you involved in any of the

11  training?  Did you oversee any training that in order for

12  these employees to operate the machines because, you

13  know, they didn't go in there and just turn it on and

14  start operating, they had to have some type of training.

15  I'm wondering what, you know, does that -- weeks -- does

16  that -- what does that consist of?

17            MR. HERNANDEZ:  Objection to form.  You can

18  answer.

19            MS. MOORE:  I know it was kind of really --

20            MR. HERNANDEZ:  Which question?

21            MS. MOORE:  -- overbroad.

22            MR. CISNEROS:  Talk about compounded,

23  doubly compounded.

24            MS. MOORE:  Triple-compound question.

25            MR. HERNANDEZ:  Triple-compound question.

0000161

26

1    Can you rephrase it?

2            MS. MOORE:  Yeah.

3       Q.   (BY MS. MOORE)  I just want to know what the

4    training might have consisted of when you were operations

5    manager.

6       A.   When I was operations manager?

7       Q.   Right.

8       A.   When I was operations manager, I had 40-hour

9    OSHA training required for all employees.

10      Q.   Okay.

11      A.   Approved by the State of Texas.

12      Q.   And what is OSHA; is that safety training?

13      A.   Occupational Safety, Health and --

14           MR. HERNANDEZ:  -- Administration.

15      A.   Yeah, Administration.

16      Q.   (BY MS. MOORE)  Okay.  Not as far as safety, but

17   as far as training?

18      A.   Then I had hydraulics training, and I had some

19   other technical training.  It was approximately

20   two-week training cycles before they went out on the

21   floor.

22      Q.   Okay.  That's what I'm asking.  And do you know,

23   did Minnie receive this training?  Do you know if she

24   did?

25      A.   I don't recall.

27

Q.   Were you her supervisor at any point?

MR. HERNANDEZ:  Objection; form.  If you can answer.

A.   Yes, as I recall.

MR. HERNANDEZ:  Direct?

THE WITNESS:  Yes.

Q.   (BY MS. MOORE)  Okay.  What supervisor?  Were you her direct supervisor?

A.   As I recall, yes.

Q.   Okay.  And what --

A.   Let me ask you a question, because I want to understand the question you're asking me.

MR. CISNEROS:  I'm objecting to that because of form.

THE WITNESS:  Okay.

Q.   (BY MS. MOORE)  Now, I understand that Minnie was employed there for a different period of time.  Why don't you tell me when you were her supervisor, you know. When did you first become your supervisor, and what type of supervisor were you at the time?

MR. CISNEROS:  Objection to form.  You can go ahead and answer, if you can.

MR. HERNANDEZ:  Both questions.

(Ms. Eileen Leeds enters conference room.)

A.   Okay.  Let me try to explain this as best I can

28

1   for you.  When she was in production, I was her

2   supervisor.  When she was a supervisor, I was her

3   supervisor for a period of time.

4       Q.   (BY MS. MOORE)  Okay.

5       A.   Those exact dates, I do not recall, ma'am.

6       Q.   Okay.  And that's what I'm trying to figure out.

7   When she was in production, you were her supervisor.  At

8   some point was she promoted to supervisor?  You just

9   talked about her being a supervisor.

10      A.   Yes.

11      Q.   Do you remember when that was?

12      A.   No, ma'am, I do not.

13      Q.   Do you remember who made the decision to promote

14  her?

15      A.   No, ma'am, I do not.

16      Q.   What was she promoted to, what position?

17      A.   Supervisor.

18      Q.   Supervisor of what?

19      A.   Tire room supervisor, I believe.

20      Q.   As tire room supervisor, what was -- what were

21  her duties?

22      A.   To supervise employees.

23      Q.   What type of things was she expected to do?

24  Just explain what "supervise employees" means?

25      A.   I don't have a job description in front of me,

0000164

29

1   otherwise I would read it to you.

2       Q.   Well, you were her supervisor.

3       A.   Can I ask you a question?

4       Q.   What did you expect her to do?

5            MS. MOORE:   Objection; nonresponsive.

6       Q.   What did you expect her to do as --

7       A.   Supervise employees.

8       Q.   And what does that consist of?  Did you -- did

9   they have to time the tire builders, were they required

10  to meet certain production quota, were they required to

11  make sure everybody as safe?  That's the question I'm

12  asking.

13           MR. CISNEROS:   Objection to form.

14      A.   Let me answer the last question.  What was the

15  last question?

16      Q.   (BY MS. MOORE)  The question was, what were they

17  required to do as a supervisor?  What were her duties as

18  a supervisor?

19           MR. CISNEROS:   Objection to form.

20      A.   Supervise employees.

21      Q.   (BY MS. MOORE)  Right, and I gave you a list of

22  examples of things that she might be able to be in charge

23  of.  What did you expect, as a supervisor, of her to be

24  in charge of?

25           MR. CISNEROS:   Same objection.

0000165

30

1    A.    Supervise employees.

2    Q.    (BY MS. MOORE)  Did you expect her to make sure

3    everybody was safe?

4    A.    To the best of her ability.

5    Q.    Did you expect her to make sure she met a

6    certain production quota, her goal, her employees met

7    them every day?

8            MR. CISNEROS:  Objection to form.

9    A.    We had production goals.

10    Q.    (BY MS. MOORE)  Okay.  Were there other things

11    other than that that you expected of her as supervisor?

12    A.    Supervise employees.

13    Q.    Okay.  And is that your answer, just to

14    supervise employees?

15    A.    Uh-huh.

16            THE REPORTER:  "Yes" or "no," please.

17    Q.    (BY MS. MOORE)  Did she receive any training to

18    be a supervisor?

19            MR. HERNANDEZ:  Let me just object.  Was

20    there an answer to the last question?

21            THE REPORTER:  No, sir, the response was

22    "Uh-huh."

23            MR. HERNANDEZ:  Okay.  Could you just

24    clarify that answer?  Did you state --

25            MS. LEEDS:  Are you making an appearance in

1    this case?

2              MR. HERNANDEZ:  I'm his personal counsel.

3              MS. LEEDS:  I know, but are you making an

4    appearance in this case because otherwise your objections

5    are not valid in this case?

6              MR. HERNANDEZ:  Am I co-counsel with you on

7    this case, Mr. Cisneros?  Yeah, I made an appearance.

8              THE WITNESS:  Who is she?

9              MR. HERNANDEZ:  She's a supervisor, Eileen

10   Leeds, and that's Ms. Moore, they're the attorneys that

11   represent Titan.

12             But I just wanted to clarify the answer because

13   it was "uh-huh" or "huh-uh," and I didn't know if the

14   "uh-huh" was a "yes" or the "uh-huh" was a "no."  And the

15   court reporter mentioned there was no audible response

16   that she could tell, either.  So rather than have to take

17   the deposition over again to get the response, I just

18   wanted to clarify what was the answer.

19             MS. LEEDS:  I understand, I just want to

20   clarify that you made an appearance.

21             MR. HERNANDEZ:  I made an appearance.

22        Q.   (BY MS. MOORE)  Now, when she was promoted to

23   supervisor of the tire room --

24             MR. HERNANDEZ:  Can we go off the record,

25   we still don't have an answer to that question.

0000167

32

1          MS. LEEDS:  Well, I believe the court

2   reporter verified what the witness said, it was "yes,"

3   right?

4          THE REPORTER:  The response was "Uh-huh."

5   Q.   (BY MS. MOORE)  Okay, can you --

6          (The Reporter reads back requested portion

7   of testimony.)

8   A.   Yes, ma'am.

9   Q.   (BY MS. MOORE)  Now, were you ever a tire room

10  supervisor?

11  A.   Yes, ma'am.

12  Q.   And as supervisor of the tire room, what was it

13  that you did?  What were your duties as supervisor?

14  A.   Supervise employees.

15  Q.   Okay.  And specifically what are some things you

16  did to make sure production got out, to make sure that

17  your employees were safe?  What are some specific things?

18  I'm asking for specific duties as a supervisor that you

19  did.

20         MR. CISNEROS:  Objection; form.

21  A.   I coordinated and communicated.

22  Q.   (BY MS. MOORE)  And what did you coordinate and

23  communicate to the employees?

24  A.   Coordinate the flow of material.  Communicated

25  the flow of material.  I coordinated and communicated

33

1    with Maintenance.  I coordinated and communicated

2    information.

3        Q.   And are those things that Minnie was expected to

4    do as supervisor?

5        A.   Yes, ma'am.

6        Q.   And did she receive any training before she

7    became a supervisor?

8              MR. HERNANDEZ:  Objection to form.  You can

9    answer.

10       A.   Did Minnie receive any training?  Yes, ma'am.

11       Q.   (BY MS. MOORE)  What type of training did she

12   receive?

13       A.   I don't recall.

14       Q.   Do you know who trained her?

15       A.   I don't know specifically who trained her --

16       Q.   Did you train her --

17       A.   -- in her career, but I have shown her how do to

18   some things.

19       Q.   What are some --

20       A.   Would that be training?

21       Q.   What are some things you showed her how to do?

22       A.   I trained her how to communicate and coordinate.

23       Q.   The things you discussed earlier?

24       A.   Uh-huh.

25       Q.   The things you listed earlier?

0000169

34

1       A.   Yes, ma'am.

2       Q.   Okay.  And at what point did you show her those

3  things?  Was it at the time she was a tire builder, was

4  it before she became a supervisor?

5       A.   I don't recall the exact time.

6       Q.   Okay.  Was it while she was a supervisor?

7       A.   I don't recall the exact time.

8       Q.   Did you ever have an opportunity to train any

9  other tire room supervisors?

10      A.   Yes.

11      Q.   And who did -- do you remember -- recall the

12 names of those employees?

13      A.   I don't recall the names of all the employees,

14 no, ma'am.

15      Q.   Do you recall some of them?  Who do you recall?

16      A.   I recall Guadalupe Salinas.

17      Q.   Anybody else?

18      A.   No, ma'am, I don't recall.

19      Q.   Okay.  And when you trained Guadalupe Salinas,

20 did you -- what did you do?  How long was the training,

21 for one?

22      A.   I trained him to communicate and coordinate.

23      Q.   Okay.  And how long was that training?

24      A.   I don't recall.

25      Q.   Did that training -- was it more than a week?

35

A.   I don't recall.

Q.   You don't even know an estimate number?

A.   I'm not going to estimate.

Q.   Okay.  And you specifically trained him, but did you -- were you involved in any way in training Minnie?

A.   I don't understand your question.

Q.   It's two questions, I know.  Let me ask you this one:  Were you involved in any way in training Minnie to become a supervisor?

A.   I showed her some things, how to communicate and coordinate.

Q.   Okay.  Do you know how long she was a supervisor?

A.   I don't recall.

Q.   Do you remember what year she became a supervisor?

A.   Don't recall.

Q.   Now, when you were her direct supervisor, were you in charge of evaluating her job performance in any way?

A.   I don't recall.

Q.   You don't recall if you ever evaluated her?

A.   I don't recall if there was an evaluation during the time she was a supervisor.

Q.   Okay.  And as evaluation I'm not just talking

1  about written evaluation or a number system where you

2  give a point system, I'm talking about just the daily

3  evaluation of her. Were you ever required to do that?

4  It doesn't have to necessarily be written.

5      A.   I don't understand your question.

6      Q.   Did you ever evaluate her, her work performance,

7  as supervisor?

8      A.   I don't recall.

9      Q.   So, as a production --

10     A.   I can't answer your question. I still don't

11  understand your question.

12     Q.   As a production -- when you were her direct

13  supervisor, did you ever evaluate her performance?

14     A.   When I was her direct supervisor, did I ever

15  talk to her about her job performance?

16     Q.   Did you ever talk to her about it?

17     A.   Is that the question?

18     Q.   Well, that's a part of an evaluation, yes.

19     A.   Did I ever counsel Minnie about her job

20  performance, is that the question?

21     Q.   Did you ever evaluate her, and that can consist

22  of talking to her about what she's doing right, what

23  she's doing wrong, what she can do better? Did you ever

24  do any of that with Minnie?

25     A.   Yes, ma'am.

37

1    Q.  And as far as evaluations, do you know what an

2  evaluation is?

3    A.  I don't know what you mean by an "evaluation."

4    Q.  Okay.

5    A.  Because I didn't understand your first question.

6  You asked me if I ever talked to her, and of course I've

7  talked to her.  Now you ask me if I understand what an

8  evaluation is.  Why don't you give me your definition of

9  an evaluation and I can answer your question?

10    Q.  Okay.  That's going to include, you know, either

11  talking to her, and you went over that, whether she could

12  do something better, whether she could do -- was she

13  doing anything wrong, was she doing things right.  Did

14  you ever have conversations with her like that?

15    A.  Did I ever have a conversation with a supervisor

16  on how they were doing their jobs?

17    Q.  That's correct.

18    A.  Yes, ma'am, that I did.

19    Q.  Specifically with Minnie, did you have those

20  conversations?

21    A.  Have I had conversations with Minnie about her

22  job performance while she was a supervisor, is that the

23  question?

24    Q.  That's the question.

25    A.  Yes, ma'am.

0000173

38

Q.   Okay.  And what were those conversations; can you recall one?

A.   I don't recall every detail, ma'am.

Q.   Okay.  Well, were there -- was there any instance when you had to meet with her for something she did right or something she did wrong?

MR. CISNEROS:   Objection to form.

A.   I don't recall specifically.

Q.   (BY MS. MOORE)  Did you ever give her a written evaluation?

A.   I don't recall.

Q.   Did you ever talk to the operations manager at the time, about her job performance?

A.   At what time?

Q.   When she was a supervisor.

A.   Which operations manager?

Q.   When Chuck Smith was there, did you ever talk to him about her job performance?

A.   I don't recall.

Q.   When Russell Ash was there, do you remember talking to him about her job performance?

A.   I don't recall specifically.

Q.   Okay.  Do you remember how long you were her direct supervisor?

A.   I don't recall specifically.

000017

39

1    Q.    Were you her direct supervisor throughout the

2    entire time she was a tire room supervisor?

3    A.    No, sir -- no, ma'am.

4    Q.    Okay.  When did you become her direct

5    supervisor?

6    A.    I don't recall specifically.

7    Q.    Was she already a supervisor?

8    A.    I don't recall specifically.

9    Q.    As far as her performance as a supervisor,

10   did -- do you remember if she was -- Minnie met her

11   production goals?

12         Well, let me ask you this.  Let me strike that.

13   Let me ask you this:  Were there production goals that a

14   supervisor -- they were required to meet?

15   A.    Yes, ma'am.

16   Q.    Do you remember what those production goals were

17   when she was a supervisor?

18   A.    No, ma'am, I don't specifically recall.

19   Q.    Do you remember -- well, let me ask you this:

20   Do you know -- and, I mean, there might be -- you know,

21   maybe not on a given day might not be 70 percent, but

22   what was the average production goal that the supervisors

23   were required to meet --

24         MR. CISNEROS:  Objection to form.

25   Q.    (BY MS. MOORE)  -- while she was a supervisor?

0000175

40

1    A.   I don't specifically recall.

2    Q.   You don't remember.  Okay.  And do you remember

3  if Minnie met the --

4    A.   No, ma'am, you said I don't remember.  I said I

5  specifically don't recall.

6    Q.   Okay.  You don't recall.  Do you remember if she

7  met the production goals?

8    A.   I don't specifically recall.

9    Q.   Do you remember having any conversations with

10  her about her not being able to meet these goals?

11    A.   I don't specifically recall.

12    Q.   Do you know who set these production goals, who

13  decided what the production goal was going to be?

14    A.   During the production, Titan Tire factory had

15  multiple operations managers and had multiple guidance.

16  Specifically, I don't remember the specific numbers when

17  and where.

18    Q.   Okay.  But it's the operations manager that sets

19  that; is that what you're saying?

20    A.   Not necessarily.

21    Q.   Okay.  Who else could set the production goals,

22  aside from the operations manager?

23    A.   That's standards that came from corporate and

24  from Mr. Campbell and from the other facilities that had

25  like-type machinery and equipment and were established

0000176

41

1   norms that were given as guidance.

2       Q.   And --

3       A.   Then -- yes, ma'am.  So, specifically, I don't

4   recall.

5       Q.   Was there a production goal that the supervisors

6   had to meet daily, their production every day?

7       A.   There were goals that people in production are

8   to meet.  Do I specifically call those numbers, no,

9   ma'am.

10      Q.   Now, are there any instances that you can recall

11  where you evaluated her performance and you talked with

12  Minnie about her job performance?

13           MR. CISNEROS:  Objection to form.

14      A.   I thought I already answered that question.

15      Q.   (BY MS. MOORE)  Okay.  I don't remember your

16  answer, can you answer that for me again?

17           MR. CISNEROS:  Let me just interject.  If

18  Counsel has perhaps some documents in connection with

19  Steve evaluating Ms. Montelongo that you would like to

20  show him so that he can refresh his recollection, and

21  then maybe he can more truthfully and accurately tell --

22           MS. MOORE:  Right, well --

23           MR. CISNEROS:  -- more accurately or

24  whatever to get you the answers that you need instead of

25  just having him try to guess, you know.

42

1          MS. MOORE:  Well, he was, I mean, her

2   supervisor for a length -- period of time.  He's here to

3   testify about this lawsuit, so -- if he can't remember

4   half of this stuff, then how's he going to remember what

5   we're here to talk about today.

6          So I'm just wanting to know -- I mean, I'm not

7   asking him if he has a written document he gave, I just

8   want to know if there was any incident that he talked to

9   her --

10         MR. CISNEROS:  But if you have any

11  documents, I mean, you could help him refresh his

12  recollection.

13         MS. MOORE:  I'm not showing him any -- I

14  don't have any documents where he made a written

15  evaluation or not; I would have shown them to him

16  already.

17         MR. CISNEROS:  Okay.  I'm just --

18         MS. MOORE:  Right.  I understand.  I'm just

19  saying, you know, we don't have any where he said Minnie

20  did this, Minnie did that, you know.

21         MR. CISNEROS:  Okay.

22         MS. MOORE:  I'm just saying, you know, is

23  there any instances when he sat down and talked to her,

24  "Minnie, you're doing a good job," "Minnie, production is

25  bad," "Minnie, you're doing this wrong."  I mean, I'm

0000178

43

1   wondering if he remembers any of that, That's my

2   question.

3        Q.   (BY MS. MOORE)   Do you recall any instances

4   where you had a conversa- -- when you talked to Minnie

5   about her job performance?   Was that -- let me ask you

6   this:   Was that part of your duties as --

7        A.   Yes, ma'am.

8        Q.   -- being her direct supervisor?

9        A.   Yes, ma'am.

10       Q.   Okay.   And do you recall any instance where you

11   talked to Minnie about her job performance?

12       A.   I remember talking to her about her job

13   performance, yes, ma'am.

14       Q.   Okay.   What do you remember talking to her

15   about?

16       A.   Specifically, I don't specifically remember.

17   That was a -- when -- I'm not sure I can answer your

18   question you asked with specific --

19       Q.   It's a simple --

20       A.   I asked -- did I counsel my supervisor?   Yes,

21   ma'am, I did.

22       Q.   You did.   Okay.   And do you remember -- okay.

23   what can you say about her job performance?   Do you

24   remember her job performance?

25       A.   What I remember from Minnie's job performance

was that she performed very well, she was very conscientious.

Q. Okay. Well, let's talk about that, then. As "performed very well," did she -- there were these production goals. Do you remember her meeting these production goals?

A. Generally, yes.

Q. "Generally," what does that mean? is that most of the time? Can you give me --

A. Most of the time, yes.

Q. -- a percentage, like --

A. No, ma'am. I can tell you most of the time.

Q. Okay. So, most of the time she met these goals?

A. Yes.

Q. Were there times she didn't meet the goals?

MR. CISNEROS: Objection to form.

Q. (BY MS. MOORE) Yes, no?

A. Rephrase the question.

Q. Were there any times that she did not meet production goals?

A. I don't specifically recall.

Q. Do you ever remember having to talk to her about not meeting a production goal?

A. I counseled my supervisors when they needed it, and I listened to them when they had questions --

45

1      Q.   Okay.

2      A.   -- and they had issues.

3      Q.   Specifically with Minnie, do you remember having

4  to talk to her about not meeting production goals?

5      A.   I don't recall specific instances or dates, but

6  I'm sure that in production you don't meet it 100 percent

7  of the time.  So I'm sure that I had conversation with

8  her about production goals.

9      Q.   Okay.

10     A.   Does that answer your question?

11     Q.   Okay.  When Chuck Smith was there, did he ever

12 talk to you about Minnie not meeting her production

13 goals?

14     A.   Did Chuck Smith ever talk to me about Minnie not

15 meeting her production goals?

16     Q.   Right.

17     A.   No, ma'am.

18     Q.   Okay.  When Russell Ash was operations manager,

19 did you ever have any conversations with Russell Ash that

20 concerned that Minnie might not -- or was not meeting her

21 production goals?

22     A.   I may have.

23     Q.   And do you remember what that conversation was?

24     A.   Do I remember the conversation --

25     Q.   What did Russell tell you --

0000181

46

1    A.    -- Mr. Ash and I had about Minnie?

2    Q.    Right.

3    A.    Reference to her --

4    Q.    To her production.

5    A.    -- production goals?

6    Q.    To her production, her not meeting production

7    goals, do you remember any conversation you had with

8    Russell?

9    A.    I remember he had a concern at one time about

10   her not meeting production goals.

11   Q.    What was his concern?

12   A.    That she was not meeting production goals.

13   Q.    Okay.  What did Russell tell you?  Did he tell

14   you, "I've talked to Minnie about not meeting it"?  Did

15   he tell you to reprimand her, write her up?  What did he

16   tell you to do about it?

17           MR. CISNEROS:  Objection to form.

18   A.    (No verbal response.)

19   Q.    (BY MS. MOORE)  Well?

20   A.    Specifically, I believe he was not pleased with

21   her performance, production.  At which time that he was

22   not specifically pleased with her production, he said I

23   was no longer her supervisor and that he would take

24   direct control of her performance and her instruction and

25   her guidance.

0000182

47

1      Q.    And when was that?

2      A.    That was -- specific date, I don't recall the

3   specific date.

4      Q.    Well, do you remember when Russell took over as

5   operations manager?

6      A.    Not specifically.

7      Q.    Okay.  Do you remember when Minnie resigned?

8      A.    I don't know whether she resigned or not.

9      Q.    Okay.  You don't know if she resigned?

10     A.    I wasn't working there then.

11     Q.    Do you remember if it was several months after

12  Russell Ash became operations manager, was it a year

13  after he became operations manager; do you remember?

14              MR. CISNEROS:  Objection to form.

15     A.    I don't specifically remember the question you

16  asked me.

17     Q.    (BY MS. MOORE)  What about generally?  Do you

18  remember -- without being specific, I'm not -- I

19  understand you don't recall specific dates.

20     A.    Generally, I believe Mr. Ash was there for a

21  year, and, generally speaking, I believe at the end of

22  that year Minnie was no longer employed at Titan.

23     Q.    Okay.

24     A.    Does that answer your question?

25     Q.    Okay.  At the end of that year, okay.  Well,

0000163

48

1    when was it that Russell Ash talked to you about Minnie

2    not meeting her production goals? Was it, generally

3    speaking, three months before she was no longer employed,

4    was it six months, was it at the beginning of when

5    Russell came to Brownsville?

6                MR. CISNEROS: I'm going to object to the

7    form.  I believe the witness has already answered that.

8    He says he doesn't remember, but if you want to --

9                MS. MOORE:  He answered he didn't

10   specifically remember.  I'm asking him for a general time

11   frame.

12               MR. CISNEROS:  If you could give him some

13   guidance and tell him when Mr. Russell started working

14   for Titan, then --

15               MS. MOORE:  He started --

16               MR. CISNEROS:  -- he can remember what year

17   it was that he started working for Titan.

18      Q.    (BY MS. MOORE)  Okay.  In July 2001, that's when

19   Russell started.  Now, July 2000, he started.  Okay.

20   Now, working with that date, can you give me a general,

21   rough estimate as to when it was that he had this

22   conversation with you about Minnie's production?

23      A.    It would have been the last -- did you say that

24   Russell was there about a year?  Is that true?

25      Q.    You said that he was there about a year.

0000184

49

1    A.  Yeah.  Is that what you said?

2    Q.  I'm asking you --

3    A.  I recall --

4    Q.  -- to remember.

5    A.  I don't specifically recall the exact dates.

6  What I'm telling you is the last six months he was here,

7  sometime in the last six months, I don't recall the

8  specific date we had the conversation, yes, ma'am.

9    Q.  Was it the last six months before Minnie

10 resigned?

11        MR. CISNEROS:  Are you --

12    Q.  (BY MS. MOORE)  Or you said you don't know --

13    A.  I don't know that she resigned --

14    Q.  -- that she resigned.

15    A.  -- or what happened.

16    Q.  Okay.  Before she left the plant, when she was

17 no longer working at the plant, was it within those last

18 six months?

19    A.  Sometime --

20        MR. CISNEROS:  Objection to form.

21    Q.  (BY MS. MOORE)  Sometime during the last --

22 those six months?

23    A.  Uh-huh.

24    Q.  Okay.

25        THE REPORTER:  "Yes" or "no," please.  The

1   response was "uh-huh."

2       A.   Yes.  I'm sorry.  I forgot my note, yes or no.

3       Q.   (BY MS. MOORE)  And at that point you testified

4   that Russell Ash took you and said you were not going to

5   be her direct supervisor anymore; is that correct?

6       A.   Yes, ma'am.

7       Q.   And do you know who became her direct

8   supervisor?

9       A.   Russell Ash.

10      Q.   Okay.  Did you at any point after that have

11  any opportunity to supervise her during those last

12  six months?

13      A.   Since I don't recall the specific date that this

14  transpired, did I supervise her within the last six

15  months, yes, ma'am, I did, because I don't recall the

16  specific date that Mr. Ash took that away from me.

17      Q.   Okay.  After Mr. Ash took the supervisor

18  position away from you, did you ever --

19      A.   No, ma'am, that's not the question.

20      Q.   -- supervise again?  That's what I'm asking you.

21  After --

22      A.   He didn't take the supervisor position away from

23  me; he changed the job description.

24      Q.   Well, after -- okay.  After you no longer

25  supervised Minnie --

51

1        A.    Yes, ma'am.

2        Q.    -- and Russell supervised her, did you have an

3    opportunity to supervise her after that?

4        A.    No.

5        Q.    Okay.  When you had this conversation with

6    Russell about Minnie not meeting her production goals,

7    did you -- had you immediate -- sometime before that,

8    generally speaking within the week or the month before

9    that, did you have any type of conversation with Minnie

10    about her not meeting her productions goals?

11                MR. CISNEROS:  Objection to form.

12        Q.    (BY MS. MOORE)  Did you ever have to talk to her

13    about meeting her production goals?

14        A.    Generally speaking, I consulted my supervisors

15    on a daily basis.

16        Q.    Do you remember speaking to Minnie?

17        A.    Specifically, I don't recall.  Generally

18    speaking, as a matter of fact doing business, I visited

19    with my supervisors on a daily basis.

20                MS. MOORE:  Okay.  Objection;

21    nonresponsive.

22        Q.    Did -- when you talked to Russell about this,

23    did you -- were -- did you agree with him about that

24    Minnie was not meeting her production goals?  Do you

25    remember if that was a problem?

52

1       A.   I can't answer your question because the way you

2   ask it.

3       Q.   Okay.  Well, earlier you test- --

4       A.   It makes no sense the way you asked it.

5            MS. MOORE:  Object to nonresponsiveness.

6            THE WITNESS:  Okay.

7       Q.   (BY MS. MOORE)  You testified that at some point

8   Minnie did have a problem meeting production.

9       A.   No, sir --

10           MR. CISNEROS:   Objection to form.

11      A.   -- I never said she had a problem.

12      Q.   (BY MS. MOORE)  Okay.  Well, you testified that

13  you did talk to her about -- at some point about meeting

14  production.  I'm wondering if it was at this point during

15  the time frame when Russell talked to you about it.

16  Did she have a problem, that you recall, meeting

17  production --

18           MR. CISNEROS:  Objection to form.

19      Q.   (BY MS. MOORE)  -- during that time frame?

20           MR. CISNEROS:  Objection to form.

21      A.   I met with my supervisors on a daily basis and

22  communicated and coordinated with them, gave them advice

23  and counsel.  I coordinated and communicated on a daily

24  basis.

25           MS. MOORE:  I'm going to object to

53

1   nonresponsiveness.

2       Q.   (BY MS. MOORE)  What kind of communication are

3   you talking about?  What did you communicate to them on a

4   daily basis?

5       A.   Material flow, priorities, maintenance,

6   absences, issues concerning production.  Guidance from

7   above.

8       Q.   Now, as to Minnie, do you remember any problems

9   that you addressed with her regarding any of those items

10  you just listed?

11      A.   I communicated on a daily basis, and coordinated

12  on a daily basis with my supervisors, all of them.

13              MS. MOORE:   I object to nonresponsive.

14      Q.   (BY MS. MOORE)  Do you remember having any

15  conversations with Minnie about not meeting those

16  requirements?

17              MR. CISNEROS:   I'm going to object to the

18  form of the question, and also that this has been asked

19  and answered.

20      A.   I coordinated --

21              MR. CISNEROS:   Do you have a document that

22  maybe you could show him that reflects that he was

23  communicating with Minnie about production goals that you

24  would like to show him so he can refresh his recollection

25  and maybe answer your question, try to answer your

0000189

54

1  question?  But, I mean, if you keep asking the same

2  question over and over again.

3              MS. MOORE:  Okay.  I'm going to object,

4  number one, that I'm going to ask you to object just to

5  form or asked and answered; and another, I'm going to

6  explain that he has not answered the question, he keeps

7  making generalizations as to everybody he supervised.

8  I'm asking toward Minnie, and I'd like him to answer that

9  question.

10             MR. CISNEROS:  And for the record, he has

11  answered the question about Minnie.

12             MS. MOORE:  No, we asked --

13             MR. CISNEROS:  You've asked it in different

14  ways, but he has answered it.

15             MS. MOORE:  No.  Okay.

16     Q.   (BY MS. MOORE)  I'm going to ask you again, as

17  to Minnie, did you -- have you -- you listed some things.

18  I asked you, what did you communicate to your, you know,

19  supervisors about, and you listed a number of things.

20  And I'm asking you as to what -- as to Minnie, do you

21  remember having conversations with Minnie about her not

22  performing those job duties, that she was not performing

23  either adequately, not meeting production, any of those

24  things you listed?

25             MR. CISNEROS:  Objection; form.

1       A.   I communicated on a daily basis with all of my

2   supervisors, including Minnie.  I communicated, I

3   coordinated and I counseled.

4       Q.   (BY MS. MOORE)  So is that -- are you saying

5   yes, that you did talk to her about not meeting

6   production goals?

7       A.   No, ma'am, I'm telling you that I talked to her

8   about work flow, I talked to her and communicated and

9   coordinated and counseled on a daily basis.

10      Q.   Do you remember any times that you had to talk

11  to her about not meeting production?

12               MR. CISNEROS:  Objection to form.

13      A.   I don't specifically recall on a daily basis.

14      Q.   (BY MS. MOORE)  Do you --

15      A.   What you -- you talk to your employees.  Like I

16  said, I communicate, I coordinate and counsel them on a

17  daily basis.

18               MS. MOORE:  I'm going to object to

19  nonresponsiveness.

20      Q.   (BY MS. MOORE)  As far as Minnie, did you have

21  ever -- do you recall any instances where you had to talk

22  to her about her not meeting her production?

23               MR. CISNEROS:  Objection; form, and asked

24  and answered.

25      A.   Again, I communicated, I coordinated and I

0000191

56

1    counseled my supervisors on a daily basis, whether they

2    met or didn't meet that standard.

3        Q.   (BY MS. MOORE)  As far as Minnie, when -- did

4    you -- how long ago was that?  Was that -- we're going to

5    say she -- her -- she was not there, at some point she

6    was -- you don't know why she left the plant but she was

7    no longer employed.  During those six months that you

8    talked about when Russell -- before that, did you have

9    any of those conversations with Minnie?

10                MR. CISNEROS:  Again, objection to form.

11       A.   On a daily basis, I communicated, I coordinated

12   and I counseled --

13       Q.   (BY MS. MOORE)  Okay.

14       A.   -- my employees and my supervisors.

15                MS. MOORE:  Okay.  I'm going to object to

16   nonresponsive.

17       A.   Does that answer your question?

18                MS. MOORE:  I'm going to object to

19   nonresponsiveness.

20       Q.   (BY MS. MOORE)  Now, are supervisors -- tire

21   room supervisors, are they required to prepare production

22   reports?

23       A.   Yes, ma'am.

24       Q.   What is a production report?

25       A.   It's a -- generally speaking, it's how many

57

1    tires are produced on their shift on which machines.

2         Q.   Does it list each employee that they supervise

3    and how many tires they built?

4         A.   Generally speaking.

5         Q.   Do you calculate some type of percentage?

6         A.   Generally speaking.

7         Q.   Are those filled out daily?

8         A.   Generally speaking, yes.

9         Q.   At the time Minnie was a supervisor, were those

10   filled out -- required to be filled out daily?

11        A.   Generally, yes.

12        Q.   Well, either they were required to be filled out

13   daily or they weren't.  Were there some days that you

14   didn't have to fill them out, or were they required to be

15   filled out daily?

16             MR. CISNEROS:  Objection to form.

17        A.   Production reports that you're referring to,

18   generally, had to be filled out daily.

19        Q.   (BY MS. MOORE)  And when are those filled out,

20   at the end of the shift?

21             MR. CISNEROS:  Objection to form.

22        A.   Generally speaking, yes.

23        Q.   (BY MS. MOORE)  What shift did Minnie supervise?

24        A.   As I recall, I believe it was the second shift,

25   depending on how you count shifts.                0000193

58

1          (Counsel sneezes.)

2          MR. CISNEROS: Bless you.

3          MR. ASH: Salud.

4     Q.   (BY MS. MOORE) What hours are those?

5          THE WITNESS: Salud.

6     A.   It would have been the afternoon shift, which is

7     about 3:00 to 11:00, depending on how they move the

8     hours, slid the hours, 8 to 12 hours.

9     Q.   (BY MS. MOORE)  What shift did you work?

10    A.   Generally speaking, I worked the day shift.

11    Q.   What hours, though?

12    A.   I used to get there about 5:30 in the morning

13    and I used to get home about 6:30, 7:00 at night.

14    Q.   As far as the production reports, are they

15    required to be filled out completely?

16    A.   It's all relative.  I don't understand your

17    question.

18    Q.   Well, if there's six employees, does each

19    employee have to be listed on the production reports?

20    A.   Employees that are building tires are supposed

21    to be reported on the production report, yes, ma'am.

22    Q.   And the number of tires, is that supposed to be

23    reported, as well?

24    A.   Yes, ma'am.

25    Q.   Okay.  What -- where do those production reports

000019

59

1    go?  Are they turned in to the operations manager, or who

2    are they -- are they turned in to the direct supervisor?

3         A.   No, ma'am.

4         Q.   Who were they turned in to?

5         A.   They were turned in to the operations manager.

6         Q.   As Minnie's direct supervisor, how would you

7    know whether or not she was meeting her production goal?

8         A.   I would see her production report.

9         Q.   And when would you see the -- are you talking

10   about the report, you saw the report?

11        A.   Uh-huh.

12        Q.   And when did you see these reports?

13        A.   Usually the next day.

14        Q.   Were there any type of meetings that the

15   supervisors had to attend regarding -- like a pre-shift

16   production meeting that they were required to attend?

17        A.   On a daily basis, I would counsel, communicate,

18   coordinate with my shift supervisors.

19        Q.   Every day you would talk to them, was this --

20   you counseled with them, was this before they started

21   their shift?

22        A.   Before and during, while I was there,

23   yes, ma'am.

24        Q.   Now, when --

25        A.   Or during and after.

60

1      Q.   When Russell was there, were there any

2   production meetings that he required supervisors to

3   attend?

4      A.   I'm sure there were.

5      Q.   Do you remember if there were?

6      A.   I don't specifically recall.

7      Q.   Did you attend any of these meetings?

8      A.   Yes, ma'am.  Yes, ma'am.

9      Q.   And who would attend these meetings?

10      A.   It depends on which meetings you're talking

11   about.  Are you talking about the meeting he had with

12   supervisors; no, I didn't always attend.  If you're

13   talking about he meeting that he had daily with

14   production meeting that he had with managers, yes,

15   I always attended.

16      Q.   Let's talk about production meetings.

17      A.   Yes, ma'am.

18      Q.   Were those -- how often were those?

19      A.   Every day.

20      Q.   Every day.  And who attended those?  Who was

21   required to attend those meetings?

22      A.   Operations managers, day shift supervisors,

23   day shift managers, scheduling department, maintenance,

24   engineering -- I may have left some out -- and I.

25      Q.   And when were these meetings held?

0000196

61

A. They were held daily at 9:00.

Q. Is that a.m., in the morning?

A. Yes, ma'am.

Q. Okay. Were --

A. 0900 hours.

Q. Were second-shift supervisors, like Minnie that came in at -- was it 3:00, was she required to attend these 9:00 o'clock a.m. meetings?

A. Not to my knowledge.

Q. Was she required to attend any meetings, like pre-shift meetings with --

A. I had a daily meeting with my shift supervisors where I coordinated, communicated and counseled, daily.

Q. What about with Russell?

A. I had a 9:00 o'clock production meeting.

Q. Okay. What about with Minnie? Was Minnie required to attend any meetings with Russell?

A. I have -- the operations manager can have a meeting with any employee he wants to practically any time he wants to, and he does not have to notify me when he's going to do that. Does that answer your question?

Q. (BY MS. MOORE) Do you know if Minnie was required to attend daily pre-shift meetings with Russell and whoever else that was on that shift?

A. I know Russell had meetings with second-shift

62

1  employees. Since he didn't inform me of those meetings,

2  I can't specifically recall what time and who attended.

3     Q.  Did you ever attend any of these meetings?

4     A.  No, ma'am.

5     Q.  Do you know who attended these meetings?

6     A.  No, ma'am.

7     Q.  Do you know if Minnie ever attended these

8  meetings?

9     A.  Sometimes, yes.

10     Q.  Did Minnie ever talk to you about what was

11  discussed at these meetings?

12     A.  No.

13     Q.  What type of employee were you, were you an

14  hourly employee or were you a salary employee?

15     A.  During which time frame?

16     Q.  When you were working at the Brownsville plant.

17     A.  Salary.

18     Q.  Were you required -- as a salaried employee were

19  you required to work a certain number of hours, or were

20  you required to work a certain time period?

21     A.  I was a salaried employee when Mr. Campbell and

22  Mr. Taylor talked to me about coming to Brownsville and

23  asked me to do whatever I needed to on a daily basis to

24  get the job done.

25     Q.  Do you remember what your salary was?

0000193

63

1    A.    Uh-huh.

2    Q.    What was it?

3         THE WITNESS:   Do I have to answer that?

4    I'm not trying to be an asshole, it's just I don't think

5    it's any of your business.

6         MS. MOORE:   I'm asking the questions.

7         MR. CISNEROS:   Go ahead and you can answer

8    that.

9    A.    Okay.  During -- I had gotten a couple of

10   raises.  So then, when I -- the last year I worked there

11   I was making $75,000 a year.

12   Q.    (BY MS. MOORE)  Okay.  Now, were you -- where

13   were you being paid from?  Who?

14   A.    Who paid me?

15   Q.    Right.  Was it -- was it the Brownsville plant

16   or was it -- or were you still being paid from

17   Des Moines, Iowa?

18   A.    No, ma'am, I was getting my check from Quincy,

19   Illinois.

20   Q.    Quincy, Illinois.

21   A.    I got paid from Iowa; I got paid from Quincy,

22   Illinois; I never received a check from Brownsville.

23   Q.    Now, at some point, a gentleman by the name of

24   Guadalupe Salinas was -- do you know if he was ever made

25   a tire room supervisor?

0000193

64

1    A.    Yes, ma'am.

2    Q.    Do you remember when that was?

3    A.    Not specifically.

4    Q.    Generally, do you remember when it was in

5    reference to when Minnie left the plant?

6    A.    No.

7    Q.    Do you remember if it was during that month but

8    prior to, two months, or had he been made a supervisor

9    for six months?   Do you remember --

10    A.    The specific date, I don't recall, but I know he

11    was a supervisor.

12    Q.    Okay.

13    A.    Okay.

14    Q.    Well, I'm not asking specifically.  We know

15    that --

16    A.    I would say within the last six months,

17    six months to a year.  I don't recall exactly.

18    Q.    Okay.  Do you know if he was required to attend

19    these production meetings?

20    A.    I don't know who attended those meetings; he may

21    or may not have.

22    Q.    Did he ever talk to you about anything that was

23    discussed at the meetings?

24    A.    No, I don't recall specifically.

25    Q.    As far as -- was one of the requirements to time

65

1    the tire builders?

2    A.   Was one of the requirements for?

3    Q.   Of the tire room supervisor -- sorry -- to time

4    the tire builders?  Did Minnie have to do that?

5              MR. CISNEROS:  Objection; form.

6    A.   I believe that was introduced.

7    Q.   (BY MS. MOORE)  Do you remember when that was

8    introduced?

9    A.   No, ma'am, not specifically.

10   Q.   Do you remember, generally, whether it was

11   before Russell came on board?

12   A.   Generally, during Russell's tenure.

13   Q.   Was it at the beginning when he --

14   A.   Don't recall.

15   Q.   Within the last six months --

16   A.   Don't recall.

17   Q.   -- of Minnie's employment?

18   A.   Ma'am --

19   Q.   I'm going to ask you to wait until I --

20   A.   Yes, ma'am.

21   Q.   -- finish my question.  What is it exactly --

22   what was -- what did that mean, timing tire builders?

23   What did they -- what did the supervisor have to do?

24             MR. CISNEROS:  Objection; form.  Are you

25   asking him what does that mean or what does the

000020l

66

1   supervisor have to do?

2          MS. MOORE:  I'm sorry.

3          MR. CISNEROS:  Are you asking him what is

4   timing means, or are you asking him what does that

5   involve as far as the supervisor is concerned?

6          MS. MOORE:  I'm asking him what is that

7   they actually do.

8          MR. CISNEROS:  Okay.

9      Q.   (BY MS. MOORE)  What is it actually that a

10  supervisor does when they time tires?

11     A.   It took you five seconds to answer the question,

12  it takes you ten seconds to build a tire.  I start it

13  when you start building a tire, I stop it when you're

14  done.  Does that answer your question?

15         MS. MOORE:  I'm going to object to

16  nonresponsiveness.

17     Q.   (BY MS. MOORE)  I'm going to ask you just to

18  answer questions.

19     A.   Okay.

20     Q.   So, I'm just going to say -- I mean, ask you,

21  this is my understanding of it.  It's just basically

22  timing how long it takes for them to start building a

23  tire to the time it takes to stop building a tire, when

24  they're finished?

25     A.   Yes, ma'am.

0000202

67

1      Q.   Is that correct?  Okay.  Now, do you know if

2    this was required to be done daily?

3      A.   I believe that it was.

4      Q.   And was there some form, or where would they

5    record this?

6      A.   It's on a locally prepared form.

7      Q.   Were all the supervisors required to time the

8    builders?

9      A.   I believe they were.  I'm not sure because at

10   that particular time Mr. Ash was giving close-up and

11   personal direction to supervisors, and I am not privy to

12   that information.

13     Q.   Before -- when you were Minnie's direct

14   supervisor, was she required to time builders?

15     A.   I think she was, as I recall.

16     Q.   Do you recall if she did this daily?

17     A.   I believe she did.

18     Q.   Do you know why it's important to time the tire

19   builders?

20     A.   Because Mr. Ash said it was important.

21     Q.   Do you know why he thought it was important?

22     A.   I didn't ask Mr. Ash why he thought it was

23   important.

24     Q.   Do you have any idea why it would be important

25   to time the tire builders?

0000203

68

A.    I have my own opinion.

Q.    And what is your opinion?

A.    I do not know why Mr. Ash wanted the tire
builders timed.

Q.    What is your opinion?

A.    I generally do what I'm told, follow orders.  He
wanted it done and I did it.

Q.    Right, but what is your opinion as to why it's
important to time tire builders?

A.    To see how quickly they can put a tire together.

Q.    And do you -- do you think that's an important
part of the supervisor's role?  Do you think that's
something they should do?

A.    I follow orders.  When I'm told to time the tire
builder, I time the tire builder.

                MS. MOORE:  I'm going to object to
nonresponsiveness.

Q.    (BY MS. MOORE)  You testified that you were a
supervisor at the Brownsville plant, you even were the
operations manager.

A.    Uh-huh.

Q.    And I'm asking you, in your opinion, did you
think that was important, and why did you think that was
important?

                MR. CISNEROS:  Objection to form.

0000204

69

```
 1        A.   I do not know why Mr. Ash thought that was
 2   important.  I do not know why Mr. Ash wanted that done.
 3   All I know is what he said to do it, and I did do it.
 4             MS. MOORE:   Object to nonresponsiveness.
 5        Q.   (BY MS. MOORE)   I'm going to ask you, as a
 6   supervisor with years of experience working in tire
 7   plants, you said you've worked for tire plants for 26
 8   years.  In that time period, I'm asking you based on that
 9   experience that you have, do you think it was important
10   that the supervisors timed the tire builders?
11        A.   Do I think it was important?
12        Q.   Do you think it was important?
13        A.   I did what I was told to do, and if Mr. Ash told
14   me to time the tire builders, I timed the tire builders.
15   Do I think -- do I -- I have no idea why Mr. Ash wanted
16   that done.
17             MS. MOORE:   I'm going to object to
18   nonresponsiveness.
19        Q.   (BY MS. MOORE)   I'm going to ask you, in your
20   opinion, --
21        A.   In my opinion.
22        Q.   -- do you think it was something important that
23   needed to be done?
24        A.   In my opinion, if my supervisor told me to do
25   something, it was important and needed to be done.
```

0000205

1          MS. MOORE:  I'm going to object to

2  nonresponsiveness.

3      A.   That's my opinion.

4      Q.   (BY MS. MOORE)  But as far as whether this was a

5  good idea, this was something we should do to increase

6  productivity, do you think that was important to know how

7  long it takes an employee to build a tire?

8      A.   Do I think it's important to know how long an

9  employee takes to build a tire?  Yes.

10     Q.   My question, do you think it's important to

11 time, to have a process where you time them daily?

12     A.   Do I think it's important for --

13     Q.   Do you think it's important that supervisors --

14     A.   No, ma'am.  Do I think it's important to be able

15 to time the tire builders to see how they build tires?

16 Yes.  If that's the question, yes.

17     Q.   Okay.  And why do you think it is important to

18 time the tire builders to see how long it takes for them

19 to build a tire?

20     A.   Because my boss told me to do it, so I did it.

21          MS. MOORE:  I'm going to object to

22 nonresponsiveness.

23     Q.   (BY MS. MOORE)  Why do you think -- in your

24 opinion and based on your 26 years of experience working

25 in a tire plant, being a supervisor and even an

G000266

71

1    operations manager, why did you think -- or why do you

2    think that is important?

3                    MR. CISNEROS:  Objection to form; asked and

4    answered.

5        A.   I think it's important to know how fast your

6    tire builder can assemble a tire so you can make a plan

7    to meet production goals, in my opinion.

8        Q.   (BY MS. MOORE)  And that's all I'm asking is

9    your opinion.

10       A.   Okay.  Excuse me.

11       Q.   Now, in your opinion -- and I'm not talking

12   about --

13                   THE WITNESS:  Excuse me.  May I have

14   some -- may I have some water?

15       Q.   (BY MS. MOORE)  In your opinion -- and I'm not

16   talking about anything Russell might have told you, any

17   direct orders anybody might have given you.  I'm asking

18   you in your opinion, based on your 26 years of experience

19   working at a tire plant, in your opinion, why is it

20   important to have production goals -- or do you think it

21   is important?  Let me ask you that first question.  Is it

22   important to have daily production goals?

23       A.   It's important to have daily production goals.

24       Q.   And why is that important?

25       A.   Why is it important to have production goals?

1   It's important to have production goals because you have

2   to have a way to measure performance.

3        Q.   What about -- in your opinion, what about

4   production meetings?  Is it important, in your opinion,

5   to have production meetings?

6        A.   Yes, ma'am.

7        Q.   Why, in your opinion, is it important --

8        A.   To communicate, coordinate and counsel.

9        Q.   In your opinion, should you have these meetings

10  on a daily basis?

11       A.   Do I think you should have these meetings?

12  In my opinion, yes.

13       Q.   In your opinion, of the tire room supervisors,

14  should they attend these meetings?

15       A.   In my opinion, you should communicate and

16  coordinate and counsel daily.

17       Q.   Are you saying that, in your opinion, all the

18  tire room supervisors should attend the production

19  meetings?

20       A.   In my opinion, all of my supervisors should be

21  communicated, coordinated and counseled on a daily basis

22  at their work.

23       Q.   Now let's talk about when Russell came to work

24  at the Brownsville plant.  We established that he started

25  working in Brownsville in July of 2000.  And do you

0000208

```
 1   recall when he came to work at the Brownsville plant?

 2        A.   The specific date, no.  Do I recall seeing him

 3   walk through the door?  Yes.  Excuse me.

 4        Q.   Do you remember if Minnie was already a

 5   supervisor when Russell came to the Brownsville plant?

 6        A.   I don't recall.

 7        Q.   And do you remember if she was promoted after he

 8   came?  Was Russell involved in promoting her; do you

 9   remember?

10        A.   I don't recall specifically.

11        Q.   Okay.  What was Russell's title when he came to

12   the Brownsville plant?

13        A.   I believe he was the operations manager.

14        Q.   Who was your direct supervisor in Brownsville?

15        A.   That's a tough one.  Can you restate the

16   question, please?

17        Q.   Who was your direct supervisor?

18             MR. CISNEROS:  I'm going to object to form/

19   Titan Tire or Titan International?

20             MS. MOORE:  In Brownsville.

21        A.   Let me --

22             MR. CISNEROS:  At what time?

23        Q.   (BY MS. MOORE)  Okay.  Well, during -- okay,

24   let's put it this way.  When Russell came to the

25   Brownsville plant, who did you report to in Brownsville?
```

0000209

74

```
 1        A.   Who did I report to in Brownsville?

 2        Q.   Right.

 3        A.   I reported to Mr. Ash.

 4        Q.   Did you have another supervisor that you had to

 5   report to?

 6                 MR. HERNANDEZ:   In Brownsville?

 7                 MS. MOORE:   Anywhere.

 8                 MR. CISNEROS:   At what time?

 9        Q.   (BY MS. MOORE)   When Russell came.

10        A.   I don't think so.   I'm not sure how --

11   because -- it's not that I'm trying to avoid your

12   question; I'm trying to answer your question as

13   completely as I can.   And I reported to the operations

14   manager at the facility.

15        Q.   Okay.

16        A.   When he gave me duties, I did what he asked me

17   to do.   When he asked me questions, I answered his

18   questions.

19        Q.   Okay.   Did you report to anybody else outside of

20   the Brownsville plant?

21        A.   I was to -- yeah.   During what time frame,

22   ma'am?

23        Q.   Okay.   When you were in -- let's start with when

24   you were in Brownsville, when you first were transferred

25   to Brownsville.
```

75

1      A.   Uh-huh.

2      Q.   Who did you report to?

3      A.   Mr. Taylor and Mr. Campbell and Mr. Carlson?

4      Q.   Okay.  At some point, you stopped having to

5  report to them?

6      A.   Officially, I was never told not to.

7      Q.   You still had to report to Mr. Taylor,

8  Mr. Campbell --

9      A.   I was told that when the operations manager came

10  there I was supposed to work for him.

11      Q.   Okay.

12      A.   Mr. Campbell told me to remember that him,

13  Smide and Taylor hired me and they were the only ones

14  that could tell me.  I worked for them.

15      Q.   Okay.  You worked for Bill Campbell,

16  Mr. Taylor --

17      A.   Mr. Taylor and Mr. Smide.

18           THE REPORTER:  I'm sorry, what's the last

19  name?

20           THE WITNESS:  Mike Smide.

21           THE REPORTER:  Thank you.  May I take a

22  brief moment off the record, please?

23           MS. MOORE:  Sure.

24           (Off the record at 11:05 a.m.)

25           (On the record at 11:20 a.m.)

000021

76

1        THE VIDEOGRAPHER: The time is 11:20, and

2   you're on the record.

3        Q.   (BY MS. MOORE)  Mr. Harrison, we're going to get

4   into some allegations that the Plaintiff in this case,

5   Minnie Montelongo, made against Russell.  And first I

6   want to ask you, have you talked -- when was the last

7   time you talked to Minnie?

8        A.   Years.  I haven't talked to Minnie for a long,

9   long, long time.

10       Q.   Okay.  After she was no longer employed at

11  Titan, did you talk to her?

12       A.   Yes.

13       Q.   Do you remember when that was, was it -- when

14  was it?

15       A.   It was in a lawyer's office, and they were

16  asking me if I recalled -- asking me something about

17  equipment.  And I seen her and I told her I hadn't seen

18  her in a long time and it was a pleasure to see her and

19  her husband, and that's pretty much it.

20       Q.   Have you talked to her about testifying in this

21  lawsuit?

22       A.   Lawsuit, no, ma'am.

23       Q.   Did she talk to you about that?

24       A.   No, ma'am.

25       Q.   Okay.  Now, Minnie has made some allegations

00000212

77

1   as -- do you know any allegations that she's made against

2   Russell?

3       A.   No.

4       Q.   Do you know -- did you ever talk to Minnie while

5   she was still employed at the plant, while Russell was

6   there, of any -- did she talk to you about any concerns

7   about Russell being inappropriate or making any comments

8   to her, anything that made her uncomfortable?

9       A.   Yes.

10          MR. HERNANDEZ:   Objection to form.

11      Q.   (BY MS. MOORE)   What did she talk to you about?

12  What is it that she told you?

13      A.   What is it that she told me about?

14      Q.   About Russell.

15      A.   About Mr. Ash?

16      Q.   Right.

17      A.   I was still her supervisor.

18      Q.   Okay.   When was that?

19      A.   Approximately the last six months of Mr. Ash's

20  tour, or his tenure --

21      Q.   Okay.   Would that -- okay, that's fine.   As far

22  as the last six months of Minnie's employment --

23      A.   I don't know when Minnie left.

24      Q.   Okay.

25      A.   So I don't -- can't say when her last six months

0000213

78

1    was --

2        Q.    Do you remember when Russell left?

3        A.    I don't remember when Russell left.

4        Q.    Okay.  Well, we're trying to get a time frame

5    here.  Usually --

6        A.    And I'm trying to tell you that it's a

7    six-month window, generally speaking, is what you asked

8    me earlier.

9        Q.    But you're saying since Russell left?  You said

10   Russell.

11       A.    I never said Russell left.

12       Q.    Okay.  Six months when?  Was it six months from

13   when he started?

14       A.    You told me that he worked there about a year,

15   and I said the last six months.

16       Q.    No, I never said that.

17       A.    I never said that.

18            MS. MOORE:  I'm sorry, I must object to

19   nonresponsiveness, and I never told you that.

20       Q.    (BY MS. MOORE)  I'm going to say I did tell you

21   that he started in July of 2000, what I told you.

22            Now, let's work with that date, July 2000.  When

23   was it that Minnie talked to you about concerns she had

24   with Russell?

25       A.    When I was her supervisor.

79

1      Q.   Okay.  And would that have been about three

2   months after he worked there, generally speaking, about

3   six months after he came to the plant?

4      A.   You got a calendar, can I look at a calendar?

5      Q.   We can get a calendar.

6      A.   I need a calendar.

7              MS. MOORE:  Can we go off the record?

8              THE VIDEOGRAPHER:  Off the record at 11:30.

9              (Off the record at 11:30 a.m.)

10             (On the record at 11:35 a.m.)

11             THE VIDEOGRAPHER:  The time is 11:35, and

12   we're on the record.

13     Q.   (BY MS. MOORE)  Okay.  So we're going to -- you

14   got a calendar --

15     A.   Uh-huh.

16     Q.   -- for the record, and you know the record does

17   not show the year 2000?

18     A.   Uh-huh.

19     Q.   Okay.  Does it show 2001?

20     A.   No, ma'am.

21     Q.   Okay.  Okay.  So we've established that Russell

22   started in July 2000; is that correct?

23     A.   You told me that, yes, ma'am.

24     Q.   Okay.  I'm going to tell you, I'm going to

25   represent to you --

0000215

80

1    A.   And I'm going to generally accept that you're

2    telling me the truth --

3    Q.   Okay.

4    A.   -- as you recall it.

5    Q.   Now, you had a conversation with Minnie about

6    her concerns with Russell?

7    A.   Yes.

8    Q.   When was that -- first of all, when was that

9    conversation?

10   A.   Generally speaking, it was the last six months

11   from the time you told me, which would put it in the

12   spring of 2001, as I recall.

13   Q.   Okay.   Spring of 2001?

14   A.   Yes, ma'am.

15   Q.   Do you remember if it would have been April or

16   May?

17   A.   No, ma'am.

18   Q.   Okay.   Did she ever talk to you any -- about any

19   concerns before that time about Russell, before spring

20   2001?

21   A.   I do not recall before.

22   Q.   Do you recall the first time she talked to you

23   about any concerns she had about Russell?

24   A.   Generally speaking, yes.

25   Q.   What is it that she told you?

00002i6

81

1    A.    The reason I recall the conversation was not the

2  date, it was because of the severity of the -- her

3  discussion.

4              MS. MOORE:   I'm going to object to

5  nonresponsiveness.

6    Q.    (BY MS. MOORE)  What is it that she told you?

7  Just answer the question.

8    A.    What did she tell me?  She told me, as I recall,

9  that Russell had asked her out, asked her to go for

10 drinks, asked her to go party with him, and she declined.

11 She felt that that was inappropriate and she was letting

12 me know, because at that particular time I was her

13 supervisor.

14   Q.    Okay.  Did she talk -- did she tell you she told

15 him anything?  What did she tell him in response to him

16 asking her out?

17   A.    I listened to what Minnie told me, and I just

18 told you what she told me.

19   Q.    Okay.

20   A.    Okay?

21   Q.    And that's all she told you?

22   A.    That's all I recall at this time, yes, ma'am.

23   Q.    Okay.  And what did you do about what she told

24 you?

25   A.    I thought about it because it was important, it

000021

82

1  would be important that I thought it be handled properly.

2      Q.   Okay.  And what --

3      A.   I didn't think that it was supposed to be

4  something that would be discussed.  So I went to

5  Joe Kolniak, who was the Human Resources manager, and

6  that would be his job to investigate.

7      Q.   Okay.  Joe Kolniak, you just testified, was the

8  Human Resources manager at the time?

9      A.   Yes, ma'am.

10     Q.   And when did you talk to him?

11     A.   Generally speaking, it was that week.  It wasn't

12 right then, because I had to think about it.  And then I

13 said, "I need to tell somebody because this could" -- I

14 needed to tell Human Resource manager, because that's his

15 job.

16     Q.   What did you tell Joe Kolniak?

17     A.   I told the Human Resource manager that Minnie

18 had conversation with me concerning Russell Ash and

19 inappropriate -- she thought that it might be

20 inappropriate and she wanted to let somebody know.  And

21 he said he would take care of it.  I needed -- Joe said

22 that he would take care of it, I need not bother myself

23 anymore.  And I thanked him and I left.

24     Q.   Okay.  In reporting such an instance, are there

25 any forms that need to be filled out?

83

1       A   Not at the time.

2           MR. HERNANDEZ:   Objection; form.

3       Q.   (BY MS. MOORE)   Okay.  At the time when you were

4   employed and Russell, was there -- and when this happened

5   when Minnie told you, were there -- there were no --

6   you're saying that there were no forms that needed to be

7   filled out?

8       A.   Not that I was aware of.  When I bring it to

9   the Human Resource manager, he would have to do an

10  investigation, and I assume that he had papers the he

11  needed to fill out.

12      Q.   Did you fill out any form?

13      A.   Did I fill out any forms?  No, ma'am.

14      Q.   Did you talk to Minnie after you talked to

15  Joe Kolniak?

16      A.   I told this -- as I recall, okay, I told her

17  that she needed to do the best of her ability at her job

18  and continue working.

19      Q.   Did you tell her that she needed to make a

20  personal report of any type?

21      A.   No, ma'am.

22      Q.   Okay.  How many times did Minnie talk to you

23  about this situation or any other concerns she had about

24  Russell?

25      A.   I don't recall.  I remember this one because I

00002.19

84

1    was -- it was -- I thought it was pretty severe, pretty

2    important conversation. I did not want to not talk to

3    the Human Resource manager so that he could resolve it.

4         Q.   So, as far as you know, what Minnie told you,

5    she only had one complaint, only this one instance?

6         A.   I don't know how many complaints she had.

7         Q.   To you, to you?  Did she only have this one

8    complaint to you?

9         A.   No.

10        Q.   No?

11        A.   No.

12        Q.   Okay.  What other complaints did she have?

13        A.   As I recall, she felt like because she did turn

14   him down that, in fact, he was trying to make her life

15   miserable inside the plant.

16        Q.   What did she tell you, how did he try to make

17   her life miserable?

18        A.   He would have discussions with her that

19   had -- as I recall, okay, I don't remember specifically,

20   but I remember she had conversations where she had

21   conversations with Russell and they were unpleasant,

22   okay.

23        Q.   What did she say as "unpleasant"?  Did she --

24        A.   They were unpleasant.  He occasionally used foul

25   language and was angry.

0000220

85

1      Q.   Okay.  Did she say to you, "I had" --

2  "Mr. Harrison, I had a conversation with Russell Ash and

3  it was unpleasant"?

4      A.   Generally speaking, yes.

5      Q.   She told you it was unpleasant?

6      A.   Generally speaking, yes.

7      Q.   Okay.  Did she go into any other examples?

8      A.   He used foul language.

9      Q.   What type of foul language?

10      A.   I didn't ask.

11      Q.   She just said he used foul language?

12      A.   Yeah, generally speaking.

13      Q.   How -- how many times did she talk to you

14  about --

15      A.   I don't recall, because shortly thereafter I was

16  no longer her supervisor and I was instructed not to

17  communicate, coordinate and counsel her.

18      Q.   How long after she told you this, her last time

19  she talked to you about making her life miserable, were

20  you no longer her supervisor?

21      A.   I don't recall specifically.

22      Q.   Well, generally speaking, was it a month later?

23      A.   Generally speaking, I don't recall.  I can't

24  answer your question because I don't recall exactly.

25  There was a lot of things that were going on inside of

0000221

1   the factory, there was a lot of personnel that were

2   moving, there were a lot of things happening.

3        Q.   What was actually happening?  Where were all

4   those things that were happening at the time that you

5   just made reference to?

6        A.   Manufacturing work is very complex, very

7   confusing, needs a lot of attention.

8        Q.   What were some of the things that were happening

9   that you just made reference to?

10       A.   Machinery was breaking down, needs to be fixed,

11  has to be coordinated, communicated.

12       Q.   Anything else?

13       A.   I think we had some new managers and

14  supervisors.

15       Q.   Do you remember who they were?

16       A.   No, they were going in and out so fast I don't

17  recall their names.  You'd have to get a log from

18  personnel and the operations manager.

19       Q.   Do you recall any of them?

20       A.   No, I don't recall any of them, I don't remember

21  their names.  It's been two years, I'm starting to move

22  on.

23       Q.   Okay.  Let me just go back.  We said that -- you

24  said that Russell -- "She told me Russell asked her out

25  and she told me this in Spring 2001."

87

1       A.   Told me? No, ma'am. What I told you was,

2  you told me that from July to July Russell was employed

3  there.  During that time frame, the last six months, this

4  happened.  And if that's the spring of 2001, then it's

5  the spring of 2001.

6       Q.   Okay, that's what I'm asking you.

7       A.   That's what I said.

8       Q.   And that's what I'm asking you.

9       A.   Uh-huh.  Yes.

10      Q.   When Minnie told you this, did she tell you when

11  it had happened?  Had it just happened that he asked her

12  out?  Had it happened -- what time frame had she told you

13  it happened?  Is that when she -- when it -- when she

14  told you it happened, is that when she told you?

15           MR. CISNEROS:  Objection to form.

16           MS. MOORE:  That was a little confusing,

17  I know.

18      A.   It's confusing, and I don't --

19      Q.   (BY MS. MOORE)  Let me ask you again.  Let me

20  ask you again.  Hang on.  Let me ask you again.

21           She told you sometime, you testified, in the

22  spring of 2001?

23      A.   Yes, ma'am.

24      Q.   That Russell asked her out?

25      A.   Yes, ma'am.

0000223

88

1      Q.   Now, my question is, did she tell you that's

2   when he asked her out, in the spring of 2001?

3      A.   I don't -- there was no date, I didn't ask her

4   for a date.  I didn't ask her for a date when this

5   happened.  Does that -- I'm trying to answer the

6   question.

7             MR. CISNEROS:  Sure, sure.

8      A.   It happened.

9      Q.   (BY MS. MOORE)  And my question is, did she ever

10  tell you when he asked her out?

11     A.   She never told me when, no.

12     Q.   Okay.  She just told you he asked her out, so

13  you don't know when it happened?

14     A.   No, ma'am.

15     Q.   Now, after you were no longer her direct

16  supervisor, did you ever talk to Minnie about Russell?

17     A.   No.

18     Q.   Did she ever come to you with any other

19  concerns?

20     A.   No.  Should it be set out as dialogue?

21  Other -- let me ask -- let me tell you, because you

22  haven't asked, and I'm not supposed to do that, I know

23  that.  But the fact of the matter is, Texas Workforce

24  Commission -- she had a hearing, and I would answer their

25  questions just like I'm answering your questions.

0000224

1    Q.   So you testified at --

2    A.   Yes, ma'am.

3    Q.   -- her Texas Workforce Commission hearing?

4    A.   Yes, ma'am, over the phone.

5    Q.   Okay.  Had you talked to her before that?

6    A.   No.

7    Q.   Did she ever ask you to be a witness in that

8    hearing?

9    A.   Yes.

10    Q.   Did you talk to her about what you would testify

11    to?

12    A.   I'm going to tell you the same thing I tell

13    everybody:  Facts are the facts.  As I recall them, I'm

14    going to tell you the truth, and the chips fall where

15    they may.

16              MS. MOORE:  I'm going to object to

17    nonresponsive.

18    Q.   (BY MS. MOORE)  What I'm asking you is, did you

19    talk to her about what you would say --

20    A.   No.

21    Q.   -- at the hearing?

22    A.   I don't believe so.  I said, "I'm going to tell

23    the truth, period."

24    Q.   But do you remember discussing --

25    A.   No, ma'am.

0000225

1       Q.    -- it with her?

2       A.    I told her I was going to tell the truth,

3   period.

4       Q.    Okay.  Do you know what Joe Kolniak -- after

5   you told him about what Russell allegedly did, did

6   Joe Kolniak do anything?

7       A.    I have no idea what Joe did or didn't do.

8       Q.    Did you ever follow up?

9       A.    I have no idea what Joe did or didn't do.

10              MS. MOORE:  Okay.  Objection;

11   nonresponsive.

12      Q.    (BY MS. MOORE)  Did you ever --

13      A.    I have no idea what Joe did or didn't do --

14              MS. MOORE:  I'm going to ask you to wait

15   until I ask a question --

16              MR. CISNEROS:  She's asked you if you

17   followed up.

18              MS. MOORE:  And when I ask the question,

19   then you can answer.

20      Q.    (BY MS. MOORE)  I'm going to ask you a question.

21   Did you follow up with Joe Kolniak to see if he did

22   anything?

23      A.    Yes.

24      Q.    And what happened, did you talk to him, did you

25   have a conversation with Joe Kolniak?

1    A.    Yes.

2    Q.    What was that conversation?

3    A.    Joe said, "I'm taking care of it."

4    Q.    And when was that conversation?

5    A.    Sometime after I talked to him the first time.

6    Q.    Well, generally speaking, give me a time frame.

7    A.    Generally speaking, within 30 days.

8    Q.    And is that all he said to you was that he was

9    taking care of it?

10    A.    Uh-huh, uh-huh.

11         THE REPORTER:    "Yes" or "no," please.

12    A.    Yes.

13    Q.    (BY MS. MOORE)  Did you tell him anything about

14    whether or not what he should be doing?  Did you talk to

15    him about reporting procedures, anything like that?

16         MR. CISNEROS:    Objection to form.

17    A.    No, ma'am, I don't recall.

18    Q.    (BY MS. MOORE)  When you went to follow up, what

19    is it you said to Joe Kolniak?

20    A.    As I recall the conversation with Joe, I asked

21    him what was happening with Minnie's allegation.  And as

22    I recall, he said I didn't need to worry about it, he was

23    taking care of it.

24    Q.    Did you have -- did you talk to Minnie after

25    that?

92

1    A.    No.

2    Q.    You never followed up with Minnie?

3    A.    I don't believe so, I don't recall.  I might

4    have told her; I don't recall if I did or didn't.

5    Q.    Okay.  Did Minnie ever complain to you after?

6    A.    She had mentioned that she thought that she was

7    getting pressure from Russell, in the meetings she was

8    being talked to.

9    Q.    And what did she say about these meetings?

10   A.    She said he used foul language and he was angry.

11   Q.    Did she say who was present at these meetings?

12   A.    I didn't ask.

13   Q.    Did she talk to you about -- other than the foul

14   language, what else the concerns were at the meeting?

15   A.    No.

16   Q.    What were the -- did she tell you what the

17   pressures were that were being put on her?

18   A.    No.  No.

19   Q.    Did you ask?

20   A.    No.  I was -- at that time, I was no longer

21   her supervisor and I was instructed not to give her

22   instructions, that she would get all of her instructions

23   from Mr. Ash.

24   Q.    Well, as a supervisor of --

25   A.    I was not her supervisor at the time.

0000228

1     Q.   Okay.  I'm not asking you about that.  As her

2  friend, did she -- or were you -- was Minnie your friend?

3  For one, was Minnie a friend of yours?

4     A.   What's your definition of a friend?

5     Q.   You --

6     A.   I can't answer your question because we have

7  different perspectives.

8     Q.   Okay.

9     A.   I work with people and I'm friendly with them.

10     Q.   Okay.  Well --

11     A.   Does that mean I go to barbecues with them?  No.

12     Q.   Okay.  As your co-employee, or your

13  acquaintance, someone that you talk to that she had

14  confidence in you to come to you to tell you about the

15  complaint about Russell, that's what --

16     A.   As her supervisor.

17     Q.   Right.  Okay.  Even when you weren't her

18  supervisor, you were her co-employee; is that correct?

19     A.   Yes.

20     Q.   Okay.  That is my -- that's --

21     A.   My co-employee, yes, I worked with her.

22     Q.   Okay.  Did --

23     A.   As I worked with hundreds of other people.

24     Q.   Did you ever -- let me backtrack.  Let me

25  go back because I'm a little confused now.  The

94

1    conversations that you had with Minnie regarding the

2    concerns she had about Russell when he asked her out,

3    those -- those -- she told you when you were still her

4    supervisor?

5        A.   Yes.

6        Q.   Okay.  The follow-up, when you talked to Joe

7    Kolniak, were you still her supervisor?

8        A.   I think I was.

9        Q.   When she came back to you and complained again

10   about Russell putting pressures on her making her life

11   miserable, were you still her supervisor?

12       A.   I don't believe so.  It gets kind of confusing

13   there because we had misdirections from the operations

14   manager as to who was to do what.  Sometimes I was told

15   to do things and sometimes I was told not to do them.

16   Sometimes I wasn't told, and then afterwards it was found

17   out that I was supposed to do something.

18       Q.   Okay.  Well, you testified that at some point

19   you were no longer to even talk to Minnie?

20       A.   Yes, ma'am.

21       Q.   Okay.  At that point, was there a period when

22   she talked to you about Russell making her life

23   miserable?

24       A.   I don't believe so.  To the best of my

25   recollection, at that point, I didn't have conversations

0000200

95

1   with her --

2       Q.   Okay.

3       A.   -- because I was instructed not to.

4       Q.   So the conversation, when she came back to you

5   about Russell making her life miserable, was before --

6   while you were still her supervisor -- in other words,

7   you were still her supervisor?

8       A.   I believe that she did come back and tell me

9   before I was not her supervisor that she was being talked

10  to with foul language and anger, okay.

11      Q.   Okay.  So, when you were still her supervisor --

12           MR. CISNEROS:  Tell him --

13      A.   Yeah, sometime.

14      Q.   (BY MS. MOORE)   Okay.

15      A.   Yeah.

16      Q.   And where --

17      A.   I guess.

18      Q.   And when she said --

19      A.   To the best of my recollection.

20      Q.   Okay.  And she was talking --

21           MR. CISNEROS:  Generally speaking.

22      Q.   (BY MS. MOORE)   -- about the pressure of making

23  her life miserable, that Russell was already doing this

24  at production meeting; is that what she said?

25      A.   During her shift.

96

1      Q.   During her shift?

2      A.   Which could mean at a meeting or not at a

3  meeting.  The operations manager can come out on the

4  floor and have a meeting with his supervisor that's

5  impromptu.

6      Q.   So, do you know if these were --

7      A.   No, I do not specifically --

8      Q.   -- happened, the foul language happened at the

9  meeting, at a meeting or --

10     A.   No, ma'am, I don't specifically know that it

11 happened at a meeting in a room or it happened out on the

12 floor.

13     Q.   After you talked to Joe Kolniak and you went in

14 there and followed up, that we've established, was while

15 you were still her supervisor, correct?

16     A.   I think so, yes.

17     Q.   Okay.  Any time after that did you followed up

18 with it?

19     A.   Nope, I don't believe so.

20     Q.   Did you talk to minnie about it?

21     A.   No, I don't believe so.

22     Q.   She never came back to you and talked to you

23 about it?

24     A.   When I first heard about it and told her I had

25 talked to Joe, I believe I let her know that I let the

1    Human Resource manager know what was going on, and I told

2    her to go back to work and please do her job.

3        Q.    Okay.  So you had two conversations with Minnie?

4        A.    I had daily communication with my employees.

5        Q.    Okay.  Well, let me clarify myself.  You had

6    two conversations with Minnie about Russell asking her

7    out, the concerns she had with Russell asking her out?

8        A.    As I recall.

9        Q.    Okay.  Did you have any more than those two

10   with Minnie?

11       A.    I don't recall if I had more or less, I never

12   kept count.

13       Q.    Okay.  Well, you --

14       A.    No, I don't recall.

15       Q.    -- testified that one -- okay.  You've testified

16   that, one, she came to you and said "Russell asked me

17   out"?

18       A.    Yep.

19       Q.    And then you said you reported it to

20   Joe Kolniak?

21       A.    Yep.

22       Q.    The next time you say she talks to you is when

23   Russell is allegedly making her life miserable; is that

24   correct?

25       A.    Uh-huh.

0000233

98

1      Q.   Okay.   That's two separate, distinct

2   conversations, is that correct?

3      A.   I had a conversation one time, had another

4   conversation.

5      Q.   Okay.  Did you ever talk to her about -- after

6   you talked -- reported it to Joe Kolniak, did you ever

7   come back to Minnie and tell her anything?

8      A.   I don't really recall.  What I recall is I have

9   daily communications, coordinations and counseling with

10  my employees.

11          MS. MOORE:   I'm going to object to

12  nonresponsive.

13     Q.   (BY MS. MOORE)  Did you -- during these

14  conversations with these daily people, you don't -- your

15  daily supervisors, you don't talk about specifically

16  Russell Ash, did you?

17     A.   No.

18     Q.   Okay.  Well my question is -- okay, first my

19  question is, after you reported it to Joe Kolniak, did

20  you go back to Minnie and tell her you had reported it?

21     A.   I believe I did.

22     Q.   You believe you didn't?

23     A.   I believe I did.

24     Q.   You believe you did.  Do you remember what you

25  told her?

0000234

100

1   got three conversations.

2       A.   Okay.

3       Q.   Three different conversations when you talked to

4   her about it.  Now, I'm asking you, is that -- that's the

5   extent of the conversations, or is there something else?

6       A.   Generally speaking, as I recall, that's all I

7   recall.

8       Q.   Okay.  Now, we've established there's three.

9   Is there anything else that you are going to say at trial

10  about that, those conversations?

11      A.   Generally speaking, as I recall, I answered your

12  questions --

13      Q.   Okay.  Well, so those are the three --

14      A.   -- to the best of my recollection.

15      Q.   Okay.  So we're going to stick with those, those

16  are the three conversations?

17              MR. CISNEROS:  Dealing with Russell Ash.

18              MS. MOORE:  Dealing with Russell Ash, yeah,

19  we got that.

20              MR. CISNEROS:  Okay.

21      Q.   (BY MS. MOORE)  Okay.  Now, let's go back

22  to -- you followed up with Joe Kolniak.  You said -- you

23  testified you were still her supervisor when you followed

24  up 30 days later, about a month later?

25      A.   I didn't say 30 days, I said within 30 days.

0000235

101

1    Q.  Well, you said about -- right.  And somewhere
2  from there, were you still her supervisor?
3    A.  I believe I was.
4    Q.  Okay.  After that, when you followed up with
5  her, did you talk to her about the follow-up?  After you
6  talked to Joe Kolniak, did you go back and talk to her?
7    A.  I honestly don't recall whether I did or
8  I didn't.
9    Q.  And did you ever talk to Minnie about whether
10  she had followed up with it?
11    A.  I don't recall whether I did or didn't.
12    Q.  Okay.  Did you ever go back to Joe Kolniak at
13  any point to follow up again?  After the first follow-up,
14  did you ever talk to him again?
15    A.  I don't think so, I don't really recall.
16  I don't recall.
17    Q.  Do you know of any investigation that was done?
18    A.  I don't know of any investigation that was done.
19    Q.  Did you ever talk to Russell Ash about what
20  Minnie had told you about him asking her out?
21    A.  Did I ever talk to Mr. Ash about what Minnie had
22  alleged?  No, I didn't want to have that conversation
23  with Mr. Ash.
24    Q.  Why not?
25    A.  First place, it's not my -- it's not my place.

0000236

102

1      Q.   Okay.  You were her direct supervisor, why is

2    that not your place?

3      A.   Because of Human Resources, that's their job.

4      Q.   Okay.  Do you know if anything was ever done?

5      A.   No, I do not.

6      Q.   After that, did you ever follow up?

7      A.   No, I don't believe so.

8      Q.   And we talked about a date of when this

9    happened, and you're -- are you testifying that you don't

10   know the date the alleged act actually occurred?

11     A.   No, I don't know the exact date it occurred, no.

12     Q.   Okay.  And let's go back to the allegation that

13   Minnie told you that he was making her life miserable and

14   she was under a lot of pressures.  What exactly did she

15   tell you about that, what kind of pressures?

16     A.   She said she's under a lot of pressure and her

17   life was miserable.  I'm trying to recall, because

18   I -- he was making every -- he was making my life

19   miserable, he was making her life miserable.  He was

20   being difficult with her.  I don't know the specifics.

21   She came and said she was having to put up with foul

22   language and a lot of anger, okay, and I asked her to

23   please just do her job.

24     Q.   Did you ever tell her to report that, the

25   pressures?

0000237

1    A.   I don't think I did.

2    Q.   Why not?

3    A.   Because she was -- shortly thereafter she was

4   talking to Joe Kolniak.

5    Q.   So she talked to Joe Kolniak?

6    A.   Yes, ma'am, and I don't know what that

7   conversation was or what it was about.

8    Q.   How do you know she was talking to Joe Kolniak?

9    A.   Because she would -- as a supervisor you

10   communicate, coordinate and counsel daily.  You stop at

11   certain stations when you pick up your paperwork, and one

12   of them that she stopped at was the Human Resource

13   Department.

14    Q.   Well, how do you know she was talking to Joe

15   about that, about the pressures?

16    A.   I didn't say she was, I said she was talking to

17   Joe.  I do not know what that conversation was about.

18    Q.   So you don't know if she complained to

19   Joe Kolniak about the pressures?

20    A.   Do not know what she talked to Joe about.

21    Q.   Do you know if she ever complained to

22   Joe Kolniak about him asking her out?

23    A.   I do not know what conversation she had with Joe

24   because Joe never got back to me about anything.

25    Q.   Okay.  Did you ever tell her that she should

104

1    report what Russell was doing, making your life

2    miserable, and all the pressures? Did you ever tell her

3    to report that?

4         A.   I really don't recall if I did or didn't.

5         Q.   Did she ever talk to you about reporting it?

6         A.   I don't recall.

7         Q.   A little while ago you said that he was

8    making -- Russell was making your life miserable, as

9    well.  How was he making your life miserable?

10        A.   A lot of anger, a lot of foul language.

11        Q.   Okay.  What was it exactly that he was doing?

12   Was he -- added pressures, more job duties, what was it

13   exactly?  What do you -- what did he do to make your life

14   so miserable?

15        A.   Do you know what misdirection is?

16        Q.   I'm asking -- just answer the question.

17        A.   He called my wife a fucking bitch.

18        Q.   When did he do this?

19        A.   Generally speaking, I don't recall.

20        Q.   Okay.  Was it after or before Minnie talked to

21   you about --

22        A.   After Minnie talked to me.

23        Q.   Was it after you reported it to Joe Kolniak?

24        A.   After I reported it to Joe Kolniak.

25        Q.   Do you know if Russell knew you reported this to

0000269

105

1   Joe?

2        A.   I have no idea what Russell knows and doesn't

3   know.

4        Q.   Okay.  How else was he making your life

5   miserable?

6        A.   He called my female employees fucking bitches.

7   I thought that was inappropriate.

8        Q.   Let's go back to your wife.  What -- what was

9   the context of that conversation?

10       A.   I don't know, you'll have to ask Mr. Ash.  All

11  I remember is the foul language.  I told him that was

12  inappropriate.

13       Q.   Well, what is it he exactly said?  You said he

14  called your wife a fucking bitch.  What exactly --

15       A.   Called her a fucking bitch.

16       Q.   What were you talking about?

17       A.   I don't specifically recall because I was angry

18  when he said that.

19       Q.   Okay.  Well, what --

20       A.   I told him he needed to no longer call my wife a

21  fucking bitch; her name is Mrs. Harrison.

22       Q.   Why was it that he called your wife that?

23       A.   I have no idea why Russell called her a fucking

24  bitch.

25       Q.   Were you talking -- was there a conversation

106

1    about your wife?

2        A.    Russell interjected that.    You need to ask

3    Russell why he called her that.

4        Q.    Well, what were you talking about?

5        A.    I don't specifically recall.

6        Q.    You don't recall what you were talking about,

7    he just, out of the blue, called your wife a bitch?

8        A.    No, he called her a fucking bitch.

9        Q.    Okay.    Out of the blue he called your wife a

10   fucking bitch, you don't recall what you were talking

11   about immediately prior to that statement?

12       A.    No, ma'am.

13       Q.    Did it have anything to do with maybe production

14   at the plant?    Did it have -- what --

15       A.    All I remember is he called my wife a fucking

16   bitch, and I thought that was inappropriate and I told

17   him it was inappropriate, that her name was Mrs. Harrison

18   and he needed to call her Mrs. Harrison from now on,

19   whether he liked my wife or not, period.

20       Q.    But you don't remember -- you remember him

21   calling your wife a fucking bitch, but you don't remember

22   what conversation you were having --

23       A.    No, ma'am.

24       Q.    -- immediately prior to that?

25       A.    No, ma'am.

107

1    Q.   You also said that he called other women at the
2  plant fucking bitches.
3    A.   Yes, ma'am.
4    Q.   And when did he do that?
5    A.   It was after a production meeting when Mr. Dave
6  Fines was present.  He's -- I think he's the operations
7  manager today --
8         MS. LEEDS:  Fines?
9    A.   -- if there's still a plant open.
10        THE WITNESS:  Dave Fines, F-i-n-e-s.
11  David.
12   Q.   (BY MS. MOORE)  Okay.  And when was this?  Was
13  this after Minnie reported?
14   A.   Most definitely, yes.
15   Q.   And who else was at the meeting?
16   A.   It was after a production meeting, and Mr. Ash
17  asked me to stay and he asked Mr. Fines to stay because
18  Mr. Fines was on there doing some work for Mr. Campbell
19  in conjunction with Mr. Ash.  And Russell was talking to
20  me in foul language, angry, and I started to get up.
21        He called my tire builders "those fucking
22  bitches," and I says, "They're not fucking bitches,
23  they're hard-working employees, and they give you a good
24  job every day.  So please do not refer to my employees as
25  fucking bitches."

0000242

108

1          And I started to walk out.  Dave looked at me

2    and said, "You need to get your composure, come back

3    down."  I said "Yes, sir."

4        Q.   How many female employees were you supervising?

5        A.   I don't recall.

6        Q.   How many employees did you supervise total; do

7    you know?

8        A.   Every day the number changed, so it went from

9    25 to 100 to 150 to 200.  Pick a number that you feel

10   comfortable with.

11       Q.   And you don't know about how many female

12   employees --

13       A.   At any specific point in time, no.

14       Q.   Okay.  When he was talking about fucking

15   bitches, your employees --

16       A.   Uh-huh.

17       Q.   -- how many employees -- how many women, female

18   employees --

19       A.   I have no idea.

20            MR. CISNEROS:  Objection to form.

21       A.   I didn't go in to Personnel and ask to see the

22   roster to see how many male or female --

23       Q.   (BY MS. MOORE)  Well, you supervised them, do

24   you --

25       A.   Ma'am --

0000243

1    Q.   -- remember how many you had?

2    A.   I do not know how many employees were female at

3    Titan at that time.

4    Q.   My question to you is, how many female employees

5    did you personally supervise?

6    A.   I really don't recall.

7    Q.   Why was -- do you know why Russell made

8    reference to the female employees as fucking bitches?

9    A.   I have no idea why Russell called them fucking

10   bitches.

11   Q.   What were you talking about that made him call

12   them fucking bitches?

13   A.   I don't recall.  What I recall is the fucking

14   bitches because I thought it was inappropriate.

15   Q.   Okay.  Well, were you talking about a problem

16   that you had with the female employees not meeting

17   production?

18   A.   No, ma'am, I don't believe so.

19   Q.   So out of the blue he just said, "Your female

20   employees are fucking bitches"?

21   A.   I have no idea why Russell said that; you would

22   have to ask Russell.

23   Q.   Now, before Minnie -- let's talk about the

24   allegation Minnie made about Russell after that.  Did

25   Russell ever use foul language before that?  From the

110

1   time he came down to the Brownsville plant, did he ever

2   use foul language?

3        A.   Did Russell ever use foul language?

4        Q.   In your presence.

5              MR. CISNEROS:   From the time he came to the

6   plant.

7        A.   Yes.

8        Q.   (BY MS. MOORE)   And did you witness that?

9        A.   Did I witness him swearing?

10       Q.   Uh-huh.

11       A.   Yes.

12       Q.   Okay.  And what occasions were they?

13       A.   I don't recall specifically which occasions.

14       Q.   What --

15       A.   Normally they were in his office, when he didn't

16   have a crowd.

17       Q.   And who would be in the office?  Do you remember

18   at least one instance where he was --

19       A.   I remember one incidence, yes, ma'am.  I

20   remember when he was talking about somebody else's wife

21   and he called her a fucking bitch.

22       Q.   Who was that?

23       A.   His name was Thong Nguyen.

24              MR. CISNEROS:   Nguyen, Tom?

25              THE WITNESS:   Tom Nguyen, yeah.  His real

0000245

111

1   name is Thong.

2       Q.   (BY MS. MOORE)  Okay.  And he called his wife a

3   fucking bitch, as well?

4       A.   Yeah.

5       Q.   Do you know why?

6               MR. HERNANDEZ:  For the record, it's

7   N-g-u-y-e-n.

8       Q.   (BY MS. MOORE)  Do you know why?

9       A.   Do I know why?  No, ma'am.

10      Q.   Well, what was the context of the conversation?

11      A.   I have no idea why he's calling people names.

12      Q.   So you're testifying that you'd have a meeting,

13  and then out of the blue Russell would say, "And by the

14  way, your wife's a fucking bitch"?

15      A.   No, that's not what I said.

16      Q.   Well, that's --

17      A.   What I said was I remembered him calling people

18  fucking bitches --

19      Q.   And I'm asking --

20      A.   -- and I do not recall that particular meeting

21  because there are lots of meetings in production and

22  there are lots of meetings in manufacturing, and I don't

23  recall the gist of that particular meeting other than

24  that incident because it's out of the norm.

25      Q.   Okay.  So how many of -- how many times did he

0000246

112

1    do this?  Were there other times?

2        A.   Most generally I tried to stay away from that

3    behavior, okay.  So I don't recall every incidence.

4    I don't recall all of the incidents.  All I recall is

5    what I told you.

6        Q.   How many other times -- I know you don't recall

7    all of them, but I'm asking you, how many times do you

8    recall?

9        A.   I'm sorry, I couldn't put a finger on it;

10   I can't.

11       Q.   Okay.  Well --

12       A.   I remember these incidents because they were --

13       Q.   Do you remember him using foul language in other

14   contexts, or the only foul language you remember him

15   using was calling people's wives fucking bitches?

16            MR. HERNANDEZ:  Objection to form.

17       A.   Most generally speaking, Mr. Ash would have a

18   meeting or be in meeting with somebody or have an

19   employee meeting where all the employees are there.  He

20   didn't swear, he didn't use foul language, and he never

21   showed anger, okay.  When he would use foul language and

22   show anger was when it was one-on-one.  Does that answer

23   your question?

24       Q.   (BY MS. MOORE)  So, Russell did this throughout

25   the time he was at the plant, at the Brownsville plant,

1  while you were there?

2      A.  I don't know how often he did it.  I do -- yeah,

3  I don't know how often he did it, I don't know who he did

4  it with.  All I know is what I told you.

5      Q.  Did he ever use foul language in front of you or

6  towards you other than referring to your wife as a

7  fucking bitch?

8      A.  No, I don't think he would have done that.

9      Q.  So the only time --

10     A.  Now, wait a minute.  There was a time in

11  Des Moines when he was going to fire me.  No, I don't

12  think he did, take it back.

13     Q.  Okay.  So the only time Russell used foul

14  language is when he -- in front of you is when he called

15  your wife a fucking bitch and when he called the female

16  employees fucking bitches --

17     A.  Fucking bitches, and when he talked about Tom's

18  wife.

19     Q.  Talked -- yeah, that's right.

20     A.  Pretty much, you know, I -- those things kind of

21  stick out in my mind because, like I said, they're out of

22  the norm.  There is --

23     Q.  When he --

24     A.  There is a normal conversation that you carry on

25  and there's out of the norm, and that's out of the norm.

0000248

1   Q.   When he was talking to you, did he ever have any

2   conversations with you about your employees not meeting

3   production?

4   A.   Well --

5   Q.   Any problems he had?

6   A.   I'm sure.

7   Q.   Okay.  Did he ever use foul language then?

8   A.   I don't recall.

9   Q.   Were you ever verbally reprimanded by

10  Russell Ash?

11  A.   There again, I'm going to ask you what you mean

12  when you say "verbally reprimand."  What does it mean to

13  you?

14  Q.   Did he ever tell you what -- anything you were

15  doing wrong?

16  A.   Uh-huh.

17  Q.   Okay.  Did he use foul language then?

18  A.   Yeah, he used foul language when he looked at

19  one of my reports and said, "This is fucking garbage."

20  Q.   Okay.

21  A.   That's one thing I recall.

22  Q.   And any other times where he used foul language

23  in regards to, you know, work you'd done?

24  A.   I don't recall any others, there may have been

25  some.

0000249

115

1      Q.   Did you ever use foul language?

2      A.   Yeah.

3      Q.   In what reference would you use foul language,

4  what context?  How about if you're talking to one of your

5  employees about them doing -- maybe they messed up, did

6  you ever use foul language?

7                MR. CISNEROS:  Objection to form.

8                MS. LEEDS:  He's not answering.

9      A.   I don't believe, as part of my counseling, part

10  of my communications, part of my coordinating, that I

11  would use foul language with a subordinate or a

12  contemporary.

13      Q.   (BY MS. MOORE)  Okay.  So, when did you use foul

14  language?

15                MR. HERNANDEZ:  Objection to form; it's

16  been answered.

17      A.   I don't know, I can't answer the question.  It's

18  not a normal part of my language.

19      Q.   (BY MS. MOORE)  Did anybody else use foul

20  language that worked at the plant, the Brownsville plant?

21      A.   Probably.

22      Q.   Do you know who?

23      A.   I would guess.

24      Q.   Well, who would you --

25      A.   That Mr. Shanholtcer would use foul language

0000253

116

1    once in a while.

2         Q.   In what context?

3         A.   I don't know.

4         Q.   What was it that he would say? How do you know

5    he used foul language?

6         A.   Because sometimes he would get angry and say

7    "goddammit," and then usually I'd leave.

8         Q.   What other foul language would he use?  Would he

9    just --

10        A.   I don't know.

11        Q.   Did anybody else use foul language?

12        A.   I don't know.

13        Q.   Did you ever hear anybody else use foul

14   language?

15        A.   It's not normal.

16        Q.   So you're saying at the Brownsville plant it

17   wasn't normal for people to use foul language?

18        A.   I don't know what's normal for you or what's

19   normal for a hundred people, but I'm guessing that most

20   people --

21             MS. MOORE:  I'm going to object to

22   nonresponsiveness.

23             THE WITNESS:  Okay.

24        Q.   (BY MS. MOORE)  Okay.  Do you have any other

25   instances or any other people that you know used foul

117

1    language?

2                MR. CISNEROS:    Objection to form.

3    Instances or people?

4                MS. MOORE:    People.

5    A.    I don't know.    I don't specifically recall

6    Q.    (BY MS. MOORE)    Now, you talked about -- you

7    mentioned previously that you were in Des Moines, Iowa,

8    and Russell may have used foul language when he was going

9    to terminate you?

10   A.    Yeah, he wanted to.

11   Q.    What was the circumstances behind that?

12   A.    He gave me a six-day suspension.    It's in the

13   records somewhere.    They said I did something that I

14   didn't do.

15   Q.    What -- what was it?    What was the allegation

16   that you did?

17   A.    They said I hid some materials so that

18   I wouldn't have to work?

19   Q.    Who said that?

20   A.    Supervisor called Dennis Nutter.    And he was --

21   Q.    He was working at the Brownsville plant?

22   A.    No, ma'am, this was in Des Moines, Iowa.

23   Q.    This we in Des Moines.    When was this?

24   A.    Right after Titan took the plant.    I don't

25   recall the specific year.

118

1      Q.   Was it before you came to Brownsville?

2      A.   Yes, ma'am.

3      Q.   Was it in 1997?

4      A.   I don't recall the specific year.

5      Q.   Okay.  Well, how many years before you came to

6   Brownsville did this happen?

7                MR. CISNEROS:  Objection to form; asked and

8   answered.

9      A.   I don't recall the specific year.  It's in the

10  records, and I don't keep the records.  It was an

11  incident that happened while I was a production employee

12  at the newly bought Titan facility in Des Moines, Iowa.

13     Q.   (BY MS. MOORE)  And so you're saying this

14  conversation -- when you were going to be terminated,

15  this happened when Titan had just bought the plant?

16     A.   Uh-huh.

17     Q.   Is that what you're testifying?

18     A.   (No verbal response.)

19     Q.   She needs a verbal answer.

20     A.   Yes, ma'am.

21     Q.   So you don't remember that year?

22     A.   No, ma'am.

23     Q.   Was Russell your supervisor at this point, in

24  Des Moines, when he wanted to terminate you?

25     A.   No, he was the temporary operations manager sent

1  down there by Moore Taylor to clean house.

2      Q.   And at that point, was he -- did you have to

3  report to him?

4      A.   No, ma'am.

5      Q.   Who was your supervisor then?

6      A.   Dennis Nutter.

7      Q.   In Des Moines, was Russell ever your supervisor?

8      A.   No.  My direct supervisor, no.  He was the

9  operations manager.

10     Q.   Did you ever have to report to him in

11 Des Moines?

12     A.   No, ma'am.

13     Q.   What happened to the -- were you terminated or

14 did you -- how was it resolved?

15     A.   I won my case, I got paid six days' back pay,

16 plus I got taken out for lunch, and then I was offered a

17 job.

18     Q.   Did you have some sort of hearing?

19     A.   Uh-huh.

20     Q.   And who was the hearing in front of?

21     A.   A hearing with the Human Resource manager, and

22 then Russell was there, the president of the union was

23 there, the chief union steward was there, and I was

24 there.

25          And then afterwards, Mr. Taylor came to the

0000201

1    facility and -- he was the CEO, I believe he was the

2    CEO at the time.  And he talked to me and I talked to

3    him.  And then Mr. Smide talked me and I talked to him

4    and he talked to me.

5            And then Mr. Campbell talked to me and I talked

6    to him.  Then it was the chief operation officer, the CEO

7    and the president of the company, and the new plant

8    manager, and I visited with them about this incident and

9    said that "It needs to be correct for the record.  And

10   correct, for the record, is the truth.  The truth is you

11   need to get to the bottom of it, you need to pay me my

12   six days, we need to move on."

13       Q.   Okay.  So you weren't terminated?

14       A.   No, ma'am.

15       Q.   Okay.  When you were in the Brownsville plant,

16   was there ever a time where you were -- where you

17   were -- were you ever terminated when you were at the

18   Brownsville plant?

19       A.   Yes, ma'am.

20       Q.   When was that?

21       A.   Two weeks before I was finally let go.

22       Q.   And what were the circumstances?

23       A.   Russell fired me.

24       Q.   Two weeks before your final termination?

25       A.   Uh-huh.

121

```
 1      Q.   Why?

 2                 THE WITNESS:  Has this got anything to do

 3  with Monte -- Minnie's case?

 4                 MR. CISNEROS:  Just --

 5                 THE WITNESS:  Do I have to answer these

 6  questions?

 7                 MR. CISNEROS:  Uh-huh.  Yes.

 8                 THE WITNESS:  I'm sorry, I just wanted to

 9  know if had to answer these questions.

10      Q.   (BY MS. MOORE)  The question was, why were you

11  terminated two weeks before your final termination?

12      A.   That would be up to Mr. Ash.

13      Q.   What did he tell you?

14      A.   I was given no excuse other than I was swore at

15  and told to leave.

16      Q.   How did you know you were terminated, then?

17      A.   He told me I was terminated.

18      Q.   Did you ask him why?

19      A.   No, I went to my office and I sat down for a

20  minute in disbelief, and Joe Kolniak came in there and I

21  said "What happened?"

22            He said, "I don't know.  Let me get you a box."

23            And I said "Okay."  And I thought about it for a

24  minute, I had worked for this company for about 31 years,

25  and I was being treated very improperly --
```

1           MR. CISNEROS:  Can we take a break?

2           MR. HERNANDEZ:  Or go to lunch?

3           THE WITNESS: I don't want to go to lunch,

4    I've got work to do.

5           MS. LEEDS:  Let her finish the line of

6    questioning, and I object to you objecting in the middle

7    of his answer.

8           MR. CISNEROS:  Okay.  Can we go off the

9    record and take a break anyway?

10          MS. LEEDS:  Well, let him finish his

11   answer.

12          MR. CISNEROS:  I think he did.  That was

13   it, he got a box and moved out his things.

14          MS. LEEDS:  He hasn't finished his answer,

15   he was still talking when you interrupted him.

16   Q.    (BY MS. MOORE)  I think you were at you worked

17   for this company for 31 years?

18   A.    Yes, ma'am.  I worked in the industry for

19   31 years.

20   Q.    Okay.  Did you ask why you had been terminated?

21   A.    Uh-huh.

22   Q.    And who did you ask; can you verbalize an

23   answer?

24   A.    I asked Joe, and I was given no answer.

25   Q.    What did he tell you?

123

1     A.   He didn't know.

2     Q.   Okay.  Who else did you ask?

3     A.   I told Mr. Campbell, who was the president of

4   the Titan Tire.

5     Q.   What did you ask him?

6     A.   I asked him why I was terminated.

7     Q.   And what did he tell you?

8     A.   He said I hadn't been terminated.

9          And I said, "Sir, I have been terminated."

10         He said, "Who terminated you?"

11         And I said "Mr. Ash."

12         And he said, "He can't do that."

13         I said, "Okay, but he's done it."

14         He said, "Get him on the phone right now."

15         And I said, "Sir, I can't do that."

16         He said, "Don't worry about it, I'll get him on

17   the phone."

18    Q.   Okay.  And were you present when Russell talked

19   to Bill Campbell?

20    A.   No, ma'am.

21    Q.   Do you know what they talked about?

22    A.   No, ma'am.

23    Q.   Did you talk to Bill Campbell about what they

24   talked about?

25    A.   No, ma'am.

0000258

124

1      Q.   Did you ever ask him what they talked about?

2      A.   No, ma'am.

3      Q.   Did you ever talk to Russell about why you were

4    terminated?

5      A.   He came -- Mr. Ash came back as I was loading

6    up my box and said I was supposed to report to work

7    Saturday, and I had better -- I can't remember the exact

8    words but that I needed to sit down.

9           And I said, "I don't think I will because I

10   don't work for you anymore."

11          He said, "Well, I tried."

12          I said, "You tried what?"

13          He said, "You won't listen."

14          I says, "What is it you have to say, Mr. Ash?"

15          He said -- I said, "I'll sit down."

16          He said I needed to go back to work.  He said,

17   "You called Mr. Campbell, you need to go back to work

18   tomorrow, but obviously your eyes are so wild I don't

19   want you here the rest of the day."

20     Q.   And did you ever ask him why he had made the

21   decision to terminate you?

22     A.   Did I ask Russell specifically?  No.

23     Q.   Did you ask anybody else?

24     A.   I asked Mr. Campbell.

25     Q.   And what did he say?

0000259

125

1    A.    He said he didn't know.

2    Q.    Oh, yeah.   Is there anybody else, did you ask

3    anybody else, did you ever find out why --

4    A.    Yes, I sure did.   I called Quincy, Illinois.

5    Q.    And who did you talk to?

6    A.    And I talked to -- I can't remember her name,

7    she's a real nice lady, she works for a legal attorney

8    for Titan Tire, the lawyer.   I don't even know if she

9    works there anymore.

10    I'm sorry, I'm bad with names.   I'm trying to

11    recall her name.

12    Q.    Sherry Hawley?

13    A.    Sherry Hawley is the lawyer.   It's the lady that

14    works for her.   Not Jennifer Kram, the other lady.

15    Q.    Amanda?

16    A.    No, no, no, I don't remember her name.

17    Q.    Okay.   Well, what did she tell you?

18    A.    She told me that, "He can't do that.   He's an

19    asshole.   You don't work for him, you work for us."

20    And I said, "He can do whatever he wants to,

21    he's here."

22    Q.    Well, did she tell you why Russell wanted to

23    terminate you?

24    A.    She never did because Russell could never give

25    them a reason why I was terminated.

0000200

126

1        Q.   Okay.   So you never found out the reason why you

2   were terminated, or did you?

3        A.   Until August 15th when --

4        Q.   Okay.   On August 15th, what happened?

5        A.   The lady -- and I'll think of her name -- called

6   me and told me that I was officially terminated as of the

7   15th of August and I was terminated for lack of

8   production.

9        Q.   Did you talk to anybody else?   Did you talk to

10  Russell about your termination?

11       A.   I never talked to Russell again.

12       Q.   Did you talk to anybody else about your

13  termination on the 15th?

14       A.   On the 15th I talked to her.   She said --

15  because there's things when your terminated:   my vacation

16  pay, my final check, my pension, my insurance, those

17  documents, I wanted to make sure that I got them so that

18  I can transition into something.

19       Q.   Did you talk to anybody else, for example,

20  Bill Campbell or Joe Kolniak?

21       A.   I never talked to Joe Kolniak again.

22       Q.   What about Bill Campbell?

23       A.   I talked to Bill Campbell.

24       Q.   What did he tell you?

25       A.   When specifically?

0000261

1    Q.   On August 15th, did you talk to him about that

2  termination?

3    A.   I didn't talk to him on August 15th, I talked to

4  him prior to August 15th.

5    Q.   You didn't, okay.

6    A.   And what he told me was that I needed to be

7  patient, that he was coming down and he would look into

8  it.  He heard there were a lot of bad things happening at

9  that plant, that I had been through an awful lot at other

10  places before, this would be nothing, "Just smile, say

11  'yes, sir,' and do your job, soldier."

12    Q.   Okay.  So two weeks before you talked to

13  Bill Campbell, he didn't give you a reason as to your

14  termination but you weren't terminated?

15    A.   No, ma'am.

16    Q.   After -- during that -- from the two weeks to

17  August 15th, did you talk to him?

18    A.   Mr. Campbell?

19    Q.   Is that when you're telling me you had that

20  conversation to be patient?

21    A.   Yes, uh-huh, uh-huh.

22    Q.   Okay.  Did you talk to him at any other time

23  within that two weeks?

24    A.   I talked to him one other time when he asked me

25  about something -- I don't recall, something about

0000261

1    production.  Production was the gist of most of our

2    conversations.

3        Q.   Well --

4        A.   I don't recall specifically.

5        Q.   Okay.

6        A.   I do recall that I did talk to him.

7        Q.   Okay.  And he said he was going to come down?

8        A.   Uh-huh.

9        Q.   "Be patient."  Did he come down?

10       A.   Nope.

11       Q.   He never came down before you were --

12       A.   Nope.

13       Q.   Okay.  And when you were terminated August 15th,

14   did you call him and talk to him about that termination?

15       A.   No.

16       Q.   Did you ever have any conversations with him

17   about that termination?

18       A.   No.  Not after that point, no.

19       Q.   Did you have any conversations with anybody else

20   except for the lady in the legal department?

21       A.   Uh-huh, she's Sherry Hawley's assistant.

22       Q.   Right.  Other than her, did you have any other

23   conversations about why you were terminated?

24       A.   Nope.

25       Q.   Did she give you any other reason as to why you

0000263

1    were being terminated?

2    A.  No.

3    Q.  The only reason was lack of production?

4    A.  Yep.

5    Q.  After August 15th, did you talk to anybody about

6    your termination?

7    A.  Yep.

8    Q.  Who did you talk to?

9    A.  Sherry Hawley's lawyer -- Sherry Hawley's

10   assistant.

11   Q.  And who is that?

12   A.  I can't recall her name.

13   Q.  Is that the same --

14   A.  Yes.

15   Q.  It's the same --

16   A.  It's -- she's been with the company forever.

17   Q.  Okay.  So it's the same lady you're talking

18   about?

19   A.  Yes, every time I needed advice when I was the

20   operations manager, concerning employees, employee

21   handbooks or any issue.

22   Q.  You talked to her?

23   A.  I talked to her, and she would put me in touch

24   with the right person to resolve the issue.

25   Q.  What did you talk to her about after the 15th?

000026

130

1    A.   Mostly my pension, insurance, my disbelief in

2  being terminated, and that I was going to write a letter

3  to Mr. Taylor, which I never did.

4    Q.   Did you ever talk to him?

5    A.   Mr. Taylor, no, I said he was too busy.

6    Q.   Did you talk to Bill Campbell after the 15th?

7    A.   Yep.

8    Q.   What did you talk to him about?

9    A.   I told him it's hard for a white boy, 52 years

10 old, to get a job in the Valley.  I said that if he had

11 an opening in another one of his facilities I would

12 relocate.

13   Q.   What did he tell you?

14   A.   He said he's got problems in the company, that

15 wasn't in the cards.

16   Q.   What does that mean?

17   A.   That means they got no jobs.  I thanked him very

18 much and I moved on.

19   Q.   Did he tell you that he had no jobs anywhere to

20 offer you?

21   A.   That's what he said.

22   Q.   Okay.

23   A.   He said he could go back and ask Mr. Fines if I

24 wanted to work there, and if Mr. Fines wanted to hire me

25 that that would be his decision, and that's what he did

131

1   say.

2       Q.   Where was that?

3       A.   That would be here in Brownsville.

4       Q.   Okay.  In talking to Mr. Campbell, did you get

5   the impression that Titan was having financial problems

6   at that time?

7       A.   I don't know.

8       Q.   What did you interpret from talking to him about

9   when he said what you testified to, that there were no --

10  you said he didn't have any job openings?  What was

11  your --

12           MR. CISNEROS:   Objection to form.

13      Q.   (BY MS. MOORE)   What was your impression of that

14  conversation?

15           MR. CISNEROS:   Objection to form; asked and

16  answered.

17      A.   You're asking me for an opinion, right?

18      Q.   (BY MS. MOORE)   I'm asking you for your opinion.

19      A.   My opinion is he was pretty busy.  He had other

20  things on his mind.

21      Q.   Did you -- when he told you that he didn't have

22  any jobs, did you believe him when he told you that, that

23  that's the reason you weren't being offered a job?

24      A.   I always believed Mr. Campbell when he told me

25  something.

0000266

132

1      Q.   What kind of relationship did you have with

2  Mr. Campbell?

3      A.   Pretty candid, pretty frank, pretty honest,

4  I thought.

5      Q.   How long did you know him?

6      A.   Ever since he came to Des Moines, Iowa.

7      Q.   How many years is that; do you know?

8      A.   When they moved Russell out and moved Bill in.

9      Q.   Would it be more than five years?

10     A.   I guess.

11     Q.   Can you give me an approximate number?

12     A.   I'd have to look at the time that Mr. Campbell

13  became the --

14          MR. CISNEROS:  Objection; form.

15     A.   -- plant manager at Des Moines; and I don't know

16  how many years.

17     Q.   (BY MS. MOORE)  Okay.  And by that conversation,

18  when he said that -- when he told you, "We don't" -- you

19  know, "We don't have any job openings" --

20          MR. CISNEROS:  Objection.

21     Q.   (BY MS. MOORE)  In talking to him, what do you

22  think he meant by that?

23          MR. CISNEROS:  Objection to form.

24     A.   He meant what he said, he didn't have a job.

25     Q.   (BY MS. MOORE)  Did you have any indication that

0000267

1    Titan was experiencing any difficulties --

2              MR. CISNEROS:  Objection to form.

3       Q.   (BY MS. MOORE)   -- in the number of employees

4    they could employ?

5              MR. CISNEROS:  Objection to form.

6       A.   I don't know.

7       Q.   (BY MS. MOORE)   No opinion as to that?

8       A.   No.

9              MR. CISNEROS:  Objection to form.

10             MS. MOORE:  Do you want to take a break?

11             MR. CISNEROS:  Do you think you have much

12   longer, can we just wrap it up?

13             MS. MOORE:  I have a couple of things

14   still.

15             THE WITNESS:  Can we finish it because I

16   got to work, I have a job to do.

17             THE VIDEOGRAPHER:  11:35 (sic), off the

18   record.

19             (Off the record at 12:35 p.m.)

20             (On the record at 12:45 p.m.)

21             THE VIDEOGRAPHER:  12:45, and you're on the

22   record.

23      Q.   (BY MS. MOORE)   Okay.  Mr. Harrison, while you a

24   supervisor, when you were the production supervisor, were

25   you required to -- were your employees required to meet

1   certain productions rates or production quotas?

2          MR. CISNEROS:  Objection to form.

3   A.   Yes.

4   Q.   (BY MS. MOORE)  Did you ever achieve those

5   production rates?

6   A.   Yes.

7   Q.   How often did you achieve those rates?

8   A.   I don't recall.

9   Q.   Were there times you didn't achieve production

10  rates?

11  A.   Yes.

12  Q.   How often, would you say?

13  A.   Don't recall.

14  Q.   In a week period, how often would you not

15  achieve production rates?

16  A.   I don't recall.

17         MR. CISNEROS:  Objection to form.

18  Q.   (BY MS. MOORE)  Before you were terminated,

19  isn't it true that you had a problem meeting

20  production --

21         MR. CISNEROS:  Objection to form.

22  Q.   (BY MS. MOORE)  -- rates or production quotas?

23         MR. CISNEROS:  Objection to form.

24  A.   I don't recall.

25  Q.   (BY MS. MOORE)  You don't recall if you had a

BOCKBUS REPORTING

135

1    problem, before you were terminated, meeting production

2    rates?

3              MR. CISNEROS:  Objection to form.

4      A.   Yeah, I said I don't recall.

5      Q.   (BY MS. MOORE)  Did Russell ever talk to you

6    about, before he terminated, a problem you had

7    meeting production rates?

8              MR. CISNEROS:  Objection to form.

9      A.   No, I don't recall.

10      Q.   (BY MS. MOORE)  Did anyone ever talk to you --

11              MR. CISNEROS:  Objection to form.

12      Q.   (BY MS. MOORE) -- about you not being able to

13    meet production rates?

14              MR. CISNEROS:  Objection to form.

15      A.   I don't recall.

16      Q.   (BY MS. MOORE)  When you were sent down to the

17    Brownsville plant, you were sent as the operations

18    manager; is that correct?

19      A.   Yes, ma'am.

20      Q.   Okay.  Were you sent to help start up the plant?

21              MR. CISNEROS:  Objection to form.

22      A.   Yes, ma'am.

23              THE REPORTER:  I'm sorry, what was the

24    answer?

25              THE WITNESS:  "Yes, ma'am."

0000270

136

1    Q.   (BY MS. MOORE)   Why is it that you lost that
2    position?  Why were you demoted to just regular
3    production manager?
4              MR. CISNEROS:  Objection to form.
5         A.   I don't believe I was demoted, that's your
6    opinion.
7         Q.   (BY MS. MOORE)  Okay.  Well, someone came in
8    and took over the operations manager position; is that
9    correct?
10             MR. CISNEROS:  Objection to form.
11        A.   Yes, ma'am.
12        Q.   (BY MS. MOORE)  And why did that happen?
13        A.   Because he was an engineer and we were building
14   a facility at the same time and he had an engineering
15   background.
16        Q.   Well, why is it that you lost the operations
17   manager position?
18             MR. CISNEROS:  Objection to form; asked and
19   answered.  He was an engineer.
20        A.   I don't know, I'm not an engineer.  I don't
21   know, I don't know.  I don't have an answer.
22        Q.   (BY MS. MOORE)  Do you know why they brought in
23   another operations manager --
24             MR. CISNEROS:  Objection to form.
25        Q.   (BY MS. MOORE)  -- and moved you to production

0000271

1    manager?

2              MR. CISNEROS:  Objection to form.

3         A.  I don't know why they did that other than

4    Mr. Smith was an engineer.  Building a facility, an

5    engineer knows more about those types of things.

6         Q.  (BY MS. MOORE)  Okay.  Does -- are all

7    operations managers engineers?

8         A.  Don't know.  I don't know.

9         Q.  Was Russell Ash an engineer?

10        A.  I don't know.

11        Q.  Was there any other reason you -- was that the

12   reason you understood, or did someone tell you --

13        A.  I don't --

14        Q.  -- that was the reason that they brought him in?

15        A.  I don't know.

16              MR. CISNEROS:  Objection to form.

17        Q.  (BY MS. MOORE)  What did they tell you when you

18   were no longer operations manager?

19        A.  They said, "We're going to do this."

20        Q.  Did you ask why?

21        A.  I usually do what my bosses tell me, and he told

22   me, "We're going to do this, we think it's in the best

23   interest."

24        Q.  And why would that have been in the best

25   interest?  Did you know what you were doing at the plant?

1      A.   I don't -- I --

2              MR. CISNEROS:  Objection to form.

3      A.   I know -- I can't answer your question.

4      Q.   (BY MS. MOORE)   I mean, were you doing a good

5  job?  If you were doing a good job, why would they have

6  demoted you?

7      A.   Ma'am, I don't know.

8              MR. CISNEROS:  Objection to form.

9      A.   You're going to have to ask them.

10     Q.   (BY MS. MOORE)   Did you get any indication as to

11  why?

12     A.   No, ma'am.

13     Q.   Did you ever ask anybody why?

14             MR. CISNEROS:  Objection to form; asked and

15  answered.

16     A.   Yes, ma'am.

17     Q.   (BY MS. MOORE)   Who did you ask?

18     A.   I asked my boss.

19     Q.   And who was that?

20     A.   Mr. Campbell.

21     Q.   And what did he tell you?

22     A.   He said, "Steve, we think this would be in the

23  best interest of the company."  And I said, "Yes, sir."

24     Q.   And you didn't ask him why?

25     A.   Saluted the flag and moved on.

1    Q.   You didn't ask him why it would be in the best

2   interest?

3              MR. CISNEROS:  Objection to form; asked and

4   answered.

5    A.   No, ma'am.  He's my boss.  He said that was in

6   the best interest of the company, I accepted that and

7   moved on.

8    Q.   (BY MS. MOORE)  Did your wife work at any time

9   at the Brownsville plant?

10             MR. CISNEROS:  Objection to form.

11    A.   I don't think so.  I think she talked to Russell

12   and I think he was going to have her sell some tires, but

13   I don't know if he ever paid her.  I don't know if she

14   ever filled out any paperwork, I don't know.

15    Q.   (BY MS. MOORE)  Has she ever worked in sales?

16    A.   I think that's what he was talking to her about.

17    Q.   Did she ever work --

18    A.   I do not know.

19    Q.   She's your wife, Mr. Harrison --

20    A.   She's my divorced wife.

21    Q.   Okay.  Well, were you married to her at the

22   time?

23    A.   Yeah.

24             MR. CISNEROS:  Objection to form.

25    Q.   (BY MS. MOORE)  And so she was your wife at the

0000274

140

1   time.

2       A.   Yes, ma'am.

3       Q.   Do you know whether she worked there?

4            MR. CISNEROS:  Objection to form.

5       A.   I know she talked to Mr. Ash.  Don't know if she

6   ever received a paycheck.  Don't know if she ever filled

7   out any paperwork.  I do not know if she was employed by

8   Titan.

9       Q.   (BY MS. MOORE)  Did you ever see her work there?

10  Did you ever see her on the plant?

11           MR. CISNEROS:  Objection to form.

12      A.   I seen her in --

13      Q.   (BY MS. MOORE)  -- in the plant?

14      A.   -- the vicinity talking to Mr. Ash.

15      Q.   So you never -- when did you divorce her?

16      A.   Ah...

17           MR. CISNEROS:  Objection to form.

18      A.   Golly, some time back.

19      Q.   (BY MS. MOORE)  Do you know the year?

20      A.   I'd have to look it up.

21      Q.   Were you working in Brownsville?

22      A.   Yes, ma'am.

23      Q.   Was it when Russell was already plant manager?

24      A.   Was I divorced from my wife when he was the

25  plant manager?  Yes, ma'am.

0000275

141

```
 1              THE WITNESS:  I'm sorry.
 2        Q.   (BY MS. MOORE)  So the comment about "Your
 3   wife's a fucking bitch," was that while you were still
 4   married to her?
 5        A.   Yeah.  Yes, ma'am.
 6        Q.   Was it before she talked to Russell Ash about
 7   working there, or after?
 8              MR. CISNEROS:  Objection to form.
 9        A.   I'm not real sure.
10        Q.   (BY MS. MOORE)  And you just don't remember if
11   she ever worked in sales?
12        A.   I know she had talked to him about selling
13   tires, because they were having trouble moving tires.
14   But did she actually go to work for him?  I don't know.
15   I know she had talked to him on several occasions.  What
16   that conversation was about, I have no idea.  Okay?
17        Q.   When Russell made the comment about your wife
18   being a fucking bitch, were you in the process of getting
19   a divorce?
20              MR. CISNEROS:  Objection to form.
21        A.   Exact dates, I don't know.  I might have been,
22   yeah.  What does that mean, "the process of getting a
23   divorce"?  That means different things to different
24   people.
25        Q.   (BY MS. MOORE)  Well, what does it mean to you?
```

0000270

142

1   You're saying --

2       A.   What it means to me that I told the woman that

3   I'm living with that's my wife that I'm going to divorce

4   her.

5       Q.   And when you told her that --

6       A.   And then I go see a lawyer and I start the

7   process.

8       Q.   Okay.  After you told her that, is that when

9   Russell made the statement about your wife being a

10  fucking bitch?

11      A.   No, I don't think so, he didn't know about it.

12  He was upset because I didn't tell him I was divorcing my

13  wife.

14      Q.   Now, did your wife ever complain to you about

15  Russell?

16              MR. CISNEROS:  Objection to form.

17      A.   Yeah, I think she did.

18      Q.   (BY MS. MOORE)  What is it that she told you?

19      A.   I don't remember her exact words, it was

20  something like he was the most difficult person.

21      Q.   What did she mean by "difficult"?

22      A.   I don't know what she meant by "difficult,"

23  I didn't ask her.

24      Q.   When did she tell you this, while you were still

25  married, or when --

0000277

1    A.   Oh, yeah, we were still -- I think we were still

2   married, yeah.

3    Q.   And how -- how did she know Russell was

4   difficult?  How did they have a --

5    A.   She was in his office and she had a meeting with

6   him.

7    Q.   And based on that --

8    A.   Which I was not privy to, so I don't know what

9   the conversation was.

10    Q.   You didn't ask her why he was difficult?

11         MR. CISNEROS:  Objection to form; asked and

12   answered.

13    Q.   (BY MS. MOORE)  You didn't ask -- I mean, as

14   her -- you know, as her husband, you didn't get upset

15   that Russell might have been difficult with her?

16         MR. CISNEROS:  Objection to form.

17    A.   I'm sorry.  I'm sorry.

18    Q.   (BY MS. MOORE)  What was your answer?

19    A.   Excuse me, what was your question?

20    Q.   As your -- as her husband, it didn't upset you

21   that he was being difficult with her?

22    A.   I think that that would be inappropriate,

23   and yes.

24    Q.   But you didn't get into what Russell actually

25   did that was so difficult?                0000273

144

1      MR. CISNEROS:  Objection to form.

2      A.   I don't remember that.

3      Q.   (BY MS. MOORE)  You don't remember asking her

4  why?

5      A.   No, ma'am.  I'm divorced from her, I kind of

6  pushed her out of my memory.

7      Q.   Did any other women complain about Russell?

8      A.   When?

9      Q.   Any time.

10      A.   Titan employees?

11      Q.   Anybody.

12      A.   Uh-huh.

13      Q.   Who?

14      A.   I saw a lady in --

15           THE WITNESS:  Do I have to tell a name?

16           MR. CISNEROS:  If you know.  If you know

17  it.

18      Q.   (BY MS. MOORE)  If you know the name.

19      A.   Marles Cortinez.

20      Q.   Who?

21      A.   Marles Cortinez.

22      Q.   Who is she?  Who does she work for?

23           MR. CISNEROS:  "La cucaracha," Marles

24  Cortinez?

25           THE WITNESS:  She didn't make it, did she?

0000279

145

1          MR. CISNEROS: I guess not.

2          THE WITNESS: This time.

3      A.   She's a real estate agent.

4      Q.   (BY MS. MOORE)  And what did she tell you?

5      A.   She told me that she was no longer with Russell.

6  She used to be his girlfriend, I think.  They were quite

7  friendly.  She said that she's no longer with Russell,

8  that she had moved on with her life and she had married a

9  nice man and she was real happy.

10     Q.   Did she ever complain about him?

11     A.   She said, "I hope that SOB gets what he deserves

12 for all the things that he's done to the people that are

13 around him."

14     Q.   Well, what is it that she was referring to?

15 What had he done?

16     A.   I didn't know anything about this, but she was

17 telling me that there's some lady that he beat up and he

18 choked her daughter.  And I thought that that was pretty

19 inappropriate.

20     Q.   Marles told you this?

21     A.   Yeah.  And I said "For real?"  She said, "Yeah."

22 I said, "Well, I'm sorry."

23     Q.   Did she tell you who this lady was?

24     A.   "I said I'm glad you're not" -- no, I didn't

25 ask, it was in a conversation.

0000280

146

```
 1        Q.   Well, you --
 2        A.   It was up in Houston or San Antonio or
 3   somewhere.
 4        Q.   And how did she know about this?
 5        A.   I don't know, I didn't ask her.  I just saw her
 6   in passing, and I said, well, I was glad for her that she
 7   had found somebody that wouldn't treat her badly and she
 8   was happy.
 9        Q.   Is she -- did anybody else complain?
10        A.   Let's see.
11             MR. CISNEROS:  Titan employees?
12             MS. MOORE:  Anybody.
13        A.   Bob McAnn, he's a Titan employee.
14        Q.   (BY MS. MOORE)  Wait a minute, I'm talking about
15   women.
16        A.   Well, he complained about the womanizing.  As
17   long as you're asking, I might as well throw it in there.
18        Q.   Who was this again?
19        A.   Bob McAnn.
20        Q.   He worked at Titan, or who was he?
21        A.   Yes, ma'am.
22        Q.   And what did he do there?
23        A.   He worked up towards the mill room, but he came
24   from Natchez, Mississippi.
25        Q.   What did he tell you?
```

0000281

147

1       A.   In Natchez, Mississippi, he used to work for

2   Russell, and he said that -- I can't exactly recall, that

3   Russell was a very difficult person and "You needed to

4   not get on the wrong side of him.  However, he'll get to

5   chasing the skirts, and that's usually what gets him into

6   trouble."

7       Q.   What do you mean --

8       A.   I don't know.

9       Q.   What do you mean by that?

10      A.   I don't know.  He said he had gotten into

11  trouble in Natchez and just about any of the other

12  25 plants he had worked at.

13      Q.   Did he tell you how he knew that?

14      A.   Oh, there's the official network, and then

15  there's the unofficial network.  He had been with the

16  company for a long time.  I pretty much stayed out of the

17  gossip thing, but those are things that I heard.  And I

18  figured that it was gossip and it wasn't facts that I

19  could prove, so I really didn't pay any attention to it.

20      Q.   Do you work -- did Bob McAnn work in

21  Brownsville?

22      A.   Yes, ma'am.

23      Q.   Do you know of any other complaints?

24      A.   Just generally speaking, no.

25      Q.   Do you know of any other complaints by Titan

148

1  women?

2  A.  Specifically, no.

3  Q.  Did you ever hear anything?

4  A.  I've always hear that there's an issue wherever

5  Mr. Ash was.

6  Q.  Did you hear anything here, in Brownsville?

7  A.  Yeah.  I heard that -- I can't remember her

8  name, she used to work in shipping.  She was a lady

9  supervisor that Russell had hired with little or no

10  experience.  There was complaints amongst the

11  Shanholtcers and Bob that she would get overtime pay

12  when the others weren't and she would get like extra

13  privileges because he had dated her prior to when she

14  got hired.

15  Q.  Did she ever complain -- did you ever hear of

16  her complaining about him?

17  A.  I never heard her complain about him because she

18  was at the other end of the plant and I had little or no

19  contact with her.

20  Q.  Okay.  So the only person you know of

21  complaining about Russell is Minnie?

22  A.  And Marles Cortinez.

23  Q.  Okay.  And Marles was his girlfriend?

24  A.  Yeah, she was, I think.

25  Q.  Okay.  Those are the only two people?

0000283

149

1        A.    That I -- other than Shanholtcer and Bob McAnn,

2    yeah.

3        Q.    Now, what is it that Shanholtcer said about

4    Russell?

5        A.    He said, "Well, I've been with Russell a lot,

6    he's a hard man. He usually comes into a place, fires

7    everybody, gets to chasing the skirts, and then they move

8    him and somebody else has to come in and clean it up."

9        Q.    Well, he said basically the same thing

10   Bob McAnn said?

11       A.    Pretty much.

12       Q.    And when they say "chasing skirts," what does

13   that mean?

14       A.    Well, I guess I don't know what the means to

15   you. In my opinion --

16       Q.    Well, I want to know what it means to you.

17       A.    -- it means that he would be chasing ladies and

18   making -- well, I don't know what it meant to them, so I

19   don't know, I'm not sure. So I guess it would be,

20   for me, that he would be -- have multiple partners.

21   I don't know.

22       Q.    But other than Minnie, at the Titan, you don't

23   know of anybody else?

24       A.    No.

25       Q.    Mr. Harrison, you don't like Mr. Russell Ash,

0000284

1   do you?

2      A.   I don't particularly care one way or the other.

3      Q.   Isn't it true that you have a pending lawsuit

4   against him and Titan Tires?

5           MR. CISNEROS:   Objection to form.   I'm

6   going to instruct my -- Mr. Harrison not to answer any

7   questions in connection with any attorney/client

8   communications in connection with that other lawsuit

9   that he's got.

10          MS. LEEDS:   We're not asking --

11     Q.   (BY MS. MOORE)   I'm not going to ask you

12  anything about that you've talked to your attorneys

13  about, I'm not going to ask you any of that.   What I want

14  to know is, isn't it true that you have a lawsuit against

15  Titan Tires and Russell Ash?

16          MR. CISNEROS:   Yeah, it's true.

17     A.   Yes, ma'am.

18     Q.   (BY MS. MOORE)   What is your lawsuit for?

19     A.   I was never told why I was discharged.   And

20  after 31 years, I think I deserve somebody to discharge

21  me properly.

22     Q.   Okay.   Well, what are you claiming?   What are

23  you saying that Russell did to file a lawsuit against

24  him?

25          MR. CISNEROS:   Objection to form.

0000285

151

```
1        A.   I don't know, I'm not --

2        Q.   (BY MS. MOORE)  You don't know --

3        A.   Do I have to answer your question?

4             MS. LEEDS:  Yes, you do.

5        Q.   (BY MS. MOORE)  You filed a lawsuit against

6   Titan Tires alleging that Russell Ash terminated you and

7   you don't believe that's a correct termination.  What is

8   it that you're claiming, what is it that you're saying he

9   did wrong?

10       A.   Did you remember the contents of the petition?

11            MS. LEEDS:  We're not asking what the

12  petition said.

13       Q.   (BY MS. MOORE)  We're not asking about the

14  petition.  I just want to know what --

15       A.   Well, I want to see the petition.

16       Q.   What --

17       A.   I want to see the petition.

18       Q.   No.  I want to know why --

19       A.   Then I won't answer your question.

20       Q.   Okay.  Why did you file a lawsuit against Titan?

21            MR. CISNEROS:  Just answer you don't know.

22       A.   I don't know.

23            MR. CISNEROS:  I mean, you know or you

24  don't know.

25       Q.   (BY MS. MOORE)  You don't know why you're suing
```

152

1   Titan?

2   A.   I don't know.

3   Q.   You have no idea?

4   A.   I don't know.

5   Q.   Do you know why you're suing Russell?

6   A.   I don't know.

7   Q.   What did Russell do to you that --

8   A.   I don't know.

9   Q.   -- made you sue him?

10          MR. CISNEROS:  If you'll allow him to

11  read the petition, he'll refresh his recollection and

12  he'll be able to answer your question.

13  Q.   (BY MS. MOORE)  Okay.  You sought legal -- okay.

14  Did anything happen to you before you ever saw a lawyer,

15  right, that caused you to go see a lawyer?

16  A.   Pardon me?

17  Q.   What is it that happened to you that made you go

18  get a lawyer to sue Russell?

19          MR. CISNEROS:  Objection to form; asked and

20  answered.  He was terminated.

21  Q.   (BY MS. MOORE)  Why did you go --

22          MS. LEEDS:  Let him answer the question.

23          MR. CISNEROS:  Objection to form; asked and

24  answered.

25  Q.   (BY MS. MOORE)  What are you saying Russell did

000026?

153

1    that you had to file a lawsuit against him?

2              MR. CISNEROS:  Objection to form; asked and

3    answered.

4              MS. LEEDS:  Staring won't help,

5    Mr. Harrison, just answer the question.

6         A.   I'm not going to answer the question, I don't

7    have the answer.

8              MS. LEEDS:  You do not know why you are

9    suing Russell Ash?

10             THE WITNESS:  Ma'am, there's a lawsuit that

11   I filed that is worded a certain way.  I don't know what

12   those words are right now, I don't recollect.

13        Q.   (BY MS. MOORE)  We're not asking you what the

14   petition says or what has been filed.  What I want to

15   know, what we want to know is why you think you have to

16   file a lawsuit against Russell.  What is it that he did

17   to you --

18        A.   Because I collected a paycheck for work that

19   I rendered to a company for 31 years, faithfully,

20   truthfully, honestly, and I no longer collect that

21   paycheck, I no longer have that pension, I no longer have

22   that insurance.

23        Q.   Right, but what is it that --

24        A.   And pretty simply, that's it.

25             THE VIDEOGRAPHER:  Excuse me, I need to

0000263

154

1    stop and change tapes.

2              MR. CISNEROS: Let's take a break.

3              THE VIDEOGRAPHER: 1:05, off the record.

4         (Off the record at 1:05 p.m.)

5         (On the record at 1:10 p.m.)

6              THE VIDEOGRAPHER: 1:10 you're on the

7    record.

8         Q.   (BY MS. MOORE)  Okay.  Mr. Harrison, before we

9    took the break we were talking about your pending lawsuit

10   against Russell Ash.  What I want to know is what you --

11   what Russell did to you and why you're suing him.

12        A.   Because I was wrongfully discharged.

13        Q.   Okay.  Why were you wrongfully discharged?

14        A.   I don't know.  That's a legal question, I'll

15   have to ask my lawyer.

16        Q.   Well, what are you basing it on?

17        A.   Wrongful discharge.

18              MR. CISNEROS:  Objection to form; asked and

19   answered.

20        Q.   (BY MS. MOORE)  Before the break you couldn't

21   answer.  Now, after talking to your lawyer you've given

22   us an answer; is that correct?

23        A.   I could answer before.

24        Q.   But you didn't.

25        A.   I didn't want to.

0000289

155

```
 1        Q.   Okay.  Well, why do you think you were
 2   wrongfully discharged?
 3        A.   Because I was.
 4        Q.   What is it about it -- I mean, there's a lot of
 5   reasons people get discharged.  What is it about you,
 6   what did Russell do to you, why do you think you were
 7   wrongfully discharged?
 8             MR. CISNEROS:  Objection to form; asked and
 9   answered.
10        A.   Russell was the man in charge of the facility,
11   I worked for Titan, and I was wrongfully discharged.
12   There's a legal document --
13        Q.   (BY MS. MOORE)  Right.
14        A.   -- and there's legal wording.  You need to talk
15   to my lawyer, Carlos Hernandez.
16        Q.   But I'm asking you, why did you go talk to
17   Carlos, your lawyer, in the beginning?  Why did you
18   think --
19        A.   Because I was wrongfully discharged.
20        Q.   Why did you think you were wrongfully
21   discharged?
22             MR. CISNEROS:  Objection; asked and
23   answered.
24             MS. MOORE:  He hasn't answered why he
25   thought he was wrongfully discharged.
```

0000290

156

1      A.   I believe I was wrongfully discharged.

2      Q.   (BY MS. MOORE)  Why were you wrongfully

3  discharged?  There's -- there's different ways to be

4  discharged, you know, you weren't meeting production; is

5  that why you think you were discharged?

6      A.   I don't know why I was discharged.  I believe I

7  was wrongfully discharged, and that's why I went and saw

8  a lawyer to file a suit.

9      Q.   Well, you've worked in a plant for 26 years.

10  People get terminated on a daily basis.  Not everybody

11  files a lawsuit.  Why is it, what was so wrong about your

12  termination that made you file a lawsuit?

13      A.   I believe I was wrongfully discharged.  I went

14  and saw a lawyer and I filed a lawsuit.  It's legal

15  wording and --

16      Q.   I understand that, Mr. Harrison, but I want --

17      A.   That's the answer.

18      Q.   -- to know, what is it, what was so wrong about

19  your termination?

20            MR. CISNEROS:  Objection; asked and

21  answered.  Objection to form.

22      Q.   (BY MS. MOORE)  What did he do to you or what

23  are you saying he did to you?

24      A.   A wrongfully discharge.  I went and saw a lawyer

25  and we filed documents, okay?

0000291

157

1       Q.   Okay.  And so then, what you're testifying here

2   today is that the sole basis for your lawsuit is wrongful

3   discharge?  There's no other reason --

4       A.   You'll have to talk to my lawyer.

5       Q.   I'm asking you.

6       A.   In my opinion, I was wrongfully discharged,

7   yes, ma'am.

8       Q.   And there's no other reason?  Yes or no?  Is

9   there any other reason, or is that the only reason?

10       A.   Wrongfully discharged, yes, I was wrongfully

11   discharged.

12       Q.   Okay.  Russell was not your employer; is that

13   correct?

14       A.   I don't understand your question.

15       Q.   Okay.  Russell was not your employer, so how

16   could he wrongfully discharge you?

17       A.   I don't know, he worked for the company, he

18   represented the company.

19            MR. CISNEROS:  He fired him.

20       Q.   (BY MS. MOORE)  What is it that he did, other

21   than terminating you?  Are you saying --

22       A.   You just asked me the same question and the

23   answer is, he fired me.

24       Q.   Well, I want to know, if you --

25       A.   That's the answer, he fired me.

0000292

1    Q.   Are you suing him -- let me ask the question.

2  Are you suing him because he fired you, period?

3           MR. CISNEROS:  Objection; asked and

4  answered.  Objection; form.

5    A.   Yeah, he fired me.

6    Q.   (BY MS. MOORE)   Is that the only reason, just

7  because he fired you?

8    A.   I think so, to the best of my recollection.

9    Q.   Did he say or do anything else?

10    A.   To the best of my recollection, the reason I'm

11  suing him is because I was wrongfully discharged, I went

12  to a lawyer, and that's it.  He was the guy who

13  represented Titan, okay?

14    Q.   Okay.  Let's get back to something you testified

15  in the middle of your deposition.  You said -- you

16  testified that Russell couldn't fire you.  You -- you --

17  you said that you talked to Bill Campbell and he said

18  Russell couldn't fire you.

19    A.   Uh-huh.

20    Q.   What is it that Russell did, then?  Russell

21  couldn't fire you; what did he do?

22    A.   He did.  Two weeks later, he fired me.

23    Q.   Who told you that you had been -- you told us

24  that someone up in Des Moines in the legal department --

25    A.   Russell and Joe Kolniak told me I no longer

159

1    worked there.  He was done with me, I needed to turn in

2    my little beeper-thing, gather my things and leave the

3    premises.

4        Q.   You said that the second time --

5        A.   Ma'am, I answered your question.

6        Q.   But you said on the 15th, the lady called you

7    and told you you were terminated.

8             MR. CISNEROS:  Objection; form.  Asked and

9    answered.  I mean, that's the testimony, let's move on.

10       Q.   (BY MS. MOORE)  So who terminated you?  Did he

11   come up to you and tell you on the 15th --

12       A.   I'm sorry.  That would be Mr. Russell Ash.

13       Q.   On the 15th, did he come to you and tell you

14   "You're terminated"?

15       A.   On the 15th, Mr. Russell Ash did not come to me.

16       Q.   Well, then who --

17       A.   When I left the facility -- and I don't recall

18   the exact date --

19       Q.   Okay.  Well, when you were --

20       A.   -- Mr. Ash told me that I no longer worked

21   there, turn in my beeper, clear my desk and leave the

22   premises.

23       Q.   On the 15th?

24       A.   No, ma'am.

25       Q.   Well, the two weeks before.  But on the 15th,

0000294

160

1    when you --

2         A.   No, ma'am, he done it twice.

3         Q.   -- were finally terminated -- when you were

4    finally terminated, who terminated you?

5                   MR. CISNEROS:   Objection; form.   Asked and

6    answered.

7         A.   He did.

8         Q.   (BY MS. MOORE)   Did he tell you anything?

9                   MR. CISNEROS:   Objection to form; asked and

10   answered.

11        A.   He said -- he said, "Turn in your beeper" --

12                  MR. CISNEROS:   "Get your box."

13        A.   -- "get my stuff, clear my desk, leave the

14   premises, you no longer work here."  I mean, I don't know

15   what else you want from me.

16        Q.   (BY MS. MOORE)   Well, my question is, earlier

17   you testified that on the 15th a lady from the legal

18   department called you and told you you were terminated.

19                  MR. CISNEROS:   She didn't fire him.

20        A.   No, she called me and told me that my final

21   check would be until the 15th, I would get paid my

22   vacation pay, that my insurance -- because that was part

23   of the important out-processing documents that Mr. Ash

24   and Mr. Kolniak didn't do when I left the premises, okay.

25        Q.   (BY MS. MOORE)   Right.   And didn't she -- you

161

1  also testified that she told you that Russell Ash

2  couldn't terminate you --

3              MR. CISNEROS:  Objection.

4  Q.  (BY MS. MOORE)  -- and that you worked for them?

5  A.  Two weeks prior to, that's what they told me.

6  Q.  Okay.  So two weeks prior to, Russell couldn't

7  terminate you, only they could, but on August 15th he

8  could terminate you?

9  A.  Uh-huh.

10             MR. CISNEROS:  Objection to form.

11 A.  I guess.

12 Q.  (BY MS. MOORE)  Is that a "yes"?  Yes?

13 A.  "I guess" is not a "yes."

14             MR. CISNEROS:  Objection to form.

15 Q.  (BY MS. MOORE)  Okay.  And so, who did you talk

16 to that they told you that Russell could terminate you on

17 the 15th?

18             MR. CISNEROS:  Objection to form; asked and

19 answered.

20 A.  The -- she's a legal aide, legal secretary for

21 Sherry Hawley.  And I can't recall her name right now

22 because I haven't talked to her in a long time.

23 Q.  (BY MS. MOORE)  Okay.  Well, did she tell you

24 that Russell could terminate you?

25 A.  Yes, ma'am.

162

1    Q.  What did she tell you?

2    A.  She said, "You have been terminated as of the

3  15th."

4    Q.  Did she say --

5    A.  "You will collect your check up until that time.

6  You will collect your owed vacation time, Steve.  We will

7  send you some documents on your insurance, I'll send you

8  some documents on your 401K" --

9    Q.  Okay.  And I understand all that.

10   Q.  "I'll send you some documents" -- that's the

11  question you asked, that's the question I answered.

12        MR. CISNEROS:  Let him finish his answer.

13   A.  Let me finish.

14   Q.  (BY MS. MOORE)  Okay.  And could -- did she ever

15  say -- in this conversation whenever you were terminated

16  on the 15th, did she say Russell had authority to

17  terminate you?

18   A.  She said I am terminated as of the 15th.

19   Q.  But did she ever say Russell had authority to

20  terminate you?

21        MR. CISNEROS:  Objection; asked and

22  answered.

23   A.  I really don't recall.

24   Q.  (BY MS. MOORE)  Okay.  I just -- it will be,

25  you know, a couple of more questions on this.

0000287

163

1          I'm going to go back to Minnie and ask you, do

2     you know if at any point after Russell -- after she

3     became supervisor, tire room supervisor, and Russell was

4     operations manager, was she ever demoted?

5          A.   I don't know.  I don't know.

6          Q.   Did she ever talk to you about being demoted?

7               MR. CISNEROS:  Objection; asked and

8     answered.

9          A.   I don't think so.  I don't think so.

10         Q.   (BY MS. MOORE)  We've talked about a gentleman

11    by the name of Guadalupe, or Lupe Salinas.

12         A.   Uh-huh.

13         Q.   Do you know if he was at one point ever promoted

14    to a supervisor?

15         A.   Sure.

16         Q.   Do you know when that was?

17         A.   No, I don't recall exact dates.

18         Q.   Okay.  Was he promoted when you were a

19    supervisor?

20         A.   I believe so.

21         Q.   Was he -- were you his supervisor?

22         A.   Yes, ma'am, I believe so.

23         Q.   Was he promoted while you were still Minnie's

24    supervisor?

25         A.   I believe so.  I believe they were supervisors

0000298

164

1    at the same time.

2        Q.   Okay.

3        A.   Very close.

4        Q.   Why was he promoted to supervisor?

5        A.   He had skill, aptitude, and was able to

6    communicate, understood the process.

7        Q.   Okay.  Did he share the duties with Minnie?

8        A.   I believe at one time Russell put them together.

9        Q.   Do you know why Russell did that?

10       A.   No, ma'am, he didn't share that with me.

11       Q.   Did you know of any confrontations that Minnie

12   might have had with Lupe?

13       A.   I have -- no, none.

14       Q.   You don't know of any?

15       A.   They had a -- they had a discussion, okay.

16       Q.   And what was that about?

17       A.   As I recall, when Russell put them together he

18   didn't define real well whose duties were what.  So they

19   were confused as to whose duties to do what, and they

20   were discussing that, and I think I told them to go talk

21   to Joe, and Russell blew up.

22       Q.   Okay.  How do you know that Russell didn't

23   define the duties quite well?

24       A.   Because they -- two people that were with him

25   didn't understand what their duties were.  So obviously

0000299

1  they didn't -- he either didn't articulate that well

2  enough to them or he didn't ask them if they understood,

3  because when they went out on the floor they were

4  confused as about who was to do what to whom when.

5      Q.  And how do you know that they were confused?

6      A.  Because they came to me asked me what to do, and

7  I said, "Look" --

8      Q.  What did they talk about?

9          MR. CISNEROS:  Let him answer it.

10     A.  -- "he's taken and told you to do this.  You

11 need to go to Joe or you need to go to Russell and have

12 him define it."

13         And then the next day -- I'll throw this

14 in -- Russell told me to keep my fucking nose out of

15 other people's business, okay.

16         MS. MOORE:  I'm going to object to

17 nonresponsive.

18         THE WITNESS:  Okay.

19         MR. CISNEROS:  You asked the question.

20         MS. LEEDS:  Object to the sidebar.

21     Q.  (BY MS. MOORE)  Okay.  When -- did both Lupe and

22 Minnie go to you about this problem they had?

23     A.  Yes.

24     Q.  Did they go to you at the same time?

25     A.  I think so, as I recall.

0000300

1      Q.    And what was it that they actually told you?

2      A.    That one of them thought they were supposed to

3  do something and the other one thought they were supposed

4  to do something, and they says, "This is" -- see, it's

5  real hard when you split a floor because the machines are

6  vacant and you move people around, and when you move them

7  around you lose the identity.

8          So now, whose property is it?  Is this my guy or

9  my machine?  Well, it was never defined, so now we have

10  people who are working and people who are not working,

11  and people who are under pressure to produce, and yet

12  they can't produce because they don't have any control

13  because of the way it was organized, okay.  Did I answer

14  your question?

15      Q.    They said -- you --

16          MS. MOORE:  I'm going to object to the last

17  statement as nonresponsive.

18          THE WITNESS:  Yes, ma'am.

19      Q.    (BY MS. MOORE)  You said Lupe and Minnie went to

20  talk to Joe Kolniak?

21      A.    I thought that that would be the best thing to

22  do.

23      Q.    Did either of them tell you what their

24  conversations with Joe Kolniak was?

25      A.    Nope.

0000301

1  Q. Do you know what -- did the situation
2 ever -- did they work out their problems; do you know?
3  A. I think they did, I don't know.
4  Q. Do you know -- when they had this problem, do
5 you know when it was?
6  A. No, ma'am.
7  Q. Do you know if it was towards the end of
8 Minnie's employment?
9  A. I don't know exactly when it was.
10  Q. Did she talk to you of any other problems she
11 had with Lupe Salinas?
12  A. I don't think so.
13  Q. Did Lupe ever talk to you about any problems he
14 had with Minnie?
15  A. He may have on coordination, that's new for
16 them.
17  Q. Well, what did he tell you?  What did he talk to
18 you about?
19  A. It was when they coordinate, they need to pass
20 information to each other, and they hadn't done that
21 before.  So I needed to explain to them that this
22 information is to be shared back and forth because you
23 both gain from the information.
24  Q. Did Lupe have problems with Minnie, did he tell
25 you?

0000302

1    A.    I don't believe he did.

2    Q.    Did you talk to Minnie when -- before she left

3 the company?

4    A.    I don't think I talked to her after I left the

5 company.

6    Q.    Did she tell you why she was?

7    A.    Did she tell me why she left?  I don't know if

8 she left the company.  I don't know why she's not working

9 at Titan; it's none of my business, okay.

10    Q.    And at this point, nobody is working there right

11 now; is that correct?

12    A.    I guess.  I never -- that's the rumor I hear.

13    Q.    And how do you hear, I mean, the rumor?  Did you

14 read it in the paper?

15    A.    No, I read in the paper that it was pretty bad,

16 and then some of the employees, they drive by there where

17 I work because they buy cars and they buy parts, and I

18 see them, and they go, "Man, it's pretty bad, Titan is

19 down."  And I said, "Yeah, it is."  So I presuppose from

20 that they're closed, okay.

21    Q.    Right now they're closed, and Minnie or you or

22 Guadalupe, nobody would actually be working there right

23 now, correct?

24    A.    I don't know.

25    Q.    Well, I mean --

1    A.   I don't know what they're doing.  I don't know

2    what Titan is doing.

3    Q.   Okay.  As far as you know -- you just testified

4    as far as you know, the plant is closed?

5    A.   Yeah, the plant is closed, but that doesn't mean

6    there's not people there working.  So I don't know if I

7    would be working there or not.

8    Q.   Okay.  But these were production people?

9    A.   I was working there when they weren't in

10   production before for two years.

11   Q.   No, but these were production tire assembly

12   production?

13   A.   We're talking about production guys, we're not

14   talking about me.

15   Q.   Okay.  Well, let's talk about production, they

16   wouldn't be working there?

17   A.   If there's no production going on, that's not

18   necessarily true, because they have equipment that has to

19   be maintained, they have facilities that have to be

20   maintained, and there are employees that are there that

21   are doing that.

22   Q.   Well, if the plant is closed then no production,

23   what would they be doing?

24        MR. CISNEROS:   Objection to form.

25   A.   Well, there would not normally be a production

1    employee there, but it does not mean that there are not

2    people there working.

3        Q.    (BY MS. MOORE)   Now, you talked about earlier

4    that you testified in the Texas Workforce Commission?

5        A.    Uh-huh.

6        Q.    What is it that you testified to?

7        A.    They asked me a lot of questions, just like you

8    did.  I don't specifically recall all the questions or...

9        Q.    What do you recall?   What do you recall telling

10   them?

11       A.    I answered a lot of questions.

12       Q.    Do you recall what you testified to?

13       A.    To the best of my recollection.

14       Q.    Do you recall what you told the hearings

15   officer?

16       A.    I believe I answered their questions to the best

17   of my ability in a truthful manner.

18       Q.    Do you remember their questions?

19       A.    No.

20       Q.    Do you remember any questions they asked you?

21       A.    Asked me my name.

22       Q.    Okay.   What else did they ask you?

23       A.    They asked me if I worked at Brownsville, and I

24   said "Yeah."

25       Q.    What else did they ask you?

0000365

171

1      A.   They asked me if I knew Minnie, and I said

2   "Yes."  They asked me if I knew Russell, and I said

3   "Yes."  Beyond that, I don't remember the exact words or

4   context.

5      Q.   Okay.  Did they ask you about the situation

6   between Russell and Minnie as to any situation that they

7   might be involved in, any knowledge?  Did you talk to --

8   did you discuss the allegations that Minnie was -- is

9   making against Russell?

10     A.   (No verbal response.)

11     Q.   In other words, what did you tell the hearings

12   officer that Russell did to Minnie?

13          MR. CISNEROS:  Objection to form.

14     A.   What they asked me.  They asked me if I knew of

15   Russell asking her out or date or whatever, however you

16   worded it, okay.  And I said, "Yes," that I went to Joe

17   Kolniak and informed him of that.  That was pretty much

18   it.

19     Q.   (BY MS. MOORE)  Did they ask you any other

20   questions?

21     A.   They asked me a lot of questions.  I don't

22   recall all the questions they asked me.

23     Q.   Is there anything you do recall other than

24   that --

25          MR. CISNEROS:  Objection to form.

172

1     Q.    (BY MS. MOORE)    -- what you've already testified
2  to?

3                MR. CISNEROS:    Objection to form.

4     A.    I recall that.    There's a lot of questions.
5  I don't recall all the question, no, ma'am.

6     Q.    (BY MS. MOORE)    After you left Titan, did you
7  get unemployment compensation?

8     A.    Yeah, a little bit.

9     Q.    For how long?

10    A.    I don't remember.

11    Q.    How long did it take you to get another job?

12    A.    Let's see, how long.    I think it was three
13  months.

14    Q.    Okay.    During that three months, were you
15  looking for a job?

16    A.    Uh-huh.    Excuse me.

17    Q.    Where did you look?

18                MR. CISNEROS:    Objection to form.

19    A.    I don't recall.

20    Q.    (BY MS. MOORE)    Where did you apply?    Did you
21  apply anywhere?

22    A.    Yes, ma'am.

23                MR. CISNEROS:    Objection to form.

24    Q.    (BY MS. MOORE)    Where did you apply to?

25    A.    Don't recall.

173

1    Q.   You don't remember the places you applied to?

2          MR. CISNEROS:  Objection to form.

3    A.   No.

4    Q.   (BY MS. MOORE)  You don't remember one place you

5    applied to in those three months?

6    A.   I filled out a form, sent it in to the Texas

7    Workforce Commission because I went to several places --

8    Q.   I understand that, and you're required, during

9    that time, to look for a job.

10   A.   Uh-huh.

11   Q.   And you don't remember where you went to go look

12   for a job?

13   A.   No.

14          MR. CISNEROS:  Objection to form.

15   Q.   (BY MS. MOORE)  At all?

16   A.   No.  I didn't keep those records.

17          MR. CISNEROS:  Objection to form.

18   A.   I moved on.

19          MS. LEEDS:  It's a memory, huh?

20   Q.   (BY MS. MOORE)  You said you work at

21   Tipton Ford now?

22   A.   Yes, ma'am.

23   Q.   And how much do you make per year now?

24          MR. CISNEROS:  Objection to form.

25          THE WITNESS:  Do I have to answer that?

G000308

1          MS. LEEDS:  Yes, you do.

2          MR. CISNEROS:  Objection to form.

3          THE WITNESS:  What does that got to do

4   with --

5          MR. CISNEROS:  It's not relevant, but you

6   have to answer it.

7          THE WITNESS:  Why do I have to answer?  May

8   I talk to him for a second?

9          MS. MOORE:  If you want to go off the

10  record.

11         THE VIDEOGRAPHER:  1:35, off the record.

12         (Off the record at 1:35 p.m.)

13         (On the record at 1:37 p.m.)

14         THE VIDEOGRAPHER:  1:37, you're on the

15  record.

16     Q.  (BY MS. MOORE)  Okay.  The last question I asked

17  you was, how much are you earning per year at Tipton

18  Ford?

19     A.  This year, I'm on commission.

20     Q.  Okay.  Well how much did you earn --

21     A.  This year, I will make between 45- and 65-.

22     Q.  Last year, how much did you earn?

23     A.  29-.

24     Q.  And when did you start your employment at

25  Tipton?

0000309

1     A.   February of last year.

2     Q.   Where did you work before Tipton?

3     A.   I'm sorry.

4     Q.   After you left Titan, where did you work after

5  that?

6     A.   I was unemployed for a long time.

7     Q.   Did you work anywhere else?

8     A.   And I worked for a short time for Global Stone.

9     Q.   And what did you do there?

10    A.   Sold stone.

11    Q.   How long did you work there?

12    A.   About 30 days.

13    Q.   And when was it that you started at

14  Global Stone?

15    A.   I don't remember the exact date, about 30 days.

16    Q.   Okay.  Well, after you were terminated from

17  Titan, how long after did you start at Global Stone?

18    A.   I worked there about a month, and I worked there

19  from, oh, November to about December.

20    Q.   Okay, November to December.  And after -- how

21  much did you make there?

22    A.   I was on training and commission.

23    Q.   How much did you make?

24    A.   $500 a week.

25    Q.   $500?

0000310

ROCKBUS REPORTING SERVICE

1      A.   Uh-huh.

2      Q.   Did you work anywhere else after Global Stone?

3      A.   Nope.

4      Q.   When did you get your job at Titan in February?

5           MS. LEEDS:  No, Tipton.

6      Q.   (BY MS. MOORE)  Tipton, Tipton in February?

7      A.   Uh-huh, last year.

8           THE REPORTER:  Is that a "yes" or "no,"

9  please?

10     A.   Yes, February.

11     Q.   (BY MS. MOORE)  Why did you leave Global Stone?

12     A.   I was selling stone and we ran out of stone.

13     Q.   Did the company shut down?

14     A.   No.  I got laid off because they didn't have any

15  stone for me to sell.  You don't need a salesman to sell

16  stone you don't have.

17     Q.   Okay.  And who was your supervisor there?

18     A.   Joe -- I can't remember Joe's last name?

19          MR. CISNEROS:  Linck.

20     A.   How could I ever forget, Joe Linck, L-i-n-c-k.

21     Q.   (BY MS. MOORE)  Have you ever filed any other or

22  been involved in any other lawsuits?

23     A.   Have I been involved in any lawsuits?

24     Q.   Uh-huh.

25     A.   Sure.

177

```
1        Q.   What are they?
2        A.   It was a lawsuit against Titan, I can't remember
3   the guy's name, he was suing Titan for something.
4        Q.   How were you involved?
5        A.   They asked me to give a deposition.
6        Q.   Who was that?
7        A.   Francisco Zabarte.
8              MS. LEEDS:  Zapata?
9              MR. CISNEROS:  Zabarte, Pancho Zabarte.
10       Q.   (BY MS. MOORE)  Were you a defendant in that
11  case, also?
12       A.   No.
13       Q.   Just a witness?
14       A.   Just took my deposition.
15       Q.   What was he suing Titan for?
16       A.   I don't know, didn't ask.
17       Q.   What did you give a deposition about?
18       A.   Asked me questions, I answered the questions.
19       Q.   What was the basic context for why you were
20  testifying at that deposition?  What were they asking you
21  about?
22             MR. CISNEROS:  Objection to form.
23       Q.   (BY MS. MOORE)  Do you need me to be more
24  specific?  Was it an employment action, was he hurt?
25  Do you know what he was suing for?
```

0000312

1    A.    I don't know why he was -- I never had to go to

2    court. I don't know.

3    Q.    Did you give a deposition?

4    A.    I gave a deposition.

5    Q.    And what did they ask you about in the

6    deposition?

7    A.    They asked me --

8    Q.    What was it?  I mean, was it someone that got

9    hurt and you were asked about safety?  Was it someone

10   that got terminated and they were asking you why?

11            MR. CISNEROS:  Objection to form.

12   A.    I don't know why he was doing what he was doing,

13   okay.

14   Q.    (BY MS. MOORE)  Okay.  Well, what kinds of

15   questions were they asking you?

16            MR. CISNEROS:  Objection to form.

17   A.    The same kind of questions you're asking.

18   Q.    (BY MS. MOORE)  Did they have to do with why he

19   was terminated?

20            MS. LEEDS:  That's why it's taking so long.

21   It was either an employment action or an injury action,

22   he can say that.

23            MR. CISNEROS:  He's not a lawyer, I mean,

24   how does he know?

25            MS. LEEDS:  Oh, come on, please.

0000313

*POCKRUS REPORTING*

1    MR. CISNEROS: Why don't you go find

2    somebody can get a copy of the depo.

3    MS. LEEDS: Well, we'll be her five more

4    hours. Answer the question. Okay.

5    Q.   (BY MS. MOORE)  Did they ask you termination

6    questions?

7    A.   They asked me why he doesn't work there anymore.

8    Q.   What was your answer?  What was --

9    A.   "I don't know, I didn't terminate him."

10   Q.   So it was a termination.  Do you know why he was

11   terminated?

12   A.   No, ma'am.

13   Q.   So you testified in that deposition that you had

14   no knowledge of why he was terminated?

15   A.   That's right.

16   Q.   Are there any other lawsuits you've been

17   involved in?

18   A.   I don't think so.

19   MR. CISNEROS:  His divorce.

20   A.   My divorce, does that count?

21   MR. CISNEROS:  That's a lawsuit.  You can

22   call Canales and get a copy of that divorce petition.

23   Q.   (BY MS. MOORE)  Okay.  Have you filed any other

24   lawsuits?

25   A.   Not that I can recall.

0000314

```
 1        Q.   So this is the only lawsuit that you've ever
 2   filed, I mean, the one we talked about, about you suing
 3   Titan and Mr. Ash, that's the only lawsuit you've ever
 4   filed?
 5        A.   Uh-huh.
 6             THE REPORTER:  "Yes" or "no," please.
 7        A.   I'm sorry.  Yes, I believe so.
 8        Q.   (BY MS. MOORE)  Okay.  Have you ever been sued
 9   as a defendant?
10        A.   No.  No.
11        Q.   Have you ever been a criminal defendant?
12             MR. CISNEROS:  Just answer "yes" or "no."
13   You don't --
14        A.   No, I don't have a criminal record, no.
15        Q.   (BY MS. MOORE)  Okay.  Have you ever been
16   convicted of a crime of moral turpitude within the last
17   ten years?
18             MR. CISNEROS:  Objection; asked and
19   answered.  He just said he's never had a criminal record.
20        A.   No, I haven't.
21             MS. LEEDS:  Different question.
22        A.   No, I haven't.
23             MR. CISNEROS:  If he was convicted he would
24   have a criminal record, and he doesn't have a criminal
25   record; therefore --                         0000315
```

ROCKRUS REPORTING

1      MS. LEEDS:  It doesn't matter, it's a

2  different question, so she can ask him.

3      MR. CISNEROS:  Objection to the portion --

4      MS. LEEDS:  That's right, we're going to be

5  here forever.

6      MR. CISNEROS:  All right.

7      MS. LEEDS:  We need to take a break.

8      MS. MOORE:  We're going to take a break.

9      THE VIDEOGRAPHER:  1:45, off the record.

10     (Off the record at 1:45 p.m.)

11     On the record at 2:40 p.m.)

12     THE VIDEOGRAPHER:  Time 2:40, and you're on

13  the record.

14     Q.  (BY MS. MOORE)  Okay, Mr. Harrison, I have just

15  a couple more questions for you.  Before we broke you had

16  mentioned that on August 15th when you were terminated

17  finally, Russell Ash talked to you and he used foul

18  language; is that correct?

19     A.  No, ma'am, that's not what I said.

20     MR. CISNEROS:  Objection to form.

21     Q.  (BY MS. MOORE)  Okay.  Did he use foul language

22  on -- at any time, either the two weeks before the

23  April 15th or on April 15th?  Did he use foul language

24  when you talked to him about your termination?

25     A.  At that particular moment, I don't recall

0000316

1  whether he used foul language or not because I was

2  focused on the fact that I didn't work there anymore.

3      Q.   Okay.  Now -- and we talked about the instances

4  of foul language with Russell Ash.  Is there anything,

5  anything else, any other time that you can think about

6  where he did use foul language?

7           MR. HERNANDEZ:  Objection to form.

8      A.   I don't recollect.

9      Q.   (BY MS. MOORE)  Okay.  And as far as -- have you

10  used any foul language and has anybody ever complained

11  about you using foul language?

12     A.   I suppose I have --

13          MR. HERNANDEZ:  Objection to form.  You can

14  answer.

15     A.   I suppose I have used foul language.

16     Q.   (BY MS. MOORE)  Do you remember in what

17  situation?

18     A.   No, ma'am.

19     Q.   Do you remember any time you used foul language?

20     A.   No, ma'am.

21     Q.   Okay.  Have you ever said anything inappropriate

22  to anyone --

23          MR. HERNANDEZ:  Ever?

24     Q.   (BY MS. MOORE)  -- employed -- while employed at

25  Titan?

0000317

1            MR. HERNANDEZ:  Objection to form.

2    A.   I don't recollect.

3    Q.   (BY MS. MOORE)  Have you ever made any -- while

4  employed at Titan, have you ever made any racial comments

5  towards anybody or in general?

6            MR. HERNANDEZ:  Objection to form.  You can

7  answer.

8    A.   I'm trying to think back.  I don't recollect.

9    Q.   (BY MS. MOORE)  So is that answer no, or you

10  just don't recall?

11    A.   I don't recall.

12    Q.   Okay.  And have you ever asked anybody out that

13  worked at Titan?

14    A.   I don't recall.

15    Q.   You don't recall if you've ever asked anybody

16  out, a woman for a date, that worked for Titan?

17            MR. HERNANDEZ:  After his divorce?

18            MS. MOORE:  At any time, at any time.

19            MS. LEEDS:  At any time.  He doesn't

20  remember if he asked an employee out?

21            MR. CISNEROS:  Which Titan facility,

22  Des Moines, Natchez?

23            MR. HERNANDEZ:  He's been there 31 years,

24  I mean.

25            MS. LEEDS:  Not at Titan.

C000318

184

1              MS. MOORE:  Not at Titan.

2              MR. CISNEROS:  Well, 26 years at Titan.

3      A.   I don't recall.

4      Q.   (BY MS. MOORE)  Well, in Brownsville, did you

5  ask anybody out for a date?

6      A.   I don't recall.

7      Q.   You don't recall if you ever asked anybody out?

8      A.   No, I don't recall.

9      Q.   Okay.  Have you ever dated anybody at Titan?

10     A.   No, ma'am.

11     Q.   That was an employee at Titan?

12             MR. HERNANDEZ:  When he was an employee of

13  Titan?

14     Q.   (BY MS. MOORE)  When you were an employee at

15  Titan?

16     A.   Can you ask me the question again?

17     Q.   Have you ever -- did you ever date anybody while

18  employed at Titan that was employed at Titan at the same

19  time?

20             MR. HERNANDEZ:  Objection to form.

21     A.   No.

22             MS. MOORE:  Those are all the questions we

23  have right now.  We'll pass the witness.

24             MR. CISNEROS:  We'll reserve -- we'll

25  reserve all our questions until the time of trial.

0000319

185

1    (The proceedings concluded at 2:50 p.m.)
2
3                        -o0o-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

186

## REPORTER'S CERTIFICATION

I, SUSAN POCKRUS, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition transcript of **STEVE HARRISON**, the witness hereinbefore named, was at the time mentioned taken by me in stenograph, the said witness having been by me first duly cautioned and sworn upon ?his oath to tell the truth, the whole truth, and nothing but the truth, and later transcribed from stenograph.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further certify that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that the above and foregoing deposition transcript as set forth in typewriting is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

0000321

187

Certified to by me this the 28th day of July, 2003.

*Susan Pockrus*
_____
SUSAN POCKRUS

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 5862    EXP. DATE: 12/31/03

POCKRUS REPORTING SERVICE
P.O. BOX 531786
HARLINGEN, TEXAS  78553
1-800-423-7713 (TOLL FREE)
1-956-350-4940 (PHONE)
1-956-350-3040 (FAX)

0000322

188

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GUILLERMINA MONTELONGO )
                       )
                       )
                       )   CIVIL ACTION NO: B-02-176
                       )         (JURY REQUESTED)
                       )
TITAN TIRE CORPORATION OF )
TEXAS, AND RUSSELL ASH    )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF
STEVE HARRISON
JULY 9, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Susan Pockrus, Certified Shorthand Reporter in

and for the State of Texas, hereby certify to the

following:

That the witness, STEVE HARRISON, was duly sworn by

the officer and that the transcript of the oral

0000323

deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on July 28, 2003, to the witness in care of Mr. Carlos Hernandez, Attorney at Law, 201 North 1st Street, Harlingen, Texas, for examination, signature and return to me by August 27, 2003.

That the amount of time used by each party at the deposition is as follows:

Mr. David A. Sanchez  - 00:00:00;

Mr. Carlos H. Cisneros - 00:00:00;

Mr. Carlos Hernandez - 00:00:00;

Ms. Melanie Ann Moore - 03:34:45;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. David A. Sanchez, MICHAEL R. COWEN, P.C., 520 East Levee Street, Brownsville, Texas 78520, appearing for the Plaintiff;

--AND-- Mr. Carlos Cisneros, CARLOS H. CISNEROS, P.C., 845 East Harrison St., Ste. A, Brownsville, Texas 78520;

Mr. Carlos Hernandez, ATTORNEY AT LAW, 201 North 1st Street, Harlingen, Texas 78550; appearing for the Plaintiff and the Deponent;

0000324

190

Ms. Melanie Ann Moore, Ms. Eileen Leeds, WILLETTE & GUERRA, L.L.P., International Plaza, Suite 460, 3505 Boca Chica Boulevard, Brownsville, Texas 78521, appearing for the Defendant;

If returned, the original deposition was delivered to Ms. Melanie Ann Moore, Custodial Attorney;

That $ 987.30 is the deposition officer's charges to the Defendants for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me this 28th day of July, 2003.


_Susan Pockrus_

SUSAN POCKRUS

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 5862    EXP. DATE: 12/31/03

POCKRUS REPORTING SERVICE
P.O. BOX 531786
HARLINGEN, TEXAS  78553
1-800-423-7713  (TOLL FREE)
1-956-350-4940  (PHONE)
1-956-350-3040  (FAX)

0000325

191

CHANGES AND SIGNATURE

PAGE    LINE    CHANGE    REASON

STEVE HARRISON              0000326

19:

I, STEVE HARRISON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
STEVE HARRISON

THE STATE OF _____ )

COUNTY OF _____ )


Before me, _____, on this day personally appeared, STEVE HARRISON, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2003.


_____
NOTARY PUBLIC IN AND FOR

THE STATE OF _____ 0000327

# Exhibit D- Expert on Sexual Harassment of Titan Tire
# employee handbook

| Titan International Inc. | PROCEDURE | REVISION 7/31/97 | PAGE 1 OF 3 |
|---|---|---|---|
| | DATE ISSUED 11/7/96 | | |
| TITLE Harassment and Sexual Harassment | APPROVED BY | | |

# HARASSMENT POLICY

Harassment at work based on sex, race, religion, disability, age or other protected characteristics is exploitative and intimidating. For example, sexual harassment is unwelcome sexual attention and is defined from the victim's perspective. In the context of Title VII of the Civil Rights Act of 1964, the Supreme Court of the United States has determined that sexual harassment constitutes illegal discrimination based on sex.

Racial harassment includes any jokes, slurs or obscene gestures aimed at individuals based on race. Similarly, age harassment includes any jokes, slurs or obscene gestures aimed at individuals based on age.

Sexual harassment includes any acts, statements or suggestions indicating that an employee's job security, professional advancement, salary, benefits, work assignment or other conditions of employment depend upon tolerating sexual harassment or will be adversely affected by refusing to condone sexual harassment anywhere in the workplace. It also includes any acts, statements or suggestions that an employee's physical attractiveness or perceived lack of physical attractiveness in the eyes of the harasser is a factor in obtaining and securing professional opportunities.

## Examples of Harassment

- Repeated unwelcome flirtations, advances or propositions;
- Racial slurs;
- Sexually graphic or degrading comments about an employee's appearance, dress or anatomy;
- Verbal abuse with graphic sexual connotations;
- Verbal abuse with racial comments;
- Display of graphic sexually suggestive objects or pictures;
- Repeated unwelcome dirty jokes and offensive gestures;
- Prurient or graphic intrusive questions about an employee's personal life;
- Graphic descriptions of the harasser's own sexual experiences;
- The unwelcome use of familiarities or diminutives such as "honey", "sweetheart", "darling", "dear", or "baby"; this can include referring to adult women as "girls";

- Whistling, catcalls;
- Comments such as "old dogs can't be taught new tricks," "new blood is needed";
- Leering;
- Exposing genitalia;
- Unwelcome physical contact: touching, hugging, kissing, patting, pinching, tugging at clothing, etc.;
- Physical or sexual assault;
- Rape;
- Jokes about the disabled;
- Religious jokes;
- Display of Nazi regalia; and
- Use of terms such as "boy," "pops," "old man," "gimp," or "spic."

## Policy Statement

Harassment creates a hostile work environment, violates a victim's civil rights and will not be tolerated.

All incidents of harassment are to be reported. A confidential investigation will be conducted. All employees are expected to cooperate with such an investigation. Violation of this policy will lead to discipline, which can include immediate discharge.

## Responding to Harassment:

If you feel you are a victim of harassment or sexual harassment:

1.  Respond by making your feelings known. Calmly tell the harasser that the comments or behavior are unwanted and that you want them to stop.

2.  Record the specifics of the incident including the time, place, and others who may have witnessed the behavior or your reactions. Write down the exact words or actions that were used.

3.  Report the harassment to your supervisor and/or Human Resources Manager as soon as possible. If your supervisor is the one harassing you, you may report it to the Human Resources Manager, Corporate Human Resources Department or Operations Manager whichever you feel most comfortable.

## Complaint Investigation

All complaints of harassment will be investigated promptly and in as impartial and confidential a manner as possible. Employees are required to cooperate in any investigation. A timely resolution

0000350

of each complaint will be reached and communicated to the parties involved.

## Retaliation Prohibited

The Company prohibits any form of retaliation against employees for bringing bona fide complaints or providing information about harassment. However, if an investigation of a complaint shows that the complaint or information was false, the individual who provided the false information will be subject to disciplinary action, up to and including termination.

0000331



Date:    April 15, 1994

To:    All Titan Employees

From:    Henry M. Washington

Subject:    Sexual Harassment Policy Statement

## TITAN WHEEL INTERNATIONAL, INC.
## SEXUAL HARASSMENT POLICY AND PROCEDURE

Titan Wheel International, Inc. believes that all employees have a right to work in a discrimination-free environment. This encompasses freedom from sexual harassment. Sexual harassment is a form of employee misconduct which interferes with work and wrongfully deprives employees of the opportunity to work in an enjoyable and productive environment. Moreover, it is prohibited and is a violation of the law and will not be condoned in any form by the Company.

Sexual harassment is defined as any unwelcome sexual advances, request for sexual favors or any verbal or physical conduct of a sexual or sex-based nature where: (1) submission to such conduct is made a term or condition of an individual's employment, (2) an employment decision is based on an individual's acceptance or rejection of such conduct, or (3) such conduct interferes with an individual's work performance or creates an intimidating, hostile or offensive working environment. In addition, it is unlawful to retaliate against anyone who has registered any concern about sexual harassment or discrimination relating to one's self or against another individual.

Examples of sexual harassment are listed as follows, but are not all inclusive:

- Sexual molestation; intentional physical conduct of a sexual nature, such as touching, pinching, grabbing, brushing against another employee's body;
- Unwanted sexual advances such as sexually-oriented gestures, jokes, noises, remarks, etc;
- Preferential treatment or promise of such for engaging in sexual activity;
- Subjecting an employee to unwelcome sexual conduct which makes such employee's job more difficult to perform;
- Sexual displays or publications such as pictures, posters, calendars, reading materials, etc., that are sexually suggestive or demeaning;
- Retaliation for sexual harassment complaints.

0000332

April 15, 1994
Sexual Harassment Policy Statement
Page Two

To ensure knowledge, self-responsibility and understanding of this policy to all employees, supervisors and managers of Titan Wheel International, Inc., this sexual harassment policy will be thoroughly communicated throughout the organization. Employees engaging in such "harassment" will be appropriately disciplined, up to and including discharge. Specific disciplinary actions shall depend upon the nature and/or severity of the misconduct or warnings.

Any employee who has a complaint of sexual harassment, a concern or a question, is encouraged to - either orally or in writing - discuss the matter thoroughly with his/her immediate supervisor, or, if preferred, with the Personnel Representative or Operations Manager. Be assured that all such charges will be treated confidentially, promptly investigated, and that no retaliatory measures will be taken against the complaining employee or witnesses.

Our management is committed to vigorously enforcing its Sexual Harassment Policies at all levels of the Company.

If you have any questions about this or other company policies, please see Henry M. Washington, Corporate Director of Human Resources.


Henry M. Washington
Corporate Director, Human Resources